IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,       )
                                    )
                    Plaintiff,      )    District Court
v.                                  )    Case No.
                                    )    19-10025-01
MICHAEL A. ARJONA,                  )
                                    )
                    Defendant.      )


TRANSCRIPT OF PROCEEDINGS

     On the 13th day of February, 2019, came on to be heard
proceedings in the above-entitled and numbered cause before the
HONORABLE KEN E. GALE, Magistrate Judge of the United States
District Court for the District of Kansas, sitting in Wichita,
commencing at 1:48 P.M. Proceedings recorded by digital
recording.  Transcript produced by computer-aided
transcription.

APPEARANCES:

The plaintiff appeared by and through:
          Ms. Kimberly A. Rodebaugh
          United States Attorney's Office
          1200 Epic Center
          301 North Main
          Wichita, Kansas  67202

The defendant appeared in person and by and through:
          Mr. Mitch E. Biebighauser
          Federal Public Defender's Office
          850 Epic Center
          301 North Main Street
          Wichita, Kansas 67202

2-13-19  USA v. ARJONA  No. 19-10025-01                    2

```
 1        THE COURT:  The court calls United States versus

 2   Michael Arjona, Case No. 19-10025-01.  May I have the

 3   appearances of defense, please.

 4        MR. BIEBIGHAUSER:  May it please the Court,

 5   Mr. Arjona appears in person, in custody, by and through

 6   counsel Mitch Biebighauser.

 7        THE COURT:  Good afternoon, Mr. Biebighauser.

 8   Good afternoon, Mr. Arjona.   This case is on the docket

 9   on the issue of detention.   I assume do we need to do

10   arraignment on the case as well?

11        MR. BIEBIGHAUSER:  No.

12        THE COURT:  You've already done that?  Okay.   Is

13   the defendant prepared to proceed on the issue of

14   detention?

15        MS. RODEBAUGH:  We are, Your Honor.  We requested

16   detention at the last hearing, and I understand it's a

17   rebuttable presumption.   We're ready to proceed.

18        THE COURT:  I'm ready to hear your presentation.

19        MS. RODEBAUGH:  In looking at the various factors

20   that would support the argument for detention, we start

21   out with the fact that the defendant is charged with two

22   other co-conspirators.  And as I mentioned, there will be

23   some -- anticipate more charges to follow.   During the

24   conspiracy dates, the defendant is charged with selling

25   over 500 grams of methamphetamine.   It certainly was
```

 1   more than that.

 2          As far as the specifics and the evidence of the

 3   case, all of these sales were made to an undercover

 4   Wichita Police Department detective.  And out of the

 5   three defendants, the defendant was the one who made the

 6   arrangements as to the time and location.  He had

 7   various associates that would help him.  But the case is

 8   quite strong because the sales were made to the

 9   undercover, and I believe there might even be one of the

10   sales or two of the sales on videotape.

11          When you look at the pretrial services criminal

12   history report, in the Government's opinion it's

13   understated.  We have concern regarding the defendant

14   being a danger to the community.  If you look at his

15   criminal history, it does show that he's had some prior

16   violent crimes.  Of note would be a 2014 conviction for

17   criminal threat.  I called the Court's attention that

18   that was a threat that was made to a Sedgwick County

19   deputy.  He was convicted of that.  But that, even

20   though the criminal history for the defendant may not

21   seem like it's that significant, there have been a number

22   of other incidents where the defendant has been called

23   out and made threats to shoot up people with an AR15.

24   He's made threats to his girlfriend.  The investigation

25   showed he's made threats to other law enforcement

1  officers, and even members in the conspiracy threats have

2  been made, and so certainly the Government contends that

3  we have grave concern regarding the dangerousness of the

4  defendant if he was released.

5       THE COURT:  Can you make a proffer about the basis

6  for any opinion about those claims about threats?

7       MS. RODEBAUGH:  I can make a proffer according to

8  the 2014 -- as far as specification on the threat to --

9  to Justin Manning, I know that deputy manning was

10  threatened.  I don't know the specifics.

11      THE COURT:  That's the charge from 2014?

12      MS. RODEBAUGH:  It was.

13      THE COURT:  I'm really asking about the other --

14  your other claims.

