IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,      )
                                   )
                    Plaintiff,     )   District Court
v.                                 )   Case No.
                                   )   19-10025-01
MICHAEL A. ARJONA,                 )
                                   )
                    Defendant.     )


TRANSCRIPT OF PROCEEDINGS

     On the 22nd day of February, 2019, came on to be heard
proceedings in the above-entitled and numbered cause before the
HONORABLE ERIC F. MELGREN, Judge of the United States District
Court for the District of Kansas, sitting in Wichita,
commencing at 10:57 A.M. Proceedings recorded by machine
shorthand.  Transcript produced by computer-aided
transcription.

APPEARANCES:

The plaintiff appeared by and through:
          Mr. Ryan C. McCarty
          U.S. Attorney's Office
          301 N. Main Street
          Suite #1200
          Wichita, Kansas  67202-4812

The defendant appeared in person and by and through:
          Mr. Mitch E. Biebighauser
          Federal Public Defender's Office
          850 Epic Center
          301 North Main Street
          Wichita, Kansas 67202

Also present:
          Ms. Josefina Durham, U.S. Probation Officer

<u>I N D E X</u>

<u>PAGE</u>


WITNESSES
    For the Plaintiff
    DETECTIVE JUSTIN MANNING
        Direct Examination By Mr. MCCARTY          29
        Cross-Examination By Mr. Biebighauser      46



REPORTER'S CERTIFICATE                            71

2-22-19  USA v. ARJONA  No. 19-10025                          3

| | | |
|---|---|---|
| 10:57:11 | 1 | CLERK DAVENPORT:  All rise. |
| 10:57:13 | 2 | THE COURT:  You may be seated. |
| 10:57:16 | 3 | The court calls the case of the United States v. |
| 10:57:25 | 4 | Michael -- can you pronounce the name for me, please? |
| 10:57:29 | 5 | THE DEFENDANT:  Arjona. |
| 10:57:30 | 6 | THE COURT:  Arjona [pronouncing]? |
| 10:57:32 | 7 | THE DEFENDANT:  Yes. |
| 10:57:32 | 8 | THE COURT:  I'm just not very good at these |
| 10:57:35 | 9 | pronunciations.  Thank you. |
| 10:57:35 | 10 | THE DEFENDANT:  The J's silent.  You're welcome, |
| 10:57:38 | 11 | sir. |
| 10:57:38 | 12 | THE COURT:  Michael Arjona, Case No. 19-10025. |
| 10:57:42 | 13 | Can we start with appearances, please. |
| 10:57:44 | 14 | MR. MCCARTY:  Your Honor, the United States |
| 10:57:46 | 15 | appears by Ryan McCarty, Assistant United States |
| 10:57:49 | 16 | Attorney. |
| 10:57:49 | 17 | MR. BIEBIGHAUSER:  May it please the Court, |
| 10:57:52 | 18 | Mr. Arjona appears on pretrial supervision and by and |
| 10:57:56 | 19 | through counsel Mitch Biebighauser, Assistant Federal |
| 10:58:00 | 20 | Public Defender. |
| 10:58:00 | 21 | THE COURT:  All right.  Thank you.  This matter's |
| 10:58:05 | 22 | had a somewhat tortuous progress, resulting in, I guess, |
| 10:58:11 | 23 | some embarrassment for the Court in my interpretations or |
| 10:58:16 | 24 | misinterpretations of various rules.  But the gist of it |
| 10:58:20 | 25 | is, the magistrate judge granted, over the Government's |

10:58:24   1   objection, the defendant's release on bond conditions for

10:58:29   2   defendant Arjona.  The Government timely and promptly

10:58:32   3   filed an appeal of that matter, through matters that I

10:58:40   4   don't need to recite now.  Although Mr. Arjona was

10:58:44   5   initially detained pending that appeal, he has been

10:58:47   6   released, is currently on release status, but, of course,

10:58:53   7   the Government is still pursuing its appeal of the

10:58:57   8   detention.

10:58:58   9        My understanding is that, based on the indictment

10:59:03  10   at issue in this case, Mr. Arjona is presumptively

10:59:09  11   detainable.  Is that correct?

10:59:10  12        MR. MCCARTY:  That is correct, Your Honor.

10:59:11  13        MR. BIEBIGHAUSER:  There's no disagreement, Judge.

10:59:13  14        THE COURT:  And based on that, it's my

10:59:15  15   understanding, therefore, that the burden would lie on

10:59:17  16   the defendant to show why the presumption should be

10:59:20  17   overcome and he be released.  Do you agree with that?

10:59:25  18        MR. MCCARTY:  That's the position of the

10:59:26  19   United States, Your Honor.

10:59:27  20        MR. BIEBIGHAUSER:  Judge, I agree.  I think

10:59:29  21   there's a -- some burden on the defendant to make an

10:59:32  22   initial showing.  It's been my understanding in the past

10:59:34  23   that that burden of production has been satisfied by

10:59:37  24   proffer, and we intend to operate that way this morning

10:59:39  25   based on information from the pretrial services report

10:59:43  1  and other folks that are here, that sort of thing.

10:59:47  2        THE COURT:  I'm not entirely sure I understood

10:59:49  3  that response, Mr. Biebighauser.

10:59:50  4        MR. BIEBIGHAUSER:  Oh, I'm sorry.

10:59:50  5        THE COURT:  No, it's not -- I understood what you

10:59:53  6  said.  I'm just not sure I understood what you meant.

10:59:55  7        MR. BIEBIGHAUSER:  I don't think we agree that the

10:59:57  8  burden lies on us to provide some evidence.

10:59:58  9        THE COURT:  At least the burden of going forward

11:00:00  10  on the burden of production, right.

11:00:01  11        MR. BIEBIGHAUSER:  Yes, sir.  Yes, sir.

11:00:02  12        THE COURT:  All right.  And then it was the part

11:00:04  13  about you intend to satisfy that by a proffer from the

11:00:06  14  pretrial services is where I lost you.

11:00:08  15        MR. BIEBIGHAUSER:  I'm sorry, Judge.  I just meant

11:00:10  16  to proceed that -- that I was going to proceed by

11:00:12  17  referencing the information that's been verified in the

11:00:15  18  pretrial services report.  And it's my understanding,

11:00:17  19  from the reading case law from this district and the

11:00:20  20  Tenth Circuit, that that satisfies at least the burden of

11:00:22  21  production to allow the Court to decide the issue.

11:00:25  22        THE COURT:  All right.  Do either of you intend to

11:00:27  23  call witnesses?

11:00:28  24        MR. MCCARTY:  Your Honor, the United States is

11:00:31  25  prepared to call Detective Justin Manning, if it would

11:00:35  1  please the Court, to establish prong three, which is the

11:00:39  2  history and characteristics of the defendant, at the

11:00:42  3  Court's discretion.  He's available, and if we think we

11:00:45  4  need that to push him over a line, we're certainly

11:00:48  5  willing to call him.

11:00:49  6      THE COURT:  Well, obviously whether you call him

11:00:51  7  or not's up to you, not me.  Do you intend to call any

11:00:55  8  witnesses, Mr. Biebighauser?

11:00:56  9      MR. BIEBIGHAUSER:  No, sir.

11:00:57  10     THE COURT:  All right.  I think what I'd like to

11:00:59  11 do then, we'll do this in a bit of a modified approach.

11:01:05  12 Given what Mr. Biebighauser's just indicated to me, I'd

11:01:08  13 like to start with him, with defense making -- directing

11:01:15  14 the Court's attention to what it thinks is appropriate

11:01:20  15 under the pretrial services report, and I will allow us

11:01:25  16 to hear that.

11:01:26  17     Given that, then if the Government wishes to put

11:01:29  18 on evidence, or argument, whichever they prefer to do, in

11:01:32  19 rebuttal of that, I'll allow them to do that.  And then

11:01:35  20 we'll hear concluding arguments as to what the Court's

11:01:40  21 decision in this matter should be.  So, Mr. Biebighauser,

11:01:41  22 why don't you start with direction to the items of

11:01:44  23 proffer you wish to make from the pretrial services

11:01:47  24 report.

11:01:47  25     MR. BIEBIGHAUSER:  Thank you, sir.

| | | |
|---|---|---|
| 11:01:49 | 1 | Referring to 18 U.S.C. 3142 -- |
| 11:01:53 | 2 | THE COURT:  In district court, at least, I'd |
| 11:01:55 | 3 | prefer that you stand while addressing the bench. |
| 11:01:57 | 4 | MR. BIEBIGHAUSER:  Yes, sir.  Be happy to.  Would |
| 11:01:59 | 5 | you like me to approach the podium? |
| 11:02:01 | 6 | THE COURT:  Either way.  If you want to do it from |
| 11:02:03 | 7 | your table, that's fine.  I just -- |
| 11:02:04 | 8 | MR. BIEBIGHAUSER:  If you don't mind -- |
| 11:02:05 | 9 | THE COURT:  You can do it either place you'd like. |
| 11:02:07 | 10 | MR. BIEBIGHAUSER:  Very well.  Yes, sir. |
| 11:02:10 | 11 | May it please the Court.  Your Honor, addressing |
| 11:02:16 | 12 | the factors in 18 U.S.C. 3142, as the Court knows, the |
| 11:02:21 | 13 | burden lies with the defendant to make some production of |
| 11:02:25 | 14 | evidence towards what the Court needs to decide, and that |
| 11:02:28 | 15 | is whether there's some reasonable assurance to determine |
| 11:02:31 | 16 | whether Mr. Arjona is a danger to the community -- I |
| 11:02:33 | 17 | should say not a danger to the community, and not a |
| 11:02:35 | 18 | flight risk, to determine whether he can be released. |
| 11:02:37 | 19 | As the Court knows, reviewing the factors under |
| 11:02:41 | 20 | 3142, it's actually that we come to detention last.  So |
| 11:02:46 | 21 | that we're not burying the lead, Mr. Arjona would ask to |
| 11:02:49 | 22 | be released on the same set of conditions imposed by |
| 11:02:51 | 23 | Judge Gale. |
| 11:02:52 | 24 | THE COURT:  What are those conditions?  Can you |
| 11:02:53 | 25 | review them for me? |

```
11:02:54   1        MR. BIEBIGHAUSER:  I can, Judge.  All of the
11:02:56   2   standard conditions were imposed by Judge Gale, which I
11:02:58   3   know the court is familiar with.  In addition, and I
11:03:00   4   think most significantly, Mr. Arjona was ordered not to
11:03:04   5   have contact with witnesses and also that he be monitored
11:03:07   6   by what I'll call "home confinement."  It's my
11:03:11   7   understanding that that's sort of a more rigorous
11:03:14   8   adaptation of electronic monitoring, where Mr. Arjona
11:03:18   9   would only be allowed to leave his home under certain
11:03:20  10   conditions.  There was a list of those provided by Judge
11:03:24  11   Gale at the hearing, which I think we can refer to in the
11:03:27  12   record.  I don't have that list before me, but it
11:03:29  13   included various things like meeting with his attorney,
11:03:31  14   attending religious ceremonies, going to work, attending
11:03:36  15   education, that sort of thing.
11:03:37  16        THE COURT:  So Mr. Arjona's currently on an
11:03:38  17   electronic bracelet?
11:03:40  18        MR. BIEBIGHAUSER:  Yes, sir.  But it's my
11:03:42  19   understanding that that's a little more rigorous because
11:03:45  20   home confinement was a condition, not just merely
11:03:48  21   electronic monitoring.
11:03:48  22        THE COURT:  No, I understand.  But his home
11:03:49  23   confinement is being monitored, if I can say that, by an
11:03:52  24   electronic bracelet?
11:03:52  25        MR. BIEBIGHAUSER:  Yes, sir.  Yes, sir.
```

| | | |
|---|---|---|
| 11:03:53 | 1 | THE COURT:  And he is not employed? |
| 11:03:54 | 2 | MR. BIEBIGHAUSER:  He has been -- for the majority |
| 11:03:59 | 3 | of his life he's been self-employed.  And Judge Gale |
| 11:04:02 | 4 | discussed that as well, that that self-employment would |
| 11:04:05 | 5 | have to satisfy the court and the supervision office that |
| 11:04:07 | 6 | that's actual, legitimate employment, and if he could |
| 11:04:09 | 7 | not, then he would need to seek some form of paycheck, |
| 11:04:15 | 8 | but that was something Judge Gale left to the pretrial |
| 11:04:18 | 9 | monitor to determine whether or not -- |
| 11:04:18 | 10 | THE COURT:  What was the nature of his |
| 11:04:20 | 11 | self-employment? |
| 11:04:20 | 12 | MR. BIEBIGHAUSER:  He's been a landscaper for the |
| 11:04:21 | 13 | last -- for almost his entire adult life.  He lived |
| 11:04:24 | 14 | with -- or he worked, I'm sorry, with his brother in a |
| 11:04:26 | 15 | landscaping business until about ten years ago, when he |
| 11:04:29 | 16 | and his brother split and he engaged in his own lawn care |
| 11:04:32 | 17 | business, so he's self-employed and the owner of his own |
| 11:04:34 | 18 | business. |
| 11:04:34 | 19 | THE COURT:  What's his status, if one's been |
| 11:04:37 | 20 | determined because this matter's moved somewhat |
| 11:04:39 | 21 | expeditiously?  What's his status regarding that |
| 11:04:42 | 22 | employment and his ability to satisfy the probation |
| 11:04:46 | 23 | office with respect to those issues?  In other words, |
| 11:04:47 | 24 | what's his work status as of this moment? |
| 11:04:49 | 25 | MR. BIEBIGHAUSER:  I think Mr. Arjona would submit |

11:04:51  1   that his work status is strong.  We're heading into

11:04:55  2   March, which would be the busy season for his lawn care

11:04:57  3   business.

11:04:58  4         THE COURT:  I guess what I mean is is he or has he

11:05:00  5   been able to satisfy the probation office that his

11:05:05  6   landscaping business is -- I'm not sure what word Judge

11:05:07  7   Gale used -- legitimate or appropriate or otherwise, and

11:05:10  8   even though on home confinement, electronic monitoring,

11:05:13  9   is he currently engaging in that business?

11:05:14  10        MR. BIEBIGHAUSER:  Yes, Judge, he will return to

11:05:17  11  that business.  He's been engaged in it for many years.

11:05:20  12  I don't -- because of the expedited nature of this, I

11:05:22  13  don't know that a formal discussion on that issue has

11:05:25  14  been had.

11:05:25  15        THE COURT:  So at this point probation's not given

11:05:28  16  a formal indication that they're satisfied that he can

11:05:32  17  continue to do that?  That's an open issue?

11:05:35  18        MR. BIEBIGHAUSER:  Yes, not to be one way or the

11:05:37  19  other.