15      MS. RODEBAUGH:  Okay.  The incident in 2015,

16  where the defendant wasn't convicted, I have read the

17  police reports, and there was a call made out -- it may

18  have been by the defendant -- and he was threatening to

19  shoot an AR15.  A number of officers arrived, and I do

20  think subsequently they found out that the defendant was

21  intoxicated.

22      He had made the threats.  They were report -- or

23  he had made the claim that he was going to shoot someone

24  with an AR15.  He ended up being tased.  I do not think

25  that charges were ever brought in that matter.  But

1   certainly I can proffer to the Court, in speaking with

2   WPD and the agent in this case, the defendant is well

3   known to law enforcement as far as making threats to law

4   enforcement.

5        As far as -- Your Honor, are those the only

6   requests you're making regarding specificity on the

7   threats?

8        THE COURT:  Just -- I mean, proffer, it doesn't

9   have to be supported by physical evidence, but the

10  statement that the defendant is well known to law

11  enforcement for making threats, that's less than a

12  proffer.  That's just a --

13       MS. RODEBAUGH:  I read three police reports on the

14  AR15 matter.

15       THE COURT:  The 2015 incident.

16       MS. RODEBAUGH:  Absolutely.  All of them were

17  concerned.  Ended up not having the gun at that time,

18  but he did not comply with law enforcement commands, was

19  going to some pampas grass, and ended up being tased.

20  They thought he might have a gun and be going for a gun,

21  and fortunately he was able to be subdued with the Taser.

22       There have -- in this investigation also --

23  various individuals have been interviewed that were

24  associates of the defendant, and there have been reports

25  that the defendant's made threats against those

1   associates as well.

2        THE COURT:  In connection with the charges in this

3   case?

4        MS. RODEBAUGH:  Yes, Your Honor.   There was a

5   police report or incident in December of 2018 where the

6   girlfriend's phone -- his girlfriend's phone was taken,

7   and she feared making a police report because she feared

8   the defendant.

9        Law enforcement officers reported in 2014

10  initially, and I have not read these police reports and

11  it may not be sufficient for the Court, but the defendant

12  ordered the kidnapping of Chris Black.   The defendant

13  was not present at the kidnapping, but the kidnapping

14  went sideways and some of the associates of the defendant

15  shot at responding officers.

16       We do have concerns that the defendant may be a

17  flight risk.   He reported in the interview that he's not

18  traveled to Mexico.  But the undercover detective that

19  was making regular purchases from the defendant had

20  conversation with defendant, and the undercover reported

21  defendant had said that he was going to go to Mexico.

22  Law enforcement officers didn't find any corroborating

23  evidence that he was going to go to Mexico, but there

24  were concerns of that as well.   And those concerns, the

25  undercover was told that in January of 2019.

1        In looking at the various factors in the pretrial

2   services report, the Government is confident that there

3   is not a combination of factors that would allow peace of

4   mind that the defendant would not be a flight risk.   But

5   I think, more prevailing, is the fact that he would it be

6   a danger if released.

7        THE COURT:  Mr. Biebighauser?

8        MR. BIEBIGHAUSER:  Thank you, Judge.

9        As this court well knows, the standard for release

10  is not that there be some certainty about the Court's

11  ability to guarantee safety or to guarantee assurance.

12  Instead, the Court's looking for a reasonable set of

13  factors that will reasonably assure that Mr. Arjona is

14  not a danger, nor that he's a flight risk.

15       Mr. Arjona submits that those factors do exist and

16  there is a reasonable set of conditions that can

17  reasonably assure the Court that he will return as

18  directed and that he will not endanger the community.

19       I'd like to start by addressing the proffer

20  provided by the Government, such that it was, and then

21  turn to some of the additional factors set out in 18

22  U.S.C. 3142.  First of all, turning to the nature of the

23  charges, which is where the Government began, there was

24  little, if anything, specific about the defendant's

25  conduct as it relates to the charges present in this

1  case.  Even if there had been, as this Court knows, I'm

2  not in a position, having not reviewed the discovery, to

3  specifically rebut those allegations.  Here, all we

4  know, according to the Government, is that Mr. Arjona,

5  according to the Government, made arrangements.

6       What's important to remember in this case, Judge,

7  despite the Government's advisement that there may be

8  other additional charges, Mr. Arjona isn't charged with

9  other additional charges.  He's charged with one count,

10  and that's what's in front of the Court today.  That's a

11  conspiracy count.  He is not charged with possession of

12  controlled substances, with distribution of controlled

13  substances, and certainly not manufacture of controlled

14  substances.