11:05:37  20        THE COURT:  All right.  Very well.  Go on.

11:05:38  21        MR. BIEBIGHAUSER:  Then turning to the factors the

11:05:40  22  Court is to consider, I'd like to proceed under 3142(g)

11:05:43  23  and consider those factors.  First is the nature and the

11:05:47  24  circumstances of the offense charged.  Of course, the

11:05:50  25  Government will address that factor.  And, of course, the

| 11:05:52 | 1 | defendant is at somewhat of a disadvantage or defense |
| 11:05:56 | 2 | counsel is at somewhat of a disadvantage in discussing |
| 11:05:58 | 3 | that factor.  I have received some additional discovery |
| 11:06:00 | 4 | and some indication of the nature of the offense.  I |
| 11:06:02 | 5 | think I can tell the Court confidently that although a |
| 11:06:04 | 6 | presumption arises based on the allegation, this charge |
| 11:06:07 | 7 | does not involve firearms at any level, it does not |
| 11:06:09 | 8 | involve threats of violence, it does not involve the use |
| 11:06:13 | 9 | of violence, it does not involve intimidation or other |
| 11:06:16 | 10 | express or implied threats. |
| 11:06:18 | 11 | THE COURT:  But I think, Mr. Biebighauser, that in |
| 11:06:20 | 12 | looking at safety of the community we would include |
| 11:06:24 | 13 | distribution of controlled substances as a factor |
| 11:06:26 | 14 | indicating against safety to the community; in other |
| 11:06:29 | 15 | words, it's an unsafe condition if we had lingering |
| 11:06:33 | 16 | concerns that further distribution of controlled |
| 11:06:35 | 17 | substances would occur, without regard to actual violence |
| 11:06:37 | 18 | or use of firearms. |
| 11:06:38 | 19 | MR. BIEBIGHAUSER:  I don't disagree, Judge.  I |
| 11:06:40 | 20 | just wanted to make note that in some cases it's not only |
| 11:06:43 | 21 | the distribution of drugs that's at issue; there are |
| 11:06:45 | 22 | other factors as well.  In this case those aren't |
| 11:06:47 | 23 | present. |
| 11:06:47 | 24 | THE COURT:  All right.  All right. |
| 11:06:48 | 25 | MR. BIEBIGHAUSER:  Moving on to the next factor |

| | | |
|---|---|---|
| 11:06:50 | 1 | then, the weight of the evidence against the person. |
| 11:06:52 | 2 | I'll leave that to the Government as well.  So I'll move |
| 11:06:54 | 3 | on then to finally, I think, the Court's question, the |
| 11:06:57 | 4 | nature and circumstances of the defendant and how -- what |
| 11:06:59 | 5 | we know about him based on the verified information in |
| 11:07:01 | 6 | the pretrial services report.  We know from that report, |
| 11:07:05 | 7 | Judge, that Mr. Arjona is a long-standing member in this |
| 11:07:09 | 8 | community.  He has ties here not through family and not |
| 11:07:11 | 9 | only through friends, but also through long-standing, |
| 11:07:14 | 10 | legitimate employment.  His mother resides here, and is |
| 11:07:16 | 11 | in the courtroom today, Violetta.  She lives just next to |
| 11:07:20 | 12 | the defendant.  They are very close, and they share |
| 11:07:24 | 13 | property across the street. |
| 11:07:26 | 14 | His father is deceased, no longer with us, but his |
| 11:07:30 | 15 | two brothers, biological brothers, Jesse and Albert, both |
| 11:07:33 | 16 | have ties to this community.  His brother Jesse is here |
| 11:07:36 | 17 | today in the back of the courtroom, lives in Wichita. |
| 11:07:38 | 18 | His brother Albert was here until recently when his job |
| 11:07:41 | 19 | transferred him to El Paso. |
| 11:07:44 | 20 | THE DEFENDANT:  Not yet. |
| 11:07:45 | 21 | MR. BIEBIGHAUSER:  Is soon to transfer him to |
| 11:07:46 | 22 | El Paso, Judge.  So he's here for the moment but will |
| 11:07:49 | 23 | soon be moving to Texas for continued employment with |
| 11:07:52 | 24 | Boeing. |
| 11:07:52 | 25 | He's close with all of those family members.  They |

| | | |
|---|---|---|
| 11:07:56 | 1 | have children in this community, and their children all |
| 11:07:58 | 2 | go to school in this community. |
| 11:08:00 | 3 | THE COURT:  Mr. Arjona is not married but has |
| 11:08:02 | 4 | children? |
| 11:08:02 | 5 | MR. BIEBIGHAUSER:  He is married, Judge.  His wife |
| 11:08:04 | 6 | is here in the courtroom, Kayla, and has multiple |
| 11:08:06 | 7 | children, some with Kayla and others as well.  His |
| 11:08:11 | 8 | first -- his oldest son, Austin, is 21, lives in Maize, |
| 11:08:15 | 9 | nearby.  His next youngest, Alexandra, is 19, lives in |
| 11:08:19 | 10 | Wichita.  He maintains strong connections with both of |
| 11:08:23 | 11 | them and provides financial support for both of them. |
| 11:08:25 | 12 | THE COURT:  Are those his children or |
| 11:08:27 | 13 | stepchildren? |
| 11:08:28 | 14 | MR. BIEBIGHAUSER:  They're his children. |
| 11:08:29 | 15 | THE DEFENDANT:  And then my daughter and I got a |
| 11:08:31 | 16 | granddaughter. |
| 11:08:31 | 17 | MR. BIEBIGHAUSER:  Right, and we'll get to that. |
| 11:08:33 | 18 | But those two, Judge, are his children. |
| 11:08:35 | 19 | THE COURT:  All right. |
| 11:08:35 | 20 | MR. BIEBIGHAUSER:  He has further biological |
| 11:08:37 | 21 | children with Kayla, and I separate those out only |
| 11:08:39 | 22 | because Kayla's here today so I just wanted to |
| 11:08:42 | 23 | distinguish that.  Those children are much younger, nine |
| 11:08:44 | 24 | and three, Alexis and Aquilles.  They live with him.  He |
| 11:08:48 | 25 | provides financial support, he provides emotional |

11:08:51  1  support, and he's an involved father in their life, along

11:08:54  2  with his mother Kayla.

11:08:57  3        Additionally, the Court should be aware that all

11:09:00  4  of his ties are here.  He doesn't have a passport.  He

11:09:02  5  has no reason to leave the country.  He doesn't leave the

11:09:04  6  country regularly and he has no means for that sort of

11:09:06  7  travel.

11:09:07  8        His residence where he's lived, he lived in this

11:09:10  9  community for 35 years.  He's lived at the same address

11:09:14  10  within this community since January 1st of 2010.  So he

11:09:17  11  has a long-standing, stable residence.  Again that's with

11:09:22  12  his mother.

11:09:22  13        His employment history, which I know the Court was

11:09:27  14  interested in, his business is named Lawn Surgeons.  He

11:09:32  15  formerly worked with his brother, Jesse, at Arjona Mowers

11:09:35  16  until about 2000 when they split up and they went their

11:09:39  17  separate ways and started their own businesses.  For

11:09:42  18  Mr. Arjona that was Lawn Surgeons.

11:09:43  19        He has a monthly income that can support himself,

11:09:46  20  his home, and his children, and he will continue to

11:09:49  21  maintain that employment.  He's the owner and operator of

11:09:52  22  the business, so he -- it's one he knows at least he can

11:09:54  23  return to.

11:09:56  24        THE COURT:  Any employees at the business?

11:09:57  25        MR. BIEBIGHAUSER:  Yes, sir, there are employees

11:09:58  1  of the business.  He has sought, based on Judge Gale's

11:10:03  2  no-contact order -- I don't know the names of all the

11:10:07  3  witnesses involved.  That wasn't disclosed to me.  But

11:10:09  4  Mr. Arjona has made some efforts to find new employees.

11:10:13  5  He's been working to set up his business, with the

11:10:16  6  expectation and the hope that when he's released he'll

11:10:18  7  have a new crop of employees to prepare for this upcoming

11:10:21  8  season.

11:10:21  9        THE COURT:  Ma'am, you don't have to leave.  Are

11:10:24  10 you Mr. Arjona's wife?

11:10:25  11        MS. CALLOWAY:  Yeah.

11:10:25  12        THE COURT:  You know, children don't bother me.

11:10:27  13        MS. CALLOWAY:  Okay.

11:10:28  14        THE COURT:  So I'm sure you want to be here.  And

11:10:31  15 I didn't even notice him before you started to leave.

11:10:34  16        MS. CALLOWAY:  Thank you.

11:10:35  17        THE COURT:  So unless he starts screaming loudly,

11:10:37  18 please feel free to stay.

11:10:39  19        MS. CALLOWAY:  Okay.  Thank you.

11:10:39  20        MR. BIEBIGHAUSER:  Thank you, Judge.

11:10:42  21        So much for his business, Judge.  He doesn't have

11:10:46  22 any physical health concerns.

11:10:47  23        THE COURT:  Can I back up just a second?  Do I

11:10:49  24 infer from your comment then that there's at least some

11:10:54  25 reasonable -- reason to believe that his past employees

| | | |
|---|---|---|
| 11:10:56 | 1 | might be potential witnesses that Judge Gale had |
| 11:11:01 | 2 | prohibited him from having contact with? |
| 11:11:03 | 3 | MR. BIEBIGHAUSER:  I don't have that list.  I |
| 11:11:04 | 4 | believe that one of his codefendants was employed in that |
| 11:11:07 | 5 | business, and so I think that's the only concern.  And of |
| 11:11:09 | 6 | course he won't have any codefendants -- contact with his |
| 11:11:12 | 7 | codefendants no matter what while on pretrial release. |
| 11:11:14 | 8 | THE COURT:  So I guess that raises the question, |
| 11:11:16 | 9 | Mr. Biebighauser, as to whether there's an overlap |
| 11:11:21 | 10 | between his legitimate business of lawn -- his lawn |
| 11:11:25 | 11 | surgeon business and the matters that he's accused of in |
| 11:11:29 | 12 | the indictment in this case. |
| 11:11:30 | 13 | MR. BIEBIGHAUSER:  Judge, I don't think there is |
| 11:11:32 | 14 | an overlap.  I don't think his business, his legitimate |
| 11:11:34 | 15 | business, has anything to do with the nature of the |
| 11:11:36 | 16 | allegations.  I think those things are entirely separate, |
| 11:11:39 | 17 | but for I think that there is that connection.  Maybe the |
| 11:11:43 | 18 | Government will be able to speak to that regarding the |
| 11:11:44 | 19 | nature of the evidence. |
| 11:11:45 | 20 | THE COURT:  And I understand they know a lot more |
| 11:11:47 | 21 | about the case. |
| 11:11:47 | 22 | MR. BIEBIGHAUSER:  Right, I'm not privy to more |
| 11:11:49 | 23 | details on that. |
| 11:11:49 | 24 | THE COURT:  I understand. |
| 11:11:50 | 25 | MR. BIEBIGHAUSER:  Yes, sir.  Further, I think the |

| | | |
|---|---|---|
| 11:11:51 | 1 | Court should note that he has no physical or mental |
| 11:11:54 | 2 | health detriments that would affect him in any way in |
| 11:11:56 | 3 | proceeding and being a safe and responsible member of the |
| 11:11:59 | 4 | community.  He will remain sober if he's released. |
| 11:12:03 | 5 | Turning last, I think, at least last listed in the |
| 11:12:05 | 6 | bond report, to his criminal history.  Judge, he has no |
| 11:12:10 | 7 | prior serious convictions. |
| 11:12:11 | 8 | THE COURT:  He has a lot of prior convictions. |
| 11:12:15 | 9 | I'm not sure how serious they are.  Based on the sheet |
| 11:12:19 | 10 | that I have, it's hard to tell.  The fact that many of |
| 11:12:22 | 11 | them are in municipal court would suggest that obviously |
| 11:12:26 | 12 | they're not particularly serious. |
| 11:12:28 | 13 | MR. BIEBIGHAUSER:  Judge, I'm not sure that |
| 11:12:29 | 14 | there's many convictions.  There's certainly a number of |
| 11:12:31 | 15 | charges here listed.  I don't see a number of |
| 11:12:34 | 16 | convictions.  If the Court wants to direct me -- |
| 11:12:36 | 17 | THE COURT:  No, no.  I mean, you're correct that |
| 11:12:38 | 18 | many of them were not convicted.  I am concerned about |
| 11:12:41 | 19 | the most recent one, which was criminal threat.  And |
| 11:12:45 | 20 | that's not only recent, as opposed to some when he was |
| 11:12:49 | 21 | much younger, but also one that has a conviction.  Do you |
| 11:12:52 | 22 | know anything about this offense? |
| 11:12:53 | 23 | MR. BIEBIGHAUSER:  Judge -- |
| 11:12:55 | 24 | THE COURT:  The November of 2014? |
| 11:12:56 | 25 | MR. BIEBIGHAUSER:  I had shared some information |

| | | |
|---|---|---|
| 11:13:00 | 1 | about that with my client, but I want to make sure he's |
| 11:13:02 | 2 | comfortable with me disclosing it.  Can I have a moment |
| 11:13:05 | 3 | to speak with him about that? |
| 11:13:06 | 4 | THE COURT:  Absolutely. |
| 11:13:07 | 5 | MR. BIEBIGHAUSER:  Thank you. |
| 11:13:07 | 6 | (Whereupon, a sotto voce discussion was had |
| 11:13:08 | 7 | between Mr. Biebighauser and the defendant.) |
| 11:13:39 | 8 | MR. BIEBIGHAUSER:  Judge, I don't have any detail |
| 11:13:40 | 9 | for the Court on that matter. |
| 11:13:41 | 10 | THE COURT:  All right. |
| 11:13:41 | 11 | MR. BIEBIGHAUSER:  It doesn't sound like there's |
| 11:13:43 | 12 | much clarity on the situation there except to say this: |
| 11:13:46 | 13 | whatever the circumstances that led to that offense, |
| 11:13:49 | 14 | Mr. Arjona was granted probation, which he successfully |
| 11:13:51 | 15 | completed without trouble.  No matter what the nature of |
| 11:13:54 | 16 | the allegations, we can submit at least that he submitted |
| 11:13:56 | 17 | to the court, he responded as appropriate, and he was |
| 11:13:58 | 18 | released from probation in one 12-month cycle, so there |
| 11:14:03 | 19 | doesn't seem to be any history there as far as his |
| 11:14:05 | 20 | compliance with court supervision, and I think that |
| 11:14:06 | 21 | weighs in his favor. |
| 11:14:07 | 22 | THE COURT:  All right.  All right.  Thank you, |
| 11:14:08 | 23 | Mr. Biebighauser. |
| 11:14:09 | 24 | MR. BIEBIGHAUSER:  I don't know that there's |
| 11:14:10 | 25 | anything else to address from the bond report as far as |