15       The allegations in this case concern whether or

16  not Mr. Arjona reached an agreement with some other

17  individual.  It's a conspiracy count.  He's not even

18  charged with possession with intent to distribute.  And

19  so the nature of the circumstances, while potentially

20  severe, Judge, don't require the sort of burden of proof

21  or elements that this Court might be familiar with when

22  it's dealing with other more specifically alleged

23  offenses.  But, again, I know very little about the

24  underlying facts of the case and so I'll move on.

25       Instead, Judge, turning to what was the bulk of

1  the Government's proffer, which I think the Court was

2  getting at, lacked true specificity I think the Court can

3  use to rely on as far as Mr. Arjona's conduct.

4       First, Judge, turning to the criminal history that

5  was brought up by the Government, they really only

6  addressed the second charge that the bond report

7  indicates Mr. Arjona is involved in.  And that's a 2014

8  case, a serious case.  It was a felony offense, Judge.

9  But Mr. Arjona was placed on probation in that case and

10 completed it successfully after one year.  There were no

11 revocations, according to the bond report.  There weren't

12 even any complications.  He received probation, he

13 completed that, demonstrating that he's able to comply

14 with what the Court asks him to when he's put in that

15 position.

16      Instead, the Government launched into a number of

17 allegations that are barely tethered to something that

18 the Court might be able to consider verifiable.  And

19 when there is something verifiable, it seems to weigh in

20 favor of release.

21      For example, regarding some threats made in 2015,

22 there appears to be no conviction or charges of any kind

23 related to that, according to the bond report, and so

24 whether or not there's ever even a probable cause claim

25 of that incident is hard to tell.

1        The Government alleges that it read three police

2 reports, but we have no idea who the officers were

3 involved in those police reports, where they were making

4 that claim from, and so there's really nothing verifiable

5 about those.   The only thing the Government was definite

6 about in that recitation was that there was no gun

7 involved, a factor that should weigh in favor of

8 Mr. Arjona's release.

9        The Government alleged that it's interviewed

10 various associates.   We have no idea who those people

11 are.   It went on to explain that associates of

12 Mr. Arjona -- who those people were or what their

13 connection is unclear.   But to the extent they are

14 associates, it would only go to explain some conduct of

15 somebody that is not Mr. Arjona, and their relationship

16 is unclear.

17        Lastly, again, coming back to this idea that there

18 are this conjecture about whether Mr. Arjona said he was

19 going to Mexico, the only thing the Government was clear

20 on on that is that there was no corroborating evidence,

21 which is exactly what the Government just told you.   So

22 there's little to suggest that Mr. Arjona is a danger to

23 the community based on the Government's proffer.

24        Instead, we can turn to a number of things that

25 have been verified by the pretrial services office.   The

1   pretrial services report indicates a number of things

2   that weigh in favor of Mr. Arjona's release.   Moving

3   forward to additional factors that should be considered

4   by the Court after factors one and two about the nature

5   of evidence and its weight, the Court needs to consider

6   the history and characteristics of Mr. Arjona.

7           As the Court knows from reviewing the bond report,

8   Mr. Arjona has lived at this same address for

9   approximately the last eight years, and has spent the

10  last 35 years of his life in Wichita.   He's built a life

11  here.   He's built multiple businesses here.   He's

12  worked with his family here.   And then he's stepped out

13  on his own to begin a second business.

14          His family has remained here in the community.

15  His mother resides in Wichita.   His siblings, Jesse

16  lives in Goddard, the brother, Albert, had been residing

17  in Texas, is presently living in Kansas.   He maintains

18  regular contact with his family members, who are not only

19  his family but his business partners.   He has prior -- I

20  don't know, maybe this isn't the way to put it, but he

21  has other extended members of his family, former

22  girlfriends and ex-wives to live in this area who are

23  raising and helping to raise his children, who he

24  maintains financial support for.   One of his children

25  lives in Maize, another lives here in Wichita.   His

1   youngest children, Alexis and Aquilles live here in

2   Wichita.   They're living with him, along with his

3   girlfriend, and they're raising those children together.

4   He's providing financial support for those minors as

5   well.

6           He does not have a -- he does not have a passport

7   whatsoever, so there's no concern that he would be able

8   to move across the border easily, and, of course, he

9   would surrender that passport had there been one.