2-22-19  USA v. ARJONA  No. 19-10025

19

| 11:14:12 | 1 | things I want to raise.  I think all of those weigh in |
| 11:14:15 | 2 | his favor regarding the factors to be considered under |
| 11:14:18 | 3 | (g)(3). |
| 11:14:19 | 4 | Judge, if there's some evidence presented by the |
| 11:14:22 | 5 | Government regarding this offense, I'd like to address |
| 11:14:24 | 6 | that in rebuttal once we hear it if they call a witness. |
| 11:14:27 | 7 | THE COURT:  I understand.  Let me ask you a |
| 11:14:28 | 8 | question then.  The dockets in these matters always have |
| 11:14:32 | 9 | a rather form standard order from the magistrates as to |
| 11:14:34 | 10 | reasons of release.  Did you represent Mr. Arjona before |
| 11:14:37 | 11 | Judge Gale? |
| 11:14:38 | 12 | MR. BIEBIGHAUSER:  Yes, sir. |
| 11:14:38 | 13 | THE COURT:  Can you speak to the reasons that |
| 11:14:44 | 14 | Judge Gale was satisfied as to why, notwithstanding the |
| 11:14:48 | 15 | presumption, Mr. Arjona qualified for release? |
| 11:14:50 | 16 | MR. BIEBIGHAUSER:  Yes, sir, I can.  What I |
| 11:14:54 | 17 | witnessed from Judge Gale's decision was sort of twofold: |
| 11:14:57 | 18 | one, I think he found that the factors addressed by the |
| 11:15:00 | 19 | bond report satisfied him that the factors besides the |
| 11:15:03 | 20 | weight of the evidence weighed in favor of Mr. Arjona's |
| 11:15:06 | 21 | release.  But he also -- |
| 11:15:07 | 22 | THE COURT:  You're saying the factors aside from |
| 11:15:10 | 23 | the weight of the evidence, is that what you're saying? |
| 11:15:11 | 24 | MR. BIEBIGHAUSER:  Yes, sir.  Yes. |
| 11:15:12 | 25 | THE COURT:  Okay. |

11:15:12  1        MR. BIEBIGHAUSER:  Also, I think he reflected on

11:15:14  2  the nature of the Government's proffer at that time,

11:15:16  3  which I think he found lacking as to the criminal history

11:15:21  4  that they alleged, and the facts that they were bringing

11:15:24  5  in.  Judge Gale asked -- at the hearing it was

11:15:27  6  Ms. Rodebaugh -- a number of times to be more specific

11:15:29  7  and to drill into the allegations that they were making.

11:15:32  8  I think he found their proffer regarding that wanting.

11:15:35  9  And so for that reason, Judge, not only did certain

11:15:37  10  factors weigh in favor of Mr. Arjona, but the proffer

11:15:40  11  raised by the Government, I think, was insufficient to

11:15:43  12  persuade him that representations they made about his

11:15:46  13  criminal history and also the nature and circumstances,

11:15:48  14  his word was "vague."

11:15:53  15        THE COURT:  All right.  Was one of the conditions

11:15:54  16  that Judge Gale imposed a drug testing?

11:15:57  17        MR. BIEBIGHAUSER:  Yes, sir.

11:15:57  18        THE COURT:  All right.  And, again he's -- this --

11:16:01  19  he hasn't been released long enough for us to have any

11:16:03  20  meaningful --

11:16:04  21        MR. BIEBIGHAUSER:  Correct.

11:16:06  22        THE COURT:  All right.  Thank you,

11:16:07  23  Mr. Biebighauser.

11:16:08  24        MR. BIEBIGHAUSER:  Thank you, sir.

11:16:09  25        THE COURT:  Mr. McCarty.

11:16:09   1          MR. MCCARTY:  Thank you, Your Honor.  From what I

11:16:12   2   can tell, Your Honor, we haven't really heard anything

11:16:15   3   that would get us over any sort of presumption in this

11:16:17   4   case.  Other than he's lived in Wichita for some time, he

11:16:21   5   hasn't really behaved himself in Wichita, as we can see

11:16:23   6   from his numerous arrests.

11:16:24   7          THE COURT:  Well, talk to me about his criminal

11:16:29   8   record, if I can call it that.  To be honest, I'm always

11:16:33   9   somewhat conflicted as to how to handle a report like

11:16:37  10   this that shows a lot of arrests but very few

11:16:42  11   convictions, because certainly when I rely on

11:16:44  12   nonconvicted arrests, defense attorneys object, I think

11:16:49  13   with some merit, that someone who's arrested still has a

11:16:54  14   presumption of innocence until they're convicted, and if

11:16:56  15   they're not convicted, then they never lost that

11:16:58  16   presumption of innocence, and so they say -- I think

11:17:02  17   Mr. Biebighauser didn't say this, but they say, in

11:17:05  18   essence, that I should give almost no weight at all to

11:17:07  19   those arrests.

11:17:07  20          I'm certainly careful to guard the presumption of

11:17:17  21   innocence, but it doesn't strike me that a series of

11:17:20  22   arrests are completely irrelevant, and so I'm always

11:17:22  23   somewhat conflicted as to how to weigh these.  So can you

11:17:26  24   help me out there?

11:17:26  25          MR. MCCARTY:  Sure.  I wish I had some point of

11:17:31   1   law --

11:17:31   2          THE COURT:  Well, I don't think there are any

11:17:33   3   points of law.

11:17:33   4          MR. MCCARTY:  But we don't need to suspend our

11:17:35   5   common sense in this case.  Each one of these resulted in

11:17:38   6   a police investigation and submitted either to the

11:17:40   7   municipal court or the state court, one of which, the

11:17:45   8   conviction from 2014, I have a witness here.  We can jump

11:17:49   9   right to him if you would like or we can wait until we

11:17:51   10  get to the third prong.

11:17:52   11         THE COURT:  Do you want to -- can you just, at

11:17:55   12  least for our instant purposes, proffer to me briefly

11:17:58   13  what that conviction involved?

11:17:59   14         MR. MCCARTY:  Sure.  It involved a traffic stop.

11:18:02   15  Detective Manning, then Deputy Manning, pulled the

11:18:05   16  defendant over for DUI.  And in the course of that DUI

11:18:09   17  investigation, many very specific and alarming threats

11:18:14   18  were made to Deputy Manning at the time.  Didn't stop on

11:18:18   19  that day.  Apparently after that there was some

11:18:21   20  interaction between the two.

11:18:22   21         THE COURT:  The defendant continued to make

11:18:24   22  threats to the law enforcement officer following the

11:18:25   23  moment of the arrest -- I mean, of the incident was over;

11:18:30   24  is that what you're saying?

11:18:30   25         MR. MCCARTY:  It was more of a seeing him out in

11:18:34   1   public and kind of making him feel intimidated.  So

11:18:37   2   verbal threat, no, but I would say that the verbal

11:18:40   3   threats of that day weren't one or two.  If Detective

11:18:46   4   Manning could address the Court, you'll learn that they

11:18:49   5   were many and over a long period of time, so much so that

11:18:53   6   in his many years working for Sedgwick County, he's never

11:18:56   7   had anything like this, where someone got under his skin

11:19:00   8   to that effect.

11:19:01   9        THE COURT:  I inferred, looking through this list

11:19:02  10   of reports, disorderly conduct, domestic battery,

11:19:07  11   criminal damage to property, that most of these were, I

11:19:11  12   assumed, alcohol-related.  But then I note that the

11:19:15  13   pretrial services report says the defendant indicates he

11:19:18  14   drinks alcohol socially but has no history of alcohol

11:19:22  15   abuse.  What do you know about this, if anything?

11:19:27  16        MR. MCCARTY:  I would argue that he probably does

11:19:31  17   have an alcohol problem, at least he did in 2014.  I

11:19:35  18   would note other discrepancies in the report which should

11:19:39  19   cause the Court to maybe question all of its veracity.

11:19:42  20   The report indicates that he is single.  He's just

11:19:45  21   represented to the Court that he's married, and I think

11:19:47  22   you met his wife.  He indicates in the report that he

11:19:50  23   doesn't have many contacts with Mexico.  Unfortunately,

11:19:53  24   we have, on good basis, that he's crossed multiple times.

11:19:59  25   A little --

| | | |
|---|---|---|
| 11:19:59 | 1 | THE COURT: Where does the report indicate no |
| 11:20:02 | 2 | contact with Mexico? |
| 11:20:03 | 3 | MR. MCCARTY: He mentions that he's only gone as a |
| 11:20:05 | 4 | child and then once about ten years ago, I believe, Your |
| 11:20:08 | 5 | Honor. |
| 11:20:08 | 6 | THE COURT: I'm sorry, say that again? |
| 11:20:10 | 7 | MR. MCCARTY: On Travel/Passport. |
| 11:20:13 | 8 | THE COURT: Yes. |
| 11:20:14 | 9 | MR. MCCARTY: He indicates that he went to Mexico |
| 11:20:16 | 10 | on vacation as a child and then approximately ten years |
| 11:20:19 | 11 | ago. |
| 11:20:19 | 12 | THE COURT: And you think that's inaccurate? |
| 11:20:21 | 13 | MR. MCCARTY: It's not a matter of accuracy; it's |
| 11:20:23 | 14 | a matter of is it sufficient. Because if you were to |
| 11:20:25 | 15 | actually dig in, which pretrial services did in this case |
| 11:20:29 | 16 | so I'm not trying to disparage them but you'll learn when |
| 11:20:32 | 17 | he went back ten years ago he crossed three times, one of |
| 11:20:37 | 18 | which the person he was found with was found with 17 |
| 11:20:40 | 19 | kilos of methamphetamine and is now wanted for murder. |
| 11:20:44 | 20 | He's now a fugitive. I'm sorry, cocaine, and is now |
| 11:20:47 | 21 | wanted, a fugitive from justice, so it wasn't a simply |
| 11:20:50 | 22 | visiting Mexico for vacation. |
| 11:20:51 | 23 | THE COURT: And this is when he was in his |
| 11:20:53 | 24 | mid-20s? |
| 11:20:54 | 25 | MR. MCCARTY: This would have been ten years ago, |

11:20:56   1   yes, Your Honor.

11:20:56   2        THE COURT:  All right.

11:20:56   3        MR. MCCARTY:  A little less than ten years ago,

11:20:57   4   actually.  So that causes me some question.  These

11:21:00   5   pretrial services reports are only as good as the candor

11:21:04   6   with which the defendant's going to deal with in the

11:21:09   7   interview.

11:21:10   8        Going back to the prongs we have to consider, I

11:21:13   9   don't think that we really met any of them, truthfully.

11:21:18   10        THE COURT:  What's the -- I understand that

11:21:19   11   there's a presumption of detention, but what's the --

11:21:24   12   what's the concerns that the Government has -- by that I

11:21:28   13   mean are you relying on the danger to the community, are

11:21:33   14   you relying on appearing as required, are you relying on

11:21:35   15   both?

11:21:36   16        MR. MCCARTY:  Both.

11:21:36   17        THE COURT:  All right.

11:21:37   18        MR. MCCARTY:  And looking at the first, I mean,

11:21:39   19   whenever we're talking about a drug conspiracy, we're

11:21:43   20   talking about a continuing criminal enterprise.  The only

11:21:45   21   reason he got picked up is -- in this case was because

11:21:49   22   that's when they decided to make that decision as law

11:21:55   23   enforcement, and bring it to us.  However, the wheels of

11:21:58   24   this enterprise haven't stopped turning.  If the

11:22:02   25   defendant is let out and the co-conspirators are out and

2-22-19  USA v. ARJONA  No. 19-10025

26

| | | |
|---|---|---|
| 11:22:06 | 1 | there are other potentially -- |
| 11:22:07 | 2 | THE COURT: Are the co-conspirators out? |
| 11:22:10 | 3 | MR. MCCARTY: One is and one, I believe -- one, I |
| 11:22:13 | 4 | believe, is still held in state custody? |
| 11:22:17 | 5 | THE AGENT: In marshal's custody. |
| 11:22:19 | 6 | MR. MCCARTY: I'm sorry, in marshal's custody, I |
| 11:22:21 | 7 | apologize. So one is out, one is in marshal's custody. |
| 11:22:24 | 8 | However, as you can see from the indictment, Your Honor, |
| 11:22:26 | 9 | we're kind of alleging that the defendant in this case is |
| 11:22:29 | 10 | the ringleader of this particular conspiracy. |
| 11:22:32 | 11 | THE COURT: Are Mr. Brandt or Mr. Cobal connected |
| 11:22:35 | 12 | with his legitimate business, do you know? |
| 11:22:38 | 13 | MR. MCCARTY: I do not know. Just one second, |
| 11:22:40 | 14 | Your Honor. Can I take a minute? |
| 11:22:42 | 15 | THE COURT: Sure. |
| 11:22:43 | 16 | (Whereupon, a sotto voce discussion was had |
| 11:22:44 | 17 | between Mr. McCarty and the agent.) |
| 11:22:47 | 18 | MR. MCCARTY: My understanding is that Cody Cobal |
| 11:22:50 | 19 | has indicated that he has done work as part of that |
| 11:22:53 | 20 | business. He is the one that's still out. I believe |
| 11:22:56 | 21 | Nick Brandt is the one that's in marshal's custody at |
| 11:22:59 | 22 | this time. |
| 11:22:59 | 23 | So for this initial indictment, we've alleged |
| 11:23:05 | 24 | conspiracy. And any time we allege conspiracy, I would |
| 11:23:08 | 25 | hope that that would give the Court some pause that there |

11:23:10  1  are multiple actors at play, and that letting any or all

11:23:15  2  of them out would pose a danger to the community.

11:23:18  3          THE COURT:  Did the Government object to

11:23:21  4  Mr. Cobal's release?

11:23:24  5          MR. MCCARTY:  Honestly, I just got this case.  And

11:23:26  6  I don't mean to throw that aside, Your Honor.

11:23:28  7          THE COURT:  These matters always come up on short

11:23:30  8  notice, so I understand that I may ask a lot of questions

11:23:35  9  you have no answer to.

11:23:36  10          MR. MCCARTY:  You would know, wouldn't you?  I

11:23:38  11  would suspect that they would have.

11:23:40  12          THE COURT:  I mean, I don't have an appeal of

11:23:42  13  Mr. Cobal's release before me.

11:23:42  14          (Whereupon, a sotto voce discussion was had

11:23:45  15  between Mr. Biebighauser and the defendant.)