10          Mr. Arjona is the owner and operator of his own

11  small business in Wichita, Lawn Surgeons.   To the extent

12  that he'll be employed and gainfully employed in that

13  position, obviously that business is somewhat seasonal

14  but it's almost March and that business will begin to

15  pick up again and he'll be able to financially support

16  not only himself but his family and continue to live here

17  in Wichita.

18          Judge, he has no physical or mental health issues

19  that would prevent him from returning to court timely, so

20  there's no concerns whatsoever there.

21          He has no substance abuse history, although he

22  admitted during the pretrial report that he has used

23  marijuana, Judge.   That's not a significant factor here.

24  Mr. Arjona's minor use should not weigh against his

25  release.   Certainly the Court has a number of conditions

1   that will assure them -- or assure the Court that he

2   won't continue to use in any capacity, going from maybe

3   slight usage to none whatsoever.   Mr. Arjona certainly

4   understands that's the expectation of the Court.

5        Lastly, turning to the -- the last factor

6   identified by the pretrial services report is, of course,

7   Mr. Arjona's criminal history.   Mr. Arjona has nearly

8   zero prior convictions.   He has one prior conviction for

9   a criminal threat case, a serious case which I previously

10  addressed, demonstrates that in responding to a serious

11  case, Mr. Arjona complied with the court, never failed to

12  appear, never violated his probation, successfully

13  completed and answered that situation, whatever the facts

14  of that may have been.   So the third factor for the Court

15  to consider, the history and characteristics of

16  Mr. Arjona, overwhelmingly weigh in his favor.

17       Mr. Arjona recognizes that there is a presumption

18  in this case.   We're not contesting the fact that the

19  law is against him, as far as that goes.   But the

20  Government's made no proffer that the facts and

21  circumstances of this case go anywhere above just the

22  bare presumption, one that he is able to rebut based on

23  the verified information in the pretrial services report

24  that appears to be that contested by the Government's

25  proffer.

 1        For those reasons, Judge, the factors weigh in

 2   favor of Mr. Arjona's release.  He'd be asking to be

 3   released to his home address, with his wife and children,

 4   on North Parkdale Court, a place he's lived for the last

 5   ten years.  He'll maintain employment.  As a condition

 6   of his release, he'll submit to random UA's.  If the

 7   Court requires it, he can submit to electronic

 8   monitoring.

 9        He'll need to work closely with the pretrial

10   services office to make sure he's allowed to move around

11   the area to continue his employment as he moves from sort

12   of lawn to lawn as part of his business.  But to the

13   extent that he needs to comply with a curfew to make sure

14   that he's home at night, to make sure that he's checking

15   not only with pretrial but his family, all those things

16   can be remedied by a number of conditions available to

17   this court.  For that reason, Judge, Mr. Arjona would

18   ask you for release under certain conditions that will

19   reasonably assure his appearance.   Thank you.

20        MS. RODEBAUGH:  If I may, Your Honor.

21        THE COURT:  Ms. Rodebaugh?

22        MS. RODEBAUGH:  I would like to add to the factual

23   basis, to make sure it's clear.  It wasn't just the

24   defendant orchestrating the -- his charge is conspiracy.

25   It could have been charged as at least three different,

1  separate meth sales that were directly to an undercover.

2  The defendant was present every one of the times.  And

3  for whatever reason, he would have associates bring in

4  the dope or take the money, but all arrangements were

5  made through the defendant, the transactions.  There

6  wasn't a situation where he wasn't orchestrating, and

7  they were made with him and his associates directly to

8  the undercover officer.

9       As far as criminal history, the assault or the

10  threat with the AR15, I will call to the Court's

11  attention he was arrested, which certainly would rise to

12  a probable cause standard 'cause law enforcement officers

13  can't arrest him unless they have probable cause.  It's

14  not a proof-beyond-a-reasonable-doubt standard, but there

15  were enough concerns from officers, as I mentioned

16  before, that initially they thought they may have to

17  shoot him because they were concerned that he may have a

18  weapon and they were concerned for their safety.  They

19  were able to subdue him with a Taser.

20       This, when the indictment was brought, at the same

21  time there were a couple search warrants we also asked

22  for.  And I should have mentioned this earlier and I

23  apologize for that, but those search warrants were

24  executed.  There -- for lack of a better term, there's a

25  duplex on Illinois Street, and the defendant lived on one

1  side of the duplex with his family and the kids, and then

2  on another side of the duplex he was paying the bills for

3  one of the codefendants.