11:23:47  16          MR. BIEBIGHAUSER:  Judge, one of the codefendants

11:23:49  17  the Government agreed to release, and the other waived

11:23:52  18  the detention hearing.

11:23:53  19          THE COURT:  So presumably Mr. Brandt waived

11:23:55  20  detention hearing and is detained and then the

11:23:58  21  Government, you're indicating, it's your understanding

11:23:59  22  the Government agreed to the release of Mr. Cobal?

11:24:02  23          MR. BIEBIGHAUSER:  That's my recollection, yes.

11:24:04  24          THE COURT:  Okay.  All right.

11:24:06  25          MR. MCCARTY:  And the reason probably for that,

11:24:08   1   Your Honor, is if you look at the indictment you'll see

11:24:10   2   that Cody Cobal is a minor player.  The amount of drugs

11:24:14   3   that can be pinned on him is less than the defendant and

11:24:16   4   Mr. Brandt; however, the amount of drugs we're talking

11:24:20   5   about amount to pounds of meth per week, which as you can

11:24:25   6   imagine, is a substantial sum.

11:24:26   7          THE COURT:  The indictment just says 500 grams and

11:24:29   8   more with respect to Mr. Arjona.

11:24:31   9          MR. MCCARTY:  Yes, Your Honor.  And if it's

11:24:33   10  necessary to --

11:24:35   11         THE COURT:  Talk to me about weight of the

11:24:37   12  evidence, since that's kind of where we are.

11:24:39   13         MR. MCCARTY:  Sure.  This case basically involves

11:24:42   14  buys, so undercover buys.  It also involves a search

11:24:46   15  warrant that was executed, Judge Gale signed off on.  And

11:24:50   16  that had five pounds, I believe, of methamphetamine in

11:24:53   17  the defendant's residence, his fingerprints on the drugs.

11:24:58   18  So I think the weight of the evidence in this case is

11:25:00   19  very strong.

11:25:01   20         THE COURT:  Were the undercover buys made from

11:25:04   21  Mr. Arjona or from his codefendants or from both?

11:25:06   22         MR. MCCARTY:  Both, both.

11:25:06   23         THE COURT:  All right.

11:25:07   24         MR. MCCARTY:  That kind of brings us to the

11:25:10   25  history and characteristics of the defendant.  And I know

| | | |
|---|---|---|
| 11:25:12 | 1 | we've talked a little bit about his many arrests since |
| 11:25:17 | 2 | the age of 18.  And he's gotten around most of 'em, but I |
| 11:25:21 | 3 | do want to at this time call, if I may, Detective Manning |
| 11:25:25 | 4 | so he can give the Court some indication of why we |
| 11:25:28 | 5 | believe he fails even prong three.  Is this a good time |
| 11:25:33 | 6 | to do that? |
| 11:25:33 | 7 | THE COURT:  Certainly.  It's at your direction. |
| 11:25:36 | 8 | MR. MCCARTY:  Okay. |
| 11:25:36 | 9 | THE COURT:  Detective, if you'd come forward, my |
| 11:25:40 | 10 | courtroom deputy will give you the oath and you can sit |
| 11:25:43 | 11 | in the witness box, I'm sure you've done this before. |
| 11:25:45 | 12 | DETECTIVE MANNING:  Yes, sir. |
| 11:25:46 | 13 | THE COURT:  And we'll proceed accordingly. |
| 11:25:47 | 14 | DETECTIVE JUSTIN MANNING, |
| 11:25:47 | 15 | having been first duly sworn to testify the truth, the |
| 11:25:47 | 16 | whole truth, and nothing but the truth, testified as |
| 11:25:47 | 17 | follows: |
| 11:26:07 | 18 | DIRECT EXAMINATION |
| 11:26:07 | 19 | BY MR. MCCARTY: |
| 11:26:10 | 20 | Q.    Good morning, Detective.  Can you please state |
| 11:26:13 | 21 | your full name for the record. |
| 11:26:14 | 22 | **A.    Justin Manning.** |
| 11:26:14 | 23 | Q.    How are you employed? |
| 11:26:15 | 24 | **A.    I'm a detective with the Sedgwick County Sheriff's** |
| 11:26:18 | 25 | **Office.** |

| | | |
|---|---|---|
| 11:26:18 | 1 | THE COURT:  Detective, can I ask you to speak into |
| 11:26:20 | 2 | the microphone a bit more?  Thank you so much. |
| 11:26:23 | 3 | THE WITNESS:  Yes. |
| 11:26:23 | 4 | BY MR. MCCARTY: |
| 11:26:24 | 5 | Q.    Were you working with Sedgwick County back in |
| 11:26:26 | 6 | 2014? |
| 11:26:26 | 7 | A.    I was. |
| 11:26:27 | 8 | Q.    November 5th, to be precise? |
| 11:26:29 | 9 | A.    Yes, sir. |
| 11:26:29 | 10 | Q.    Were you a detective then or a deputy? |
| 11:26:32 | 11 | A.    I was not.  I was a road patrol deputy. |
| 11:26:35 | 12 | Q.    And on that day did you have occasion to run into |
| 11:26:38 | 13 | the defendant in this case? |
| 11:26:39 | 14 | A.    Yes, I did. |
| 11:26:40 | 15 | Q.    And did he have -- why did you run into him, or |
| 11:26:44 | 16 | what was the nature? |
| 11:26:45 | 17 | A.    It was a traffic stop. |
| 11:26:46 | 18 | THE COURT:  Can I interrupt you?  Can you tell me |
| 11:26:48 | 19 | again what date we're talking about?  I'm sorry, I missed |
| 11:26:51 | 20 | it. |
| 11:26:51 | 21 | MR. MCCARTY:  Yes, Your Honor.  This was |
| 11:26:52 | 22 | November 5th of 2014. |
| 11:26:52 | 23 | BY MR. MCCARTY: |
| 11:26:53 | 24 | Q.    Is that correct? |
| 11:26:54 | 25 | THE COURT:  I thought you said 2014.  I wanted to |

2-22-19  USA v. ARJONA  No. 19-10025

| | | |
|---|---|---|
| 11:26:56 | 1 | make sure I heard that correct.  I'm sorry. |
| 11:26:57 | 2 | Please continue, Detective. |
| 11:26:59 | 3 | BY MR. MCCARTY: |
| 11:27:00 | 4 | Q.     Where were you patrolling that day? |
| 11:27:01 | 5 | A.     7 Beat, which is West Street to 183rd, everything |
| 11:27:06 | 6 | from Maple south to county line. |
| 11:27:10 | 7 | Q.     Did you make any stops for DWI or DUI that day? |
| 11:27:13 | 8 | A.     I did. |
| 11:27:14 | 9 | Q.     Did you stop Michael Arjona? |
| 11:27:17 | 10 | A.     I did. |
| 11:27:17 | 11 | Q.     Do you recognize him in the courtroom here today? |
| 11:27:19 | 12 | A.     Yes, I do. |
| 11:27:20 | 13 | Q.     Can you please point him out, indicate an article |
| 11:27:23 | 14 | of clothing for the judge? |
| 11:27:24 | 15 | A.     Sitting off to my left, he's wearing gray pants, a |
| 11:27:27 | 16 | black button-up shirt, black pants. |
| 11:27:31 | 17 | MR. MCCARTY:  I'd ask the Court to note he's |
| 11:27:33 | 18 | identified the defendant. |
| 11:27:33 | 19 | THE COURT:  The Court will note. |
| 11:27:34 | 20 | BY MR. MCCARTY: |
| 11:27:35 | 21 | Q.     And can you tell us a little bit about what |
| 11:27:37 | 22 | observations you made to warrant a stop for DUI? |
| 11:27:41 | 23 | A.     Initially, as I was following the vehicle, I saw |
| 11:27:44 | 24 | it failed to maintain a single lane by driving over the |
| 11:27:47 | 25 | line just by a little bit, which that in and of itself |

| | | |
|---|---|---|
| 11:27:50 | 1 | isn't much, but for no apparent reason whatsoever the |
| 11:27:53 | 2 | vehicle accelerated rapidly, driving over a hundred miles |
| 11:27:57 | 3 | an hour westbound on Kellogg. |
| 11:27:58 | 4 | Q.    What time of day are we talking? |
| 11:28:01 | 5 | A.    The stop was at 0 -- I'm sorry, 2:00 A.M. in the |
| 11:28:05 | 6 | morning. |
| 11:28:08 | 7 | Q.    Did you give pursuit? |
| 11:28:10 | 8 | A.    No, the vehicle did stop once I finally could |
| 11:28:12 | 9 | catch up to it. |
| 11:28:13 | 10 | Q.    Okay.  Did you approach the driver's side? |
| 11:28:16 | 11 | A.    I did. |
| 11:28:16 | 12 | Q.    How many occupants were in the vehicle? |
| 11:28:18 | 13 | A.    One. |
| 11:28:18 | 14 | Q.    And that was the defendant? |
| 11:28:20 | 15 | A.    Mr. Arjona. |
| 11:28:20 | 16 | Q.    Were there any other indicia of intoxication at |
| 11:28:24 | 17 | that time? |
| 11:28:24 | 18 | A.    Not present, no, sir. |
| 11:28:25 | 19 | Q.    Did you make conversation with the defendant? |
| 11:28:28 | 20 | A.    I did. |
| 11:28:29 | 21 | Q.    Was that conversation pleasant? |
| 11:28:34 | 22 | A.    It started out as a typical traffic stop, and I |
| 11:28:39 | 23 | could tell that there were indicators of intoxication |
| 11:28:42 | 24 | there, specifically of alcohol intoxication.  I could |
| 11:28:45 | 25 | smell the odor coming off of his breath and other |

2-22-19  USA v. ARJONA  No. 19-10025

33

11:28:47  1  indicators, at which point I asked him to step out of the

11:28:50  2  vehicle so that I could run him through standardized

11:28:53  3  field sobriety testing to ensure that he was able to

11:28:55  4  operate a motor vehicle safely.

11:28:57  5  Q.     Okay.

11:28:57  6  A.     We did that.  Once we got done with the testing

11:29:00  7  and were getting towards the preliminary breath test

11:29:02  8  portion is when things came unraveled, so to speak.

11:29:07  9  Q.     And how did they come unraveled?

11:29:10  10  A.     Mr. Arjona became extremely aggressive.  He became

11:29:17  11  verbally abusive.  He made numerous threats towards me,

11:29:20  12  my family, other law enforcement officers.

11:29:23  13  Q.     At that time how long had you been a law

11:29:28  14  enforcement officer?

11:29:28  15  A.     I started in 2002 and this was in 2014, so . . .

11:29:34  16  Q.     So 12 years?

11:29:35  17  A.     Correct.

11:29:36  18  Q.     And you've been in law enforcement since?

11:29:39  19  A.     Yes, I have.

11:29:40  20  Q.     Have you ever experienced anything quite like

11:29:44  21  anything that night?

11:29:44  22  A.     I've had numerous threats over the years.  I can't

11:29:47  23  even begin to count how many threats I've had against me.

11:29:50  24  I've even had some threats towards my family.  I could

11:29:52  25  tell you, without a doubt, Mr. Arjona, on that night,

| | | |
|---|---|---|
| 11:29:56 | 1 | made the most heinous threats that I have ever received. |
| 11:29:59 | 2 | He was very consistent.  He dug deeper and deeper.  He |
| 11:30:04 | 3 | tried everything he could to make me very aware that he |
| 11:30:08 | 4 | was not making threats, that he was making promises. |
| 11:30:10 | 5 | Q.    I know it might require you to refresh your |
| 11:30:13 | 6 | recollection with your report, but can you give the Court |
| 11:30:15 | 7 | some indication of the types of threats he was making |
| 11:30:18 | 8 | specifically? |
| 11:30:20 | 9 | A.    Yes, I can.  And forgive me, I went through my |
| 11:30:24 | 10 | report and I was highlighting and I tried to redact as |
| 11:30:27 | 11 | much as I could, Your Honor. |
| 11:30:28 | 12 | THE COURT:  You know, I've heard it all before. |
| 11:30:30 | 13 | THE WITNESS:  I kept the high points and I'll try |
| 11:30:32 | 14 | to keep the quotations in the appropriate places -- |
| 11:30:34 | 15 | THE COURT:  Fine. |
| 11:30:34 | 16 | THE WITNESS:  -- for the language. |
| 11:30:39 | 17 | A.    As I said, it was right at the breath test, and it |
| 11:30:44 | 18 | was at that point in time I was asking him to take a |
| 11:30:46 | 19 | preliminary breath test when he began leaning up, getting |
| 11:30:48 | 20 | inches away from my face.  I put my hand in his chest, |
| 11:30:51 | 21 | pushed him back, from my reaction area and for officer |
| 11:30:54 | 22 | safety, and I told him not to get up in my face. |
| 11:30:56 | 23 | He then began complaining that I assaulted him, |
| 11:31:00 | 24 | for whatever reason.  After that, he was making threats. |
| 11:31:06 | 25 | I asked him if he had anything on his person, when I |

| | | |
|---|---|---|
| 11:31:09 | 1 | placed him under arrest, that was going to cut me poke |
| 11:31:13 | 2 | me, stick me, or hurt me and he said, "Hopefully."  He |
| 11:31:15 | 3 | asked me if I knew who he worked for.  I told him that I |
| 11:31:18 | 4 | did not.  I asked him if he was threatening me, and he |
| 11:31:22 | 5 | told me at that point in time, "No, I don't make threats; |
| 11:31:25 | 6 | I make promises." |
| 11:31:26 | 7 | When I had searched the vehicle, I'd found some |
| 11:31:29 | 8 | .357 ammunition round inside the vehicle.  He made a |
| 11:31:33 | 9 | comment to me, "You didn't find my gun in the vehicle, |
| 11:31:35 | 10 | did you?"  He told me, "I work for the fucking cartel. |
| 11:31:41 | 11 | You motherfuckers ain't going to find shit.  That's why |
| 11:31:45 | 12 | the sheriff who lives in my neighborhood is leaving, but |
| 11:31:47 | 13 | I know where he's going." |
| 11:31:48 | 14 | Furthermore, he said, "I fucking work for the |
| 11:31:54 | 15 | cartel, pussy.  I don't play your games."  And at that |
| 11:31:59 | 16 | point in time he was yelling at me.  He said again, "I |
| 11:32:04 | 17 | done made you fuckers fear me.  Well, obviously not you, |
| 11:32:07 | 18 | but you will feel my wrath.  I am not the one to fuck |
| 11:32:11 | 19 | with.  I will be out tonight and I will get all your |
| 11:32:13 | 20 | family's names." |
| 11:32:15 | 21 | He continued on.  I told him I didn't appreciate |
| 11:32:18 | 22 | him threatening my family.  I was not yelling, cursing, |
| 11:32:22 | 23 | being belligerent towards him.  And he responded by |
| 11:32:27 | 24 | saying, "I ain't doing shit.  You know how the cartel |
| 11:32:32 | 25 | works, you cocksucker."  I then responded by telling him |