4        The officers found 5 pounds of methamphetamine at

5  the residence, and I -- and he hasn't been charged with

6  that.  But I did talk with Special Agent Heiser

7  [phonetic] today, and it's the quickest turnaround on

8  fingerprints that I've seen.  Even though the 5 pounds of

9  methamphetamine that was found in the defendant's

10  residence were wrapped a couple times, I can proffer to

11  the Court the defendant's fingerprints were on the 5

12  pounds of methamphetamine that he was keeping in his

13  house with who -- whatever, the mother of the children

14  and the children, and so that causes grave concerns as

15  well.

16        As far as the monetary ability to -- or the

17  ability to have a job, I would call to the Court's

18  attention that the defendant self-reports that he has a

19  lawn service.  But investigators have looked at his tax

20  returns, and in 2017 only $6,000 was reported for any

21  taxable income from this lawn service, so the idea of him

22  having gainful employment is sketchy at best.

23        It's the Government's contention that the

24  defendant has not overcome the presumption, and that

25  there still are grave concerns regarding the danger to

1    the community, specifically danger to law enforcement,

2    and that's what I'd stress.

3         THE COURT:  Would you like to respond to any of

4    those, Mr. Biebighauser?

5         MR. BIEBIGHAUSER:  Only two assertions, Judge.   I

6    think, first, as far as the proffer regarding

7    Mr. Arjona's criminal history, I think the Government

8    stated, again it goes to maybe some level of hyperbole

9    but not something the Court can rely on, and that was the

10   Government said although they were concerned he had a

11   gun.  He did not.  And I think that speaks to

12   Mr. Arjona.  Although the Government's raised these

13   certain allegations, he's innocent until proven guilty.

14   There's no indication that he has any priors having to do

15   with firearms whatsoever, and those concerns apparently

16   have been dispelled time and time again.

17        Regarding the facts and circumstances of this

18   case, Judge, as the Court knows, I'm in no position to

19   tackle those head on.   What I will say is that there's

20   already a presumption in this case.   The Court can

21   already be assured that that is considered under the

22   presumption.   Mr. Arjona is charged with an offense that

23   carries a presumption.   He recognizes that.   The facts

24   and circumstances of this case, conspiracy, don't raise

25   beyond any level that's not already considered by the

1   presumption.   He's able to shatter that presumption by

2   demonstrating not only his long-standing ties to the

3   community but his family relationships here.   For that

4   reason, Judge, he has overcome the presumption and

5   certain circumstances will justify his return to court.

6          THE COURT:  I'm going to deny the motion for

7   detention, put the defendant on bond, but I intend to

8   make some fairly restrictive conditions.   This is a

9   close one, and the defendant has a very odd criminal

10  history with a whole lot of arrests and almost no

11  convictions.   In fact, one conviction which has been

12  discussed at some length, which is a serious one, but the

13  record, at least as far as we have it from that case,

14  does mitigate in his favor somewhat because it appears

15  that he successfully completed a 12-month probation

16  period, which would indicate some ability to operate

17  under court conditions.

18          The circumstances surrounding this offense, if

19  they were clearer, could tip the balance a little bit

20  more.   But there is some -- at this stage of the case, at

21  least -- there's some uncertainty about some of that.

22  There is a presumption.   The presumption, as I'm

23  beginning to understand in the law in these cases, shifts

24  the -- requires the defense -- imposes upon the defense a

25  burden of presumption.   And I think that they've met

1    that.

2        The Court remains -- it remains for the Court to

3    make a finding of either flight risk or danger.   I don't

4    think there's any -- I don't think there's really

5    sufficient evidence in this case for the Court to make a

6    flight risk finding.

7        The question is danger.   Ms. Rodebaugh's really

8    right about that, and that's a finding I have to make by

9    clear and convincing evidence.   The nature of the

10   proffer on some of the violence concerns is just too

11   vague for the Court to give some of it a lot of credence

12   except, of course, for a prior conviction of a criminal

13   threat.   And I'm not going to and I don't know enough

14   about the -- to make that finding about specific threats

15   and things that surround this particular case.   And so

16   I'm going to release the defendant on bond.   And give me

17   a minute to think about it.