2-22-19  USA v. ARJONA  No. 19-10025

36

| | | |
|---|---|---|
| 11:32:37 | 1 | that I do know what he was saying, and that what he's |
| 11:32:40 | 2 | saying I was taking as a threat at that point in time. |
| 11:32:42 | 3 | And he told me, "But when they release me" -- or, I'm |
| 11:32:51 | 4 | sorry, "When they release me, I'll have all your names." |
| 11:32:55 | 5 | He went on to say -- he spoke about an officer, |
| 11:33:00 | 6 | Eric Little, who had committed suicide.  He made comments |
| 11:33:03 | 7 | about having sex with Mr. Little's wife and causing him |
| 11:33:07 | 8 | to commit suicide.  He told me, "I might have to order |
| 11:33:10 | 9 | somebody's wife to get raped just to be a dick, the |
| 11:33:14 | 10 | children, too."  That was a quote as well. |
| 11:33:16 | 11 | He told me he had the FBI, CIA, and KBI on the |
| 11:33:22 | 12 | lookout because -- for him because they were all on his |
| 11:33:27 | 13 | payroll.  And he told me, "You don't know how easy I can |
| 11:33:31 | 14 | find out, how easy I can find out who you and your family |
| 11:33:34 | 15 | is.  You don't think they'd give you up for a little bit |
| 11:33:38 | 16 | of money?" |
| 11:33:39 | 17 | He went on further.  I asked him what his address |
| 11:33:42 | 18 | was for the general booking information, and he responded |
| 11:33:46 | 19 | by saying, "Ask your kids when they get picked up." |
| 11:33:49 | 20 | I told him once again not to threaten my family, |
| 11:33:52 | 21 | and he responded by saying, "Well, then what the fuck are |
| 11:33:56 | 22 | you going to do to me?  Nothing, motherfucker, because |
| 11:33:59 | 23 | you have to follow the books."  He then stated, "What? |
| 11:34:04 | 24 | I can threaten whatever."  He then began talking about |
| 11:34:07 | 25 | how nothing could happen to him if he was in another |

11:34:10   1   country, and when I asked him for his phone number, he

11:34:13   2   replied, "None of your fucking business.  Ask your wife

11:34:18   3   when I have her fucking raped.  But, honestly, it's going

11:34:22   4   to hurt worse when your kids are."

11:34:24   5       As we're transporting to the jail, he continued

11:34:30   6   with his banter in the back seat.  He was insistent about

11:34:34   7   getting all officers on scene's names and information so

11:34:38   8   that he could "send somebody to pay y'all a visit.

11:34:43   9   You'll feel my presence, but your wife might feel it

11:34:45   10  first or one of your punk-ass kids."

11:34:49   11      He went on further, saying, "Hopefully you have

11:34:54   12  daughters."  I told him at that point in time, just to

11:34:59   13  try to get him to shut up and get off of the subject,

11:35:02   14  that I don't have a wife and kids, and he responded, "You

11:35:05   15  know you've got a mom and a dad, though."  So, as I

11:35:09   16  tried to quell it, he's trying to find another avenue to

11:35:12   17  keep it going.

11:35:14   18      And he told me, "My name is already known, but,

11:35:19   19  wait, I have plenty of sleeper cells out there so when

11:35:22   20  your wife gets fucking raped, thank me for it."  That

11:35:25   21  was a quote as well.

11:35:26   22      He -- we were talking about how originally when I

11:35:34   23  stopped him I asked him to get off of his cell phone

11:35:38   24  'cause it is an officer safety reason why we have them

11:35:40   25  off their cell phone.  He recognized that, was able to

| | | |
|---|---|---|
| 11:35:43 | 1 | come back to it and address it at this point in time by |
| 11:35:46 | 2 | stating, "That's why you fucking pussies didn't want me |
| 11:35:50 | 3 | on the phone because if I was on my fucking phone you |
| 11:35:53 | 4 | motherfuckers wouldn't be taking me to jail right now. |
| 11:35:56 | 5 | All you pussies would be shot up, and I'd get away and |
| 11:35:59 | 6 | act like I didn't know what the fuck happened.  I was |
| 11:36:03 | 7 | scared for my life.  You're probably not thinking much of |
| 11:36:06 | 8 | it now, but when a DEA and FBI comes to you, and they |
| 11:36:10 | 9 | won't even fucking protect you."   I'm not 100 percent |
| 11:36:14 | 10 | sure what that last sentence meant, but that was his |
| 11:36:16 | 11 | words. |
| 11:36:20 | 12 | He went on further to state, "I don't play games. |
| 11:36:23 | 13 | As a matter of fact, you know my presence.  I'll take |
| 11:36:27 | 14 | pictures of your whole fucking family, and I'm going to |
| 11:36:30 | 15 | mail them to you so you know I'm for real.  Remember that |
| 11:36:33 | 16 | when you get something in the mail." |
| 11:36:35 | 17 | And then he stated, "You know who the fuck I am. |
| 11:36:39 | 18 | I have all the money to get me out of trouble."  He went |
| 11:36:42 | 19 | on further to state, "It's going to get dropped just like |
| 11:36:48 | 20 | all of my shit does.  Why?  Because Carl Brewster has my |
| 11:36:52 | 21 | back.  Not only that, Judge Waller does, too," which were |
| 11:36:57 | 22 | predominant individuals in the judiciary community at |
| 11:37:03 | 23 | that point in time. |
| 11:37:06 | 24 | He stated, "That's what you guys don't understand. |
| 11:37:10 | 25 | You can arrest me and do whatever the fuck, as long as |

11:37:14   1   you've got money, it pays your way out."   He went on to

11:37:23   2   say that we couldn't get him on anything else, and he

11:37:25   3   said, "You know why?  Because I don't even fuck with this

11:37:30   4   country.  I'm an arms dealer.  I sell guns to other

11:37:33   5   countries.  You motherfuckers can never indict me on that

11:37:36   6   shit."   As he was speaking with me on this, he said that

11:37:43   7   we always try to indict him on drugs and murders, and

11:37:46   8   stated, "You know why I do my own murder shit?  Because

11:37:50   9   nobody can testify against me, and that's why I'm so

11:37:52  10   fucking successful."

11:37:53  11       He then went on further to state, "But after your

11:37:58  12   little bitch-ass report, you lock me up, you'll see.  You

11:38:02  13   do a little history on me and you'll see, and you're

11:38:05  14   going to be worried and you'll scare your wife and kids."

11:38:07  15       He then stated that he would go back to Mexico

11:38:10  16   after he got out "And all you motherfuckers are going to

11:38:14  17   pay.  Everybody that was involved in this would pay."

11:38:22  18   And then he said, "It's not what I can do; it's what my

11:38:25  19   people can do.  You fucked with the wrong person."

11:38:25  20   BY MR. MCCARTY:

11:38:29  21   Q.    Thanks for giving us a flavor of some of the

11:38:32  22   threats.

11:38:32  23   A.    Okay.

11:38:34  24   Q.    Did he ever mention anything about his landscaping

11:38:37  25   business?

| | | |
|---|---|---|
| 11:38:40 | 1 | A.    I don't think at that point in time he did, but I |
| 11:38:43 | 2 | think I found out later that he was in the landscaping |
| 11:38:45 | 3 | business. |
| 11:38:45 | 4 | Q.    But when he was on his tirade, he never mentioned |
| 11:38:49 | 5 | he was a seasonal worker for a landscaper? |
| 11:38:51 | 6 | A.    No, he told me his business was working for the |
| 11:38:53 | 7 | cartel, raping and murdering, kidnapping. |
| 11:38:55 | 8 | Q.    You said at some point he talked about how much |
| 11:38:58 | 9 | money he had? |
| 11:38:59 | 10 | A.    Yes. |
| 11:38:59 | 11 | Q.    Would that be like $2800 a month? |
| 11:39:02 | 12 | A.    I wouldn't have any clue.  From what he was |
| 11:39:05 | 13 | telling me -- there was actually another portion that I |
| 11:39:08 | 14 | hadn't gotten to yet, where he talked about -- and this |
| 11:39:17 | 15 | is -- "like I said, I can -- I can get out and if I want |
| 11:39:22 | 16 | to fucking kill you I could pop you in the middle of the |
| 11:39:26 | 17 | intersection.  It would just cost me $300,000 to get out |
| 11:39:29 | 18 | of it, and that's why we are the way we are because we've |
| 11:39:31 | 19 | got the money to do shit like that." |
| 11:39:34 | 20 | Q.    Okay.  In your 17 years of service for the county, |
| 11:39:39 | 21 | how many times have you really felt intimidated or |
| 11:39:42 | 22 | threatened? |
| 11:39:43 | 23 | A.    I've never been threatened to this extent, not |
| 11:39:46 | 24 | before or since. |
| 11:39:49 | 25 | Q.    Did you take any affirmative steps after this |

| 11:39:53 | 1 | incident to protect yourself and your family? |
| 11:39:54 | 2 | A.     Obviously.  I showed his picture to my family, |
| 11:39:59 | 3 | told 'em "If you see him, you call 911, my department, |
| 11:40:05 | 4 | run."  I've never taken a picture of anybody home to show |
| 11:40:08 | 5 | him family.  I told -- my department took steps, by |
| 11:40:14 | 6 | contacting three different agencies, to put extra watches |
| 11:40:16 | 7 | on my home and my family.  I went home, I checked all my |
| 11:40:22 | 8 | window locks, I checked my door locks.  I'm a law |
| 11:40:26 | 9 | enforcement officer.  I have guns.  I keep guns.  It's no |
| 11:40:29 | 10 | secret.  I made sure there were extra guns loaded and |
| 11:40:32 | 11 | placed in places around my house where they'd be quicker |
| 11:40:35 | 12 | access that I never had to before. |
| 11:40:37 | 13 | Q.     And did you do anything to conceal where you were |
| 11:40:40 | 14 | living? |
| 11:40:40 | 15 | A.     As best I could.  There was a stone in my front |
| 11:40:44 | 16 | yard at the time that had my last name on it.  And it was |
| 11:40:47 | 17 | right around Thanksgiving, in November.  We had some |
| 11:40:50 | 18 | straw bales out in front, pumpkins, things of that |
| 11:40:52 | 19 | nature.  I took 'em leaned 'em up against the stone in |
| 11:40:55 | 20 | front of my yard and put the pumpkins around so it was |
| 11:40:58 | 21 | covering my name up, on the off chance he does find out |
| 11:41:02 | 22 | where I live, since he was toting he could find out so |
| 11:41:05 | 23 | easily, and drove by, it was just one little step that I |
| 11:41:07 | 24 | could do to try to cover things up and make it a little |
| 11:41:10 | 25 | bit harder to try to find me.  Truth be told, you can't |

| | | |
|---|---|---|
| 11:41:13 | 1 | hide these days. |
| 11:41:14 | 2 | Q.    It would be fair to say that your interaction with |
| 11:41:17 | 3 | him that night, you didn't walk away thinking "He's just |
| 11:41:20 | 4 | another drunk, it's just a drunken tirade"? |
| 11:41:23 | 5 | A.    No. |
| 11:41:23 | 6 | Q.    You took it very seriously? |
| 11:41:24 | 7 | A.    Well, some of it was.  But then furthermore, when |
| 11:41:27 | 8 | I started finding out more about his drug involvement, |
| 11:41:29 | 9 | that caused me more and more concern, such as the border |
| 11:41:32 | 10 | crossing where 17 kilos of cocaine were out of the |
| 11:41:36 | 11 | vehicle when he -- that was associated with him somewhat, |
| 11:41:39 | 12 | either directly or indirectly.  There was a Wichita |
| 11:41:43 | 13 | Police Department case number with Officer Mold.  And I |
| 11:41:48 | 14 | was not involved in that case.  I was not involved in the |
| 11:41:50 | 15 | case that he's being indicted for now.  During that case, |
| 11:41:55 | 16 | there was supposedly an individual that was sent to |
| 11:41:58 | 17 | collect on a drug debt for Mr. Arjona.  When he went to |
| 11:42:04 | 18 | collect on that drug debt, the gun was produced.  The |
| 11:42:06 | 19 | other individual produced a gun, somehow that turned into |
| 11:42:09 | 20 | a law enforcement chase with the individual Mr. Arjona |
| 11:42:12 | 21 | had sent to collect on a drug debt.  During the course of |
| 11:42:15 | 22 | that chase, at some point in time the individual had |
| 11:42:18 | 23 | started firing rounds at Officer Mold with the Wichita |
| 11:42:21 | 24 | Police Department.  To the best of my knowledge, that's |
| 11:42:24 | 25 | off of -- the suspect at that point in time said that he |

| | | |
|---|---|---|
| 11:42:27 | 1 | was there to collect that debt from Mr. Arjona with |
| 11:42:33 | 2 | drugs. |
| 11:42:34 | 3 | Q.    And after that incident, where you arrested him |
| 11:42:38 | 4 | for DUI -- you did arrest him? |
| 11:42:39 | 5 | A.    I did. |
| 11:42:41 | 6 | Q.    Did you ever see him after that? |
| 11:42:42 | 7 | A.    I did.  I showed up at the club not too long after |
| 11:42:45 | 8 | that 'cause he was parking in a handicapped stall, and I |
| 11:42:48 | 9 | wrote him a citation for parking in a handicapped stall. |
| 11:42:51 | 10 | That went on without incident other than the fact that he |
| 11:42:54 | 11 | didn't want to talk to me.  He was angry.  He was upset, |
| 11:42:56 | 12 | which justifiably so.  Still it was on my beat, it was on |
| 11:42:59 | 13 | the -- the club was on my beat.  It's part of my |
| 11:43:02 | 14 | enforcement action, so I didn't feel it necessary to hide |
| 11:43:04 | 15 | behind other officers and I took the enforcement action |
| 11:43:07 | 16 | that was there. |
| 11:43:07 | 17 | There was another time, keeping in mind what he |
| 11:43:10 | 18 | had talked about having me shot in an intersection at any |
| 11:43:14 | 19 | point in time, that I was backing another officer down |
| 11:43:17 | 20 | off of K-42 -- correction, K-15 highway down south.  And |
| 11:43:24 | 21 | as I was backing that other officer on a traffic stop, I |
| 11:43:27 | 22 | seen Mr. Arjona driving through the parking lot with his |
| 11:43:30 | 23 | window down, looking over at me, slow rolling -- what we |
| 11:43:33 | 24 | call slow rolling by, driving extremely slow.  And he was |
| 11:43:37 | 25 | looking at me.  I made eye contact with him.  I don't |

11:43:39  1  know what his intentions were at that point in time, but

11:43:42  2  obviously my mind automatically rewound to the point

11:43:45  3  where he said, "I'll have you shot in the intersection."