18        And, Ms. Rodebaugh, I'll want to hear from you

19   especially about what -- after I go through and think

20   about some conditions -- about what additional ones that

21   you might request in this case.

22        (Brief pause.)

23        THE COURT:  Okay.   So I'm going to go through

24   what I've got so far for conditions and then I'll

25   consider both counsels' comments concerning that.   It'll

1  be a $100,000 unsecured bond.   That isn't money you get

2  to pay up front but it is money you'd be liable for, Mr.

3  Arjona, if you violate the bond.

4       So the conditions include that, of course, you

5  can't break any laws -- federal, state, or local -- on

6  release.   Then the collection of DNA sample's authorized

7  by law.  You must cooperate with that.   You can't change

8  your residence or telephone number without the permission

9  of pretrial services without advising the court in

10 writing.

11      You have to come back to court any time there's a

12 hearing scheduled.   You'll have a supervised bond, so

13 you'll get a supervising officer.   You'll need to

14 cooperate with them and follow their instructions.

15      I'm requiring you to continue or actively seek

16 employment, and I've added to that that employment must

17 be verifiable.   I'm going to -- probation will help --

18 will decide whether or not working through your business

19 constitutes verifiable employment, but it may well be

20 that you'll be required to go someplace where you'll get

21 a pay stub, but you are required to get a job.

22      You can't have any contact with anyone who's a

23 witness in the investigation, including the codefendants.

24 You can't have any contact with them.

25      You can't possess a firearm, destructive device,

1  or any weapon.   You basically can't be anywhere near a

2  firearm, nothing in the home, nothing in a car you're in,

3  nothing near you.   You can't use alcohol.   You can't

4  use unlawful drugs.   And you'll be tested for drug use

5  and alcohol use.   If probation decides you need to go

6  into inpatient treatment therapy or outpatient treatment

7  therapy, you need to cooperate with that.

8        I'm going to propose home detention, which is a

9  little unusual, but that means that you'll be restricted

10  to your residence at all times except for employment,

11  education, religious services, medical, substance abuse

12  or medical health treatment, attorney visits, court

13  appearances, court-ordered obligations or other

14  activities approved in advance by pretrial services.

15        And I think what pretrial services will tell you

16  is that if you're going to be out of the home, they need

17  to know you're going to be out of the home and why; in

18  other words, not making your own judgments about whether

19  it comes within those categories, but getting approved by

20  pretrial when you're going to be out.   And at the point

21  where you have a job to go to, they just need to know

22  what those regular hours are, where you're going to be,

23  and approve that.   But otherwise you need to be home.

24        There is equipment required for that, some

25  monitoring equipment required for that, and they don't

1  have it right now.  My understanding is it might take a

2  day or two to get it.  So I'll be staying your release

3  until they can get their hands on the equipment needed to

4  do the home detention, but that's what I'll be imposing

5  on that.

6      If you can help copay for a drug treatment and

7  testing or whatever, Counsel, you're doing, you need to

8  do that.

9      So let me stop for a moment and ask Ms. Rodebaugh

10  first about conditions.

11      MS. RODEBAUGH:  I can't think of any other

12  conditions.  I am concerned that the defendant says that

13  he was living at a Parkdale residence where the Court is

14  releasing him, but the search warrant was on Illinois, so

15  I would ask no contact with the Illinois residence.  If

16  that's not his house, then there would be no reason to go

17  over there.

18      THE COURT:  Do you disagree with that,

19  Mr. Biebighauser?

20      MR. BIEBIGHAUSER:  No problem with no contact with

21  the Illinois address.  I didn't hear the actual address.

22      MS. RODEBAUGH:  It would be Illinois addresses,

23  plural.  It's a duplex.

24      THE COURT:  I think we all know probably what's

25  been talked about here.  Okay.  I have added that.

1  I've just said no contact with the Illinois addresses.

2  If that needs clarification, you need to get

3  clarification from the prosecutor.   Anything else you

4  can think of, Ms. Rodebaugh?

5       MS. RODEBAUGH:  No, Your Honor.

6       MR. BIEBIGHAUSER:  Can I have one second to make

7  sure we're clear, Judge?

8       THE COURT:  Sure.

9       (Whereupon, a sotto voce discussion was had

10  between Mr. Biebighauser and the defendant.)

11       MR. BIEBIGHAUSER:  Judge, there's no question

12  about that, so I think everybody's clear on that.