11:43:50  4  I was there, backing another deputy at that point in

11:43:52  5  time.  I couldn't really -- I couldn't leave them

11:43:55  6  hanging, so I waited until they were done.  As soon as I

11:43:58  7  could get to my car, I went to look for him.  Couldn't

11:44:00  8  find him in the area.

11:44:01  9  Q.    And since then have you seen him until today?

11:44:04  10  A.    Not till today, no.

11:44:06  11       MR. MCCARTY:  No further questions for this

11:44:07  12  witness, Judge.

11:44:08  13       THE COURT:  Detective, were you able to finish

11:44:10  14  your DUI testing on him at the time of this traffic stop?

11:44:16  15  In other words, did he ever complete the breath test?

11:44:16  16       THE WITNESS:  He did not.  He refused the breath

11:44:18  17  test, Your Honor.

11:44:19  18       THE COURT:  Were you able to make an assessment as

11:44:21  19  to whether you thought he was impaired at that point?

11:44:23  20       THE WITNESS:  Yes.

11:44:23  21       THE COURT:  What was your assessment?

11:44:24  22       THE WITNESS:  My assessment was that he was under

11:44:27  23  the influence of alcohol.  He was able to carry on a

11:44:29  24  coherent conversation.  He was able to provide

11:44:31  25  appropriate answers.  But he was under the influence of

11:44:36  1  alcohol to the point to where he could not operate a

11:44:38  2  motor vehicle safely.

11:44:39  3      THE COURT:  All right.  And you read at length

11:44:42  4  from your report, many of those in quotations.  Were

11:44:46  5  those quotations derived at the time you prepared your

11:44:49  6  report from your memory or from your body mic, or where

11:44:51  7  did those come from?

11:44:52  8      THE WITNESS:  It was from my body mic.

11:44:54  9      THE COURT:  All right.  So those --

11:44:54  10      THE WITNESS:  I went back --

11:44:55  11      THE COURT:  So those were actual recordings of

11:44:56  12  what -- you went back, I assume, and listened to them and

11:44:59  13  put those in your report?

11:45:00  14      THE WITNESS:  Forgive me.  Yes, Your Honor, I did.

11:45:01  15  I went back, listened to them, wrote them down verbatim,

11:45:06  16  and then we have what's known as a Dictaphone system

11:45:10  17  where we call it in.  At this point in time they were

11:45:13  18  trying to expedite for Mr. Arjona, who was in custody, to

11:45:16  19  get the charges put over as an in-custody.  So I went to

11:45:19  20  one of our records clerks who types those Dictaphone and

11:45:22  21  read it off to her verbatim from the notes I took off the

11:45:26  22  video and they typed it out so we could get it to them.

11:45:29  23      THE COURT:  Thank you, Detective.

11:45:30  24      Mr. Biebighauser, cross-examination?

11:45:30  25      MR. BIEBIGHAUSER:  Yes, sir.

| | | |
|---|---|---|
| 11:45:33 | 1 | CROSS-EXAMINATION |
| 11:45:34 | 2 | BY MR. BIEBIGHAUSER: |
| 11:45:37 | 3 | Q.     Judge Melgren asked you about whether or not you |
| 11:45:39 | 4 | believed Mr. Arjona was intoxicated at the time of the |
| 11:45:41 | 5 | DUI stop.  And I think you said you did believe him to be |
| 11:45:44 | 6 | intoxicated at that time? |
| 11:45:45 | 7 | **A.     Yes, sir.  As far as -- my job is to be able to** |
| 11:45:50 | 8 | **figure out if they're intoxicated to the point to where** |
| 11:45:53 | 9 | **it impairs them from being able to operate a motor** |
| 11:45:55 | 10 | **vehicle safely.** |
| 11:45:56 | 11 | Q.     And you do believe he -- |
| 11:45:57 | 12 | **A.     I do, yes.** |
| 11:45:58 | 13 | Q.     The next night, when you issued a traffic citation |
| 11:46:01 | 14 | at the club, you met with Mr. Arjona at that time? |
| 11:46:03 | 15 | **A.     Uh-huh, uh-huh.** |
| 11:46:03 | 16 | Q.     And he didn't make any threats to you at that |
| 11:46:06 | 17 | time? |
| 11:46:06 | 18 | **A.     There was no threats.  There was a little bit of** |
| 11:46:09 | 19 | **aggression, but there was no threats towards me.** |
| 11:46:11 | 20 | Q.     Sure. |
| 11:46:12 | 21 | **A.     He told me -- as a matter of fact, he didn't want** |
| 11:46:13 | 22 | **to speak to me, and I had to explain -- he told me it was** |
| 11:46:16 | 23 | **a no-contact order, and I had to explain to him that** |
| 11:46:20 | 24 | **"It's different if I am contacting you in an official** |
| 11:46:23 | 25 | **capacity.  You can speak with me."  And he told me he** |

11:46:26   1   still didn't want to speak with me at that point in time,

11:46:28   2   so he spoke with one of my colleagues to the side while I

11:46:30   3   finished the citation.

11:46:31   4   Q.    The night before hadn't gone very good.

11:46:34   5   A.    I'm sorry?

11:46:35   6   Q.    The night before it hadn't gone very good.

11:46:36   7   A.    Fair enough.

11:46:36   8   Q.    And he was a little upset probably from that

11:46:39   9   still?

11:46:39  10   A.    Yes, sir.

11:46:40  11   Q.    But you said no threats at that time?

11:46:42  12   A.    No threats at that time.

11:46:44  13   Q.    You had another contact with him when you said he

11:46:47  14   drove by, you made eye contact?

11:46:49  15   A.    Correct.

11:46:49  16   Q.    Did he shout anything at you?

11:46:50  17   A.    He did not.

11:46:50  18   Q.    Say anything?

11:46:51  19   A.    He did not.

11:46:51  20   Q.    Did you ever see him turn the car around and come

11:46:54  21   back?

11:46:54  22   A.    No.

11:46:54  23   Q.    The threats that he -- maybe we can sum it up this

11:46:57  24   way.  Besides those three contacts, did you ever see him

11:47:00  25   again till now?

11:47:03  1  A.    I didn't actively pursue him, so no, I didn't make

11:47:07  2  it a point, and I didn't happen to run into him at any

11:47:10  3  point in time either.

11:47:11  4  Q.    Never found out that he actively pursued you

11:47:13  5  either?

11:47:13  6  A.    No.

11:47:15  7  Q.    You had mentioned that the threats included things

11:47:17  8  involving a firearm?

11:47:19  9  A.    He was asking me if I knew where the firearm -- or

11:47:22  10  that I didn't find his gun inside of the vehicle, that he

11:47:25  11  was an arms dealer with the cartel.

11:47:27  12  Q.    My other question was the threats involved a

11:47:29  13  firearm; is that right?

11:47:29  14  A.    No, he didn't get specific enough to say he was

11:47:32  15  going to shoot me.  It was more the actions he was going

11:47:35  16  to take.

11:47:35  17  Q.    And you never saw him with a firearm at any point

11:47:37  18  in time?

11:47:37  19  A.    No, I did not.

11:47:38  20      MR. BIEBIGHAUSER:  Nothing further.

11:47:39  21      THE COURT:  Any redirect?

11:47:40  22      MR. MCCARTY:  No, Judge.  Thank you.

11:47:41  23      THE COURT:  Thank you, Detective.  You may step

11:47:43  24  down.

11:47:43  25      (Witness excused from the witness stand.)

| | | |
|---|---|---|
| 11:47:46 | 1 | THE COURT:  Mr. McCarty, what else do you want to |
| 11:47:48 | 2 | present? |
| 11:47:49 | 3 | MR. MCCARTY:  I want to circle back to the first |
| 11:47:51 | 4 | point.  I apologize for not covering this.  This is |
| 11:47:53 | 5 | charged as a conspiracy.  One of the members of the |
| 11:47:55 | 6 | conspiracy we did not charge because he is a minor, which |
| 11:47:58 | 7 | I also think goes to the danger to the community.  This |
| 11:48:02 | 8 | conspiracy is not limited to what we consider adults in |
| 11:48:05 | 9 | this case, but he's using a younger population to some |
| 11:48:10 | 10 | extent. |
| 11:48:11 | 11 | Then I'd just go back, the nature and seriousness, |
| 11:48:14 | 12 | I would underscore the fact that this is -- our initial |
| 11:48:17 | 13 | indictment, it is the conspiracy charge.  The |
| 11:48:23 | 14 | conspiracy's ongoing.  If it's interrupted it's only |
| 11:48:25 | 15 | because of these proceedings here.  And we believe |
| 11:48:29 | 16 | that -- a couple things.  If he were to get out, not only |
| 11:48:31 | 17 | would his participation in the conspiracy get back on |
| 11:48:36 | 18 | track, but we believe there is a danger to any potential |
| 11:48:41 | 19 | codefendants or witnesses in this case, not to mention |
| 11:48:45 | 20 | probably a danger to the defendant himself. |
| 11:48:48 | 21 | I articulated earlier that we seized about 5 |
| 11:48:52 | 22 | pounds of methamphetamine.  I don't know what the current |
| 11:48:54 | 23 | street value of that is, but I know someone's probably |
| 11:48:57 | 24 | going to want to collect a drug debt from him, and that |
| 11:49:00 | 25 | being the case, him being out and trying to legitimately |

11:49:04  1  protect his family from anyone that might try collecting

11:49:08  2  on that could pose a danger to the community.  So we ask,

11:49:12  3  for these reasons, all four prongs actually, that he

11:49:14  4  remain detained pending trial.

11:49:16  5       THE COURT:  Talk to me about risk of flight,

11:49:18  6  because you said that you relied on that factor as well,

11:49:21  7  but I haven't actually heard you address that.

11:49:22  8       MR. MCCARTY:  Sure.  The risk of flight is obvious

11:49:25  9  in the fact that he is facing a substantial sentence.  He

11:49:28  10  does have ties to Mexico.  I know they're downplayed on

11:49:32  11  the pretrial sentence report.

11:49:33  12       THE COURT:  What are his ties to Mexico?

11:49:34  13       MR. MCCARTY:  I don't know his family ties to

11:49:37  14  Mexico.  I think we've heard that most of his family

11:49:40  15  lives here.  But, again, to the extent that we can rely

11:49:43  16  on this report is questionable.  We've already found

11:49:45  17  several inconsistencies in it.

11:49:46  18       We do know that he's crossed the border three or

11:49:50  19  four times less than ten years ago.  That, coupled

11:49:53  20  with --

11:49:53  21       THE COURT:  I thought you said it was ten years

11:49:55  22  ago.  Has there been any incidents since the one ten

11:49:58  23  years ago?

11:49:58  24       MR. MCCARTY:  The last recording I think we have

11:50:00  25  was about nine years ago.

| | | |
|---|---|---|
| 11:50:02 | 1 | THE COURT:  Okay. |
| 11:50:02 | 2 | MR. MCCARTY:  And that was multiple crossings, one |
| 11:50:05 | 3 | of which was on foot.  One of his associates, as I |
| 11:50:09 | 4 | mentioned, was found with 17 kilograms of cocaine and is |
| 11:50:14 | 5 | now a fugitive wanted for murder. |
| 11:50:17 | 6 | This isn't someone who just operates a nice lawn |
| 11:50:20 | 7 | care business in Wichita.  This is somebody that's |
| 11:50:23 | 8 | clearly running many, many pounds of drugs per week. |
| 11:50:26 | 9 | This is not someone that the judiciary should just |
| 11:50:28 | 10 | release back into the community, even on electronic |
| 11:50:31 | 11 | monitoring, hoping he's just going to stay inside his |
| 11:50:33 | 12 | house or leave for religious services or what have you. |
| 11:50:37 | 13 | This is somebody that's facing serious time.  We've got a |
| 11:50:40 | 14 | good case, we're going to make the case, and he needs to |
| 11:50:43 | 15 | be detained pending trial. |
| 11:50:46 | 16 | THE COURT:  You referenced the four prongs.  Would |
| 11:50:50 | 17 | you just summarize those for me. |
| 11:50:51 | 18 | MR. MCCARTY:  Sure.  The nature and the |
| 11:50:53 | 19 | circumstances of the offense charged.  So far we've |
| 11:50:56 | 20 | charged, in the first indictment, a conspiracy involving |
| 11:51:00 | 21 | three people.  We will submit to the court there are more |
| 11:51:02 | 22 | than those three people, one of which is a minor. |
| 11:51:05 | 23 | THE COURT:  Right. |
| 11:51:05 | 24 | MR. MCCARTY:  The drugs involved.  Just the most |
| 11:51:09 | 25 | recent search warrant yielded 5 pounds.  We have it on |

11:51:13  1   good authority that they're moving many pounds per week

11:51:15  2   of methamphetamine.

11:51:18  3        This all goes to the weight of the evidence, which

11:51:20  4   is both eyewitness testimony and the fruits of the search

11:51:25  5   warrant, fingerprint evidence linking the defendant to

11:51:29  6   the drugs.

11:51:30  7        As we heard at length from Detective Manning, and

11:51:33  8   as we can see from the pretrial services report, he has

11:51:37  9   had a lot of dealings with the law.  He's been able to

11:51:40  10  skirt most of them, but he was not able to skirt the

11:51:44  11  criminal threats.  And, albeit, it was for a DUI that he

11:51:50  12  was stopped, he certainly went well beyond most DUIs that

11:51:54  13  I've seen, and certainly Detective Manning has never

11:51:57  14  experienced anything like that in his 17 years.

11:52:00  15       So, again, this is -- the burden is on him.

11:52:04  16       THE COURT:  And what's the fourth?

11:52:05  17       MR. MCCARTY:  I'm sorry, the fourth would be the

11:52:07  18  nature and seriousness to the community if he's released.

11:52:10  19  And here we're looking at drug debts to be collected.  So

11:52:15  20  he may be in danger, number one; and then we have other

11:52:20  21  co-conspirators and witnesses still at large that could

11:52:25  22  be in danger if he's out.