13       THE COURT:  Okay.

14       MR. BIEBIGHAUSER:  The only thing that I missed --

15  and I'm the last person to talk about fast talking

16  because that's what I do, unfortunately --

17       THE COURT:  Including me, yeah.

18       MR. BIEBIGHAUSER:  -- you listed a number of home

19  detention but certain places that are okay to be on

20  release for bond.

21       THE COURT:  Those are listed in the bond.

22       MR. BIEBIGHAUSER:  Okay.

23       THE COURT:  I merely just read the bond

24  conditions.

25       MR. BIEBIGHAUSER:  Very good.

```
 1          THE COURT:  But the point I wanted to make about

 2   that is that whether he fits one of those categories or

 3   not, he needs -- probation needs to know he's going to be

 4   out of the house and why, basically.

 5          MR. BIEBIGHAUSER:  Understood.  And if those

 6   places are listed there, then that's fine, Judge.

 7          THE COURT:  And they are, they are.  Okay.

 8          Sir, if you violate -- Mr. Arjona, if you violate

 9   any of the conditions, a warrant will be issued for your

10   arrest and you could be back in confinement while the

11   case is pending.  This was a close one, and you're going

12   to be on a pretty short leash, so it won't take much of a

13   violation to get the bond revoked.

14          If you commit --  if you commit a federal felony

15   while you're on bond, then you can get ten years on top

16   of whatever penalty a felony would get otherwise, if it's

17   a federal felony.  If you commit a misdemeanor, you can

18   get an additional one year on top of what it would

19   normally carry.  It's a crime to obstruct the

20   investigation of this case, to interfere with evidence,

21   or tamper with witnesses.  And it's a crime to fail to

22   come back to court when you're supposed to.  You can be

23   charged with crimes for that, too.  Do you understand

24   that?

25          THE DEFENDANT:  Yes, sir.
```

2-13-19  USA v. ARJONA  No. 19-10025-01

25

```
 1        THE COURT:  Mr. Biebighauser, if you'll come get

 2   the bond work and you can review it with the defendant,

 3   please.

 4        MR. BIEBIGHAUSER:  Yes, sir.   May I approach?

 5        THE COURT:  Yes, please.  I haven't written on

 6   there that I'm staying the release until probation gets

 7   the equipment for the home detention, but I will be

 8   writing that at the end of the bond.

 9        MR. BIEBIGHAUSER:  Is that going to be written

10   before he signs it?

11        THE COURT:  No.  That's before my signature, so I

12   think that will be all right.

13        (Whereupon, a sotto voce discussion was had

14   between Mr. Biebighauser and the defendant.)

15        MR. BIEBIGHAUSER:  Judge, may I approach?

16        THE COURT:  Yes, please.   Thank you.

17        (Brief pause.)

18        THE COURT:  The defendant has signed the bond,

19   which I've approved, and I've ordered his release under

20   the terms of the bond but I stayed that release until

21   probation may advise the marshals that they've received

22   the home detention monitoring.

23        MR. BIEBIGHAUSER:  Judge, just so I can keep my

24   client informed, I don't know how long that will take.

25   Is there any expectation about that?
```

1        THE COURT:  Yeah, we think it's going to be no

2   more than a couple of days.   It might -- it might be one

3   day.   I was asking probation about that.   You can sure

4   check with them, too.

5        MR. BIEBIGHAUSER:  Okay.

6        THE COURT:  I think it's going to be pretty soon.

7        MR. BIEBIGHAUSER:  Okay.

8        THE COURT:  I wouldn't expect that to -- this is a

9   Wednesday.   I wouldn't expect that to go -- to take us

10  into the weekend, but I suppose nothing's impossible.

11       Okay.   We don't need to proceed to arraignment.

12  Anything else on this, Ms. Rodebaugh?

13       MS. RODEBAUGH:  No, Your Honor.   Thank you.

14       THE COURT:  Mr. Biebighauser?

15       MR. BIEBIGHAUSER:  Nothing further, Judge.   Thank

16  you.

17       THE COURT:  Thank you, Mr. Arjona.

18       (Whereupon, the proceedings were concluded at 2:24

19  P.M.)

20

21

22

23

24

25

CERTIFICATE


I certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.



                         s/ Johanna L. Wilkinson
                         Johanna L. Wilkinson, CSR, CRR, RMR
                         United States Court Reporter