11:52:29  23       THE COURT:  Why do you say the conspiracy's

11:52:30  24  ongoing, given that you indicated that there are three

11:52:33  25  people arrested in this case, plus a minor?  One of the

| | | |
|---|---|---|
| 11:52:37 | 1 | other two is in custody.  What gives you reason to |
| 11:52:40 | 2 | believe the conspiracy's ongoing? |
| 11:52:43 | 3 | MR. MCCARTY:  I don't think that if he gets out, |
| 11:52:45 | 4 | Judge, he's going to go back to being a landscaper.  I |
| 11:52:48 | 5 | think that this level of operation doesn't just stop. |
| 11:52:52 | 6 | There were drugs seized.  Those drugs that were seized |
| 11:52:56 | 7 | have a monetary value.  Someone's going to have to come |
| 11:52:59 | 8 | up with that money.  You're not going to make it in |
| 11:53:01 | 9 | landscaping; you're going to have to continue the |
| 11:53:03 | 10 | criminal enterprise.  And we would submit that whether he |
| 11:53:06 | 11 | does it himself or he has one of his people do it, as |
| 11:53:09 | 12 | mentioned to Detective Manning, he has a lot of people |
| 11:53:12 | 13 | working for him, somehow that's going to continue. |
| 11:53:14 | 14 | So, you know, I can say that there is no basis on |
| 11:53:19 | 15 | these four prongs to let him out pending trial, and |
| 11:53:23 | 16 | certainly don't think that the presumption's been |
| 11:53:26 | 17 | overcome in this case by defense counsel. |
| 11:53:28 | 18 | THE COURT:  Tell me how you know about the |
| 11:53:30 | 19 | incident at the Mexican border nine or ten years ago. |
| 11:53:34 | 20 | MR. MCCARTY:  Absolutely.  I do have an HSI agent |
| 11:53:39 | 21 | here.  That's a matter of some sensitivity, so I don't |
| 11:53:41 | 22 | know how much he wants me to go into it.  But they do |
| 11:53:44 | 23 | track border crossings, and he did go through a port of |
| 11:53:46 | 24 | entry, I believe twice in a vehicle and once on foot.  Is |
| 11:53:49 | 25 | that -- |

| | | |
|---|---|---|
| 11:53:49 | 1 | THE COURT:  And that's just from normal border |
| 11:53:51 | 2 | crossing information? |
| 11:53:52 | 3 | MR. MCCARTY:  Correct. |
| 11:53:52 | 4 | THE COURT:  And then that information shows who he |
| 11:53:55 | 5 | was crossing with? |
| 11:53:55 | 6 | MR. MCCARTY:  It does. |
| 11:53:56 | 7 | THE COURT:  And then you have a criminal record on |
| 11:53:59 | 8 | that -- let's call him the co-traveler? |
| 11:54:02 | 9 | MR. MCCARTY:  I don't want to speak out of turn. |
| 11:54:04 | 10 | Can I confer, Your Honor, just for a moment? |
| 11:54:07 | 11 | THE COURT:  Sure.  Of course. |
| 11:54:10 | 12 | (Whereupon, a sotto voce discussion was had |
| 11:54:11 | 13 | between Mr. McCarty and the agent.) |
| 11:54:26 | 14 | MR. MCCARTY:  The individual was with him one time |
| 11:54:29 | 15 | during one of the three crossings.  Two years later he |
| 11:54:32 | 16 | was found with 17 kilograms of cocaine at the border. |
| 11:54:36 | 17 | He's also wanted, now a fugitive, wanted in Mexico for |
| 11:54:41 | 18 | murder.  His whereabouts at this point are unknown. |
| 11:54:43 | 19 | THE COURT:  So at the time of Mr. Arjona's border |
| 11:54:48 | 20 | crossing, one of those with this individual, there are no |
| 11:54:52 | 21 | controlled substances intercepted? |
| 11:54:53 | 22 | MR. MCCARTY:  No. |
| 11:54:54 | 23 | THE COURT:  All right.  Anything else, |
| 11:54:56 | 24 | Mr. McCarty? |
| 11:54:56 | 25 | MR. MCCARTY:  No, thank you, Judge. |

| | | |
|---|---|---|
| 11:54:57 | 1 | THE COURT:  All right.  Mr. Biebighauser? |
| 11:54:58 | 2 | MR. BIEBIGHAUSER:  Judge, I'll do my best to trace |
| 11:55:26 | 3 | the factors again sort of in summary for the Court. |
| 11:55:29 | 4 | Regarding the first factor, I'd note that the |
| 11:55:31 | 5 | factor is not nature and circumstances of crime |
| 11:55:35 | 6 | generally.  It's nature and circumstances of the offense |
| 11:55:38 | 7 | charged.  I think that's an important distinction.  The |
| 11:55:40 | 8 | distinction lies in what the Government has alleged of |
| 11:55:44 | 9 | Mr. Arjona.  It is not alleged that he has possessed with |
| 11:55:48 | 10 | the intent to distribute methamphetamine.  It's not |
| 11:55:50 | 11 | alleged that he's manufactured methamphetamine.  It's |
| 11:55:53 | 12 | alleged in a conspiracy.  I think there are certainly, |
| 11:55:56 | 13 | according to the proffer, a number of facts and |
| 11:55:58 | 14 | circumstances the Court can consider. |
| 11:55:59 | 15 | THE COURT:  Is it a conspiracy to distribute? |
| 11:56:01 | 16 | MR. BIEBIGHAUSER:  Yes, sir, it is. |
| 11:56:02 | 17 | THE COURT:  I'm not sure I understand your point |
| 11:56:04 | 18 | then. |
| 11:56:04 | 19 | MR. BIEBIGHAUSER:  My point is, Judge, that I |
| 11:56:07 | 20 | would ask the Court to constrain its consideration of the |
| 11:56:10 | 21 | nature of the offense charged to the offense charged, and |
| 11:56:14 | 22 | to not entertain the idea that there may be more offenses |
| 11:56:17 | 23 | coming, because those aren't charged and that's not what |
| 11:56:19 | 24 | the Congress' -- |
| 11:56:20 | 25 | THE COURT:  Oh, I agree with that.  I think |

11:56:21  1  that -- I understood the prosecutor to talk about, as he

11:56:24  2  mentioned several times, that this is a conspiracy

11:56:27  3  charge, it involved three codefendants plus an additional

11:56:29  4  one.  His allegations about the conspiracy ongoing, and I

11:56:33  5  asked him about it, and I agree did seem more

11:56:37  6  speculative, but his primary focus was on the conspiracy

11:56:40  7  charge.  And based on the amount of drugs seized from the

11:56:42  8  search warrant or from the undercover buys.  I think

11:56:45  9  that's what the limit of that factor is.  I agree with

11:56:47  10  that.

11:56:47  11      MR. BIEBIGHAUSER:  Understood.  And so addressing

11:56:48  12  that factor and to its limit, I would say, Judge, that

11:56:52  13  the nature of the Government's proffer has included that

11:56:55  14  they believe Mr. Arjona is involved in drug transactions.

11:56:58  15  But it hasn't gone further than that.  They haven't

11:57:01  16  offered any sort of proffer that Mr. Arjona, in this

11:57:03  17  case, was involved in making threatening remarks, that it

11:57:08  18  involved violence, that it involves intimidation.

11:57:10  19      THE COURT:  Well, I think you're mixing the

11:57:12  20  factors here.  The nature and circumstances of the

11:57:15  21  offense charged relates to the offense charged.

11:57:19  22      MR. BIEBIGHAUSER:  Yes, sir.

11:57:19  23      THE COURT:  But when I look at the circumstances

11:57:20  24  of the defendant, that's a different factor that I think

11:57:23  25  their evidence with the threats charged to went to, so --

```
11:57:27   1          MR. BIEBIGHAUSER:  I agree.  And I'm doing my best

11:57:28   2   to parse those.  I wanted to draw attention first to the

11:57:31   3   first factor.  The nature and circumstances of this

11:57:33   4   offense charged does not involve those things.

11:57:35   5          THE COURT:  Does not involve violent threats?

11:57:37   6          MR. BIEBIGHAUSER:  Correct, yes, sir.

11:57:37   7          THE COURT:  All right.

11:57:38   8          MR. BIEBIGHAUSER:  And so I think that, while the

11:57:40   9   presumption arises based on the nature of the allegations

11:57:42   10  and not to mean -- or not to disparage the severity of

11:57:45   11  drug offenses, I think all we have is a drug offense.

11:57:49   12  There's not something more here to consider, and so I

11:57:51   13  think the presumption is satisfied but I don't think the

11:57:53   14  nature of the allegations goes further than that to

11:57:56   15  satisfy that element any more so than the nature of the

11:57:59   16  allegation on its face.

11:58:00   17         Because it's a conspiracy charge, the elements of

11:58:03   18  that charge involve agreements.  It doesn't involve the

11:58:07   19  sorts of other things that we've mentioned.

11:58:09   20         So moving forward, again, the Government's in the

11:58:13   21  best position to address the weight of the evidence, and

11:58:15   22  so without --

11:58:17   23         THE COURT:  I think what they indicated with the

11:58:20   24  weight of the evidence is there were five undercover buys

11:58:23   25  which were from this defendant and others, from which I
```

11:58:26  1  assume that not all five were from him, and that a search

11:58:28  2  warrant revealed 5 pounds of meth seized, I think from

11:58:35  3  his house.  Is that what they said?

11:58:36  4      MR. BIEBIGHAUSER:  That's what the Government

11:58:37  5  said, Judge.  And I'm in a -- not in a great position.

11:58:40  6  But his residence, Judge, as listed in the bond report,

11:58:43  7  is an address on Parkdale Court.  I don't believe that

11:58:48  8  there was any search warrant executed at a Parkdale Court

11:58:51  9  address.  That's where he lives, across the street from

11:58:53  10  his mother.  I could be wrong.  I'd be happy to be told

11:58:56  11  I'm wrong, but my preliminary understanding of the case

11:58:58  12  does not include an executed search warrant at that

11:59:00  13  Parkdale address.

11:59:01  14      THE COURT:  Can I just ask, Mr. McCarty, where was

11:59:02  15  the search warrant served and why do you believe that to

11:59:05  16  be the defendant's residence?

11:59:06  17      MR. MCCARTY:  Your Honor, the -- again, this goes

11:59:10  18  to the inadequacy of the report that was submitted to the

11:59:13  19  Court.  The defendant actually has several places he

11:59:18  20  stays.  And as I mentioned, law enforcement had on a good

11:59:24  21  basis to conduct a search.  Let's see if it's in the file

11:59:28  22  here.  Do you remember the address?

11:59:36  23      (Whereupon, a sotto voce discussion was had

11:59:36  24  between Mr. McCarty and the agent.)

11:59:38  25      MR. MCCARTY:  408 and 406 South Illinois.  That's

11:59:41  1  where the drugs were found.  But, mind you, his

11:59:45  2  fingerprints were on the drugs, so --

11:59:47  3        THE COURT:  So what you're saying is the drugs

11:59:49  4  were seized, perhaps not from his principal residence but

11:59:53  5  from a place he frequented?

11:59:55  6        MR. MCCARTY:  I'm not going to go that far.  I

11:59:57  7  think he probably did stay there.  Just a moment.

12:00:00  8        (Whereupon, a sotto voce discussion was had

12:00:00  9  between Mr. McCarty and the agent.)

12:00:05  10        MR. MCCARTY:  He was found there the morning of

12:00:08  11  the search warrant.

12:00:08  12        THE COURT:  All right.

12:00:08  13        MR. MCCARTY:  Again, just because he tells the

12:00:11  14  pretrial services officer something doesn't make it true.

12:00:14  15  He had multiple places he was staying.  This was clearly

12:00:16  16  a place that was keeping drugs.  In this case the drugs

12:00:18  17  were wrapped with three different layers.  His

12:00:21  18  fingerprints were found on the inner-most layer.  There

12:00:24  19  clearly is drugs.  And it also corroborates what he said

12:00:28  20  way back in 2014, when he mentions he's dealing in drugs.

12:00:31  21        THE COURT:  All right.  Thank you.

12:00:33  22  Mr. Biebighauser?

12:00:34  23        MR. BIEBIGHAUSER:  Judge, I want to reassert that

12:00:39  24  that's not Mr. Arjona's residence.  It hasn't been his

12:00:41  25  residence.  And Judge Gale addressed that as well.  It's

| | | |
|---|---|---|
| 12:00:43 | 1 | something I didn't mention.  I know you had asked about |
| 12:00:45 | 2 | Judge Gale's conditions.  Judge Gale heard that evidence, |
| 12:00:47 | 3 | and elected to impose a condition that Mr. Arjona not at |
| 12:00:51 | 4 | all have any contact with those addresses, recognizing |
| 12:00:54 | 5 | that the Parkdale address is different.  So I would |
| 12:00:56 | 6 | submit there is a condition to prevent him from going -- |
| 12:00:59 | 7 | I mean, near that whole block, if the Court wanted to, |
| 12:01:01 | 8 | and of course he's on electronic monitoring. |
| 12:01:03 | 9 | THE COURT:  His family resides at the Parkdale |
| 12:01:05 | 10 | address? |
| 12:01:06 | 11 | MR. BIEBIGHAUSER:  Yes, sir, his mother does. |
| 12:01:08 | 12 | THE COURT:  Where do his wife and children reside? |
| 12:01:10 | 13 | MR. BIEBIGHAUSER:  With him on Parkdale. |
| 12:01:12 | 14 | THE COURT:  They're also at the Parkdale address. |
| 12:01:14 | 15 | MR. BIEBIGHAUSER:  Yes, sir.  There's two |
| 12:01:15 | 16 | addresses at Parkdale. |
| 12:01:17 | 17 | THE COURT:  Right.  You said he lived near his |
| 12:01:20 | 18 | mother. |
| 12:01:20 | 19 | MR. BIEBIGHAUSER:  Yes, sir, yes, sir. |
| 12:01:20 | 20 | THE COURT:  All right. |
| 12:01:20 | 21 | MR. BIEBIGHAUSER:  So he has no reason to go near |
| 12:01:22 | 22 | those locations anyway and they are not his residence.  I |
| 12:01:24 | 23 | don't think we heard that from the Government either. |
| 12:01:43 | 24 | As far as the allegation this is an ongoing |
| 12:01:45 | 25 | offense, I think the Court parsed this already so I won't |

12:01:49  1    belabor it, but I didn't hear any evidence that there is

12:01:52  2    some other further ongoing offense.  When you inquired of

12:01:54  3    the Government --

12:01:54  4         THE COURT:  I didn't hear any evidence of that

12:01:55  5    either.

12:01:55  6         MR. BIEBIGHAUSER:  Fair enough.  Judge, lastly

12:01:59  7    then I'd just return to -- I think I'll concede I think

12:02:04  8    the Government has demonstrated their representation

12:02:06  9    about the fingerprints in their proffer.  I can't

12:02:08 10    contest.  I don't contest that they've given the Court

12:02:11 11    some reason to believe, in addition to the presumption,

12:02:14 12    that Mr. Arjona's involved in drugs.  Without anything

12:02:17 13    regarding his right to be presumed innocent, they've made

12:02:21 14    that showing at least, I think, with their proffer.  But

12:02:23 15    what they haven't done is demonstrated that there isn't

12:02:27 16    some reasonable set of conditions the court can impose to

12:02:29 17    ensure that he's not a danger to the community and that

12:02:31 18    he's not a flight risk.  I don't think we heard anything

12:02:34 19    about whether he's a flight risk.

12:02:35 20         The nature of their evidence as to the danger was

12:02:38 21    twofold:  one, their proffer that he was involved in

12:02:40 22    drugs; and two, this DUI incident.  I think there's no

12:02:44 23    question he was intoxicated.  He said things he shouldn't

12:02:46 24    have.  They were heinous and wrong.  He should not have

12:02:49 25    said them.  But to the fact he made that mistake in 2014,

| | | |
|---|---|---|
| 12:02:53 | 1 | he hasn't made it since and he hasn't made any contact |
| 12:02:56 | 2 | with that officer.  He went on probation.  He completed |
| 12:02:58 | 3 | it without incident.  That's behind him. |
| 12:02:59 | 4 | And so regarding his danger to the community, if |
| 12:03:02 | 5 | the Court finds that the Government's proffer that he's |
| 12:03:05 | 6 | involved in drugs satisfies the Court, that that's |
| 12:03:07 | 7 | enough, then I guess frequently I'm going to be confused |
| 12:03:11 | 8 | about what the purposes of these hearings are about, |
| 12:03:13 | 9 | because I think there are a number of other factors.  I |
| 12:03:15 | 10 | think almost every other factor weighs in favor of his |
| 12:03:17 | 11 | release, his ties to the community. |
| 12:03:19 | 12 | And I would be remiss, Judge -- I'm about to sit |
| 12:03:23 | 13 | down, I promise -- but there's another individual here, |
| 12:03:24 | 14 | and because he's here I wanted to honor his presence. |
| 12:03:27 | 15 | His name is -- he runs Hernandez Boxing Academy.  His |
| 12:03:32 | 16 | name is Luis Hernandez.  He is a business owner in the |
| 12:03:35 | 17 | community and wanted the Court to know he's here in |
| 12:03:38 | 18 | support of Mr. Arjona because Mr. Arjona's a frequent |
| 12:03:41 | 19 | volunteer at his boxing academy, and so I just wanted to |
| 12:03:44 | 20 | bring the Court's attention to that. |
| 12:03:45 | 21 | THE COURT:  Okay.  Thank you. |
| 12:03:46 | 22 | MR. BIEBIGHAUSER:  And that's the only other |
| 12:03:47 | 23 | factor that I would -- or the only other item of fact I |
| 12:03:50 | 24 | would address.  I think that the factors, except for the |
| 12:03:53 | 25 | fact of the Government's proffer that Mr. Arjona's |

| | | |
|---|---|---|
| 12:03:55 | 1 | involved in drugs, all weigh in favor of Mr. Arjona's |
| 12:03:58 | 2 | release, his ties to the community, and besides the one |
| 12:04:01 | 3 | incident they cited, his lack of any danger in the past. |
| 12:04:04 | 4 | With that, Judge, I'll conclude my argument.  Thank you. |
| 12:04:06 | 5 | THE COURT:  Thank you, Mr. Biebighauser. |
| 12:04:07 | 6 | Anything else, Mr. McCarty? |
| 12:04:08 | 7 | MR. MCCARTY:  Just briefly, Your Honor. |
| 12:04:10 | 8 | First, I'd just stress that this hearing is a de |
| 12:04:14 | 9 | novo hearing.  We don't need to consider what Judge Gale |
| 12:04:16 | 10 | may or may or may not have thought and what was presented |
| 12:04:18 | 11 | back then. |
| 12:04:18 | 12 | THE COURT:  I realize his findings below aren't |
| 12:04:20 | 13 | binding on me.  I'm just curious. |
| 12:04:22 | 14 | MR. MCCARTY:  Sure.  And I just wanted to reassert |
| 12:04:25 | 15 | that and again reassert that the presumption in this |
| 12:04:27 | 16 | case, given that the time he's looking at, is on him. |
| 12:04:30 | 17 | THE COURT:  What time is he looking at? |
| 12:04:31 | 18 | MR. MCCARTY:  Just on the conspiracy alone he's |
| 12:04:33 | 19 | looking at ten years minimum.  And that's not anything |
| 12:04:36 | 20 | else that we may or may not charge in the future. |
| 12:04:39 | 21 | THE COURT:  Well, I have to operate on the charges |
| 12:04:41 | 22 | that exist today. |
| 12:04:42 | 23 | MR. MCCARTY:  Sure.  And to the extent that he's |
| 12:04:43 | 24 | saying the conspiracy is not ongoing, I believe it's the |
| 12:04:46 | 25 | case that the search warrant was executed after this all |

| 12:04:51 | 1 | took place, to suggest that it is ongoing and it's not |
|---|---|---|

12:04:51  1  took place, to suggest that it is ongoing and it's not

12:04:54  2  something that they --

12:04:55  3       THE COURT:  I'm sorry, the search warrant was

12:04:56  4  executed after what?

12:04:57  5       MR. MCCARTY:  After the buys took place.

12:04:59  6       THE COURT:  Okay.

12:05:00  7       MR. MCCARTY:  After all this.

12:05:01  8       THE COURT:  But obviously before he was arrested?

12:05:04  9       MR. MCCARTY:  Was it before he was arrested?

12:05:06  10      THE AGENT:  He was arrested at the scene.

12:05:08  11      MR. MCCARTY:  He was arrested at the search

12:05:09  12  warrant, and so the Government's position, he was

12:05:11  13  arrested while they executed the search warrant.

12:05:12  14      THE COURT:  So when you said he was found at this

12:05:14  15  address, and I've gotten the address, but whatever it

12:05:17  16  was, where the drugs were found and he was there that

12:05:19  17  morning, he was actually there at the time of the

12:05:21  18  execution of the search warrant?

12:05:22  19      MR. MCCARTY:  Correct.

12:05:22  20      THE COURT:  Okay.

12:05:24  21      MR. MCCARTY:  This isn't just a drug case.  This

12:05:26  22  is a major drug case.  Simply saying that he has ties to

12:05:30  23  the community and bringing in some family members, I

12:05:33  24  don't think, overcomes his presumption in this case.  The

12:05:37  25  burden has been on the defense counsel, and he hasn't met

12:05:39    1    any of the four factors in this case.  Bringing up the

12:05:42    2    criminal threat is not just to -- that's not our only

12:05:45    3    point of saying he's a danger to the community.  It's

12:05:47    4    corroborating what we're alleging in this case.  Some of

12:05:50    5    the things he said during those threats aren't something

12:05:53    6    that would be necessarily said -- and the Court's common

12:05:57    7    sense can assess this -- by a landscaper that just does

12:06:00    8    seasonal work and just has a meager existence here in

12:06:04    9    Wichita.

12:06:04    10         So we hope that the Court would see through that

12:06:07    11   and through a lot of the assertions made in this report

12:06:11    12   submitted to the Court and find that he should be

12:06:12    13   detained.  But in the end, I actually concur with

12:06:16    14   pretrial services, who thinks that he should be detained.

12:06:18    15         THE COURT:  The pretrial services report indicates

12:06:20    16   that his monthly income from his landscaping business is

12:06:24    17   about 2800.  That equates to a little over $30,000 annual

12:06:29    18   income.

12:06:29    19         Do you have any evidence of a lifestyle in excess

12:06:33    20   of what his known sources of income would support?

12:06:37    21         MR. MCCARTY:  What I have heard, I don't have

12:06:40    22   specific information.  I do know he has, just talking

12:06:44    23   with the case agent, he has been known to rent some

12:06:47    24   pretty fancy cars from time to time.  He has multiple

12:06:50    25   residences.

12:06:52  1        THE COURT:  Multiple residences?  Obviously the

12:06:57  2   Parkdale house and the place were the drugs were found.

12:06:59  3        MR. MCCARTY:  Yes, he has a Parkdale address.  He

12:07:01  4   has two Illinois addresses.

12:07:03  5        THE COURT:  Illinois Street or Illinois state?

12:07:05  6        MR. MCCARTY:  Illinois Street, I apologize, here

12:07:08  7   in Wichita.

12:07:08  8        THE COURT:  Are those property -- is one of those

12:07:10  9   where the drugs were found?

12:07:11  10        MR. MCCARTY:  Correct.

12:07:11  11        THE COURT:  And are those properties leased or

12:07:13  12   owned in his name?  What's his title to those properties?

12:07:17  13        MR. MCCARTY:  Just a moment, if I may, Your Honor.

12:07:19  14        (Whereupon, a sotto voce discussion was had

12:07:20  15   between Mr. McCarty and the agent.)

12:07:22  16        MR. MCCARTY:  The belief is that he's leasing

12:07:24  17   them, Your Honor.

12:07:24  18        THE COURT:  So the leases are in his name?

12:07:26  19        MR. MCCARTY:  Yes.

12:07:28  20        THE COURT:  All right.  Anything else?

12:07:30  21        MR. MCCARTY:  That's it, Judge.  Thank you.

12:07:32  22        THE COURT:  All right.  Thank you.  Well, I

12:07:33  23   appreciate the evidence that you all presented.  As

12:07:36  24   Mr. Biebighauser particularly has noted, the problem with

12:07:39  25   these types of hearing is because they need to arise on

12:07:42  1  short notice.  The fact that they arise on short notice

12:07:45  2  means that the amount of evidence that's available is

12:07:48  3  obviously somewhat limited.  I do note -- this was noted

12:07:51  4  at the outset of the hearing -- that there is a

12:07:52  5  presumption of detention on the defendant, based on the

12:07:55  6  nature of the charge he's facing.

12:07:57  7      Detention arises under two characteristics:  risk

12:08:01  8  of flight and safety to the community.  First of all, I

12:08:06  9  find that the defendant has overcome the presumption with

12:08:11  10  respect to risk of flight.  All of his family's here.

12:08:15  11  He's a lifelong resident here.  He owns property --

12:08:18  12  according to the prosecution quite a bit of property --

12:08:20  13  or at least he has control of property here.  He has long

12:08:24  14  ties to this community.  Our last known international

12:08:29  15  contact of his was nearly ten years ago.  I find that

12:08:34  16  he's overcome the presumption of risk of flight that

12:08:37  17  arises by operation of the law.

12:08:39  18      The second presumption is danger to the community.

12:08:43  19  The factors involving that danger to the community,

12:08:46  20  Mr. Biebighauser said if merely the fact that he's

12:08:48  21  charged with drug conspiracy is enough, then these

12:08:51  22  hearings are pointless.  That wasn't your word but I

12:08:55  23  think that was the gist of it.

12:08:56  24      And I think that bald statement would be true, but

12:09:01  25  in addition to his charges -- and I would note, as

12:09:04   1  Mr. Biebighauser did at the outset, that there are no

12:09:06   2  firearms involved at the time of his arrest or otherwise

12:09:09   3  alleged, at least at this stage of the proceeding.  I

12:09:12   4  would note that he was involved in at least some

12:09:16   5  undercover buys -- I don't know the number that

12:09:19   6  specifically involved him -- that a significant quantity

12:09:21   7  of drugs were found with his fingerprints on it, and that

12:09:24   8  there are other people that were involved in this

12:09:30   9  conspiracy.  So I find that the weight of the evidence is

12:09:32  10  pretty significant in this case.

12:09:34  11        The nature and circumstances of the offense,

12:09:38  12  again, I think in this case that's the factor upon which

12:09:41  13  the presumption arises.  It arises on the basis of the

12:09:45  14  offense charged.  The other factors don't address the

12:09:50  15  presumption particularly.  But the presumption itself

12:09:53  16  arises from the nature and circumstances of the offense,

12:09:55  17  and the quantity of drugs give rise to that.

12:09:57  18        The circumstances of the defendant I find to be,

12:10:00  19  frankly, quite concerning.  There's been some dispute as

12:10:07  20  to what his nature is, but I guess at this point the

12:10:11  21  defendant repeatedly asserted that he's a member of the

12:10:13  22  cartel.  And if that's the position he wants to take,

12:10:17  23  then I should give some credence to that.  And involving

12:10:20  24  the threat to the community, I think that the actual

12:10:22  25  distribution of significant quantities of drugs is itself

12:10:26  1  a significant threat.

12:10:27  2      I'm not entirely persuaded, as Mr. McCarty

12:10:30  3  alleged, that the conspiracy is ongoing today.  But I

12:10:37  4  think what the Government may be trying to say is that by

12:10:40  5  having at least two of the three charged members of the

12:10:42  6  conspiracy out, even though the Government agreed to the

12:10:46  7  release of Mr. Cobal, to say nothing of the minor that's

12:10:49  8  been referred to, there's a possibility that those

12:10:59  9  activities could continue.

12:10:59  10      I find of particular significance the fact that,

12:11:03  11  although I don't dispute and I accept that the defendant

12:11:05  12  resides at the Parkdale address, that he was maintaining

12:11:09  13  another property, which he appears to have been

12:11:11  14  maintaining for purposes of -- based on the indictment --

12:11:16  15  for purposes of the drug distribution.  That's where they

12:11:19  16  found the drugs.  That's where they found him.  This

12:11:23  17  wasn't something he was doing out of the back seat of his

12:11:25  18  car, but he was maintaining a residence for those

12:11:28  19  purposes.

12:11:28  20      So I'm finding that the defendant has not overcome

12:11:31  21  his presumption with respect to danger to the community.

12:11:36  22  Based on that, I am going to invoke the presumption and

12:11:39  23  order the defendant to be detained.  He's currently on

12:11:42  24  release status.  I think, Mr. Biebighauser, I'll ask you

12:11:46  25  and Mr. Arjona to remain here in the courtroom.  Our

12:11:48   1  court security officer will ask the marshals to come up,

12:11:51   2  and I'm going to ask that he be taken into custody at

12:11:54   3  this point.

12:11:55   4      That's the finding of the court in this case.  Is

12:11:58   5  there anything else we need to take up at this point?

12:12:00   6      MR. MCCARTY:  Nothing from the Government, Your

12:12:02   7  Honor.

12:12:02   8      MR. BIEBIGHAUSER:  No, sir.

12:12:03   9      THE COURT:  Court's in recess.

12:12:05  10      CLERK DAVENPORT:  All rise.

12:12:06  11      (Whereupon, the proceedings were concluded at

12:12:09  12  12:12 P.M.)

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 29th day of May, 2020.


s/ Johanna L. Wilkinson
Johanna L. Wilkinson, CSR, CRR, RMR
United States Court Reporter