IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,     )  District Court
                                 )  Case No.
              Plaintiff,    )  19-10025-01
v.                           )
                                 )  Appellate No.
MICHAEL A. ARJONA,           )  21-3099
                               )
              Defendant.    )

TRANSCRIPT OF PROCEEDINGS

On the 3rd day of June, 2021, came on to be heard proceedings in the above-entitled and numbered cause before the HONORABLE ERIC F. MELGREN, Judge of the United States District Court for the District of Kansas, sitting in Wichita, commencing at 9:30 A.M. Proceedings recorded by machine shorthand. Transcript produced by computer-aided transcription.

APPEARANCES:

The plaintiff appeared by and through:
        Ms. Katherine J. Andrusak
        United States Attorney's Office
        1200 Epic Center
        301 North Main
        Wichita, Kansas  67202

The defendant appeared in person and by and through:
        Mr. Mitch E. Biebighauser
        Federal Public Defender's Office
        850 Epic Center
        301 North Main Street
        Wichita, Kansas 67202

ALSO PRESENT:
        Mr. Michael D. Hepperly, Attorney at Law, on behalf of Mr. Cobal
        Mr. Corey Kirk, USPO

1                          I N D E X

                                                    PAGE
2


3
     WITNESSES
4          For the Plaintiff
           DETECTIVE SHEK WEBER
5             Direct Examination By Ms. Andrusak        9
              Cross-Examination By Mr. Biebighauser    18
6             Redirect Examination By Ms. Andrusak     53
           CODY COBAL
7             Direct Examination By Ms. Andrusak       56
              Cross-Examination By Mr. Biebighauser    84
8             Redirect Examination By Ms. Andrusak    123

9


10
     REPORTER'S CERTIFICATE                           175
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6-3-21  USA v. ARJONA  No. 19-10025-01                3

| | | |
|---|---|---|
| 09:30:45 | 1 | CLERK KOEHLER:  All rise. |
| 09:30:46 | 2 | The United States District Court for the District |
| 09:30:48 | 3 | of Kansas is now in session, the Honorable Eric F. |
| 09:30:51 | 4 | Melgren presiding. |
| 09:30:51 | 5 | THE COURT:  Good morning.  You may be seated. |
| 09:30:55 | 6 | The court calls the case of the United States v. |
| 09:30:59 | 7 | Michael Arjona, Case No. 19-10025-01.  United States |
| 09:31:05 | 8 | appears by Assistant United States Attorney Katherine |
| 09:31:08 | 9 | Andrusak, and the defendant appears in person and by his |
| 09:31:11 | 10 | counsel Assistant Federal Public Defender Mitch |
| 09:31:13 | 11 | Biebighauser.  This matter comes before the court for |
| 09:31:18 | 12 | sentencing. |
| 09:31:18 | 13 | For the record, sir, are you Michael Arjona? |
| 09:31:22 | 14 | THE DEFENDANT:  Yes, sir. |
| 09:31:23 | 15 | THE COURT:  Mr. Arjona, as I just indicated, we're |
| 09:31:25 | 16 | here because this is the time set for sentencing.  We've |
| 09:31:27 | 17 | come to this point because the United States Probation |
| 09:31:30 | 18 | Office has prepared a background presentence |
| 09:31:33 | 19 | investigation report on you for our use at this hearing. |
| 09:31:36 | 20 | Have you had an opportunity to go through that |
| 09:31:38 | 21 | report and to discuss it with your counsel? |
| 09:31:40 | 22 | THE DEFENDANT:  Yes, sir. |
| 09:31:41 | 23 | THE COURT:  Thank you. |
| 09:31:42 | 24 | Counsel, I believe, first of all, we have a |
| 09:31:45 | 25 | procedural matter that we need to take up. |

| | | |
|---|---|---|
| 09:31:48 | 1 | MS. ANDRUSAK:  Yes, Your Honor. |
| 09:31:53 | 2 | Your Honor, earlier yesterday defense counsel |
| 09:31:57 | 3 | requested a copy of an addendum to a plea agreement for a |
| 09:32:02 | 4 | codefendant in this case that is anticipated to testify. |
| 09:32:06 | 5 | I alerted counsel that since it was a sealed proceeding |
| 09:32:09 | 6 | and a sealed document, that I would need a court -- the |
| 09:32:12 | 7 | court to order me to do so. |
| 09:32:13 | 8 | Counsel and I met in your chambers prior to this |
| 09:32:18 | 9 | hearing, discussed the situation with you.  The Court |
| 09:32:20 | 10 | ordered me to do so, and I have now passed off a copy of |
| 09:32:23 | 11 | that that I will then take back from defense counsel at |
| 09:32:26 | 12 | the end of this hearing. |
| 09:32:26 | 13 | THE COURT:  All right.  Thank you, Ms. Andrusak. |
| 09:32:28 | 14 | Anything to add, Mr. Biebighauser? |
| 09:32:30 | 15 | MR. BIEBIGHAUSER:  Yes, Your Honor.  And I have a |
| 09:32:31 | 16 | copy of the addendum to the plea agreement in front of |
| 09:32:33 | 17 | me. |
| 09:32:35 | 18 | THE COURT:  All right.  The matters recited by Ms. |
| 09:32:38 | 19 | Andrusak are correct.  I did authorize the release of |
| 09:32:41 | 20 | that sealed document to defense counsel.  It's |
| 09:32:43 | 21 | appropriate for them to have it.  And the record will |
| 09:32:46 | 22 | reflect that I did so order, and as Ms. Andrusak's |
| 09:32:48 | 23 | indicated, at the conclusion of this hearing and the use |
| 09:32:51 | 24 | of these matters, defense counsel is to return that |
| 09:32:53 | 25 | document to the Government. |

09:32:56  1        Mr. Biebighauser, you have several objections

09:33:01  2  raised to the presentence investigation report as

09:33:06  3  contained therein.  I'm aware that the Government has

09:33:08  4  witnesses it wishes to call.  I'm assuming those

09:33:11  5  witnesses relate to the objections.

09:33:13  6        Is that correct, Ms. Andrusak?

09:33:15  7        MS. ANDRUSAK:  Yes, Your Honor.

09:33:16  8        THE COURT:  So I'm not informed beyond that.  How

09:33:22  9  do you want to proceed?  Do you think I should hear all

09:33:25  10 the evidence first and then walk through the objections,

09:33:27  11 or are there some objections we can take care of first?

09:33:30  12 I'm really indifferent as to how you all prefer to

09:33:33  13 proceed.

09:33:33  14        MR. BIEBIGHAUSER:  Your Honor, one of the

09:33:35  15 objections -- I don't want to use this word too

09:33:38  16 strongly -- I think is uncontested by the Government, and

09:33:41  17 that goes to the attributable drug weight.  I've agreed

09:33:44  18 with Ms. Andrusak that there's some evidence related to

09:33:47  19 that as far as lab testing reports to determine reliable

09:33:50  20 evidence related to that weight.

09:33:51  21        I think Ms. Andrusak wants to tender that evidence

09:33:54  22 to the court, and I think that will dispense with the

09:33:56  23 first objection, as the parties agreed that that's the

09:34:00  24 only reliable evidence related to the drug weight

09:34:03  25 calculation.

09:34:04   1        THE COURT:  What evidence do you wish to tender,

09:34:06   2   Ms. Andrusak?

09:34:06   3        MS. ANDRUSAK:  Your Honor, I've got Government's

09:34:09   4   Exhibits 1, 2, and 3, which are the lab reports with the

09:34:13   5   weight and testing of the drugs that were obtained by our

09:34:20   6   undercover officer during hand-to-hand buys with the

09:34:22   7   defendant and various codefendants and unindicted

09:34:27   8   coconspirators, as well as the amount of methamphetamine

09:34:29   9   that was located in the defendant's residence at a search

09:34:32   10  warrant at the end of the investigation of this case.

09:34:34   11       THE COURT:  This is a slightly perplexing

09:34:37   12  objection for me.  I've read the matters contained in the

09:34:42   13  presentence investigation report, and I believe that I'm

09:34:44   14  at least generally familiar with the parties' positions

09:34:47   15  with respect to this objection number one.  And,

09:34:51   16  moreover, I'm aware of the fact that, so to speak, the

09:34:56   17  Government has the burden of proof on these issues, and

09:34:58   18  if the Government elects not to go forward, we all know

09:35:02   19  how that plays out.

09:35:03   20       All that notwithstanding, Ms. Andrusak, I wonder

09:35:06   21  if you would address paragraph 209 in this objection,

09:35:10   22  which is contained in the probation office's response to

09:35:14   23  that objection, which I at least tend to read, if I

09:35:17   24  understand it correctly, that on identical facts the

09:35:21   25  Government is taking differing positions between

09:35:26  1   Mr. Arjona and between a similarly situated defendant.

09:35:28  2        MS. ANDRUSAK:  Yes, Your Honor.  It's the

09:35:30  3   Government's position, one, that in the spirit of the

09:35:31  4   plea agreement, which I addressed in my response to the

09:35:34  5   defense counsel's objections, that the only amounts

09:35:37  6   contemplated by the parties were those, whereas the

09:35:40  7   amounts contemplated with defense counsel in Mr. Brandt's

09:35:44  8   case was the amount that he admitted to.

09:35:46  9        Additionally, I do think, in the interests of

09:35:49  10  justice, when we're talking about amounts that

09:35:52  11  individuals are estimating, it's one thing when somebody

09:35:56  12  admits that they handled that amount.  It's another when

09:36:00  13  it goes against someone when it's essentially double

09:36:06  14  hearsay, where someone's like, "Oh, I believe I have 11

09:36:09  15  pounds, I believe I had this much," when that's not the

09:36:12  16  defendant's statements, that he did, in fact, handle that

09:36:14  17  much.

09:36:14  18        I do think, in the interests of justice, when

09:36:18  19  they're being used as hearsay, basically double hearsay

09:36:21  20  against the defendant, and that they weren't contemplated

09:36:23  21  by defense counsel, where they were in Mr. Brandt's case.

09:36:26  22        THE COURT:  So what I understand you to say is

09:36:29  23  that the critical difference between this issue in

09:36:34  24  Mr. Brandt's case and the present case is that Mr. Brandt

09:36:37  25  admitted to the larger amount and Mr. Arjona, of course,

| | | |
|---|---|---|
| 09:36:39 | 1 | has not admitted.  Do I understand that correctly? |
| 09:36:40 | 2 | MS. ANDRUSAK:  Yes, Your Honor.  And that the |
| 09:36:42 | 3 | amounts that would be used against him, beyond the |
| 09:36:45 | 4 | evidence the Government's going to present, are amounts |
| 09:36:48 | 5 | that are guesstimated by individuals that haven't been |
| 09:36:51 | 6 | weighed or tested. |
| 09:36:52 | 7 | THE COURT:  All right.  I understand.  I |
| 09:36:53 | 8 | appreciate that response. |
| 09:36:54 | 9 | Given what I've read in the Government's response |
| 09:36:59 | 10 | to objection number one, and given the Government's |
| 09:37:02 | 11 | stated position comparable to that, I don't know that |
| 09:37:07 | 12 | there's any remaining dispute with respect to objection |
| 09:37:10 | 13 | number one. |
| 09:37:11 | 14 | If you think it's important for the record that |
| 09:37:15 | 15 | those exhibits be admitted, I can do so.  But I don't |
| 09:37:17 | 16 | know that they're necessary for my ruling on the |
| 09:37:21 | 17 | objection. |
| 09:37:21 | 18 | MS. ANDRUSAK:  Then the Government does not need |
| 09:37:23 | 19 | to admit them, Your Honor. |
| 09:37:24 | 20 | THE COURT:  All right.  Well, I'll note that they |
| 09:37:27 | 21 | were at least proffered, and based on the Government's |
| 09:37:29 | 22 | position, I'm going to sustain defendant's objection |
| 09:37:34 | 23 | number one. |
| 09:37:37 | 24 | How would you all like to proceed next?  Do you |
| 09:37:41 | 25 | think at this point it'd be preferable to take testimony |

| | | |
|---|---|---|
| 09:37:43 | 1 | and then address the remaining objections? |
| 09:37:45 | 2 | MS. ANDRUSAK:  I think so, Your Honor, because |
| 09:37:46 | 3 | both of my witnesses will be addressing both of the |
| 09:37:49 | 4 | additional objections for the importation enhancement and |
| 09:37:54 | 5 | the aggravating role in it. |
| 09:37:55 | 6 | THE COURT:  Mr. Biebighauser? |
| 09:37:55 | 7 | MR. BIEBIGHAUSER:  I don't disagree. |
| 09:37:57 | 8 | THE COURT:  All right.  Well, let's proceed that |
| 09:37:58 | 9 | way then. |
| 09:37:58 | 10 | Ms. Andrusak, you may call the Government's first |
| 09:38:01 | 11 | witness. |
| 09:38:01 | 12 | MS. ANDRUSAK:  Thank you, Your Honor.  The |
| 09:38:03 | 13 | Government called Detective Shek Weber. |
| 09:38:05 | 14 | THE COURT:  Detective, if you would come stand in |
| 09:38:07 | 15 | front of my courtroom deputy, she will swear you in, and |
| 09:38:09 | 16 | then you may have a seat in the witness box over here to |
| 09:38:12 | 17 | our right. |
| 09:38:13 | 18 | DETECTIVE SHEK WEBER, |
| 09:38:13 | 19 | having been first duly sworn to testify the truth, the |
| 09:38:13 | 20 | whole truth, and nothing but the truth, testified as |
| 09:38:33 | 21 | follows: |
| 09:38:37 | 22 | THE COURT:  Counsel, you may proceed when you're |
| 09:38:38 | 23 | ready. |
| 09:38:39 | 24 | MS. ANDRUSAK:  Thank you, Your Honor. |
| 09:38:39 | 25 | DIRECT EXAMINATION |

| | | |
|---|---|---|
| 09:38:39 | 1 | BY MS. ANDRUSAK: |
| 09:38:40 | 2 | Q.    Can you please state your name and occupation for |
| 09:38:42 | 3 | the record. |
| 09:38:42 | 4 | **A.    Shek Weber, a detective with the Wichita Police** |
| 09:38:47 | 5 | **Department.** |
| 09:38:47 | 6 | Q.    How long have you been a detective with the WPD? |
| 09:38:50 | 7 | **A.    Twenty-three years.** |
| 09:38:51 | 8 | Q.    And in those 23 years, have you done significant |
| 09:38:54 | 9 | investigations regarding drug trafficking? |
| 09:38:56 | 10 | **A.    Yes.** |
| 09:38:57 | 11 | Q.    Were you involved in the investigation of the |
| 09:39:00 | 12 | defendant Michael Arjona back in 2019? |
| 09:39:04 | 13 | **A.    Yes.** |
| 09:39:05 | 14 |     THE COURT:  Detective, can I ask you to speak a |
| 09:39:07 | 15 | bit more clearly into the microphone.  You're |
| 09:39:09 | 16 | soft-spoken.  I want to make sure everyone can hear you. |
| 09:39:12 | 17 | Is that microphone on? |
| 09:39:14 | 18 |     THE WITNESS:  Yes, Your Honor. |
| 09:39:15 | 19 |     THE COURT:  It appears to be on.  Very good. |
| 09:39:18 | 20 | BY MS. ANDRUSAK: |
| 09:39:19 | 21 | Q.    So based on your investigation of the defendant, |
| 09:39:22 | 22 | can you please explain for the Court how the defendant's |
| 09:39:25 | 23 | drug operation functioned? |
| 09:39:27 | 24 | **A.    I'm sorry, can you repeat that?** |
| 09:39:28 | 25 | Q.    Yeah.  Based on your investigation of the |

| 09:39:30 | 1 | defendant back in 2019, can you explain how the |
| 09:39:33 | 2 | defendant's drug operation functioned? |
| 09:39:36 | 3 | **A.      Basically he directed other people in the** |
| 09:39:41 | 4 | **organization to deliver drugs, specifically to myself.** |
| 09:39:46 | 5 | Q.     Okay.  So there were a number of undercover buys |
| 09:39:51 | 6 | in this case; is that right? |
| 09:39:52 | 7 | **A.      Yes, there was.** |
| 09:39:53 | 8 | Q.     And they occurred on November 20th -- and this is |
| 09:39:56 | 9 | all in 2019 -- November 20th, November 27th, |
| 09:40:01 | 10 | December 5th, December 12th, and December 20th; is that |
| 09:40:06 | 11 | right? |
| 09:40:06 | 12 | **A.      Yes.** |
| 09:40:06 | 13 | Q.     And for each one of those buys, how did the -- how |
| 09:40:11 | 14 | did you initiate the buy with the defendant's group? |
| 09:40:15 | 15 | **A.      Outside the first buy, I contacted Mr. Arjona by** |
| 09:40:19 | 16 | **telephone to arrange the buy of crystal meth.** |
| 09:40:23 | 17 | Q.     Okay.  And is that the only number you had to call |
| 09:40:29 | 18 | to arrange those deals? |
| 09:40:32 | 19 | **A.      Yes.** |
| 09:40:32 | 20 | Q.     And is that who you talked to primarily for each |
| 09:40:36 | 21 | deal that I discussed earlier? |
| 09:40:38 | 22 | **A.      Yes, it was.** |
| 09:40:39 | 23 | Q.     Who set the prices for these deals? |
| 09:40:42 | 24 | **A.      Mr. Arjona.** |
| 09:40:43 | 25 | Q.     And I see you nodding.  Is he here in the |

| | | |
|---|---|---|
| 09:40:45 | 1 | courtroom today? |
| 09:40:46 | 2 | **A.      Yes, he is.** |
| 09:40:47 | 3 | Q.     Can you point out where he's sitting and what he's |
| 09:40:49 | 4 | wearing? |
| 09:40:49 | 5 | **A.      Sitting at the defense counsel table, wearing the** |
| 09:40:52 | 6 | **gray jumpsuit.** |
| 09:40:52 | 7 | MS. ANDRUSAK:  Your Honor, may the record reflect |
| 09:40:54 | 8 | that the witness has identified the defendant? |
| 09:40:56 | 9 | THE COURT:  The record will so reflect. |
| 09:40:58 | 10 | BY MS. ANDRUSAK: |
| 09:40:59 | 11 | Q.     So the defendant set the prices; right?  That's |
| 09:41:01 | 12 | where we were at. |
| 09:41:02 | 13 | **A.      That is correct.** |
| 09:41:03 | 14 | Q.     Who set the exchange location? |
| 09:41:06 | 15 | **A.      Mr. Arjona.** |
| 09:41:10 | 16 | Q.     What would happen when you got to those exchange |
| 09:41:13 | 17 | locations? |
| 09:41:14 | 18 | **A.      I would meet whoever he directed me to meet.** |
| 09:41:19 | 19 | **There was different people involved.** |
| 09:41:21 | 20 | Q.     Okay.  Who were some of those people? |
| 09:41:23 | 21 | **A.      The first one was Cody Cobal.  The second one** |
| 09:41:28 | 22 | **was -- or the last two were Matthew McMillan.** |
| 09:41:30 | 23 | Q.     Okay.  Did you have numbers for either Cody or |
| 09:41:35 | 24 | Matthew? |
| 09:41:35 | 25 | **A.      I did not.** |

| 09:41:36 | 1 | Q.      Did you discuss prices or amounts with Cody or |
| 09:41:39 | 2 | Matthew? |
| 09:41:39 | 3 | **A.      I did not.** |
| 09:41:40 | 4 | Q.      Can you explain the nature of the contact you had |
| 09:41:43 | 5 | with both Cody and Matthew during these deals? |
| 09:41:45 | 6 | **A.      The nature of the contact was simply the exchange** |
| 09:41:49 | 7 | **of money for the crystal meth.** |
| 09:41:52 | 8 | Q.      So would they get in your vehicle? |
| 09:41:54 | 9 | **A.      Yes.** |
| 09:41:55 | 10 | Q.      Did you have much conversation with them while |
| 09:41:57 | 11 | they were in the vehicle? |
| 09:41:58 | 12 | **A.      Very limited conversation.** |
| 09:42:00 | 13 | Q.      They handed you the drugs and took the money? |
| 09:42:03 | 14 | **A.      Correct.** |
| 09:42:03 | 15 | Q.      And then that was the end of your contact with |
| 09:42:06 | 16 | that individual? |
| 09:42:07 | 17 | **A.      Yes.** |
| 09:42:09 | 18 | Q.      And was that true for each of the deals that we |
| 09:42:11 | 19 | discussed earlier in 2019? |
| 09:42:14 | 20 | **A.      Yes.** |
| 09:42:20 | 21 | Q.      And so you never discussed amounts or prices with |
| 09:42:24 | 22 | any of these individuals that dropped drugs off? |
| 09:42:25 | 23 | **A.      If it was, it was very limited.** |
| 09:42:28 | 24 | Q.      Okay. |
| 09:42:28 | 25 | **A.      Like "Is this half a pound?" type thing.** |

| | | |
|---|---|---|
| 09:42:31 | 1 | Q.    So asking questions, but not negotiating? |
| 09:42:33 | 2 | **A.    Correct.** |
| 09:42:34 | 3 | Q.    Okay.  Can you explain what "fronting "means in |
| 09:42:39 | 4 | the drug trafficking sense. |
| 09:42:40 | 5 | **A.    That's where you're paid later.  You're given the** |
| 09:42:47 | 6 | **crystal meth up front and pay it off later.** |
| 09:42:50 | 7 | Q.    So you pay for some of it but not the full |
| 09:42:53 | 8 | requested amount? |
| 09:42:54 | 9 | **A.    Correct.** |
| 09:42:57 | 10 | Q.    Was there ever a deal with the defendant where you |
| 09:42:59 | 11 | were allowed to front for the drugs you received? |
| 09:43:02 | 12 | **A.    Yes.** |
| 09:43:03 | 13 | Q.    What deal was that? |
| 09:43:04 | 14 | **A.    I believe it was the second or third deal.** |
| 09:43:07 | 15 | Q.    Who brought up fronting? |
| 09:43:12 | 16 | **A.    The defendant, Mr. Arjona.** |
| 09:43:14 | 17 | Q.    So he offered that option to you? |
| 09:43:16 | 18 | **A.    Correct.** |
| 09:43:22 | 19 | Q.    And at any point in your interactions with the |
| 09:43:27 | 20 | defendant, did he ask you to take on more drugs, a higher |
| 09:43:32 | 21 | number of drugs?  Sorry. |
| 09:43:33 | 22 | **A.    Yes, he did.** |
| 09:43:33 | 23 | Q.    When did that happen? |
| 09:43:34 | 24 | **A.    That was on the half-pound meth deal.  He wanted** |
| 09:43:39 | 25 | **me to get a pound the next time.** |

| | | |
|---|---|---|
| 09:43:42 | 1 | Q.    Okay.  And he initiated that conversation? |
| 09:43:44 | 2 | **A.    Yes, he did.** |
| 09:43:48 | 3 | Q.    So ultimately the defendant, Mr. McMillan, and |
| 09:43:53 | 4 | Mr. Cobal, were arrested in this case; is that right? |
| 09:43:55 | 5 | **A.    Correct.** |
| 09:43:56 | 6 | Q.    And all three of them provided statements under |
| 09:43:59 | 7 | *Miranda*? |
| 09:43:59 | 8 | **A.    Correct.** |
| 09:44:00 | 9 | Q.    So let's first talk about Matthew McMillan. |
| 09:44:04 | 10 | Did he explain to you or explain to officers how |
| 09:44:08 | 11 | he got involved with Mr. Arjona? |
| 09:44:10 | 12 | **A.    He basically said, I think, he was connected to** |
| 09:44:14 | 13 | **Mr. Arjona's son.  And Matthew McMillan had a falling out** |
| 09:44:19 | 14 | **with his mother and was basically homeless, had nowhere** |
| 09:44:23 | 15 | **to stay, and that's when the defendant offered to give** |
| 09:44:26 | 16 | **him a place to stay.** |
| 09:44:27 | 17 | Q.    Okay.  And what did -- did Mr. McMillan explain |
| 09:44:33 | 18 | what he had to do in exchange for living free with |
| 09:44:36 | 19 | Mr. Arjona? |
| 09:44:36 | 20 | **A.    In exchange for living free and provided, I** |
| 09:44:40 | 21 | **believe, some food, Mr. McMillan needed to deliver meth** |
| 09:44:46 | 22 | **to -- at the direction of Mr. Arjona to different people.** |
| 09:44:49 | 23 | Q.    And he said that he did this at the defendant's |
| 09:44:51 | 24 | direction? |
| 09:44:53 | 25 | **A.    Correct.** |

09:44:57  1   Q.     In this interview with Mr. McMillan, did he ever

09:45:00  2   state where he thought the defendant was getting his

09:45:03  3   drugs?

09:45:04  4   A.     **From somebody in Mexico.**

09:45:07  5   Q.     Okay.  Did he observe the vehicle of the

09:45:16  6   individual that was bringing the drugs up at Arjona's

09:45:19  7   residence?

09:45:20  8   A.     **Yes, either the vehicle and/or the actual Hispanic**

09:45:25  9   **male from Mexico.**

09:45:25  10  Q.     Okay.  And did he indicate that the plates were,

09:45:30  11  in fact, Mexican plates on the vehicle?

09:45:33  12  A.     **Yes.**

09:45:35  13  Q.     Did he mention where the driver stayed when he

09:45:39  14  brought loads up?

09:45:40  15  A.     **At 408 South Illinois, the duplex.**

09:45:44  16  Q.     And that was one side of the duplex that the

09:45:49  17  defendant maintained for sometimes his residence and then

09:45:53  18  these other individuals' residences?

09:45:55  19  A.     **Correct.**

09:45:59  20  Q.     So I want to move on to the defendant's interview.

09:46:06  21  Did the defendant acknowledge that he knew drugs were

09:46:08  22  coming up from Mexico during that interview?

09:46:11  23  A.     **Yes.**

09:46:12  24  Q.     And did he tell law enforcement that he could get

09:46:16  25  individuals that were bringing up large quantities from

| | | |
|---|---|---|
| 09:46:19 | 1 | Mexico? |
| 09:46:20 | 2 | **A.      Yes.** |
| 09:46:20 | 3 | Q.      Did he give you any names? |
| 09:46:22 | 4 | **A.      Yes.** |
| 09:46:22 | 5 | Q.      Can you tell me those names? |
| 09:46:24 | 6 | **A.      He mentioned an Aniceto that was bringing the** |
| 09:46:27 | 7 | **drugs up from Mexico, and a Mauricio that was in Wichita** |
| 09:46:35 | 8 | **that had involvement with the movement of those -- of the** |
| 09:46:39 | 9 | **crystal meth.** |
| 09:46:39 | 10 | Q.      Okay.  And so that would be Aniceto Gonzalez; |
| 09:46:44 | 11 | right? |
| 09:46:44 | 12 | **A.      Correct.** |
| 09:46:45 | 13 | Q.      And then Mauricio Garcia? |
| 09:46:47 | 14 | **A.      Yes.** |
| 09:46:47 | 15 | Q.      And the defendant admitted knowing that both were |
| 09:46:50 | 16 | moving methamphetamine either across the border or within |
| 09:46:54 | 17 | Wichita? |
| 09:46:54 | 18 | **A.      Yes.** |
| 09:46:56 | 19 | Q.      And he knew that Aniceto was from Mexico? |
| 09:46:59 | 20 | **A.      Yes.** |
| 09:47:01 | 21 |        MS. ANDRUSAK:  I don't have no further questions, |
| 09:47:02 | 22 | Your Honor. |
| 09:47:03 | 23 |        THE COURT:  Thank you, Ms. Andrusak. |
| 09:47:04 | 24 |        Mr. Biebighauser, you may cross-examine the |
| 09:47:07 | 25 | witness. |

| | | |
|---|---|---|
| 09:47:22 | 1 | CROSS-EXAMINATION |
| 09:47:22 | 2 | BY MR. BIEBIGHAUSER: |
| 09:47:40 | 3 | Q.     Officer -- excuse me, Detective Weber, I want to |
| 09:48:03 | 4 | walk through some of those buys that you engaged in, |
| 09:48:06 | 5 | undercover buys, a little more closely.  Okay? |
| 09:48:09 | 6 | A.     Sure. |
| 09:48:10 | 7 | Q.     The first buy -- you mentioned this on direct |
| 09:48:13 | 8 | examination, but I just want to direct our attention to |
| 09:48:15 | 9 | it -- was on November 20th of 2018; is that right? |
| 09:48:18 | 10 | A.     That sounds correct. |
| 09:48:20 | 11 | Q.     And you had not spoken with Mike prior to that |
| 09:48:24 | 12 | first buy; is that right? |
| 09:48:25 | 13 | A.     That's correct. |
| 09:48:26 | 14 | Q.     The buy was, in fact, arranged by a confidential |
| 09:48:30 | 15 | informant? |
| 09:48:30 | 16 | A.     Yes. |
| 09:48:31 | 17 | Q.     And the confidential informant had contacted an |
| 09:48:34 | 18 | individual named Cody Cobal; right? |
| 09:48:37 | 19 | A.     Cody Cobal and Mr. Arjona. |
| 09:48:40 | 20 | Q.     Okay.  One of -- is it your understanding whether |
| 09:48:45 | 21 | it was the confidential informant or Mr. Cobal that had |
| 09:48:48 | 22 | contacted Mr. Arjona? |
| 09:48:49 | 23 | A.     I understood the confidential informant contacted |
| 09:48:53 | 24 | Mr. Arjona directly.  Mr. Arjona sent Cody Cobal on that |
| 09:48:57 | 25 | first buy. |

| 09:48:58 | 1 | Q.    Okay.  We're going to talk about setting in a |
| 09:49:02 | 2 | second.  At this point you hadn't talked to Mike Arjona |
| 09:49:06 | 3 | at this point at all; is that right? |
| 09:49:07 | 4 | **A.    That's correct.** |
| 09:49:08 | 5 | Q.    Before this buy you didn't know his involvement in |
| 09:49:10 | 6 | this situation? |
| 09:49:15 | 7 | **A.    I knew he was involved.** |
| 09:49:17 | 8 | Q.    Okay.  During the conversation between the CI and |
| 09:49:24 | 9 | Cody and one of their conversations with Mr. Arjona, you |
| 09:49:27 | 10 | don't know the content of that communication, do you? |
| 09:49:31 | 11 | **A.    No, I don't know the content of that conversation.** |
| 09:49:34 | 12 | Q.    And on this occasion, you received methamphetamine |
| 09:49:38 | 13 | from Cody Cobal; is that correct? |
| 09:49:40 | 14 | **A.    That's correct.** |
| 09:49:40 | 15 | Q.    And you received Mike's number from the |
| 09:49:43 | 16 | confidential informant? |
| 09:49:44 | 17 | **A.    That's correct.  The confidential informant told** |
| 09:49:47 | 18 | **me that Mike said I could have his number to contact him** |
| 09:49:51 | 19 | **directly.** |
| 09:49:52 | 20 | Q.    Let's go to the next buy.  That was on |
| 09:49:55 | 21 | November 26th of 2018 -- I'm sorry, this wasn't a buy. |
| 09:49:58 | 22 | I'm actually a bit confused about this.  I'm going to ask |
| 09:50:00 | 23 | you. |
| 09:50:00 | 24 | On November 26th of 2018, I think is the date and |
| 09:50:05 | 25 | the time when you met with Mike to discuss cars.  Do you |

| | | |
|---|---|---|
| 09:50:08 | 1 | remember that? |
| 09:50:08 | 2 | **A.      No.** |
| 09:50:08 | 3 | Q.      You don't remember that at all?  Do you |
| 09:50:11 | 4 | remember -- not necessarily on that date, but do you |
| 09:50:13 | 5 | remember doing that at all? |
| 09:50:14 | 6 | **A.      In 2019?** |
| 09:50:15 | 7 | Q.      What did I say?  2018, excuse me. |
| 09:50:19 | 8 | **A.      This was in 2019.** |
| 09:50:22 | 9 | Q.      Okay.  2019.  Do you remember talking to Mike |
| 09:50:25 | 10 | about cars, meeting him in a yard and talking to him |
| 09:50:27 | 11 | about it? |
| 09:50:28 | 12 | **A.      I talked to the confidential informant about cars.** |
| 09:50:46 | 13 | Q.      I'm trying to figure this out here, and so I'm |
| 09:50:50 | 14 | sorry, I'm asking you maybe confusing questions 'cause I |
| 09:50:52 | 15 | really don't know the answer.  Okay?  So bear with me. |
| 09:50:55 | 16 | I'm looking at a wire transcript that's dated |
| 09:50:58 | 17 | November 26th of 2018.  Do you remember -- well, I'll |
| 09:51:04 | 18 | just show it to you and you can help me out here. |
| 09:51:12 | 19 | You see that transcript in front of you? |
| 09:51:14 | 20 | **A.      Yes.** |
| 09:51:14 | 21 | Q.      You see the date that I mentioned? |
| 09:51:16 | 22 | **A.      Yes.** |
| 09:51:16 | 23 | Q.      It says Wire in the top left corner? |
| 09:51:20 | 24 | **A.      Correct.** |
| 09:51:20 | 25 | Q.      And if you just thumb through that, you see this |

6-3-21   USA v. ARJONA   No. 19-10025-01                    21

| | | |
|---|---|---|
| 09:51:22 | 1 | is a conversation about cars? |
| 09:51:25 | 2 | A.    Yeah, I remember, yes. |
| 09:51:27 | 3 | Q.    Okay.  That says MA on it; right?  At the top it |
| 09:51:31 | 4 | lists the persons? |
| 09:51:32 | 5 | A.    Yes. |
| 09:51:32 | 6 | Q.    It indicates that's Michael Arjona? |
| 09:51:34 | 7 | A.    That's incorrect. |
| 09:51:35 | 8 | Q.    Okay.  Who is that supposed to be? |
| 09:51:37 | 9 | A.    Confidential informant. |
| 09:51:38 | 10 | Q.    Okay.  So that conversation didn't involve Michael |
| 09:51:42 | 11 | Arjona at all; is that what you're saying? |
| 09:51:43 | 12 | A.    Correct. |
| 09:51:44 | 13 | Q.    I'll take that back from you.  That clears up my |
| 09:51:46 | 14 | misunderstanding, I guess. |
| 09:51:47 | 15 |      So I'll replace in my own mind here references to |
| 09:51:56 | 16 | Mike with a reference to a confidential informant, but I |
| 09:51:59 | 17 | still want to address this.  Do you remember this |
| 09:52:02 | 18 | situation generally now that we started -- now that we're |
| 09:52:05 | 19 | talking about the same thing? |
| 09:52:05 | 20 | A.    Yes, yes. |
| 09:52:06 | 21 | Q.    Okay.  Do you remember that Cody Cobal showed up |
| 09:52:09 | 22 | at that meeting? |
| 09:52:09 | 23 | A.    Yes. |
| 09:52:10 | 24 | Q.    And you remember that at the time you were going |
| 09:52:13 | 25 | by the undercover name Jimmy; right? |

09:52:16  1  A.      Yes.

09:52:16  2  Q.      Okay.  And Cody showed up, and he said -- you were

09:52:22  3  sort of introduced to him or you met him again at that

09:52:24  4  time; right?

09:52:24  5  A.      I met Cody for the first time, yes.

09:52:27  6  Q.      Okay.  You met Cody for the first time on -- and

09:52:30  7  is the date 11-26, 2018, correct?

09:52:33  8  A.      Should be '19.

09:52:33  9  Q.      Okay.  That's wrong, too.  So 11-26, 2019, is the

09:52:38  10 first time you met Cody Cobal?

09:52:39  11 A.      Correct.

09:52:40  12 Q.      Okay.  You said "What's up?" to him.  You chatted

09:52:43  13 for a second, and do you remember saying to him, "All

09:52:47  14 right.  I'm good, I'm good.  We're doing business

09:52:50  15 together.  Yeah, yeah, so whoever."  [As read.]

09:52:52  16      Do you remember having this conversation about

09:52:54  17 doing business with him?

09:52:57  18 A.      Yes, yes, I had a brief conversation with Cody in

09:53:00  19 the car.

09:53:01  20 Q.      Okay.  And you remember he said, "Yeah, on me.

09:53:04  21 You got a number, a phone number?"  You remember him

09:53:06  22 asking you that?

09:53:08  23 A.      I think I remember asking Cody that.

09:53:10  24 Q.      Yep.  No, did Cody ask you that?

09:53:14  25 A.      I don't believe so.

6-3-21   USA v. ARJONA   No. 19-10025-01                    23

09:53:15   1   Q.    Okay.  I'm going to bring you down to the bottom

09:53:23   2   of that page.  Just take a look at that.  That says C and

09:53:28   3   then a colon there towards the bottom before it

09:53:32   4   references a phone number.

09:53:51   5        (Brief pause.)

09:53:59   6   A.    It starts out the confidential informant is

09:54:01   7   speaking to Cody at this point, and I believe it's the

09:54:07   8   confidential informant speaking to Cody.

09:54:08   9   Q.    Can I come over there and we can just look at it

09:54:11   10  together?  I should have brought a copy for myself.

09:54:14   11  A.    It would help if there was the actual video,

09:54:17   12  'cause there is video.

09:54:18   13  Q.    It sure would.  I'm going to use the transcript,

09:54:21   14  though, and ask you if you just recollect.  DW, that's

09:54:24   15  you; right?  Detective Weber?

09:54:25   16  A.    Yes.

09:54:25   17  Q.    The transcript here says, "All right, I'm good.

09:54:27   18  Good business together.  So, yeah, yeah, yeah, so

09:54:31   19  whoever."  Right?

09:54:31   20  A.    Okay.

09:54:32   21  Q.    And Cody said -- well, it says C, C says yeah, on

09:54:36   22  me, you got a number, phone number?"

09:54:38   23  A.    From what I recollect, that's between the

09:54:41   24  informant and Cody.

09:54:43   25  Q.    Okay.  They were talking about this, the phone

| | | |
|---|---|---|
| 09:54:46 | 1 | number? |
| 09:54:46 | 2 | **A.    That's what I remember, yes.** |
| 09:54:49 | 3 | Q.    Okay.  But you were standing right there next to |
| 09:54:52 | 4 | 'em; right? |
| 09:54:53 | 5 | **A.    Yeah, I was on the other side of the car.** |
| 09:54:54 | 6 | Q.    And it says C here, it says, "Text me, man"? |
| 09:54:57 | 7 | **A.    Uh-huh.** |
| 09:54:58 | 8 | Q.    What's your recollection of who he was talking to? |
| 09:55:00 | 9 | **A.    That was the informant and Cody Cobal.** |
| 09:55:02 | 10 | Q.    Okay.  When they were sharing phone numbers, is it |
| 09:55:14 | 11 | your understanding that they were talking about doing |
| 09:55:16 | 12 | business, the context of that meaning that they were |
| 09:55:18 | 13 | talking about transacting in controlled substances? |
| 09:55:24 | 14 | **A.    Not necessarily.** |
| 09:55:26 | 15 | Q.    Okay.  Well, the CI that you were talking to was a |
| 09:55:32 | 16 | CI you were using to buy and sell controlled substances? |
| 09:55:34 | 17 | **A.    Right.  And the whole arrangement was for me to** |
| 09:55:38 | 18 | **get introduced to Mr. Arjona.** |
| 09:55:39 | 19 | Q.    Okay.  And Cody Cobal, you knew, was involved in |
| 09:55:45 | 20 | the situation with Mr. Arjona? |
| 09:55:46 | 21 | **A.    Yes.** |
| 09:55:46 | 22 | Q.    Selling methamphetamine? |
| 09:55:47 | 23 | **A.    Yes.** |
| 09:55:48 | 24 | Q.    And these two guys, the CI and Cody, were |
| 09:55:51 | 25 | exchanging their phone numbers? |

| | | |
|---|---|---|
| 09:55:54 | 1 | A.       Possibly.  I couldn't hear the whole conversation. |
| 09:55:57 | 2 | Q.    Let's go to the next buy.  That was on |
| 09:56:00 | 3 | November 27th.  On that buy on November 27th, before, |
| 09:56:06 | 4 | this time you spoke with Mike directly on the phone; |
| 09:56:09 | 5 | right? |
| 09:56:09 | 6 | A.    Correct. |
| 09:56:11 | 7 | Q.    This is the first buy where you had spoken with |
| 09:56:13 | 8 | him directly on the phone; right? |
| 09:56:16 | 9 | A.    Yes. |
| 09:56:17 | 10 | Q.    Okay.  He asked you if you had seen Cody; right? |
| 09:56:21 | 11 | A.    Yes. |
| 09:56:21 | 12 | Q.    And you tried to contact Cody but you couldn't |
| 09:56:24 | 13 | reach him? |
| 09:56:24 | 14 | A.    Correct. |
| 09:56:26 | 15 | Q.    How did you try to contact him? |
| 09:56:29 | 16 | A.    So he asked if I had seen Cody, which I had on the |
| 09:56:32 | 17 | first buy. |
| 09:56:33 | 18 | Q.    Okay.  Did you try and contact Cody before this |
| 09:56:36 | 19 | November 27th buy? |
| 09:56:37 | 20 | A.    So I tried to -- yes, I tried to get ahold of Cody |
| 09:56:42 | 21 | at the direction of Mr. Arjona, and I couldn't, I |
| 09:56:45 | 22 | couldn't reach him. |
| 09:56:46 | 23 | Q.    When you tried to get ahold of Cody, how did you |
| 09:56:48 | 24 | try to do that? |
| 09:56:49 | 25 | A.    I believe I was given a number by Mr. Arjona to |

| | | |
|---|---|---|
| 09:56:52 | 1 | call him, and he wouldn't answer. |
| 09:56:54 | 2 | Q.      So you did have Mr. Cobal's phone number then? |
| 09:56:57 | 3 | A.      I believe from Mr. Arjona. |
| 09:56:58 | 4 | Q.      And you used it to try and contact Cody? |
| 09:57:00 | 5 | A.      At the direction of Mr. Arjona. |
| 09:57:03 | 6 | Q.      But you didn't get ahold of Cody; is that right? |
| 09:57:06 | 7 | A.      Right.  So speaking to Mr. Arjona, he finally got |
| 09:57:10 | 8 | ahold of Cody and directed him to meet me. |
| 09:57:13 | 9 | Q.      Right.  Mike said he was going to try and wake |
| 09:57:16 | 10 | Cody up; right? |
| 09:57:17 | 11 | A.      Correct. |
| 09:57:20 | 12 | Q.      You spoke with Mike later about a meeting |
| 09:57:24 | 13 | location? |
| 09:57:26 | 14 | A.      Yes. |
| 09:57:26 | 15 | Q.      You asked Mike -- I'm sorry, Mike asked you where |
| 09:57:32 | 16 | did you want to meet; right? |
| 09:57:37 | 17 | A.      Entirely possible. |
| 09:57:40 | 18 | Q.      Well, is that -- I'm sorry, is that what happened |
| 09:57:42 | 19 | or it didn't happen? |
| 09:57:44 | 20 | A.      I'd have to look at the report. |
| 09:57:45 | 21 | Q.      Let's look at the transcript.  There were |
| 09:57:49 | 22 | transcripts made of your contacts with -- on these |
| 09:57:53 | 23 | various phone calls; right? |
| 09:57:55 | 24 | A.      Correct. |
| 09:58:01 | 25 | MR. BIEBIGHAUSER:  May I approach the witness?  I |

| | | |
|---|---|---|
| 09:58:03 | 1 | should have asked earlier.  I'm sorry. |
| 09:58:04 | 2 | THE COURT:  You may approach the witness at any |
| 09:58:07 | 3 | time, Mr. Biebighauser.  Thank you. |
| 09:58:11 | 4 | BY MR. BIEBIGHAUSER: |
| 09:58:12 | 5 | Q.    Okay.  You see that's a transcript of one of your |
| 09:58:14 | 6 | conversations with Mike on the phone? |
| 09:58:17 | 7 | **A.    Yes.** |
| 09:58:17 | 8 | Q.    What's the date of that call? |
| 09:58:19 | 9 | **A.    12-5 of '18.** |
| 09:58:21 | 10 | Q.    Okay.  Is this -- oh, I'm sorry.  I got ahead of |
| 09:58:38 | 11 | myself.  I'm glad I asked.  Let me take that back.  I'm |
| 09:58:41 | 12 | going to give you one for a different day. |
| 09:58:50 | 13 | We are talking about November 27th.  I'm going to |
| 09:58:54 | 14 | hand you another piece of paper here.  What's the date on |
| 09:58:57 | 15 | that one? |
| 09:58:58 | 16 | **A.    November 27th.** |
| 09:59:00 | 17 | Q.    Okay.  So before we get ahead of ourselves, |
| 09:59:03 | 18 | staying on November 27th, that's a transcript of a phone |
| 09:59:06 | 19 | call that you had with Mr. Arjona; right? |
| 09:59:09 | 20 | **A.    Correct.** |
| 09:59:09 | 21 | Q.    Okay.  Take a look at that for me and then get |
| 09:59:12 | 22 | ready to answer some questions.  You tell me after you've |
| 09:59:15 | 23 | read it.  We'll talk. |
| 09:59:18 | 24 | **A.    (The witness complies.)  Okay.** |
| 09:59:40 | 25 | Q.    Okay.  In that conversation Mike asked you where |

| | | |
|---|---|---|
| 09:59:44 | 1 | you want to meet; right? |
| 09:59:46 | 2 | A.      Correct. |
| 09:59:46 | 3 | Q.      You told him, "Wherever works for Cody." |
| 09:59:56 | 4 | A.      Correct. |
| 09:59:57 | 5 | Q.      You asked for Cody's number? |
| 10:00:09 | 6 | A.      Yes. |
| 10:00:10 | 7 | Q.      Mike said he'd have Cody text you? |
| 10:00:12 | 8 | A.      Correct. |
| 10:00:14 | 9 | Q.      Okay.  Take that back.  That's all on that one. |
| 10:00:21 | 10 | Cody did text you? |
| 10:00:24 | 11 | A.      Yes, I believe so. |
| 10:00:25 | 12 | Q.      And Cody showed up? |
| 10:00:27 | 13 | A.      Correct. |
| 10:00:27 | 14 | Q.      You had a conversation with Cody when he showed |
| 10:00:29 | 15 | up? |
| 10:00:32 | 16 | A.      A brief -- briefly. |
| 10:00:35 | 17 | Q.      You told Cody -- well, a little background of |
| 10:00:39 | 18 | this, trying to get this particular buy set up, you spent |
| 10:00:42 | 19 | a lot of time waiting on people to get this done; right? |
| 10:00:45 | 20 | You remember that? |
| 10:00:47 | 21 | A.      Waiting on who? |
| 10:00:48 | 22 | Q.      I don't know.  It just took awhile to get this |
| 10:00:51 | 23 | whole deal done and get you showing up with Cody.  You |
| 10:00:54 | 24 | remember that problem? |
| 10:00:56 | 25 | A.      Yeah, I mean, the typical drug deal. |

| | | |
|---|---|---|
| 10:00:58 | 1 | Q.    Okay.  Fair enough.  And during the deal, you -- |
| 10:01:05 | 2 | speaking generally here -- you expressed to Cody that you |
| 10:01:08 | 3 | didn't like having to wait on this whole process to |
| 10:01:10 | 4 | unfold; right? |
| 10:01:11 | 5 | A.    I think I mentioned that. |
| 10:01:13 | 6 | Q.    Okay.  Cody told you, "Yeah, you could hit me up. |
| 10:01:18 | 7 | I'll always reply, and I get it quicker." |
| 10:01:20 | 8 | Do you remember that? |
| 10:01:21 | 9 | A.    I do. |
| 10:01:23 | 10 | Q.    He didn't tell you to go straight through Mike, |
| 10:01:26 | 11 | did he? |
| 10:01:26 | 12 | A.    I don't think he said that. |
| 10:01:28 | 13 | Q.    Okay.  He didn't tell you he had to wait for Mike |
| 10:01:31 | 14 | to get in touch with you or him about it? |
| 10:01:32 | 15 | A.    He didn't tell me that. |
| 10:01:34 | 16 | Q.    And on this occasion you got meth from Cody; |
| 10:01:36 | 17 | right? |
| 10:01:37 | 18 | A.    That's correct. |
| 10:01:39 | 19 | Q.    I'm now going to go, finally, December 5th.  On |
| 10:01:45 | 20 | the December 5th buy, you had a handful of phone calls |
| 10:01:49 | 21 | with Mike before receiving meth again; right? |
| 10:01:52 | 22 | A.    Yes. |
| 10:01:53 | 23 | Q.    During a call with him, he said to get ahold of |
| 10:01:57 | 24 | him you could call Cody; right? |
| 10:01:59 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 10:01:59 | 1 | Q.    He said to get ahold of Cody you could call him? |
| 10:02:05 | 2 | **A.    Correct.** |
| 10:02:06 | 3 | Q.    And -- or you could call Cody, and if you couldn't |
| 10:02:10 | 4 | reach him, then you could call Mike; right? |
| 10:02:12 | 5 | **A.    Right.** |
| 10:02:14 | 6 | Q.    I'm going to move now to December 12th.  Again, |
| 10:02:19 | 7 | you had a handful of phone calls with Mike before the |
| 10:02:22 | 8 | buy; right? |
| 10:02:22 | 9 | **A.    Correct.** |
| 10:02:23 | 10 | Q.    Okay.  And this time a few of those calls were |
| 10:02:27 | 11 | about pricing because you were moving into larger |
| 10:02:29 | 12 | quantities now; right? |
| 10:02:31 | 13 | **A.    Yes.** |
| 10:02:31 | 14 | Q.    We're going to come back to pricing, but I'm going |
| 10:02:35 | 15 | to just sort of put a pin in that.  This was on the 12-12 |
| 10:02:39 | 16 | calls with pricing.  But for this buy in particular, Mike |
| 10:02:42 | 17 | told you on the phone that he would be there personally |
| 10:02:45 | 18 | this time; right? |
| 10:02:46 | 19 | **A.    I don't remember that.** |
| 10:03:05 | 20 | Q.    I'm going to hand you another transcript here just |
| 10:03:08 | 21 | to see if you remember it.  And I'm only going to ask you |
| 10:03:10 | 22 | about this first three or four lines, so just let me know |
| 10:03:14 | 23 | if you've read this. |
| 10:03:16 | 24 | **A.    Okay.** |
| 10:03:16 | 25 | Q.    Okay.  He said that he was going to show up |

| 10:03:18 | 1 | personally this time? |
| 10:03:20 | 2 | **A.**      **Yes.** |
| 10:03:20 | 3 | Q.      And this meet was going to happen in a Wal-Mart |
| 10:03:24 | 4 | parking lot? |
| 10:03:24 | 5 | **A.**      **Yes.** |
| 10:03:25 | 6 | Q.      Mike told you, forgive me if I go past those first |
| 10:03:29 | 7 | couple lines, that he said he was going to hop in the car |
| 10:03:32 | 8 | with you when you arrived? |
| 10:03:33 | 9 | **A.**      **Correct.** |
| 10:03:33 | 10 | Q.      All right.  Now this time when he's there |
| 10:03:44 | 11 | personally, he does get in your car, doesn't he? |
| 10:03:47 | 12 | **A.**      **Yes.** |
| 10:03:47 | 13 | Q.      And you talked about pricing again with him face |
| 10:03:50 | 14 | to face; right? |
| 10:03:50 | 15 | **A.**      **Yes.** |
| 10:03:50 | 16 | Q.      And while he's sitting in the car with you, |
| 10:03:53 | 17 | talking face to face, Matthew brings over the math and |
| 10:03:55 | 18 | hands it to you; right? |
| 10:03:58 | 19 | **A.**      **Well, there's a gap in between there, but yes.** |
| 10:04:01 | 20 | Q.      Let's go to December 20th, 2018. |
| 10:04:08 | 21 |         Again, before this buy you had some phone calls |
| 10:04:11 | 22 | with Mike about the upcoming transaction? |
| 10:04:13 | 23 | **A.**      **Yes.** |
| 10:04:13 | 24 | Q.      And this time, again, you're going to meet at a |
| 10:04:15 | 25 | Wal-Mart parking lot? |

6-3-21  USA v. ARJONA  No. 19-10025-01          32

```
10:04:17   1   A.      Correct.

10:04:17   2   Q.      This time, Mike, Matthew, and a bunch of other

10:04:24   3   people show up at the Wal-Mart.  They're in a couple of

10:04:27   4   cars; right?

10:04:27   5   A.      There may have been a couple, yes.

10:04:29   6   Q.      Okay.  And this time Matthew brought

10:04:33   7   methamphetamine to your vehicle; right?

10:04:35   8   A.      Yes.

10:04:35   9   Q.      And then everybody that showed up at Wal-Mart,

10:04:37  10   including Mike and others, they all left together?

10:04:40  11   A.      I believe that's correct, after what surveillance

10:04:44  12   saw.

10:04:45  13   Q.      All right.  I'm going to talk generally now about

10:04:48  14   all of these sort of together.  Okay?

10:04:50  15          During each of these events, I'm talking about

10:04:52  16   before, between, and after your phone calls with Mike,

10:04:57  17   just generally, there was some arrangement made between

10:04:59  18   Mike and other individuals; right?

10:05:04  19   A.      There was an arrangement made between Mike and

10:05:06  20   other individuals.  I don't know if I could testify to

10:05:08  21   that.

10:05:08  22   Q.      Well, you talked to Mike and somebody else showed

10:05:11  23   up sometimes; right?

10:05:11  24   A.      Right.

10:05:12  25   Q.      Okay.  Sometimes he showed up personally; right?
```

| | | |
|---|---|---|
| 10:05:15 | 1 | **A.      Right.** |
| 10:05:16 | 2 | Q.      Okay.  So -- and this may be what you were just |
| 10:05:21 | 3 | getting at.  You were not part of the conversations |
| 10:05:23 | 4 | between Mike and others between the phone calls that you |
| 10:05:26 | 5 | were having with Mike as these deals were unfolding; is |
| 10:05:29 | 6 | that correct? |
| 10:05:29 | 7 | **A.      I was not part of those conversations.** |
| 10:05:31 | 8 | Q.      And you didn't have any secret or concealed |
| 10:05:34 | 9 | listening devices, anything that you could reference to |
| 10:05:37 | 10 | overhear those conversations? |
| 10:05:39 | 11 | **A.      No.** |
| 10:05:40 | 12 | Q.      You did not hear what Mike said to Cody or Matthew |
| 10:05:44 | 13 | about any of these transactions before, during, or after |
| 10:05:47 | 14 | they were held; is that right? |
| 10:05:48 | 15 | **A.      No.** |
| 10:05:49 | 16 | Q.      You did not hear what Cody or Matthew said to Mike |
| 10:05:52 | 17 | about the transactions after, so either direction? |
| 10:05:56 | 18 | **A.      Right.** |
| 10:05:57 | 19 | Q.      You did not observe Mike or others discussing |
| 10:06:02 | 20 | pricing or profits; is that right? |
| 10:06:03 | 21 | **A.      Correct.** |
| 10:06:04 | 22 | Q.      You did not observe how Mike and others decided |
| 10:06:07 | 23 | who would physically provide you the methamphetamine? |
| 10:06:10 | 24 | **A.      Correct.** |
| 10:06:10 | 25 | Q.      You did not observe who packaged the |

| 10:06:13 | 1 | methamphetamine in the quantities that you received? |
| 10:06:15 | 2 | A.      Correct. |
| 10:06:18 | 3 | Q.      During your phone calls with him and your |
| 10:06:21 | 4 | surveillance that you mentioned, you observed Mike and |
| 10:06:25 | 5 | his coconspirators together on a few different occasions; |
| 10:06:29 | 6 | is that true? |
| 10:06:30 | 7 | A.      Correct. |
| 10:06:30 | 8 | Q.      You saw them coming and going together from a |
| 10:06:34 | 9 | house address at 406? |
| 10:06:36 | 10 | A.      Yes. |
| 10:06:37 | 11 | Q.      You saw them lingering there together sometimes? |
| 10:06:40 | 12 | A.      Yes. |
| 10:06:40 | 13 | Q.      You saw them together at Wal-Mart? |
| 10:06:44 | 14 | A.      Yes. |
| 10:06:44 | 15 | Q.      You saw them enter and exit vehicles together? |
| 10:06:50 | 16 | A.      I believe so. |
| 10:06:51 | 17 | Q.      And you didn't always see them together -- or |
| 10:06:55 | 18 | maybe I'll ask you generally about surveillance.  You |
| 10:06:58 | 19 | didn't always see them together in the same groups; |
| 10:07:01 | 20 | right? |
| 10:07:04 | 21 | A.      Can you rephrase that question? |
| 10:07:05 | 22 | Q.      Yeah.  Sometimes maybe you saw these two, but not |
| 10:07:08 | 23 | the other one?  Other times you saw these two, but not |
| 10:07:11 | 24 | that first one?  I mean, they'd meet together in |
| 10:07:13 | 25 | different pairs and triplets; right? |

6-3-21   USA v. ARJONA   No. 19-10025-01          35

| | | |
|---|---|---|
| 10:07:16 | 1 | **A.**      **Sure.** |
| 10:07:17 | 2 | Q.      Okay.  So sometimes they were gathered without |
| 10:07:19 | 3 | Mike around at all; right? |
| 10:07:23 | 4 | **A.**      **Yes.** |
| 10:07:23 | 5 | Q.      Okay.  And other times Mike was there? |
| 10:07:26 | 6 | **A.**      **Yes.** |
| 10:07:28 | 7 | Q.      So based on the experience that you had with Mike, |
| 10:07:33 | 8 | you'd agree with me that he was a drug supplier; is that |
| 10:07:39 | 9 | fair? |
| 10:07:39 | 10 | **A.**      **Sure.** |
| 10:07:39 | 11 | Q.      Yeah.  That's consistent with Mike receiving large |
| 10:07:42 | 12 | quantities of drugs from others, yeah? |
| 10:07:44 | 13 | **A.**      **From him receiving large quantity of drugs from** |
| 10:07:48 | 14 | **others?** |
| 10:07:48 | 15 | Q.      Yeah.  Having large quantities, that would be |
| 10:07:50 | 16 | consistent with him being a supplier, having large |
| 10:07:52 | 17 | quantities? |
| 10:07:52 | 18 | **A.**      **Drugs come from somewhere, yes.** |
| 10:07:54 | 19 | Q.      Okay.  Right.  And him being a supplier would be |
| 10:07:57 | 20 | consistent with Mike providing fractions of those larger |
| 10:08:00 | 21 | quantities to other people? |
| 10:08:01 | 22 | **A.**      **Yes.** |
| 10:08:01 | 23 | Q.      And him being a supplier would be consistent with |
| 10:08:04 | 24 | him communicating the prices for the drugs that he was |
| 10:08:07 | 25 | selling; right? |

| | | |
|---|---|---|
| 10:08:08 | 1 | A.      **Yes.** |
| 10:08:08 | 2 | Q.      It'd be consistent with him offering drugs on |
| 10:08:11 | 3 | fronts; right? |
| 10:08:12 | 4 | A.      **Yes.** |
| 10:08:12 | 5 | Q.      It'd be consistent with him having multiple |
| 10:08:15 | 6 | customers? |
| 10:08:16 | 7 | A.      **Yes.** |
| 10:08:16 | 8 | Q.      It'd be consistent with him developing new |
| 10:08:19 | 9 | customers? |
| 10:08:20 | 10 | A.      **Yes.** |
| 10:08:20 | 11 | Q.      It'd be consistent with him selling in larger |
| 10:08:23 | 12 | quantities to existing customers over time? |
| 10:08:25 | 13 | A.      **Yes.** |
| 10:08:25 | 14 | Q.      Like you? |
| 10:08:27 | 15 | A.      **Correct.** |
| 10:08:29 | 16 | Q.      Let's talk about pricing and profit sharing then. |
| 10:08:32 | 17 | So way back, we put a pin in the conversations you had on |
| 10:08:35 | 18 | December 12th, so I'm now finally going to come back to |
| 10:08:41 | 19 | that with you. |
| 10:08:41 | 20 |       So, again, just to reorient ourselves, you had had |
| 10:08:44 | 21 | a handful of phone calls with Mike about pricing before |
| 10:08:48 | 22 | that transaction? |
| 10:08:50 | 23 | A.      **Yes.** |
| 10:08:51 | 24 | Q.      On the phone, you told him that you were "moving |
| 10:08:54 | 25 | shit like crazy"; right? |

6-3-21  USA v. ARJONA  No. 19-10025-01          37

| | | |
|---|---|---|
| 10:08:56 | 1 | **A.      Yes.** |
| 10:08:56 | 2 | Q.     And on the same call, you asked him what he could |
| 10:08:59 | 3 | sell you a half a pound of meth for? |
| 10:09:02 | 4 | **A.      Correct.** |
| 10:09:03 | 5 | Q.     He told you he would have to see and needed to get |
| 10:09:06 | 6 | back to you; right? |
| 10:09:09 | 7 | **A.      I believe that's correct.** |
| 10:09:10 | 8 | Q.     Okay.  I'm going to pause here for a second about |
| 10:09:13 | 9 | that statement. |
| 10:09:14 | 10 | Is it your understanding that he was contacting |
| 10:09:16 | 11 | then someone else or had to gather more information? |
| 10:09:20 | 12 | **A.      Contacting someone else, no.** |
| 10:09:22 | 13 | Q.     Okay.  You don't know where -- you don't know what |
| 10:09:24 | 14 | it was that he was going to go try and establish before |
| 10:09:27 | 15 | he got back to you? |
| 10:09:28 | 16 | **A.      Yeah, it's typical, I've done a lot of these** |
| 10:09:30 | 17 | **deals, and that's typical conversation for --** |
| 10:09:34 | 18 | Q.     Right? |
| 10:09:35 | 19 | **A.      -- when you buy drugs.** |
| 10:09:36 | 20 | Q.     You don't know what he needed to go and gather |
| 10:09:38 | 21 | before he could give you a price; fair to say? |
| 10:09:40 | 22 | **A.      I don't know what he's doing on the back end.** |
| 10:09:42 | 23 | Q.     You don't know whether he was going to contact |
| 10:09:45 | 24 | Aniceto? |
| 10:09:45 | 25 | **A.      No clue.** |

| | | |
|---|---|---|
| 10:09:46 | 1 | Q.     Or Mauricio? |
| 10:09:47 | 2 | **A.     No.** |
| 10:09:48 | 3 | Q.     But you don't know whether he spoke with Cody |
| 10:09:51 | 4 | about pricing either, do you? |
| 10:09:52 | 5 | **A.     I don't know who he spoke to.** |
| 10:09:53 | 6 | Q.     And you don't know whether he spoke to Matthew |
| 10:09:55 | 7 | about pricing? |
| 10:09:56 | 8 | **A.     I don't.** |
| 10:09:56 | 9 | Q.     Okay.  And then ultimately for this buy it was |
| 10:09:59 | 10 | Matthew that showed up? |
| 10:10:01 | 11 | **A.     Correct.** |
| 10:10:02 | 12 | Q.     Okay.  So getting back to those phone calls then |
| 10:10:07 | 13 | before the buy, on a later phone call he told you that he |
| 10:10:12 | 14 | could do it for $2,250; right? |
| 10:10:16 | 15 | **A.     Correct.** |
| 10:10:17 | 16 | Q.     You have no idea where that number came from, do |
| 10:10:21 | 17 | you? |
| 10:10:21 | 18 | **A.     That's the number he gave me.** |
| 10:10:24 | 19 | Q.     When Mike met you personally during that |
| 10:10:27 | 20 | transaction on the 12th.  You talked more about pricing |
| 10:10:32 | 21 | when he was sitting there in your car.  We mentioned |
| 10:10:34 | 22 | that; right? |
| 10:10:35 | 23 | **A.     Yes.** |
| 10:10:35 | 24 | Q.     He said he'd be able to sell you a pound for |
| 10:10:38 | 25 | 4,000, yeah? |

| | | |
|---|---|---|
| 10:10:38 | 1 | **A.       Correct.** |
| 10:10:39 | 2 | Q.       He said that way he can tell them on the next one |
| 10:10:44 | 3 | you might be ready for a full pound.   You remember that? |
| 10:10:47 | 4 | **A.       Yes.** |
| 10:10:47 | 5 | Q.       You don't know if "them" was Mauricio? |
| 10:10:51 | 6 | **A.       Don't know who "them" is.** |
| 10:10:53 | 7 | Q.       Or if it was -- I'll go through the particular |
| 10:10:57 | 8 | people you mentioned.   You don't know if "them" was |
| 10:10:59 | 9 | Aniceto either? |
| 10:11:00 | 10 | **A.       I don't know.** |
| 10:11:01 | 11 | Q.       And you don't know what Mike's profit share for |
| 10:11:03 | 12 | that price would have been; right? |
| 10:11:04 | 13 | **A.       I do not.** |
| 10:11:06 | 14 | Q.       On February 5th of 2019, you tried to set up an |
| 10:11:14 | 15 | additional buy with Mike that never came to be because he |
| 10:11:17 | 16 | was arrested.   Do you remember doing that? |
| 10:11:20 | 17 | **A.       Can you repeat that?** |
| 10:11:21 | 18 | Q.       Yeah.   On February 5th of 2019, you had tried to |
| 10:11:25 | 19 | set up another buy with Mike that never materialized |
| 10:11:29 | 20 | because he got arrested.   Is that right? |
| 10:11:33 | 21 | **A.       I'd have to see the report on that.** |
| 10:11:35 | 22 | Q.       Yeah, that's fine.   And, you know, Detective, if |
| 10:11:39 | 23 | you tell me this involves somebody else, I'm fine to hear |
| 10:11:42 | 24 | that, too, if there's another typo here.   Just peruse |
| 10:11:50 | 25 | that and let me know if it looks familiar. |

6-3-21   USA v. ARJONA   No. 19-10025-01

40

| | | |
|---|---|---|
| 10:12:02 | 1 | A.      (The witness complies.)   Okay.   What was the |
| 10:13:14 | 2 | question again? |
| 10:13:15 | 3 | Q.     Well, now my question is:  Do you remember that |
| 10:13:17 | 4 | generally now? |
| 10:13:18 | 5 | A.     Yes. |
| 10:13:19 | 6 | Q.     Okay.  So this is February 5th, 2019; right? |
| 10:13:24 | 7 | A.     That's what the date says, yes. |
| 10:13:26 | 8 | Q.     Okay.  And this is just before Mike gets arrested, |
| 10:13:29 | 9 | so this, what we're talking about here, never actually |
| 10:13:31 | 10 | happens? |
| 10:13:32 | 11 | A.     Correct. |
| 10:13:33 | 12 | Q.     Okay.  Now he told you during this conversation |
| 10:13:35 | 13 | that you get a break if you could buy in bulk; right? |
| 10:13:39 | 14 | A.     Yes. |
| 10:13:39 | 15 | Q.     And you had told him that you didn't know if you'd |
| 10:13:42 | 16 | be able to buy as much as sort of this bulk kind of |
| 10:13:45 | 17 | pricing deal; right? |
| 10:13:46 | 18 | A.     Yes. |
| 10:13:47 | 19 | Q.     Okay.  He told you again he'd have to talk to |
| 10:13:51 | 20 | "them" first; right? |
| 10:13:54 | 21 | A.     Yeah, I'd have to refer to where you're looking |
| 10:13:59 | 22 | at. |
| 10:14:00 | 23 | Q.     Sure.  (Indicating.) |
| 10:14:18 | 24 | A.     Okay, that's right. |
| 10:14:19 | 25 | Q.     Okay.  And if you agreed, he said he would "talk |

6-3-21   USA v. ARJONA   No. 19-10025-01          41

```
10:14:24   1   to them about getting an even better deal"; right?

10:14:28   2   A.     Yes.

10:14:29   3   Q.     Okay.  So at this point you still didn't know who

10:14:32   4   "them" was; is that right?

10:14:34   5   A.     I did not.

10:14:34   6   Q.     Okay.  And you didn't know what he was going to

10:14:37   7   tell them?

10:14:39   8   A.     Correct.

10:14:40   9   Q.     Okay.  And you didn't know what they/them were

10:14:44  10   going to tell him; right?

10:14:46  11   A.     Right.

10:14:47  12   Q.     Mike's commentary here, though, is that -- and

10:14:50  13   maybe you just have to review it to refresh yourself --

10:14:53  14   the commentary here was that Mike wasn't going forward

10:14:56  15   sort of without this other information; right?

10:14:58  16   A.     Sure.

10:15:00  17   Q.     All right.  Jumping out from those -- and let me

10:15:05  18   get that.

10:15:16  19         Jumping out from those particulars, as a part of

10:15:20  20   your investigation, you believed that Mike was getting

10:15:24  21   drugs from Aniceto; right?

10:15:28  22   A.     Prior to him being arrested?

10:15:29  23   Q.     Yeah, right.

10:15:31  24   A.     I didn't know who he was getting it from.

10:15:34  25   Q.     Okay.  Now, with the information you have,
```

```
10:15:37   1   generally you know that that was one of the sources of

10:15:39   2   supply?

10:15:39   3   A.     Correct.

10:15:40   4   Q.     Okay.  Same goes with Mauricio?

10:15:44   5   A.     Correct.

10:15:45   6   Q.     You didn't know while this was happening what

10:15:48   7   Aniceto's price for the drugs he was selling was, do you?

10:15:51   8   A.     I did not.

10:15:52   9   Q.     Okay.  And you don't know what Mauricio's price

10:15:58  10   was for selling drugs, do you?

10:15:59  11   A.     No.

10:15:59  12   Q.     You've never heard any conversations between Mike

10:16:01  13   and Aniceto or Mike and Mauricio?

10:16:03  14   A.     I have not.

10:16:04  15   Q.     You don't know whether they told Mike to sell

10:16:06  16   drugs at a certain price point?

10:16:07  17   A.     Correct.

10:16:08  18   Q.     You don't know how Mike's profit sharing was

10:16:11  19   arranged between Aniceto and Mauricio?

10:16:14  20   A.     I did not.

10:16:14  21   Q.     You don't know what profit margin Mike was making

10:16:18  22   on the drugs that he was passing to you?

10:16:21  23   A.     No.

10:16:24  24   Q.     Mike had -- or Mike was living with, sort of

10:16:28  25   eventually, off and on, Mike's living with some other
```

| | | |
|---|---|---|
| 10:16:31 | 1 | coconspirators at 406 Parkdale; right? |
| 10:16:38 | 2 | A.     Yes. |
| 10:16:38 | 3 | Q.     And all of the coconspirators that you've talked |
| 10:16:44 | 4 | to or heard conversation of said that at that location |
| 10:16:47 | 5 | their rent was paid for; right? |
| 10:16:51 | 6 | A.     For the most part, yes. |
| 10:16:53 | 7 | Q.     Do you know, as you sit here today, the fair |
| 10:16:56 | 8 | market value for a two-bedroom residential duplex in |
| 10:16:59 | 9 | November of 2019? |
| 10:17:02 | 10 | A.     Do I know that?  No. |
| 10:17:03 | 11 | Q.     None of them told -- these other individuals, none |
| 10:17:08 | 12 | of them said they paid for the cost of utilities at 406; |
| 10:17:11 | 13 | right? |
| 10:17:12 | 14 | A.     I don't remember that part. |
| 10:17:14 | 15 | Q.     You don't know that they ever said that they paid |
| 10:17:16 | 16 | for utilities? |
| 10:17:16 | 17 | A.     Correct. |
| 10:17:17 | 18 | Q.     You haven't heard that? |
| 10:17:19 | 19 | A.     I don't know. |
| 10:17:21 | 20 | Q.     Do you know what the cost of utilities was at 406? |
| 10:17:24 | 21 | A.     No. |
| 10:17:26 | 22 | Q.     You don't -- a few of them, sort of in their |
| 10:17:30 | 23 | characterizations, they said that they were over there |
| 10:17:35 | 24 | playing video games.  It's one of the things they do? |
| 10:17:37 | 25 | A.     Yes. |

6-3-21   USA v. ARJONA   No. 19-10025-01

44

| | | |
|---|---|---|
| 10:17:38 | 1 | Q.      You don't know all the value of the entertainment |
| 10:17:40 | 2 | systems and accessories that were seized from 406, do |
| 10:17:44 | 3 | you? |
| 10:17:44 | 4 | **A.      No.** |
| 10:17:46 | 5 | Q.      And the other individuals that were there at 406, |
| 10:17:48 | 6 | they said they didn't pay for any of the weed that they |
| 10:17:51 | 7 | smoked; right? |
| 10:17:53 | 8 | **A.      I believe some of them said that, yeah.** |
| 10:17:55 | 9 | Q.      And you don't know the total value of the weed |
| 10:17:57 | 10 | that they were smoking, do you? |
| 10:17:59 | 11 | **A.      No.** |
| 10:18:14 | 12 | Q.      As a part of your investigation you have either |
| 10:18:18 | 13 | conducted or reviewed interviews conducted by others; is |
| 10:18:23 | 14 | that right? |
| 10:18:23 | 15 | **A.      Yes.** |
| 10:18:25 | 16 | Q.      And as an investigator, one of the things you're |
| 10:18:28 | 17 | trained to do is to assess the credibility of the people |
| 10:18:31 | 18 | that you interview or watch others interview; right? |
| 10:18:34 | 19 | **A.      Assess the credibility of people I'm interviewing?** |
| 10:18:37 | 20 | Q.      Yeah. |
| 10:18:37 | 21 | **A.      Yes.** |
| 10:18:38 | 22 | Q.      And then, generally, later, when you're writing a |
| 10:18:42 | 23 | report about an interview, it's your practice to sort of |
| 10:18:45 | 24 | write summaries or paraphrase those interviews; right? |
| 10:18:50 | 25 | **A.      Yes.** |

| | | |
|---|---|---|
| 10:18:52 | 1 | Q.    A few of the interviews involved in this case, you |
| 10:18:56 | 2 | were not present for the interview of Cody Cobal on |
| 10:18:59 | 3 | February 6th; is that right? |
| 10:19:01 | 4 | A.    **I was not present.** |
| 10:19:02 | 5 | Q.    But you were present for his interview on |
| 10:19:05 | 6 | April 3rd; right? |
| 10:19:06 | 7 | A.    **Correct.** |
| 10:19:07 | 8 | Q.    You were not present for the interview of Matthew |
| 10:19:10 | 9 | McMillan on March 5th of 2020; right? |
| 10:19:14 | 10 | A.    **Correct.** |
| 10:19:14 | 11 | Q.    And you were present, though, for an interview of |
| 10:19:17 | 12 | Tristen Baker on July 9th? |
| 10:19:20 | 13 | A.    **Correct.** |
| 10:19:22 | 14 | Q.    When you were testifying on direct examination, |
| 10:19:25 | 15 | you were putting together the information of all three of |
| 10:19:30 | 16 | these individuals, yeah? |
| 10:19:32 | 17 | A.    **Yes.** |
| 10:19:32 | 18 | Q.    And you were sort of summarizing or paraphrasing |
| 10:19:34 | 19 | what they were saying? |
| 10:19:35 | 20 | A.    **Correct.** |
| 10:19:35 | 21 | Q.    At the time of each of their interviews, they had |
| 10:19:38 | 22 | been arrested or indicted for joint criminal activity |
| 10:19:41 | 23 | with Mike; is that right? |
| 10:19:43 | 24 | A.    **Yes.** |
| 10:19:43 | 25 | Q.    At the time of each of their interviews, they were |

| | | |
|---|---|---|
| 10:19:46 | 1 | codefendants of Mike? |
| 10:19:48 | 2 | **A.      Yes.** |
| 10:19:48 | 3 | Q.      And at the time of each of their interviews, |
| 10:19:51 | 4 | somehow they communicated to them in different ways that |
| 10:19:54 | 5 | if they cooperate, they would receive leniency? |
| 10:19:58 | 6 | **A.      That's not part of my involvement.** |
| 10:20:00 | 7 | Q.      Okay.  So you don't know whether that happened or |
| 10:20:02 | 8 | not? |
| 10:20:02 | 9 | **A.      I would assume so, but I wasn't involved in that.** |
| 10:20:05 | 10 | Q.      And you knew that at the time that each of the |
| 10:20:09 | 11 | individuals interviewed by you or others that you |
| 10:20:12 | 12 | reviewed was a drug user at the time of the offense; is |
| 10:20:17 | 13 | that right? |
| 10:20:17 | 14 | **A.      Of marijuana.** |
| 10:20:19 | 15 | Q.      So that's a "yes"? |
| 10:20:20 | 16 | **A.      Yes.** |
| 10:20:23 | 17 | Q.      Okay.  You talked about on direct examination an |
| 10:20:27 | 18 | interview with Matthew McMillan; right? |
| 10:20:29 | 19 | **A.      Can you repeat that?** |
| 10:20:31 | 20 | Q.      Yeah.  You talked about on direct examination an |
| 10:20:34 | 21 | interview with Matthew McMillan? |
| 10:20:37 | 22 | **A.      Yes.** |
| 10:20:37 | 23 | Q.      You didn't attend that interview? |
| 10:20:40 | 24 | **A.      No.** |
| 10:20:41 | 25 | Q.      But you reviewed it or watched it, or you just |

| | | |
|---|---|---|
| 10:20:43 | 1 | read the report? |
| 10:20:44 | 2 | A.    Correct. |
| 10:20:45 | 3 | Q.    Which? |
| 10:20:46 | 4 | A.    Reviewed it, reviewed the transcripts and the |
| 10:20:50 | 5 | reports that were made on the case. |
| 10:20:52 | 6 | Q.    Okay.  Did you review it as you prepared for |
| 10:20:54 | 7 | today's hearing? |
| 10:20:55 | 8 | A.    Yes. |
| 10:20:57 | 9 | Q.    He said he was staying at 406; right? |
| 10:21:01 | 10 | A.    406 or 408.  I can't remember which one. |
| 10:21:04 | 11 | Q.    Okay.  That's a duplex? |
| 10:21:06 | 12 | A.    Correct. |
| 10:21:07 | 13 | Q.    One unit, two doors? |
| 10:21:10 | 14 | A.    Yes. |
| 10:21:11 | 15 | Q.    He said he stayed there from November to February; |
| 10:21:14 | 16 | right? |
| 10:21:15 | 17 | A.    That sounds correct. |
| 10:21:17 | 18 | Q.    He said the weed was already there? |
| 10:21:20 | 19 | A.    Correct. |
| 10:21:20 | 20 | Q.    He said it was a pretty kicking place? |
| 10:21:24 | 21 | A.    If that's what it says, yeah. |
| 10:21:25 | 22 | Q.    He said they smoked? |
| 10:21:28 | 23 | A.    Okay, yes. |
| 10:21:29 | 24 | Q.    He said there were PS4s there? |
| 10:21:32 | 25 | A.    Yes. |

6-3-21   USA v. ARJONA   No. 19-10025-01

48

```
10:21:32   1   Q.     He said it was cool if he had friends over?

10:21:35   2   A.     Yes.

10:21:37   3   Q.     He later said, and I think you mentioned this,

10:21:40   4   about how he was -- he was doing things for Mike.  I

10:21:47   5   can't remember the word you used, but that he was doing

10:21:49   6   things for Mike is sort of what you characterized or

10:21:52   7   summarized his interview; right?

10:21:53   8   A.     Okay.

10:21:54   9   Q.     Is that how it -- I can't remember your word

10:21:57   10  exactly.

10:21:57   11  A.     Yeah, that sounds right.

10:21:58   12  Q.     Okay.  So Matthew, though, said that he wasn't

10:22:08   13  scared of Mike; is that right?

10:22:12   14  A.     I don't recall that.

10:22:16   15  Q.     Okay.  Well, he said -- do you recall that he said

10:22:18   16  that Mike never made any specific threats, he just "did

10:22:22   17  dumb-ass shit all the time"?  You remember he said that?

10:22:25   18  A.     I don't.

10:22:47   19         MR. BIEBIGHAUSER:  Would you patch me in, please?

10:22:50   20  I'm using the one at defense desk.  Oh, I guess I'm not,

10:23:09   21  am I?  That's better.

10:23:24   22  BY MR. BIEBIGHAUSER:

10:23:24   23  Q.     I'm going to play something.  Then I'm going to

10:23:26   24  ask you if you remember.  Okay?

10:23:28   25         (Viewing McMillan interview video.)
```

| | | |
|---|---|---|
| 10:23:42 | 1 | Q.    Okay.  So is that your voice? |
| 10:23:45 | 2 | **A.    No.** |
| 10:23:45 | 3 | Q.    Okay.  So somebody asked him if he ever made any |
| 10:23:48 | 4 | specific threats; right? |
| 10:23:49 | 5 | **A.    That's correct.** |
| 10:23:50 | 6 | Q.    And he said, "He just did dumb-ass shit all the |
| 10:23:54 | 7 | time"? |
| 10:23:54 | 8 | **A.    Yes.** |
| 10:23:55 | 9 | Q.    Talking about Mike? |
| 10:23:56 | 10 | **A.    Yes.** |
| 10:24:04 | 11 | Q.    All right.  Matthew also talked about Cody staying |
| 10:24:07 | 12 | at 406; right? |
| 10:24:08 | 13 | **A.    Yes.** |
| 10:24:10 | 14 | Q.    The investigator that was talking said -- you |
| 10:24:15 | 15 | know, he said, "We know Cody was threatened"; right? |
| 10:24:20 | 16 | **A.    I'd have to look at the transcript or the** |
| 10:24:23 | 17 | **interview.** |
| 10:24:23 | 18 | Q.    Okay.  Let me ask you this:  do you remember |
| 10:24:25 | 19 | Matthew saying Cody was a dumb-ass? |
| 10:24:28 | 20 | **A.    Yes.** |
| 10:24:28 | 21 | Q.    Okay.  He said Cody had opportunities to leave? |
| 10:24:35 | 22 | **A.    I don't remember that part.** |
| 10:24:50 | 23 | Q.    I'm going to play something for you and then I'm |
| 10:24:52 | 24 | going to ask you if you just remember. |
| 10:24:53 | 25 | THE COURT:  Would you identify, Mr. Biebighauser, |

6-3-21   USA v. ARJONA   No. 19-10025-01

50

| | | |
|---|---|---|
| 10:24:55 | 1 | who this witness is that's being displayed on the video? |
| 10:24:58 | 2 | MR. BIEBIGHAUSER:  Oh, I'm sorry. |
| 10:24:58 | 3 | BY MR. BIEBIGHAUSER: |
| 10:24:59 | 4 | Q.    This is the interview of Mr. McMillan; right? |
| 10:24:59 | 5 | **A.    Correct.** |
| 10:25:03 | 6 | Q.    This whole time we've been discussing the |
| 10:25:04 | 7 | interview with Matthew McMillan? |
| 10:25:07 | 8 | **A.    Yes.** |
| 10:25:07 | 9 | THE COURT:  Thank you. |
| 10:25:09 | 10 | (Viewing Mr. McMillan's interview.) |
| 10:25:31 | 11 | BY MR. BIEBIGHAUSER: |
| 10:25:32 | 12 | Q.    All right.  So the investigator asked him, or I |
| 10:25:36 | 13 | guess told him, "We know Cody was threatened."  Yeah? |
| 10:25:39 | 14 | **A.    Okay.** |
| 10:25:40 | 15 | Q.    And Matthew said Cody was a dumb-ass; right? |
| 10:25:44 | 16 | **A.    Right.** |
| 10:25:44 | 17 | Q.    He said Cody had opportunities to leave? |
| 10:25:47 | 18 | **A.    Right.** |
| 10:25:48 | 19 | Q.    He said he didn't know why Cody came back? |
| 10:25:51 | 20 | **A.    Right.** |
| 10:25:51 | 21 | Q.    He said it was for promises of making money? |
| 10:25:54 | 22 | **A.    Right.** |
| 10:25:57 | 23 | Q.    Nobody asked Matthew in the course of the |
| 10:25:59 | 24 | interview that you reviewed how customers were determined |
| 10:26:02 | 25 | or identified; right? |

| | | |
|---|---|---|
| 10:26:03 | 1 | A.    I don't believe so. |
| 10:26:04 | 2 | Q.    Nobody asked Matthew if Matthew had other |
| 10:26:06 | 3 | customers? |
| 10:26:07 | 4 | A.    I don't believe so. |
| 10:26:08 | 5 | Q.    Nobody asked Matthew how customer prices were set? |
| 10:26:12 | 6 | A.    Correct. |
| 10:26:14 | 7 | Q.    Nobody asked Matthew if he knew what Mike's share |
| 10:26:17 | 8 | of the profits were with Ceto or Mauricio? |
| 10:26:22 | 9 | A.    Correct. |
| 10:26:23 | 10 | Q.    Nobody asked Matthew if somebody tried to claim |
| 10:26:27 | 11 | some larger share of profits? |
| 10:26:28 | 12 | A.    Correct. |
| 10:27:31 | 13 | Q.    You conducted an interview of Tristen Baker; |
| 10:27:34 | 14 | right? |
| 10:27:36 | 15 | A.    Yes. |
| 10:27:36 | 16 | Q.    During that interview, nobody asked Tristen how |
| 10:27:39 | 17 | customers were determined or identified, did they -- did |
| 10:27:43 | 18 | you or anybody else? |
| 10:27:46 | 19 | A.    Other than through Michael Arjona, no. |
| 10:27:49 | 20 | Q.    Okay.  Mike mentioned some, but you didn't ask him |
| 10:27:53 | 21 | how those names got brought up or where those customers |
| 10:27:56 | 22 | came from; right? |
| 10:27:57 | 23 | A.    From Mr. Arjona. |
| 10:27:58 | 24 | Q.    Okay.  So I want to actually set the stage a |
| 10:28:02 | 25 | little bit.  You were there and also Special Agent Heizer |

| | | |
|---|---|---|
| 10:28:04 | 1 | was there as well? |
| 10:28:05 | 2 | A.      Correct. |
| 10:28:06 | 3 | Q.      You didn't ask Tristen if there were other -- |
| 10:28:09 | 4 | Tristen had other customers; right? |
| 10:28:11 | 5 | A.      Correct. |
| 10:28:12 | 6 | Q.      You didn't ask Tristen how customer prices were |
| 10:28:15 | 7 | set; right? |
| 10:28:16 | 8 | A.      Other than through Mr. Arjona. |
| 10:28:18 | 9 | Q.      They were communicated to Tristen but you didn't |
| 10:28:20 | 10 | ask him how they were determined, did you? |
| 10:28:23 | 11 | A.      They were determined through Mr. Arjona. |
| 10:28:25 | 12 | Q.      You didn't ask Tristen that, did you?  You're sort |
| 10:28:28 | 13 | of summarizing that, but that's -- Tristen said they were |
| 10:28:31 | 14 | communicated to him, but otherwise he didn't know? |
| 10:28:34 | 15 | A.      Yeah, it was all -- it was all directed -- |
| 10:28:37 | 16 | Q.      That's not my question. |
| 10:28:38 | 17 | A.      -- from Mr. Arjona to Tristen. |
| 10:28:40 | 18 | Q.      My question is did you ever ask Tristen -- let me |
| 10:28:45 | 19 | take a step back. |
| 10:28:46 | 20 | When you were talking to -- let's just talk |
| 10:28:52 | 21 | specifically, I guess, about his experience specifically. |
| 10:28:57 | 22 | Tristen said, "Mike didn't really ask me to do anything. |
| 10:29:00 | 23 | I was always just chilling there." |
| 10:29:02 | 24 | Isn't that what he said? |
| 10:29:03 | 25 | A.      Correct. |

| | | |
|---|---|---|
| 10:29:04 | 1 | Q.    Okay.  Tristen said, "It was a kind of shrug the |
| 10:29:13 | 2 | shoulders-type thing, like 'Whatever, bro'"? |
| 10:29:15 | 3 | **A.    Yes.** |
| 10:29:15 | 4 | Q.    Tristen said, "I am smart enough to know when |
| 10:29:19 | 5 | something is sketchy.  My girlfriend quite a few times, |
| 10:29:22 | 6 | she'd be like, 'Why are you hanging out over there if |
| 10:29:24 | 7 | it's sketchy?'  My answer isn't because I get to smoke |
| 10:29:27 | 8 | for free or any of that; it's simply because my best |
| 10:29:31 | 9 | friend lived there and I've always had his back." |
| 10:29:33 | 10 | **A.    Correct.** |
| 10:29:33 | 11 | (Whereupon, a sotto voce discussion was had |
| 10:29:49 | 12 | between Mr. Biebighauser and the defendant.) |
| 10:30:08 | 13 | MR. BIEBIGHAUSER:  Nothing further. |
| 10:30:10 | 14 | THE COURT:  Redirect, Ms. Andrusak? |
| 10:30:12 | 15 | MS. ANDRUSAK:  Thank you, Your Honor. |
| 10:30:13 | 16 | REDIRECT EXAMINATION |
| 10:30:13 | 17 | BY MS. ANDRUSAK: |
| 10:30:17 | 18 | Q.    Detective, I want to clear up a couple things |
| 10:30:20 | 19 | regarding dates. |
| 10:30:21 | 20 | **A.    Yes.** |
| 10:30:21 | 21 | Q.    So in this case the defendant was indicted on the |
| 10:30:25 | 22 | charges initially on January 30th of 2019, so these deals |
| 10:30:30 | 23 | that we've been talking about, we've thrown out 2018, |
| 10:30:33 | 24 | 2019.  So the deals on November 20th, then that phone |
| 10:30:37 | 25 | call defense counsel brought up on November 26th, deal on |

10:30:40  1   the 27th of November, December 5th, December 12th, and

10:30:43  2   December 20th, those were all in 2018; correct?

10:30:47  3   A.      Yes.

10:30:48  4   Q.      So then the interviews of McMillan, Cobal, and the

10:30:52  5   defendant, those occurred in 2019?

10:30:52  6   A.      Correct.

10:30:55  7   Q.      And those occurred after the indictment and their

10:30:58  8   arrest on the grand jury warrants; correct?

10:30:59  9   A.      Yes.

10:31:00  10  Q.      Okay.  Just want to clear that up for the record.

10:31:03  11          So on these deals, particularly November 27th,

10:31:11  12  while you physically got the methamphetamine from Cody

10:31:15  13  Cobal, you did not arrange the deal with Mr. Cobal;

10:31:18  14  correct?

10:31:19  15  A.      I did not.

10:31:19  16  Q.      Okay.  You arranged the deal with the defendant?

10:31:22  17  A.      That is correct.

10:31:23  18  Q.      And you negotiated your prices with the defendant?

10:31:27  19  A.      That is correct.

10:31:27  20  Q.      And you discussed the amounts you were getting

10:31:30  21  from the defendant with the defendant?

10:31:32  22  A.      Correct.

10:31:33  23  Q.      Okay.  Then another thing to clear up.  There was

10:31:38  24  mention of different residences, Parkdale and then 406.

10:31:43  25  At one point Mr. Cobal and the defendant and, actually,

| | | |
|---|---|---|
| 10:31:45 | 1 | Mauricio lived at a residence on Parkdale; is that right? |
| 10:31:49 | 2 | A.      Can you repeat that? |
| 10:31:50 | 3 | Q.      Yes.  So before we get to the duplex at 406 and |
| 10:31:55 | 4 | 408 Illinois, Mr. Cobal, the defendant, and Mauricio |
| 10:32:00 | 5 | lived on an address in Parkdale, on Parkdale; is that |
| 10:32:05 | 6 | right? |
| 10:32:05 | 7 | A.      I believe that's correct, yes, years before. |
| 10:32:09 | 8 | Q.      Yes.  So when discussing 406 and where McMillan |
| 10:32:12 | 9 | lived, that is actually 406 Illinois Street? |
| 10:32:16 | 10 | A.      That is correct. |
| 10:32:16 | 11 | Q.      Okay. |
| 10:32:20 | 12 | MS. ANDRUSAK:  That's all, Your Honor. |
| 10:32:22 | 13 | THE COURT:  Any recross within the scope? |
| 10:32:23 | 14 | MR. BIEBIGHAUSER:  No. |
| 10:32:24 | 15 | THE COURT:  Detective, you may step down.  Thank |
| 10:32:26 | 16 | you for your testimony here. |
| 10:32:28 | 17 | (Witness excused from the witness stand.) |
| 10:32:28 | 18 | THE COURT:  Ms. Andrusak, you have another |
| 10:32:29 | 19 | witness? |
| 10:32:29 | 20 | MS. ANDRUSAK:  Yes, Your Honor.  My agent is going |
| 10:32:32 | 21 | to grab him, but the next witness will be Cody Cobal. |
| 10:32:35 | 22 | He's currently in the jury room. |
| 10:33:18 | 23 | [Brief pause.] |
| 10:33:18 | 24 | THE COURT:  Mr. Cobal, you may -- that works -- |
| 10:33:26 | 25 | come and stand before my courtroom deputy here.  She's |

```
10:33:28    1   going to give you an oath, and then you can work your way
10:33:32    2   around to the back and have a seat in this witness box
10:33:35    3   here.
10:33:35    4           THE WITNESS:  Okay.
10:33:35    5                         CODY COBAL,
10:33:35    6   having been first duly sworn to testify the truth, the
10:33:35    7   whole truth, and nothing but the truth, testified as
10:33:55    8   follows:
10:33:55    9           THE COURT:  Ms. Andrusak, you may inquire when
10:33:56   10   you're ready.
10:33:57   11           What are the items that were left on the counter
10:34:00   12   here at the witness box?  Are those yours or are those
10:34:05   13   Mr. Biebighauser's?  I'm just talking about the things
10:34:09   14   there to your left, Ms. Andrusak.
10:34:11   15           MS. ANDRUSAK:  These?
10:34:12   16           THE COURT:  Yes.
10:34:13   17           MS. ANDRUSAK:  I believe those are the microphone
10:34:14   18   covers, Your Honor.
10:34:15   19           THE COURT:  Oh, all right.  Well, that's a good
10:34:17   20   place for them then.  Thank you.
10:34:19   21                    DIRECT EXAMINATION
10:34:19   22   BY MS. ANDRUSAK:
10:34:22   23   Q.   And actually, Cody, since I'm up, will you please
10:34:26   24   scooch forward and get this microphone closer to you.
10:34:33   25           Can you please state your name for the record.
```

| | | |
|---|---|---|
| 10:34:37 | 1 | **A.**      **Cody James Cobal.** |
| 10:34:39 | 2 | Q.      And how old are you, Mr. Cobal? |
| 10:34:41 | 3 | **A.**      **I'm 25.** |
| 10:34:42 | 4 | Q.      Okay.  Do you know Michael Arjona? |
| 10:34:47 | 5 | **A.**      **Yes.** |
| 10:34:47 | 6 | Q.      Do you see him in the courtroom today? |
| 10:34:49 | 7 | **A.**      **Yes.** |
| 10:34:49 | 8 | Q.      Can you please point out where he's sitting and |
| 10:34:51 | 9 | what he's wearing. |
| 10:34:52 | 10 | **A.**      **Sitting right there wearing the blue jumpsuit.** |
| 10:34:55 | 11 |       MS. ANDRUSAK:  Your Honor, may the record reflect |
| 10:34:56 | 12 | that the witness has identified the defendant? |
| 10:34:58 | 13 |       THE COURT:  The record will so reflect. |
| 10:35:00 | 14 | BY MS. ANDRUSAK: |
| 10:35:00 | 15 | Q.      Can you tell me how you first met the defendant. |
| 10:35:03 | 16 | **A.**      **I met him through his son.** |
| 10:35:05 | 17 | Q.      Okay.  What's his son's name? |
| 10:35:07 | 18 | **A.**      **Austin.** |
| 10:35:08 | 19 | Q.      How long have you known Austin? |
| 10:35:10 | 20 | **A.**      **I maybe have only known Austin for about a year.** |
| 10:35:16 | 21 | Q.      Okay.  And did you end up living with the |
| 10:35:18 | 22 | defendant? |
| 10:35:18 | 23 | **A.**      **Yes.** |
| 10:35:18 | 24 | Q.      When did that happen? |
| 10:35:21 | 25 | **A.**      **That happened, I'd say, another year after having** |

10:35:25  1  met Mike.

10:35:27  2  Q.      So is that like 2016, 2017?

10:35:30  3  A.      I mean, he stayed with us a lot in 2016, and 2017

10:35:34  4  is when he pretty much lived with me.

10:35:36  5  Q.      Okay.  Let me back up.  So what was your living

10:35:41  6  situation prior to Mr. Arjona stepping in?

10:35:46  7  A.      We -- "we" as in myself, a lot of my friends -- we

10:35:50  8  lived in a big house all together that Mike paid for.

10:35:56  9  Q.      Okay.  Before you were at that house, were you

10:36:00  10  living with family members?

10:36:02  11  A.      No.

10:36:04  12  Q.      Why is that?

10:36:06  13  A.      I had been kicked out.  I had nowhere to live.

10:36:10  14  Q.      You had been kicked out of a residence by your

10:36:12  15  family?

10:36:13  16  A.      Yes.

10:36:14  17  Q.      And at that point you got hooked up with the

10:36:16  18  defendant through his son and he provided you a

10:36:18  19  residence?

10:36:19  20  A.      Yes.

10:36:20  21  Q.      And that happened around 2016?

10:36:22  22  A.      The end of 2016.

10:36:26  23  Q.      Okay.  Who all was living in that residence?

10:36:29  24  A.      Myself, Austin, Nathan Miller, Ethan Tunnel, and

10:36:38  25  then a lot of other people would just stay there.

| | | |
|---|---|---|
| 10:36:41 | 1 | Q.    What about a gentleman by the name of Mauricio? |
| 10:36:44 | 2 | **A.    Mauricio lived there.** |
| 10:36:46 | 3 | Q.    What did you like about that living situation that |
| 10:36:52 | 4 | Arjona set up for you? |
| 10:36:54 | 5 | **A.    I got to be lazy.** |
| 10:36:57 | 6 | Q.    You could do what you wanted? |
| 10:36:58 | 7 | **A.    Pretty much.** |
| 10:36:59 | 8 | Q.    There were video games? |
| 10:37:01 | 9 | **A.    Yes.** |
| 10:37:01 | 10 | Q.    There was marijuana? |
| 10:37:02 | 11 | **A.    Yes.** |
| 10:37:03 | 12 | Q.    He provided food for you? |
| 10:37:08 | 13 | **A.    Yeah.** |
| 10:37:08 | 14 | Q.    Okay.  Did that environment change over time?  Did |
| 10:37:13 | 15 | you have to start doing things for the defendant? |
| 10:37:14 | 16 | **A.    Eventually, yes.** |
| 10:37:16 | 17 | Q.    What things did you start doing for the defendant? |
| 10:37:18 | 18 | **A.    I was basically a chauffeur.  I drove him around** |
| 10:37:22 | 19 | **everywhere.  Started off just going to get food, then I** |
| 10:37:28 | 20 | **was taking him to meet people.** |
| 10:37:29 | 21 | Q.    And did you also chauffeur Mauricio? |
| 10:37:33 | 22 | **A.    Yes.** |
| 10:37:38 | 23 | Q.    So you said that you took the defendant to meet |
| 10:37:40 | 24 | people. |
| 10:37:41 | 25 | **A.    Yes.** |

| | | |
|---|---|---|
| 10:37:41 | 1 | Q.    Do you know what he was meeting those people for? |
| 10:37:43 | 2 | A.    **I didn't at first, no.** |
| 10:37:45 | 3 | Q.    Did you eventually learn what he was meeting those |
| 10:37:48 | 4 | people for? |
| 10:37:49 | 5 | A.    **Yes.** |
| 10:37:49 | 6 | Q.    How did you come to learn that? |
| 10:37:51 | 7 | A.    **Because I began doing that eventually for him** |
| 10:37:54 | 8 | **myself.** |
| 10:37:55 | 9 | Q.    Because he told you to? |
| 10:37:57 | 10 | A.    **Yes.** |
| 10:37:57 | 11 | Q.    Okay.  Where were you living?  Because you |
| 10:38:11 | 12 | mentioned this house. |
| 10:38:13 | 13 | A.    **Uh-huh.** |
| 10:38:13 | 14 | Q.    And the court has heard prior testimony about a |
| 10:38:16 | 15 | residence on Parkdale and a residence on Illinois Street. |
| 10:38:19 | 16 | A.    **Yes.** |
| 10:38:19 | 17 | Q.    So this house where you were just describing the |
| 10:38:21 | 18 | individuals that lived there, including Mauricio, was |
| 10:38:24 | 19 | that the residence on Parkdale? |
| 10:38:26 | 20 | A.    **Yes, it was.** |
| 10:38:26 | 21 | Q.    Okay.  And when did you move over to the Illinois |
| 10:38:29 | 22 | residence? |
| 10:38:32 | 23 | A.    **Somewhere around six months after living at** |
| 10:38:34 | 24 | **Parkdale.** |
| 10:38:35 | 25 | Q.    Okay.  So did you start -- did you become involved |

10:38:41  1  on the drug side of things while you were at that

10:38:44  2  Parkdale residence?

10:38:45  3  A.      That's kind of when I was introduced to it, but it

10:38:50  4  became something I was really involved in when we moved

10:38:52  5  to the Illinois residence.

10:38:54  6  Q.    How were you introduced to it?  Tell us how that

10:38:57  7  happened.

10:38:58  8  A.      After everybody moved out of the Parkdale

10:39:01  9  residence, I was left with nowhere to go again, and he

10:39:05  10  offered me a place to stay at the 406 South Illinois

10:39:09  11  residence if I were to make a trip to Omaha, Nebraska.

10:39:16  12  Q.    Okay.  Did he tell you what this trip was for?

10:39:20  13  A.      It was to pick up drugs.

10:39:21  14  Q.    And he told you that?

10:39:23  15  A.      Yes.

10:39:27  16  Q.    When was this trip?

10:39:29  17  A.      2017, I'd say.

10:39:36  18  Q.    Did you go on that trip alone?

10:39:38  19  A.      No.

10:39:38  20  Q.    Who went with you?

10:39:39  21  A.      My friend Ethan went with me.

10:39:43  22  Q.    Who -- how did that happen?  How did Ethan join

10:39:46  23  the trip?

10:39:46  24  A.      I asked if he could come.  I didn't want to go by

10:39:48  25  myself, and I needed a ride up there, so I could take a

| | | |
|---|---|---|
| 10:39:52 | 1 | bus back. |
| 10:39:53 | 2 | Q.    Who did you ask if he could come? |
| 10:39:54 | 3 | A.    I asked Mike. |
| 10:39:55 | 4 | Q.    Why did you ask Mike? |
| 10:39:58 | 5 | A.    Because I didn't want to do it.  I mean, I didn't |
| 10:40:01 | 6 | know who I was going to meet.  I didn't know what would |
| 10:40:04 | 7 | happen if I didn't ask. |
| 10:40:05 | 8 | Q.    Did you need Mike's permission to add somebody to |
| 10:40:08 | 9 | this trip? |
| 10:40:08 | 10 | A.    Yes. |
| 10:40:08 | 11 | Q.    And is that because it was his trip -- "his" being |
| 10:40:12 | 12 | it was Mike's trip -- that he was sending you on? |
| 10:40:14 | 13 | A.    Yes. |
| 10:40:15 | 14 | Q.    What vehicle did you drive up there? |
| 10:40:18 | 15 | A.    It was a vehicle he provided.  It was a Ford |
| 10:40:23 | 16 | Escape, I believe. |
| 10:40:24 | 17 | Q.    Okay.  So the defendant set up the trip and he |
| 10:40:28 | 18 | provided the vehicle? |
| 10:40:29 | 19 | A.    Yes. |
| 10:40:30 | 20 | Q.    Did he provide any travel expenses for you to use |
| 10:40:32 | 21 | for gas and food? |
| 10:40:34 | 22 | A.    Yes. |
| 10:40:36 | 23 | Q.    Did you -- before you left Kansas, did you know |
| 10:40:41 | 24 | who you were meeting in Omaha? |
| 10:40:43 | 25 | A.    No. |

10:40:44  1  Q.    Were you provided a number to contact when you got

10:40:47  2  to Omaha?

10:40:49  3  **A.    When I got to Omaha, he gave the person my number**

10:40:53  4  **to contact me and set up a place to meet.**

10:40:57  5  Q.    "He" being the defendant?

10:40:58  6  **A.    Mike, Michael Arjona.**

10:41:00  7  Q.    So the defendant gave the supplier in Omaha your

10:41:04  8  number and the supplier contacted you at some point?

10:41:08  9  **A.    Yes.**

10:41:08  10  Q.    But up until that phone call, you had no contact

10:41:11  11  with who you were meeting?

10:41:13  12  **A.    Correct.**

10:41:19  13  Q.    Did you have to pay for the drugs?

10:41:22  14  **A.    No.**

10:41:25  15  Q.    And did you know going up there that you would not

10:41:28  16  have to provide payment?

10:41:31  17  **A.    Yeah, because I wasn't sent with money for it.**

10:41:37  18  Q.    Did you negotiate the amount of drugs that you

10:41:39  19  were picking up?

10:41:40  20  **A.    No.**

10:41:41  21  Q.    Who did?

10:41:42  22  **A.    Mike.**

10:41:46  23  Q.    Would you have made this trip to Omaha, Nebraska,

10:41:49  24  but for the defendant asking you to?

10:41:51  25  **A.    No.**

| | | |
|---|---|---|
| 10:41:53 | 1 | Q.    Did you have any reason to make the trip to Omaha |
| 10:41:56 | 2 | but for the defendant asking you to? |
| 10:41:57 | 3 | **A.    No.** |
| 10:41:59 | 4 | Q.    And was it so much an "ask" or were you told that |
| 10:42:03 | 5 | this is what you needed to do for your residence? |
| 10:42:05 | 6 | **A.    I was told, to be able to stay there, that's what** |
| 10:42:07 | 7 | **I had to do.** |
| 10:42:12 | 8 | Q.    And did you ultimately make the trip? |
| 10:42:15 | 9 | **A.    Yes.** |
| 10:42:19 | 10 | Q.    So you said that's how you were introduced into |
| 10:42:25 | 11 | his drug business.  What happened after that? |
| 10:42:31 | 12 | **A.    Can you rephrase that?** |
| 10:42:32 | 13 | Q.    Of course.  When you returned back from Omaha -- |
| 10:42:36 | 14 | actually, I'm going to stop there.  You interviewed with |
| 10:42:41 | 15 | law enforcement a couple of times; isn't that right? |
| 10:42:43 | 16 | **A.    Yes.** |
| 10:42:43 | 17 | Q.    And one of them was in -- I believe it was April |
| 10:42:50 | 18 | of 2019.  Do you remember that? |
| 10:42:52 | 19 | **A.    Yes, I do.** |
| 10:42:53 | 20 | Q.    Okay.  And you discussed this trip to Nebraska at |
| 10:42:55 | 21 | that time, didn't you? |
| 10:42:57 | 22 | **A.    Yes.** |
| 10:42:58 | 23 | Q.    But you told law enforcement that it was to |
| 10:43:01 | 24 | Lincoln, Nebraska; correct? |
| 10:43:03 | 25 | **A.    Yeah, I made a mistake.** |

| | | |
|---|---|---|
| 10:43:03 | 1 | Q.     Okay.  Why did you tell them Lincoln? |
| 10:43:08 | 2 | **A.     I got the cities confused.  I had gone to Lincoln** |
| 10:43:11 | 3 | **quite a bit when I was younger.  My family stays in** |
| 10:43:14 | 4 | **Nebraska, and I just had Lincoln in my head.  Omaha was** |
| 10:43:17 | 5 | **the right place.** |
| 10:43:18 | 6 | Q.     Okay.  So you went to Omaha? |
| 10:43:18 | 7 | **A.     Yes.** |
| 10:43:20 | 8 | Q.     Okay.  Thank you.  So when you returned from |
| 10:43:24 | 9 | Omaha, what kind of interactions did you have with the |
| 10:43:27 | 10 | defendant after that? |
| 10:43:30 | 11 | **A.     We didn't stay there quite as much at that time,** |
| 10:43:35 | 12 | **but we pretty much stayed at 406 South Illinois, and I** |
| 10:43:37 | 13 | **drove him around, continuing to do what we were doing** |
| 10:43:41 | 14 | **before.** |
| 10:43:42 | 15 | Q.     And when you say "continuing to do what we did |
| 10:43:44 | 16 | before," what do you mean? |
| 10:43:46 | 17 | **A.     Meeting people to sell drugs.** |
| 10:43:49 | 18 | Q.     And at that point you knew that these trips were |
| 10:43:52 | 19 | to drop off drugs? |
| 10:43:54 | 20 | **A.     Yes.** |
| 10:43:55 | 21 | Q.     And were you told to drive the defendant? |
| 10:43:58 | 22 | **A.     Yes.** |
| 10:43:58 | 23 | Q.     For each of these trips? |
| 10:43:59 | 24 | **A.     Yes.** |
| 10:44:00 | 25 | Q.     And who told you to drive the defendant? |

10:44:01  1   A.      He told me to drive him.

10:44:04  2   Q.      Okay.  And so some of these trips, were they up to

10:44:07  3   Hutchinson?

10:44:08  4   A.      Yes.

10:44:09  5   Q.      Can you tell me how the trips to Hutchinson

10:44:11  6   started.

10:44:12  7   A.      It started off he asked me to drive him to Hutch.

10:44:18  8   It was actually outside of Hutch, a small town outside of

10:44:22  9   Hutch, I can't remember the name right now.  He asked me

10:44:24  10  if I'd go up there, and I sat outside while he went into

10:44:27  11  a house and waited, and he came out and we went back

10:44:31  12  home.  And then I went with him again.  I went inside

10:44:33  13  with him, with Mike, and it was to sell drugs.  And then

10:44:39  14  we did that, I think, one more time where I had gone with

10:44:42  15  him.  Then after that I would go by myself, bringing the

10:44:45  16  drugs or going to collect the money.

10:44:48  17  Q.      Okay.  So I'm going to break down those trips just

10:44:52  18  a little bit.

10:44:52  19          So the first trip up to Hutchinson, did you know

10:44:54  20  what you were going there to do?

10:44:56  21  A.      No.

10:44:56  22  Q.      So you were just told to drive?

10:44:58  23  A.      Yeah.

10:44:58  24  Q.      And then Mr. Arjona got out of the car, and then

10:45:04  25  came back and you drove him home?

| | | |
|---|---|---|
| 10:45:06 | 1 | A.       Yes. |
| 10:45:07 | 2 | Q.       And did he direct you to drive him on that trip? |
| 10:45:10 | 3 | A.       Yes. |
| 10:45:10 | 4 | Q.       Okay.  So then the second trip, this time you went |
| 10:45:14 | 5 | in with the defendant; is that right? |
| 10:45:15 | 6 | A.       Correct. |
| 10:45:16 | 7 | Q.       And he directed you to be a part of this trip? |
| 10:45:20 | 8 | A.       Yes. |
| 10:45:21 | 9 | Q.       And at that point what happened when you were in |
| 10:45:24 | 10 | this residence that you had arrived to? |
| 10:45:27 | 11 | A.       I just saw a drug deal happen. |
| 10:45:30 | 12 | Q.       Okay.  And at that time did you know that's why |
| 10:45:32 | 13 | you were going up to Hutch? |
| 10:45:34 | 14 | A.       Yes. |
| 10:45:35 | 15 | Q.       Okay.  And so you said there were two instances |
| 10:45:38 | 16 | where you drove the defendant up and you both went in for |
| 10:45:44 | 17 | the drug deal; is that correct? |
| 10:45:44 | 18 | A.       Correct. |
| 10:45:45 | 19 | Q.       And then after that he trusted you to make these |
| 10:45:49 | 20 | trips by yourself? |
| 10:45:51 | 21 | A.       Yes. |
| 10:45:51 | 22 | Q.       And each one of those trips, did you decide when |
| 10:45:55 | 23 | those trips were going to happen? |
| 10:45:56 | 24 | A.       No. |
| 10:45:57 | 25 | Q.       Did you contact the individuals in Hutch to set up |

| | | |
|---|---|---|
| 10:46:00 | 1 | the trips? |
| 10:46:01 | 2 | A.      No. |
| 10:46:01 | 3 | Q.      Who did that? |
| 10:46:02 | 4 | A.      Mike. |
| 10:46:03 | 5 | Q.      And each of these trips you were told by the |
| 10:46:06 | 6 | defendant to make? |
| 10:46:07 | 7 | A.      Yes. |
| 10:46:07 | 8 | Q.      And just to clarify, I'm talking about the trips |
| 10:46:11 | 9 | where he started letting you go by yourself. |
| 10:46:13 | 10 | A.      Yes. |
| 10:46:13 | 11 | Q.      Each one of those were set up by the defendant? |
| 10:46:15 | 12 | A.      Correct. |
| 10:46:16 | 13 | Q.      And did you have any role in the negotiating of |
| 10:46:22 | 14 | amounts of drugs or amounts of money that were going to |
| 10:46:26 | 15 | be exchanged while in Hutchinson? |
| 10:46:27 | 16 | A.      No. |
| 10:46:28 | 17 | Q.      Okay.  Who did all of that? |
| 10:46:29 | 18 | A.      Mike. |
| 10:46:30 | 19 | Q.      Okay.  So these trips, I reference them as being |
| 10:46:42 | 20 | somewhat of a test, based on our previous conversations. |
| 10:46:46 | 21 | Did you believe that these trips were first you just |
| 10:46:49 | 22 | drove, then he introduced you into the deal, and then you |
| 10:46:52 | 23 | were doing them by yourself, he was testing you or |
| 10:46:54 | 24 | grooming you? |
| 10:46:55 | 25 | A.      I believe so. |

| | | |
|---|---|---|
| 10:46:57 | 1 | Q.      How long did you make these trips to Hutch? |
| 10:47:09 | 2 | A.      **I can't remember exactly.  Maybe six months.** |
| 10:47:11 | 3 | Q.      Okay.  And each trip that you made during that |
| 10:47:15 | 4 | time period was at the direction of the defendant? |
| 10:47:18 | 5 | A.      **Yes.** |
| 10:47:18 | 6 | Q.      Okay.  Did you believe that you could tell him,. |
| 10:47:23 | 7 | "No, I don't want to take that trip"? |
| 10:47:25 | 8 | A.      **No.** |
| 10:47:25 | 9 | Q.      Why did you feel that way? |
| 10:47:27 | 10 | A.      **Because there was nobody else to do it, I don't** |
| 10:47:30 | 11 | **think, and -- I mean, I was scared to tell him no.  I** |
| 10:47:34 | 12 | **needed a place to stay.** |
| 10:47:36 | 13 | Q.      Why were you scared to tell him no? |
| 10:47:40 | 14 | A.      **I feared him.** |
| 10:47:46 | 15 | Q.      Why -- what made you fear him?  Were there |
| 10:47:49 | 16 | experiences that made you -- |
| 10:47:50 | 17 | A.      **There was some experiences, yes.** |
| 10:47:51 | 18 | Q.      Can you tell me about those. |
| 10:47:53 | 19 | A.      **There was multiple experiences where I had a gun** |
| 10:47:56 | 20 | **pointed at me and -- while he was drunk, and I did not** |
| 10:48:00 | 21 | **want to go through that again.  I didn't know what would** |
| 10:48:02 | 22 | **happen.** |
| 10:48:02 | 23 | Q.      When you say he "had a gun pointed at me," who |
| 10:48:05 | 24 | pointed it? |
| 10:48:06 | 25 | A.      **Mike, Mike.** |

| | | |
|---|---|---|
| 10:48:07 | 1 | Q.      Was it a loaded gun? |
| 10:48:08 | 2 | **A.      Yes.** |
| 10:48:08 | 3 | Q.      How do you know that? |
| 10:48:09 | 4 | **A.      I saw it be loaded.** |
| 10:48:12 | 5 | Q.      You saw him load it? |
| 10:48:14 | 6 | **A.      Yeah.** |
| 10:48:14 | 7 | Q.      And he did this while he was intoxicated? |
| 10:48:16 | 8 | **A.      Yes.** |
| 10:48:17 | 9 | Q.      And that scared you? |
| 10:48:19 | 10 | **A.      Yes.** |
| 10:48:19 | 11 | Q.      And so you made these trips out of fear of not |
| 10:48:24 | 12 | having a living arrangement and, two, that something |
| 10:48:27 | 13 | could happen based on those behaviors? |
| 10:48:30 | 14 | **A.      Yes.** |
| 10:48:34 | 15 | Q.      Did someone eventually take care of the trips to |
| 10:48:38 | 16 | Hutchinson? |
| 10:48:38 | 17 | **A.      Yes.** |
| 10:48:39 | 18 | Q.      Who took those over? |
| 10:48:40 | 19 | **A.      Mitch Newman.** |
| 10:48:42 | 20 | Q.      Okay.  And did the defendant coordinate those |
| 10:48:46 | 21 | trips for Mr. Newman as well? |
| 10:48:49 | 22 | **A.      As far as I know.** |
| 10:49:07 | 23 | Q.      So we've talked about the living arrangements at |
| 10:49:10 | 24 | Parkdale, and then you moved over to 406 South Illinois; |
| 10:49:14 | 25 | correct? |

| 10:49:15 | 1 | A.      Yes. |
| 10:49:16 | 2 | Q.      Did individuals live with you at that residence? |
| 10:49:19 | 3 | And "that residence" being at the Illinois residence. |
| 10:49:22 | 4 | A.      Yes. |
| 10:49:22 | 5 | Q.      Who lived with you there? |
| 10:49:23 | 6 | A.      Matthew McMillan lived with me. |
| 10:49:25 | 7 | Q.      Okay.  Did Mr. McMillan have a similar arrangement |
| 10:49:32 | 8 | with the defendant as you? |
| 10:49:34 | 9 | A.      Yes. |
| 10:49:34 | 10 | Q.      How do you know that? |
| 10:49:36 | 11 | A.      I witnessed it, watched it happen. |
| 10:49:42 | 12 | Q.      So Mr. McMillan also ran drugs at the defendant's |
| 10:49:46 | 13 | direction? |
| 10:49:48 | 14 | A.      Yes. |
| 10:49:49 | 15 | Q.      And you know that because you watched it happen? |
| 10:49:52 | 16 | A.      Yes. |
| 10:49:56 | 17 | Q.      Were there other people who stayed with you but |
| 10:49:58 | 18 | maybe for not as long a term? |
| 10:50:01 | 19 | A.      Yes. |
| 10:50:02 | 20 | Q.      Can you tell me some of those people. |
| 10:50:04 | 21 | A.      One of their names I believe was Tyler Leach.  He |
| 10:50:09 | 22 | wasn't there for very long.  It was towards the end. |
| 10:50:14 | 23 | There was kids that would just stay over, you know, stay |
| 10:50:17 | 24 | the night for a few days.  There wasn't anybody that |
| 10:50:19 | 25 | lived there like we did. |

| | | |
|---|---|---|
| 10:50:20 | 1 | Q.    And those people that stayed the night, one |
| 10:50:23 | 2 | example being Tristen Baker -- |
| 10:50:24 | 3 | **A.    Yes.** |
| 10:50:25 | 4 | Q.    -- did you observe them being instructed by Arjona |
| 10:50:30 | 5 | to make drops as well? |
| 10:50:32 | 6 | **A.    A few times.** |
| 10:50:34 | 7 | Q.    And you observed the defendant directing them to |
| 10:50:38 | 8 | do so? |
| 10:50:38 | 9 | MR. BIEBIGHAUSER:  Objection.  Leading. |
| 10:50:40 | 10 | THE COURT:  Overruled. |
| 10:50:43 | 11 | **A.    Can you repeat that?** |
| 10:50:43 | 12 | BY MS. ANDRUSAK: |
| 10:50:44 | 13 | Q.    Yes.  So I asked that you observed the defendant |
| 10:50:48 | 14 | direct these people to do that; is that right? |
| 10:50:51 | 15 | **A.    There was a time when we were out of town and he** |
| 10:50:53 | 16 | **needed something done, and I saw him text the person and** |
| 10:50:58 | 17 | **have them meet somebody.** |
| 10:51:04 | 18 | Q.    Okay.  Thank you.  So I want to talk about some of |
| 10:51:09 | 19 | the more local deals.  Can you tell me how they would |
| 10:51:17 | 20 | happen when you were asked to physically walk drugs to a |
| 10:51:22 | 21 | location.  Can you tell me how those deals typical went |
| 10:51:25 | 22 | down. |
| 10:51:25 | 23 | **A.    He'd either call me or he would be at the** |
| 10:51:27 | 24 | **apartment and he would say, "There's a bag in the** |
| 10:51:30 | 25 | **kitchen.  Grab it.  Go meet this car in the McDonald's** |

| | | |
|---|---|---|
| 10:51:35 | 1 | parking lot, and they might give you" -- like he would |
| 10:51:38 | 2 | tell me if they were going to give me cash or not.  And |
| 10:51:41 | 3 | as I'd go, I never knew the person; I knew their name. |
| 10:51:45 | 4 | Q.    Did you weigh out the drugs before making these |
| 10:51:47 | 5 | deals? |
| 10:51:48 | 6 | A.    No.  It was always packaged up in a drawer ready |
| 10:51:52 | 7 | to go. |
| 10:51:54 | 8 | Q.    Did you negotiate the amounts with any of the |
| 10:51:56 | 9 | people you were meeting? |
| 10:51:58 | 10 | A.    No. |
| 10:51:58 | 11 | Q.    Did you control the prices? |
| 10:52:01 | 12 | A.    No. |
| 10:52:03 | 13 | Q.    When the defendant would call you and tell you |
| 10:52:06 | 14 | about these deals, did he discuss the prices or amounts |
| 10:52:08 | 15 | with you? |
| 10:52:09 | 16 | A.    No. |
| 10:52:14 | 17 | Q.    Who did all of that? |
| 10:52:15 | 18 | A.    Mike. |
| 10:52:28 | 19 | Q.    Did you ever run drugs without being told to by |
| 10:52:34 | 20 | the defendant? |
| 10:52:34 | 21 | A.    No. |
| 10:52:41 | 22 | Q.    Did the defendant also ask you to wire funds? |
| 10:52:44 | 23 | A.    Yes. |
| 10:52:44 | 24 | Q.    Can you tell me how that went down. |
| 10:52:46 | 25 | A.    He would give me a piece of paper with all the |

| | | |
|---|---|---|
| 10:52:49 | 1 | information I needed to send it to the person, and I'd go |
| 10:52:52 | 2 | to Dillons and do it. |
| 10:52:53 | 3 | Q.     And he would direct you to do these things? |
| 10:52:56 | 4 | A.     Yes. |
| 10:52:56 | 5 | Q.     And were some of these transfers to Mexico? |
| 10:53:01 | 6 | A.     Yes. |
| 10:53:01 | 7 | Q.     And so you physically made the -- you physically |
| 10:53:05 | 8 | made the wire transfers to Mexico? |
| 10:53:08 | 9 | A.     Yes. |
| 10:53:09 | 10 | Q.     And did he have other people beyond just you |
| 10:53:12 | 11 | making these wire transfers? |
| 10:53:13 | 12 | A.     Yes. |
| 10:53:23 | 13 | Q.     Did you ever try to leave or stop selling drugs |
| 10:53:27 | 14 | for Arjona? |
| 10:53:28 | 15 | A.     Yes. |
| 10:53:29 | 16 | Q.     What happened when you did? |
| 10:53:30 | 17 | A.     He asked me to come back. |
| 10:53:36 | 18 | Q.     He just asked you, or did he incentivize you to |
| 10:53:41 | 19 | come back? |
| 10:53:42 | 20 | A.     I mean, it was kind of like I should probably come |
| 10:53:46 | 21 | back or, I mean, he knew where all my family lived or he |
| 10:53:49 | 22 | made it clear he knew where they all lived. |
| 10:53:53 | 23 | Q.     So he made it clear to you that he knew where your |
| 10:53:55 | 24 | family lived? |
| 10:53:56 | 25 | A.     Yes. |

| | | |
|---|---|---|
| 10:53:56 | 1 | Q.    Did he threaten you or your family? |
| 10:53:58 | 2 | **A.    He showed me videos of what the cartel does to** |
| 10:54:01 | 3 | **people that don't listen, I guess.** |
| 10:54:05 | 4 | Q.    And did he show you these after you indicated to |
| 10:54:07 | 5 | him you no longer wanted to do what you were doing? |
| 10:54:10 | 6 | **A.    Yeah, when I came back, yeah, he showed me.** |
| 10:54:17 | 7 | Q.    Okay.  Did he mention the cartel frequently to |
| 10:54:21 | 8 | you? |
| 10:54:21 | 9 | **A.    It came up quite a bit when he wanted to make a** |
| 10:54:24 | 10 | **point.** |
| 10:54:25 | 11 | Q.    And did that -- how did that make you feel when he |
| 10:54:30 | 12 | would bring those things up? |
| 10:54:31 | 13 | **A.    It was terrifying.** |
| 10:54:31 | 14 | Q.    So did you, in fact, come back? |
| 10:54:34 | 15 | **A.    Yes, yeah.** |
| 10:54:35 | 16 | Q.    And why? |
| 10:54:35 | 17 | **A.    'Cause I was terrified.** |
| 10:54:41 | 18 | Q.    Do you know where the defendant got his drugs? |
| 10:54:46 | 19 | **A.    Pretty certain it was Mexico.** |
| 10:54:48 | 20 | Q.    Okay.  Who brought the drugs up from Mexico? |
| 10:54:59 | 21 | **A.    I don't know everybody.  One of the names was** |
| 10:55:04 | 22 | **Ceto.  I don't know if that's his real name or not.** |
| 10:55:07 | 23 | Q.    Did you see Ceto at the residence on Illinois |
| 10:55:13 | 24 | Street? |
| 10:55:13 | 25 | **A.    Yes.** |

| | | |
|---|---|---|
| 10:55:13 | 1 | Q.      And you saw him there while you were living there? |
| 10:55:17 | 2 | **A.      Yes.** |
| 10:55:22 | 3 | Q.      And did the defendant tell you why Ceto was there? |
| 10:55:25 | 4 | **A.      I don't know if he actually said it, but I saw,** |
| 10:55:29 | 5 | **like, he was there.** |
| 10:55:29 | 6 | Q.      And why was that? |
| 10:55:31 | 7 | **A.      He was cooking drugs.** |
| 10:55:32 | 8 | Q.      Okay.  Were you in the residence when he was |
| 10:55:35 | 9 | cooking drugs? |
| 10:55:35 | 10 | **A.      Sometimes.** |
| 10:55:37 | 11 | Q.      And did you know how Ceto brought those drugs up |
| 10:55:42 | 12 | from Mexico? |
| 10:55:44 | 13 | **A.      I think in the windshield wiper reservoir or** |
| 10:55:48 | 14 | **something.  That's what I heard.** |
| 10:55:50 | 15 | Q.      Okay.  Who did you hear that from? |
| 10:55:52 | 16 | **A.      Mike.** |
| 10:55:59 | 17 | Q.      And when Ceto came up from Mexico, where did he |
| 10:56:04 | 18 | say? |
| 10:56:04 | 19 | **A.      At 406 South Illinois.** |
| 10:56:07 | 20 | Q.      Okay.  Were you able to communicate with Ceto? |
| 10:56:11 | 21 | **A.      Not really.** |
| 10:56:12 | 22 | Q.      Why is that? |
| 10:56:12 | 23 | **A.      He spoke Spanish.** |
| 10:56:14 | 24 | Q.      Do you speak Spanish? |
| 10:56:15 | 25 | **A.      No.** |

| | | |
|---|---|---|
| 10:56:16 | 1 | Q.    Does the defendant speak Spanish? |
| 10:56:18 | 2 | **A.    Yes.** |
| 10:56:18 | 3 | Q.    Did you observe the defendant and Ceto speaking |
| 10:56:21 | 4 | Spanish together? |
| 10:56:22 | 5 | **A.    Yes.** |
| 10:56:24 | 6 | Q.    So if you wanted to contact Ceto for any reason, |
| 10:56:28 | 7 | would you really -- would you have the ability to do so |
| 10:56:30 | 8 | without an interpreter? |
| 10:56:32 | 9 | **A.    No.** |
| 10:56:32 | 10 | Q.    Did you ever contact Ceto on your own? |
| 10:56:35 | 11 | **A.    No.** |
| 10:56:59 | 12 | Q.    Were you ever asked to go down to Mexico? |
| 10:57:04 | 13 | **A.    Yes.** |
| 10:57:05 | 14 | Q.    And was it an "ask" or a -- |
| 10:57:09 | 15 | **A.    I had to go.  I did not want to go.** |
| 10:57:10 | 16 | Q.    Okay.  Who directed you to go? |
| 10:57:13 | 17 | **A.    Mike.** |
| 10:57:15 | 18 | Q.    Okay.  What was the purpose of going down to |
| 10:57:17 | 19 | Mexico? |
| 10:57:18 | 20 | **A.    To bring drugs back.** |
| 10:57:20 | 21 | Q.    Did he tell you that? |
| 10:57:21 | 22 | **A.    Yes.** |
| 10:57:28 | 23 | Q.    What vehicle did you drive down? |
| 10:57:30 | 24 | **A.    I think it was a Dodge Stratus.** |
| 10:57:34 | 25 | Q.    Who provided that vehicle? |

| | | |
|---|---|---|
| 10:57:35 | 1 | **A.**      **Mike.** |
| 10:57:36 | 2 | Q.      And I'm assuming there was some sort of planning |
| 10:57:40 | 3 | phase before you were sent down to Mexico; is that right? |
| 10:57:43 | 4 | **A.**      **Yes.** |
| 10:57:44 | 5 | Q.      Who made the plans? |
| 10:57:45 | 6 | **A.**      **Mike.** |
| 10:57:47 | 7 | Q.      Okay.  Did you travel by yourself? |
| 10:57:49 | 8 | **A.**      **No.** |
| 10:57:49 | 9 | Q.      Who else traveled with you? |
| 10:57:50 | 10 | **A.**      **Mitch Newman.  He drove.** |
| 10:57:52 | 11 | Q.      Okay.  And is that the same Mitch Newman who took |
| 10:57:55 | 12 | over the Hutch trips? |
| 10:57:56 | 13 | **A.**      **Yes.** |
| 10:57:57 | 14 | Q.      So Mitch drove and you were the passenger? |
| 10:58:00 | 15 | **A.**      **Yes.** |
| 10:58:00 | 16 | Q.      What was the plan? |
| 10:58:02 | 17 | **A.**      **They were going to go to Mexico, get the drugs,** |
| 10:58:05 | 18 | **come back.  I was going to get out when we got to the** |
| 10:58:07 | 19 | **border and walk across because I didn't want to be in the** |
| 10:58:10 | 20 | **car, and then drive back here.** |
| 10:58:13 | 21 | Q.      Okay.  Were you directed to a specific location in |
| 10:58:19 | 22 | Mexico? |
| 10:58:20 | 23 | **A.**      **Yes.** |
| 10:58:20 | 24 | Q.      Where? |
| 10:58:26 | 25 | **A.**      **I think it was Durango.** |

| | | |
|---|---|---|
| 10:58:28 | 1 | Q.     Okay.  Was there a specific gate that you were |
| 10:58:32 | 2 | supposed to enter Mexico at? |
| 10:58:34 | 3 | **A.     Yes.** |
| 10:58:34 | 4 | Q.     Where is that? |
| 10:58:35 | 5 | **A.     It was Larado.** |
| 10:58:37 | 6 | Q.     Okay.  And who directed you to enter at that gate? |
| 10:58:40 | 7 | **A.     Mike.** |
| 10:58:46 | 8 | Q.     Were you provided funds for the travel expenses? |
| 10:58:49 | 9 | **A.     Yes.** |
| 10:58:49 | 10 | Q.     Who provided those funds? |
| 10:58:51 | 11 | **A.     Mike.** |
| 10:59:00 | 12 | Q.     Did you have any decision-making authority other |
| 10:59:02 | 13 | than you didn't want to be in the car when the drugs came |
| 10:59:04 | 14 | back through for this trip? |
| 10:59:06 | 15 | **A.     I did not.** |
| 10:59:08 | 16 | Q.     Did you have a contact number for the person that |
| 10:59:11 | 17 | you were supposed to be meeting in Mexico? |
| 10:59:15 | 18 | **A.     We got one as soon as we got to the border.  We** |
| 10:59:17 | 19 | **were supposed to follow somebody, and we never made it** |
| 10:59:20 | 20 | **that far.** |
| 10:59:21 | 21 | Q.     Okay.  So what happened?  You said you never made |
| 10:59:24 | 22 | it that far. |
| 10:59:25 | 23 | **A.     We didn't have the proper identification or, I** |
| 10:59:30 | 24 | **mean, stuff in the vehicle.  I don't think we had** |
| 10:59:32 | 25 | **anything for the vehicle to make it across.** |

6-3-21   USA v. ARJONA   No. 19-10025-01          80

| | | |
|---|---|---|
| 10:59:34 | 1 | Q.    Okay.  So did you want to make this trip to |
| 10:59:39 | 2 | Mexico? |
| 10:59:40 | 3 | **A.    No.** |
| 10:59:40 | 4 | Q.    Why did you? |
| 10:59:42 | 5 | **A.    I think at that time I was offered, like, $700 or** |
| 10:59:45 | 6 | **something.  I was going to get a drum set and I thought** |
| 10:59:48 | 7 | **that was an easy, lazy way to do it.** |
| 10:59:50 | 8 | Q.    Who offered you that money? |
| 10:59:51 | 9 | **A.    Mike.** |
| 10:59:52 | 10 | Q.    Okay.  So we discussed Mauricio, that he lived |
| 11:00:03 | 11 | with you briefly at the beginning of our discussion.  Do |
| 11:00:06 | 12 | you remember that? |
| 11:00:07 | 13 | **A.    Yes.** |
| 11:00:07 | 14 | Q.    So once you guys moved out, did you interact with |
| 11:00:11 | 15 | Mauricio after that? |
| 11:00:13 | 16 | **A.    Not really.  Sometimes.** |
| 11:00:18 | 17 | Q.    Could you communicate with Mauricio? |
| 11:00:20 | 18 | **A.    No, no.** |
| 11:00:21 | 19 | Q.    Why is that? |
| 11:00:21 | 20 | **A.    He spoke -- he didn't speak any English at all.** |
| 11:00:24 | 21 | Q.    Okay.  And, again, you don't speak any Spanish? |
| 11:00:27 | 22 | **A.    No.** |
| 11:00:27 | 23 | Q.    Okay.  Were there ever times that you would take |
| 11:00:30 | 24 | the defendant over to Mauricio's residence when it was no |
| 11:00:34 | 25 | longer with you? |

6-3-21   USA v. ARJONA   No. 19-10025-01                    81

| | | |
|---|---|---|
| 11:00:35 | 1 | A.      Yes. |
| 11:00:35 | 2 | Q.      Okay.  What would happen during those |
| 11:00:38 | 3 | interactions? |
| 11:00:39 | 4 | A.      We would drop off money or pick up drugs. |
| 11:00:41 | 5 | Q.      Okay.  And did you see the money and the drugs? |
| 11:00:44 | 6 | A.      Sometimes. |
| 11:00:47 | 7 | Q.      But if you wanted to have a pickup, if you wanted |
| 11:00:52 | 8 | to coordinate a pickup from Mauricio, would you be able |
| 11:00:55 | 9 | to without the assistance of an interpreter? |
| 11:00:57 | 10 | A.      No. |
| 11:00:57 | 11 | Q.      Did Mr. McMillan speak Spanish? |
| 11:01:03 | 12 | A.      I don't think so. |
| 11:01:04 | 13 | Q.      Okay.  You never observed him speaking Spanish |
| 11:01:06 | 14 | with anybody? |
| 11:01:07 | 15 | A.      No. |
| 11:01:17 | 16 | Q.      While you lived either with the defendant or in |
| 11:01:21 | 17 | the defendant's residence, did you have to pay for food? |
| 11:01:27 | 18 | A.      No. |
| 11:01:27 | 19 | Q.      Did you have to pay the water bill, the electric |
| 11:01:29 | 20 | bill, anything like that? |
| 11:01:31 | 21 | A.      No. |
| 11:01:32 | 22 | Q.      Did the defendant ever take you out to a bar or to |
| 11:01:35 | 23 | dinner? |
| 11:01:36 | 24 | A.      Yes. |
| 11:01:37 | 25 | Q.      And when that happened, who paid for all of the |

| | | |
|---|---|---|
| 11:01:39 | 1 | drinks? |
| 11:01:40 | 2 | A.      Mike did. |
| 11:01:40 | 3 | Q.      Who paid for all the food? |
| 11:01:42 | 4 | A.      Mike. |
| 11:01:48 | 5 | Q.      So he provided you with pretty much everything you |
| 11:01:51 | 6 | needed for the lifestyle you wanted? |
| 11:01:54 | 7 | A.      Yes. |
| 11:02:13 | 8 | Q.      So we talked a little bit that you had been |
| 11:02:15 | 9 | interviewed by law enforcement a couple of times in this |
| 11:02:17 | 10 | case; right? |
| 11:02:19 | 11 | A.      Yes. |
| 11:02:20 | 12 | Q.      And one of those interviews, the first one, was |
| 11:02:23 | 13 | right after you were arrested on this indictment; right? |
| 11:02:25 | 14 | A.      Yes. |
| 11:02:27 | 15 | Q.      And at that point they did ask you where the drugs |
| 11:02:31 | 16 | were coming from; right? |
| 11:02:32 | 17 | A.      Yes. |
| 11:02:33 | 18 | Q.      And at first you told them you didn't know -- |
| 11:02:37 | 19 | A.      Yes. |
| 11:02:37 | 20 | Q.      -- where they were coming from; right? |
| 11:02:41 | 21 | A.      Correct. |
| 11:02:41 | 22 | Q.      But later in that same interview you started |
| 11:02:44 | 23 | talking about Aniceto in Mexico; correct? |
| 11:02:44 | 24 | A.      Correct. |
| 11:02:47 | 25 | Q.      Why didn't you tell law enforcement that |

| 11:02:49 | 1 | information up front? |
| 11:02:50 | 2 | **A.    I was uncomfortable and scared.  I didn't know** |
| 11:02:52 | 3 | **what I wanted to do yet.** |
| 11:02:54 | 4 | Q.    How old were you at this time? |
| 11:02:55 | 5 | **A.    I think I was 22.** |
| 11:02:59 | 6 | Q.    Had you ever been in trouble like that before? |
| 11:03:02 | 7 | **A.    Never.** |
| 11:03:02 | 8 | Q.    Had you ever been arrested before? |
| 11:03:04 | 9 | **A.    Never.** |
| 11:03:05 | 10 | Q.    Had you ever had to be interviewed under *Miranda* |
| 11:03:09 | 11 | before? |
| 11:03:09 | 12 | **A.    No.** |
| 11:03:10 | 13 | Q.    But in that same interview, as you started getting |
| 11:03:13 | 14 | more comfortable with law enforcement, you told them what |
| 11:03:16 | 15 | really happened, didn't you? |
| 11:03:16 | 16 | **A.    Correct.** |
| 11:03:18 | 17 | Q.    And you told them that again when you talked to |
| 11:03:20 | 18 | them in April of 20 -- 2019; correct? |
| 11:03:24 | 19 | **A.    Correct, yep.** |
| 11:03:25 | 20 | Q.    And then, Mr. Cobal, you are a named codefendant |
| 11:03:29 | 21 | in this case; correct? |
| 11:03:30 | 22 | **A.    Yes.** |
| 11:03:30 | 23 | Q.    And you have entered a plea agreement in this |
| 11:03:34 | 24 | case? |
| 11:03:34 | 25 | **A.    Yes.** |

| | | |
|---|---|---|
| 11:03:35 | 1 | Q.      Has my office made you any promises as to what |
| 11:03:40 | 2 | kind of sentence you're going to get or that we are going |
| 11:03:44 | 3 | to recommend in exchange for your testimony? |
| 11:03:46 | 4 | **A.      No, they did not.** |
| 11:03:47 | 5 | Q.      So are you here today because you want to tell the |
| 11:03:50 | 6 | truth about what happened with the defendant? |
| 11:03:52 | 7 | **A.      Yes.** |
| 11:03:52 | 8 | MS. ANDRUSAK:  No further questions, Your Honor. |
| 11:03:54 | 9 | THE COURT:  Thank you, Ms. Andrusak. |
| 11:03:55 | 10 | Cross-examination, Mr. Biebighauser? |
| 11:04:09 | 11 | CROSS-EXAMINATION |
| 11:04:10 | 12 | BY MR. BIEBIGHAUSER: |
| 11:04:21 | 13 | Q.      Mr. Cobal, I'm going to be vulnerable here with |
| 11:04:44 | 14 | you for a second and tell you that sometimes I speak |
| 11:04:46 | 15 | really fast, and the court reporter tells me that, since |
| 11:04:50 | 16 | I talk too fast, but I'm worried in this particular case |
| 11:04:52 | 17 | I'm going to ask you a question so fast that you don't |
| 11:04:55 | 18 | hear it or answer it correctly.  So I know that I'm doing |
| 11:04:58 | 19 | it but I don't always stop myself. |
| 11:04:59 | 20 | **A.      Uh-huh.** |
| 11:05:00 | 21 | Q.      If I talk too fast and you miss my question, just |
| 11:05:03 | 22 | let me know, I know I need to slow down.  You just let me |
| 11:05:06 | 23 | know.  Okay? |
| 11:05:07 | 24 | **A.      Of course.** |
| 11:05:07 | 25 | Q.      I want to start with you, sir, where the |

| | | |
|---|---|---|
| 11:05:10 | 1 | Government left off, and that was about sort of how you |
| 11:05:14 | 2 | come to be testifying in this case and your decision to |
| 11:05:18 | 3 | cooperate with the Government. |
| 11:05:20 | 4 | You made that decision sort of well before today; |
| 11:05:23 | 5 | right? |
| 11:05:24 | 6 | A.    Yes. |
| 11:05:25 | 7 | Q.    Let's go back to February 6th of 2019.  That's |
| 11:05:30 | 8 | when you were arrested and interviewed by federal law |
| 11:05:33 | 9 | enforcement officers; right? |
| 11:05:34 | 10 | A.    Yes. |
| 11:05:35 | 11 | Q.    That interview lasted more than an hour, didn't |
| 11:05:39 | 12 | it? |
| 11:05:39 | 13 | A.    I'm not sure.  I don't remember. |
| 11:05:41 | 14 | Q.    Okay.  Well, do you remember it was pretty quick, |
| 11:05:44 | 15 | within the first 15 minutes, that you asked what kind of |
| 11:05:46 | 16 | time you were looking at? |
| 11:05:51 | 17 | A.    Yeah. |
| 11:05:51 | 18 | Q.    They told you that you were looking at a five-year |
| 11:05:55 | 19 | mandatory minimum.  Do you remember? |
| 11:05:57 | 20 | A.    Yes. |
| 11:05:57 | 21 | Q.    They said also that it could be a lot worse than |
| 11:06:00 | 22 | that, too, didn't they? |
| 11:06:02 | 23 | A.    I think so. |
| 11:06:02 | 24 | Q.    They said that, depending on the purity of meth, |
| 11:06:06 | 25 | it could be a ten-year mandatory minimum; right? |

| | | |
|---|---|---|
| 11:06:08 | 1 | **A.     Yeah.** |
| 11:06:08 | 2 | Q.     Okay.  You heard that, you did not want to go to |
| 11:06:12 | 3 | prison for ten years, did you? |
| 11:06:13 | 4 | **A.     No.** |
| 11:06:14 | 5 | Q.     You didn't want to go to prison at all, in |
| 11:06:16 | 6 | fairness to you. |
| 11:06:17 | 7 | **A.     No.** |
| 11:06:18 | 8 | Q.     But they told you, though, that they had good news |
| 11:06:21 | 9 | for you, that with what you're doing here, they said, "We |
| 11:06:25 | 10 | will go to bat for you." |
| 11:06:26 | 11 | Do you remember them saying that? |
| 11:06:28 | 12 | **A.     Yeah.** |
| 11:06:28 | 13 | Q.     That was all within those first 20 minutes of them |
| 11:06:31 | 14 | talking to you; right? |
| 11:06:32 | 15 | **A.     Yeah.** |
| 11:06:32 | 16 | Q.     They didn't say they might go to bat for you; |
| 11:06:36 | 17 | right? |
| 11:06:36 | 18 | **A.     Yeah.** |
| 11:06:36 | 19 | Q.     They said they will go to bat for you? |
| 11:06:42 | 20 | **A.     What does that mean, though?** |
| 11:06:44 | 21 | Q.     I'm just asking you what they said.  Is that what |
| 11:06:46 | 22 | they said, "We will go to bat for you"? |
| 11:06:50 | 23 | **A.     Yeah.** |
| 11:06:50 | 24 | Q.     And they said they couldn't make you a promise, |
| 11:06:52 | 25 | which you mentioned, but one of the agents told you, "I |

| | | |
|---|---|---|
| 11:06:57 | 1 | think you can see that reduced, probably greatly." |
| 11:07:00 | 2 | Right? |
| 11:07:02 | 3 | **A.     Yeah.** |
| 11:07:02 | 4 | Q.    And you want your punishment reduced, don't you? |
| 11:07:05 | 5 | **A.     Of course.** |
| 11:07:05 | 6 | Q.    As much as it can possibly be reduced? |
| 11:07:07 | 7 | **A.     I think anybody would.** |
| 11:07:08 | 8 | Q.    Fair.   Right.   You were then brought before the |
| 11:07:13 | 9 | court on an initial appearance on February 7th of 2019, |
| 11:07:17 | 10 | the next day; right? |
| 11:07:18 | 11 | **A.     Yes.** |
| 11:07:19 | 12 | Q.    And you were provided notice with the original |
| 11:07:21 | 13 | indictment that was charged in this case? |
| 11:07:24 | 14 | **A.     Yep.** |
| 11:07:25 | 15 | Q.    In that count it was alleged that you conspired to |
| 11:07:28 | 16 | distribute methamphetamine, in violation of 21 U.S.C. |
| 11:07:32 | 17 | 841(b)(1)(B).   Is that right? |
| 11:07:36 | 18 | **A.     If that's -- yeah, if that's --** |
| 11:07:39 | 19 | Q.    You appeared before Judge Gale, and he advised you |
| 11:07:43 | 20 | of the potential penalties for that offense during that |
| 11:07:47 | 21 | first appearance? |
| 11:07:47 | 22 | **A.     Yes.** |
| 11:07:47 | 23 | Q.    He told that you you were, in fact, facing a |
| 11:07:48 | 24 | five-year mandatory minimum; right? |
| 11:07:51 | 25 | **A.     Yes.** |

| | | |
|---|---|---|
| 11:07:51 | 1 | Q.     And you didn't want to go to prison for five years |
| 11:07:55 | 2 | either, did you? |
| 11:07:56 | 3 | **A.     No.** |
| 11:07:57 | 4 | Q.     On February 27th, 2019, the Government filed a |
| 11:08:00 | 5 | superseding indictment; right? |
| 11:08:02 | 6 | **A.     Yes.** |
| 11:08:02 | 7 | Q.     And I don't mean to catch you on the date.  I'm |
| 11:08:03 | 8 | not playing games with you.  They filed a superseding |
| 11:08:05 | 9 | indictment; right? |
| 11:08:06 | 10 | **A.     Yes.** |
| 11:08:08 | 11 | Q.     Okay.  And, again, you had to appear before Judge |
| 11:08:10 | 12 | Gale for a new arraignment; right? |
| 11:08:12 | 13 | **A.     Yes.** |
| 11:08:12 | 14 | Q.     And he provided you notice of the superseding |
| 11:08:16 | 15 | indictment this time, yeah? |
| 11:08:20 | 16 | **A.     Yeah.** |
| 11:08:20 | 17 | Q.     And you were charged then in additional counts, a |
| 11:08:24 | 18 | Count 2, distribution of meth, and a Count 3, |
| 11:08:26 | 19 | distribution of meth; right? |
| 11:08:29 | 20 | **A.     I can't remember exactly what it was.** |
| 11:08:30 | 21 | Q.     You don't remember what's in the superseding |
| 11:08:33 | 22 | indictment that you were charged with? |
| 11:08:33 | 23 | **A.     No, no.** |
| 11:08:47 | 24 |         MR. BIEBIGHAUSER:  May I approach this witness |
| 11:08:49 | 25 | Your Honor? |

| | | |
|---|---|---|
| 11:08:49 | 1 | THE COURT:  You may.  And you need not ask |
| 11:08:52 | 2 | permission, Mr. Biebighauser.  I appreciate that but it's |
| 11:08:54 | 3 | not necessary. |
| 11:08:54 | 4 | MR. BIEBIGHAUSER:  Thank you, Your Honor. |
| 11:08:58 | 5 | BY MR. BIEBIGHAUSER: |
| 11:08:59 | 6 | Q.    You see there's a title of that document in like |
| 11:09:02 | 7 | horizontal brackets. |
| 11:09:03 | 8 | A.    **Yes.** |
| 11:09:03 | 9 | Q.    What's that say? |
| 11:09:04 | 10 | A.    **Superseding Indictment.** |
| 11:09:07 | 11 | Q.    And there's counts listed there.  Do you see where |
| 11:09:11 | 12 | it says Count 1? |
| 11:09:12 | 13 | A.    **Yes.** |
| 11:09:12 | 14 | Q.    Do you see your name under that? |
| 11:09:13 | 15 | A.    **Yes, I do.** |
| 11:09:14 | 16 | Q.    And that says conspiracy to distribute |
| 11:09:16 | 17 | methamphetamine? |
| 11:09:16 | 18 | A.    **Yes.** |
| 11:09:16 | 19 | Q.    That was the original count that you have been |
| 11:09:19 | 20 | charged with earlier; right? |
| 11:09:20 | 21 | A.    **Yes.** |
| 11:09:20 | 22 | Q.    Okay.  But some new charges have been brought |
| 11:09:23 | 23 | about by this point; right? |
| 11:09:25 | 24 | A.    **Yes.** |
| 11:09:25 | 25 | Q.    There was a Count 2 that mentions your name? |

| | | |
|---|---|---|
| 11:09:29 | 1 | A.      Yes. |
| 11:09:29 | 2 | Q.      And a Count 3 that mentions your name? |
| 11:09:32 | 3 | A.      Yes. |
| 11:09:32 | 4 | Q.      Okay.  So those -- that brings us back to where we |
| 11:09:38 | 5 | were, which was you were charged in Count 2 and Count 3 |
| 11:09:41 | 6 | of a superseding indictment, now with two more counts of |
| 11:09:44 | 7 | distribution of methamphetamine; right? |
| 11:09:46 | 8 | A.      Yes. |
| 11:09:46 | 9 | Q.      Okay.  You've got it in front of you still.  Go to |
| 11:09:49 | 10 | where it says Count 3, 'cause I'm not trying to catch you |
| 11:09:52 | 11 | here so I want to help you.  Count 3 says distribution of |
| 11:09:57 | 12 | methamphetamine, in violation of 21 United States Code |
| 11:10:00 | 13 | 841(b)(1)(B), just like before; right? |
| 11:10:03 | 14 | A.      Yes. |
| 11:10:03 | 15 | Q.      And so you appeared in front of Judge Gale, and he |
| 11:10:06 | 16 | advised you of the charges again; right? |
| 11:10:08 | 17 | A.      Yes. |
| 11:10:08 | 18 | Q.      So for Count 3, just like initially, you're |
| 11:10:11 | 19 | looking at now another mandatory minimum of five years |
| 11:10:14 | 20 | imprisonment; right? |
| 11:10:15 | 21 | A.      Yes. |
| 11:10:15 | 22 | Q.      Okay.  After that happened -- we're done with |
| 11:10:18 | 23 | that. |
| 11:10:19 | 24 | A.      Okay. |
| 11:10:19 | 25 | Q.      After that superseding indictment, you met for a |

| | | |
|---|---|---|
| 11:10:30 | 1 | second time with federal law enforcement officers; right? |
| 11:10:34 | 2 | A.    Yes. |
| 11:10:34 | 3 | Q.    I'm going to tell you that was on April 3rd.  Does |
| 11:10:37 | 4 | that sound right? |
| 11:10:37 | 5 | A.    Sounds right. |
| 11:10:38 | 6 | Q.    Okay.  By this time you had a lawyer; right? |
| 11:10:40 | 7 | A.    Yes. |
| 11:10:40 | 8 | Q.    And you had consulted with your lawyer first? |
| 11:10:43 | 9 | A.    Yes. |
| 11:10:43 | 10 | Q.    You learned how to answer questions well? |
| 11:10:46 | 11 | MR. HEPPERLY:  Your Honor, I -- |
| 11:10:49 | 12 | THE COURT:  Counsel?  Would you first state your |
| 11:10:53 | 13 | appearance for the record. |
| 11:10:54 | 14 | MR. HEPPERLY:  Yes.  My name is Mike Hepperly. |
| 11:10:57 | 15 | THE COURT:  Mr. Hepperly, you represent Mr. Cobal? |
| 11:11:00 | 16 | MR. HEPPERLY:  Yes.  And my objection would be the |
| 11:11:02 | 17 | attorney-client privilege. |
| 11:11:04 | 18 | THE COURT:  It's marginal, but I'm going to |
| 11:11:07 | 19 | sustain the objection. |
| 11:11:09 | 20 | MR. HEPPERLY:  Thank you. |
| 11:11:13 | 21 | BY MR. BIEBIGHAUSER: |
| 11:11:13 | 22 | Q.    It was your goal when you went into that April 3rd |
| 11:11:16 | 23 | interview to continue to assist law enforcement; right? |
| 11:11:19 | 24 | A.    Yes. |
| 11:11:20 | 25 | Q.    You had created sort of a plan in your own mind to |

11:11:24  1   do what you could to try and assist them to assist

11:11:26  2   yourself; right?

11:11:27  3   A.      I wanted to set the record straight.

11:11:31  4   Q.      And you wanted, like we had talked about, not to

11:11:33  5   go to prison; right?

11:11:35  6   A.      I mean, I don't think anybody wants to go to

11:11:37  7   prison.

11:11:37  8   Q.      I don't think so either.  You included; right?

11:11:39  9   A.      I guess so, yeah.

11:11:40  10  Q.      Okay.  After that April 3rd interview, you entered

11:11:46  11  a plea agreement with the Government; right?

11:11:49  12  A.      Yes.

11:11:50  13  Q.      You pled guilty to just one count, that you

11:11:53  14  distributed meth, same numbers again, in violation of 21

11:11:56  15  U.S.C. 841(b)(1)(B); right?

11:12:00  16  A.      Yes.

11:12:00  17  Q.      Now, this time Judge Melgren advised you that that

11:12:03  18  carries a mandatory minimum prison sentence of five

11:12:05  19  years; right?

11:12:10  20  A.      Yes.

11:12:10  21  Q.      But you'd like, as a part of your plea agreement,

11:12:11  22  and just in general, to get a more lenient sentence than

11:12:14  23  that, wouldn't you?

11:12:15  24  A.      Of course.

11:12:16  25  Q.      And you negotiated in your plea agreement a number

| | | |
|---|---|---|
| 11:12:19 | 1 | of provisions to make it available to you to get a more |
| 11:12:25 | 2 | lenient sentence; right? |
| 11:12:26 | 3 | A.    Yes. |
| 11:12:26 | 4 | Q.    That's part of what plea agreement is; yeah? |
| 11:12:30 | 5 | A.    Yeah. |
| 11:12:35 | 6 | Q.    If you need to look at it, let me know, but I'm |
| 11:12:38 | 7 | just going to go through a few of them.  First, the |
| 11:12:40 | 8 | Government says they're going to recommend a sentence at |
| 11:12:42 | 9 | the low end of the guideline range; right? |
| 11:12:44 | 10 | A.    Okay. |
| 11:12:44 | 11 | Q.    Is that what they say? |
| 11:12:46 | 12 | A.    If that's what it says. |
| 11:12:57 | 13 | Q.    You've got there a copy of your plea agreement. |
| 11:12:58 | 14 | You see where it says Government's Agreements in bold? |
| 11:13:03 | 15 | A.    Yes. |
| 11:13:06 | 16 | Q.    It says there one of the things that they're going |
| 11:13:08 | 17 | to do is recommend a sentence at the low end of the |
| 11:13:11 | 18 | guideline range; right? |
| 11:13:12 | 19 | A.    Yes. |
| 11:13:13 | 20 | Q.    The guideline range is something that Judge |
| 11:13:18 | 21 | Melgren's going to rely on to help determine your |
| 11:13:19 | 22 | sentence? |
| 11:13:19 | 23 | A.    Yes. |
| 11:13:20 | 24 | Q.    And you understand that the guideline range, even |
| 11:13:22 | 25 | if the Government recommends the low end, that's still |

| | | |
|---|---|---|
| 11:13:24 | 1 | going to be a range of imprisonment; right? |
| 11:13:26 | 2 | **A.**     **Yes.** |
| 11:13:26 | 3 | Q.     So, second, the Government has agreed to tell the |
| 11:13:30 | 4 | court you are a minimal participant; right? |
| 11:13:32 | 5 | **A.**     **Yes.** |
| 11:13:33 | 6 | Q.     Okay.  You understand that that's going to reduce |
| 11:13:36 | 7 | your guideline range? |
| 11:13:38 | 8 | **A.**     **Yes.** |
| 11:13:38 | 9 | Q.     Okay.  So that reduces the Government's |
| 11:13:40 | 10 | recommendation for prison at the low end of that range; |
| 11:13:43 | 11 | right? |
| 11:13:43 | 12 | **A.**     **Yes.** |
| 11:13:43 | 13 | Q.     So when you said they haven't made any promises to |
| 11:13:46 | 14 | you, they have agreed to do that; right?  Tell the Court |
| 11:13:49 | 15 | that you're a minimal participant? |
| 11:13:51 | 16 | **A.**     **It's part of the plea agreement.** |
| 11:13:52 | 17 | Q.     So they have? |
| 11:13:55 | 18 | **A.**     **I don't know if that's a promise.  It's not a** |
| 11:13:57 | 19 | **promise, is it?** |
| 11:13:58 | 20 | Q.     It's an agreement. |
| 11:14:00 | 21 | **A.**     **Yes, yeah.** |
| 11:14:00 | 22 | Q.     So, third, you negotiated a deal that allows you |
| 11:14:05 | 23 | to request probation in the plea agreement; right? |
| 11:14:08 | 24 | **A.**     **Yes.** |
| 11:14:09 | 25 | Q.     Now, because you're charged with a mandatory |

| 11:14:11 | 1 | minimum, you can receive probation if you qualify for |
| 11:14:13 | 2 | something called "the safety valve."  Are you familiar |
| 11:14:15 | 3 | with that? |
| 11:14:16 | 4 | A.    A little bit. |
| 11:14:17 | 5 | Q.    Okay.  It's a term there in your plea agreement; |
| 11:14:19 | 6 | right? |
| 11:14:20 | 7 | A.    Yes. |
| 11:14:20 | 8 | Q.    Okay.  So you learned about it before you entered |
| 11:14:22 | 9 | that agreement? |
| 11:14:23 | 10 | A.    Yes. |
| 11:14:24 | 11 | Q.    Because you entered that agreement knowingly? |
| 11:14:26 | 12 | A.    Yes. |
| 11:14:26 | 13 | Q.    Okay.  One criteria then you understand is that |
| 11:14:31 | 14 | you have to truthfully provide to the Government all |
| 11:14:33 | 15 | information and evidence you have concerning the offense; |
| 11:14:36 | 16 | right? |
| 11:14:36 | 17 | A.    Yes. |
| 11:14:37 | 18 | Q.    If you do that, you can escape the mandatory |
| 11:14:39 | 19 | minimum? |
| 11:14:44 | 20 | A.    Yeah. |
| 11:14:44 | 21 | Q.    And the Government's going to recommend a |
| 11:14:46 | 22 | two-level reduction contingent upon your safety valve |
| 11:14:49 | 23 | eligibility; right? |
| 11:14:51 | 24 | A.    Yes. |
| 11:14:51 | 25 | Q.    So you understand the Government is going to have |

| 11:14:53 | 1 | an opinion on whether or not you qualify for that valve; |
| 11:14:57 | 2 | right? |
| 11:14:57 | 3 | A.      Yes. |
| 11:14:57 | 4 | Q.      And you want that opinion to be a good one? |
| 11:15:00 | 5 | A.      Of course. |
| 11:15:02 | 6 | Q.      The Government's opinion about whether you've |
| 11:15:04 | 7 | provided all information is based on what you told them |
| 11:15:08 | 8 | in February; right? |
| 11:15:09 | 9 | A.      Yes. |
| 11:15:09 | 10 | Q.      Based on what you told them in April? |
| 11:15:11 | 11 | A.      Yes. |
| 11:15:11 | 12 | Q.      And based upon your answers to the Government |
| 11:15:14 | 13 | prosecutor here today; right? |
| 11:15:15 | 14 | A.      Yes. |
| 11:15:15 | 15 | Q.      That's the same prosecutor that's going to |
| 11:15:17 | 16 | recommend whether you qualify for the judge; right? |
| 11:15:21 | 17 | A.      Yes. |
| 11:15:22 | 18 | Q.      That's not the end of your plea agreement, is it? |
| 11:15:27 | 19 | That was a bad question by me.  There's also an addendum |
| 11:15:30 | 20 | to your plea agreement, isn't there? |
| 11:15:31 | 21 | A.      Yeah. |
| 11:15:31 | 22 | Q.      You're familiar with that addendum? |
| 11:15:35 | 23 | A.      Yeah. |
| 11:15:35 | 24 | Q.      We're done with that one.  That's called a 5K |
| 11:15:43 | 25 | agreement.  You've heard that term before? |

| | | |
|---|---|---|
| 11:15:44 | 1 | **A.**    **I have.** |
| 11:15:46 | 2 | Q.    And that's what's discussed in the addendum to |
| 11:15:48 | 3 | your plea agreement, isn't it? |
| 11:15:50 | 4 | **A.**    **Yes.** |
| 11:15:50 | 5 | Q.    When we talk about promises the courts -- the |
| 11:15:53 | 6 | Government's made to you, in that addendum it says that |
| 11:15:56 | 7 | they shall request the Court consider reducing your |
| 11:15:59 | 8 | sentence that would otherwise -- that you would otherwise |
| 11:16:00 | 9 | receive; right? |
| 11:16:02 | 10 | **A.**    **Yes.** |
| 11:16:02 | 11 | Q.    So it's a promise anyway that they're going to |
| 11:16:04 | 12 | request that the Court consider it, isn't it? |
| 11:16:06 | 13 | **A.**    **Okay.** |
| 11:16:07 | 14 | Q.    Right? |
| 11:16:08 | 15 | **A.**    **Can you repeat that?** |
| 11:16:09 | 16 | Q.    Yeah.  It's a promise at least that they're going |
| 11:16:12 | 17 | to request the Court consider reducing your sentence? |
| 11:16:18 | 18 | **A.**    **I don't understand.** |
| 11:16:18 | 19 | Q.    Okay.  I'll just read it to you.  It says, |
| 11:16:21 | 20 | "Subject to the defendant's agreements below, the |
| 11:16:24 | 21 | Government shall request that the Court consider reducing |
| 11:16:27 | 22 | the sentence."   Is that what it says? |
| 11:16:29 | 23 | **A.**    **Yes.** |
| 11:16:30 | 24 | Q.    Now they told you, and it says here in the |
| 11:16:32 | 25 | addendum, that the United States has not yet made a |

| | | |
|---|---|---|
| 11:16:36 | 1 | determination as to the extent of your substantial |
| 11:16:38 | 2 | assistance.  Right? |
| 11:16:39 | 3 | **A.**    **Yes.** |
| 11:16:40 | 4 | Q.    But it says that that decision is left entirely |
| 11:16:44 | 5 | and exclusively within the discretion of the |
| 11:16:47 | 6 | United States, the Government; right? |
| 11:16:48 | 7 | **A.**    **Yes.** |
| 11:16:49 | 8 | Q.    Represented by the prosecutor that just asked you |
| 11:16:51 | 9 | questions on direct examination? |
| 11:16:52 | 10 | **A.**    **Yes.** |
| 11:16:52 | 11 | Q.    Who's going to make the ultimate recommendation to |
| 11:16:55 | 12 | the Court; right? |
| 11:16:56 | 13 | **A.**    **Yes.** |
| 11:17:05 | 14 | Q.    All right.  Let's jump back into sort of what |
| 11:17:14 | 15 | happened.  On direct examination you said that at the |
| 11:17:19 | 16 | time you were living at 406 North Parkdale you had |
| 11:17:25 | 17 | nowhere else to stay; right? |
| 11:17:26 | 18 | **A.**    **406 South Illinois?** |
| 11:17:28 | 19 | Q.    What did I say, Parkdale? |
| 11:17:30 | 20 | **A.**    **Yes.** |
| 11:17:35 | 21 | Q.    You talked on direct examination about having |
| 11:17:37 | 22 | nowhere else to stay other than 406 North Illinois; |
| 11:17:40 | 23 | right? |
| 11:17:41 | 24 | **A.**    **Yes.** |
| 11:17:42 | 25 | Q.    On direct examination you talked about being |

| | | |
|---|---|---|
| 11:17:44 | 1 | scared of leaving 406 North Illinois, yeah? |
| 11:17:48 | 2 | **A.      Yes.** |
| 11:17:49 | 3 | Q.      Before living with Mike at 406, you were living at |
| 11:17:55 | 4 | 11007 North First Street; right? |
| 11:17:59 | 5 | **A.      That sounds right.** |
| 11:18:01 | 6 | Q.      Okay.  Before that, before living on First Street, |
| 11:18:06 | 7 | had you lived in North Dakota before? |
| 11:18:09 | 8 | **A.      Yeah.** |
| 11:18:09 | 9 | Q.      Okay.  Who lived in North Dakota that you knew? |
| 11:18:12 | 10 | **A.      I mean, that's where I grew up.** |
| 11:18:13 | 11 | Q.      Okay.  You had family up there? |
| 11:18:15 | 12 | **A.      Yeah.** |
| 11:18:15 | 13 | Q.      Okay.  How long had you lived in North Dakota |
| 11:18:18 | 14 | before moving into the address on First Street? |
| 11:18:21 | 15 | **A.      I had been in Kansas for a bit, for a few years,** |
| 11:18:23 | 16 | **before moving into -- I hadn't been in North Dakota for** |
| 11:18:27 | 17 | **years.** |
| 11:18:27 | 18 | Q.      Okay.  You had been living in other places in |
| 11:18:29 | 19 | Kansas? |
| 11:18:30 | 20 | **A.      Yes.** |
| 11:18:31 | 21 | Q.      How much of your life had you spent in North |
| 11:18:37 | 22 | Dakota? |
| 11:18:37 | 23 | **A.      Maybe 14 years.** |
| 11:18:43 | 24 | Q.      So 14 years in North Dakota, some time in Kansas. |
| 11:18:46 | 25 | When did you move into 11007 North First Street? |

6-3-21  USA v. ARJONA  No. 19-10025-01

100

| 11:18:51 | 1 | A.      The end of 2016.  Probably November -- it was |
| 11:18:58 | 2 | right after Thanksgiving. |
| 11:19:01 | 3 | Q.    Okay.  I'm going to call that address -- let's |
| 11:19:04 | 4 | just call it First Street.  Okay? |
| 11:19:06 | 5 | A.      Okay. |
| 11:19:06 | 6 | Q.    When did you start -- you moved in there, First |
| 11:19:09 | 7 | Street, end of November 2016.  When did you start living |
| 11:19:13 | 8 | with Mauricio at that address? |
| 11:19:16 | 9 | A.      A few days after we moved in. |
| 11:19:20 | 10 | Q.    Sometime after you were living there, do you |
| 11:19:24 | 11 | remember that there was a party where Mauricio's drugs |
| 11:19:26 | 12 | were almost discovered by law enforcement? |
| 11:19:29 | 13 | A.      I don't remember that. |
| 11:19:35 | 14 | Q.    I might have the address wrong.  Do you remember a |
| 11:19:38 | 15 | time at all where Mauricio's drugs were almost found by |
| 11:19:42 | 16 | law enforcement after a party? |
| 11:19:43 | 17 | A.      I can't -- I mean, there was a lot of parties |
| 11:19:45 | 18 | there.  I can't remember. |
| 11:19:47 | 19 | Q.    Okay.  So you remember talking about one of those |
| 11:19:49 | 20 | parties during your interview with law enforcement? |
| 11:19:51 | 21 | A.      Right now I do not remember. |
| 11:19:53 | 22 | Q.    Okay.  Mr. Cobal, my goal here is not to, like, |
| 11:20:24 | 23 | catch you in something you weren't aware of.  So I'm |
| 11:20:26 | 24 | going to play it just to help you remember, and then |
| 11:20:28 | 25 | hopefully that will help you answer some of my questions. |

| | | |
|---|---|---|
| 11:20:31 | 1 | Okay? |
| 11:20:31 | 2 | **A.      Okay.** |
| 11:20:31 | 3 | Q.    I'm not trying to surprise you with this. |
| 11:20:38 | 4 | MR. BIEBIGHAUSER:  Ready when you are. |
| 11:20:40 | 5 | CLERK KOEHLER:  I think you need to -- |
| 11:20:41 | 6 | MR. BIEBIGHAUSER:  No, I'm not, am I? |
| 11:20:41 | 7 | BY MR. BIEBIGHAUSER: |
| 11:21:02 | 8 | Q.    I'm going to start playing this.  Okay, I'm going |
| 11:21:14 | 9 | to play this for just a second to help you remember.  If |
| 11:21:17 | 10 | at some point before before I turn it off, you remember |
| 11:21:21 | 11 | "Oh, yeah, I remember," just nod your head so I can turn |
| 11:21:23 | 12 | it off and you can talk. |
| 11:21:24 | 13 | (Playing Cobal interview audio.) |
| 11:21:32 | 14 | BY MR. BIEBIGHAUSER: |
| 11:21:32 | 15 | Q.    This is a challenge for both of us. |
| 11:21:34 | 16 | Unfortunately, towards the end -- you haven't heard this |
| 11:21:36 | 17 | before, have you? |
| 11:21:37 | 18 | **A.      I'm sure I have.** |
| 11:21:38 | 19 | Q.    Oh, you think you have.  Okay. |
| 11:21:40 | 20 | **A.      Yeah.** |
| 11:21:40 | 21 | Q.    Do you remember that, once it gets towards the |
| 11:21:42 | 22 | end, the audio starts to get really choppy? |
| 11:21:45 | 23 | **A.      Yeah.** |
| 11:21:45 | 24 | Q.    Do you know why that happened? |
| 11:21:47 | 25 | **A.      No.** |

11:21:47   1   Q.      Okay, me either.  I'm going to play it and we'll

11:21:51   2   just do our best.

11:21:53   3          It may need to get turned up because the audio

11:21:56   4   quality is not very good.

11:21:58   5          (Playing Cobal interview audio.)

11:22:15   6   Q.      You're nodding at me.  Is that because you

11:22:17   7   remember?

11:22:17   8   A.      Yeah.

11:22:17   9   Q.      Okay.  All right.  So this is the party I'm

11:22:19  10   talking about.  So you do remember this party where

11:22:21  11   Mauricio's drugs were almost discovered?

11:22:24  12   A.      Yeah.

11:22:24  13   Q.      Okay.  That was when you were still on First

11:22:28  14   Street.  This would have been early 2017 then; right?

11:22:31  15   A.      Yes.

11:22:33  16   Q.      So by this point, early 2017, you knew that

11:22:36  17   Mauricio was involved in drugs?

11:22:37  18   A.      I was aware, yeah.

11:22:38  19   Q.      And you knew that he was Mike's boss?

11:22:44  20   A.      Yeah.  I didn't know if -- I don't know if I knew

11:22:46  21   he was his boss or not, but I had an idea what was going

11:22:48  22   on.

11:22:49  23   Q.      All right.  And that was as early as early 2017?

11:22:53  24   A.      Yeah.

11:22:53  25   Q.      So during the party police get called and the

| 11:22:57 | 1 | drugs in the house get hidden; right? |
| 11:22:59 | 2 | **A.      I don't know if they were ever moved.   There** |
| 11:23:01 | 3 | **was -- I think everybody was just scared that cops were** |
| 11:23:06 | 4 | **going to come in.** |
| 11:23:06 | 5 | Q.     And find them in the attic, I think, is what you |
| 11:23:09 | 6 | were going to go on to say? |
| 11:23:10 | 7 | **A.      Yeah.** |
| 11:23:10 | 8 | Q.     So that's what spooked Mauricio and caused him to |
| 11:23:14 | 9 | move out of that house on First Street; right? |
| 11:23:16 | 10 | **A.      Yeah.** |
| 11:23:16 | 11 | Q.     And that's when Mauricio moved into 406 North |
| 11:23:20 | 12 | Illinois, now in like April, May or June of 2017; right? |
| 11:23:28 | 13 | **A.      Yeah, South Illinois.   It's 406 South Illinois.** |
| 11:23:30 | 14 | Q.     Right, 406 South Illinois.   After Mauricio moves |
| 11:23:36 | 15 | out in mid 2017, did you move back to North Dakota at |
| 11:23:41 | 16 | that point? |
| 11:23:41 | 17 | **A.      No.** |
| 11:23:42 | 18 | Q.     Okay.  You stayed in Wichita? |
| 11:23:44 | 19 | **A.      Yes.** |
| 11:23:47 | 20 | Q.     Where did you live right after Mauricio moved out |
| 11:23:52 | 21 | of 11007? |
| 11:23:53 | 22 | **A.      I lived with my friends Nate and Ethan.** |
| 11:24:01 | 23 | Q.     All right.  So in -- after staying with Nate and |
| 11:24:09 | 24 | Ethan, how long were you there with Nate and Ethan? |
| 11:24:12 | 25 | **A.      I don't know exactly how long it was.   It was** |

11:24:14  1   **until I was offered the job, I guess you could call it,**

11:24:19  2   **to go to Nebraska and be able to do that to have a place**

11:24:23  3   **to stay.**

11:24:23  4   Q.    When was that?

11:24:24  5   **A.    That was in 2017.**

11:24:25  6   Q.    Okay.  So this is now sometime later in 2017;

11:24:29  7   right?  After June sometime?

11:24:30  8   **A.    Maybe, yeah.**

11:24:33  9   Q.    So before you moved into 406, you already knew at

11:24:40  10  that point what Mauricio was into; right?

11:24:43  11  **A.    Yeah.**

11:24:43  12  Q.    You knew what Mike was into?

11:24:45  13  **A.    Yeah.**

11:24:45  14  Q.    Okay.  Before you moved into that, you knew that

11:24:50  15  Mike was working for Mauricio, didn't you?

11:24:53  16  **A.    I don't know if I knew he was working for him.  I**

11:24:56  17  **knew they were working together.**

11:24:57  18  Q.    Okay.  But you had put those together -- pieces

11:25:00  19  together that they were linked up?

11:25:02  20  **A.    Yeah.**

11:25:02  21  Q.    Okay.  When you first moved into 406 Park --

11:25:07  22  Illinois, sorry, 406 Illinois, in fall of 2017, you chose

11:25:11  23  to get a roommate as well; right?

11:25:14  24  **A.    Yeah.**

11:25:14  25  Q.    That was somebody you picked out, Josh Nichols?

6-3-21   USA v. ARJONA   No. 19-10025-01

105

| | | |
|---|---|---|
| 11:25:17 | 1 | A.      He needed a place to stay, too, yeah. |
| 11:25:19 | 2 | Q.      And he stayed there for a couple months with you? |
| 11:25:23 | 3 | A.      Yeah. |
| 11:25:23 | 4 | Q.      And then about moving in, you said that to move in |
| 11:25:26 | 5 | you had to pick up meth from Nebraska; right? |
| 11:25:29 | 6 | A.      Yes. |
| 11:25:29 | 7 | Q.      Okay.  You said that Mike communicated this to |
| 11:25:32 | 8 | you? |
| 11:25:32 | 9 | A.      Yes. |
| 11:25:33 | 10 | Q.      But the meth was for your old roommate Mauricio, |
| 11:25:37 | 11 | wasn't it? |
| 11:25:39 | 12 | A.      I'm not sure.  I think so, yeah.  I'm assuming it |
| 11:25:42 | 13 | was, but it was also for Mike. |
| 11:25:45 | 14 | Q.      You knew that it was for Mauricio because when you |
| 11:25:48 | 15 | got back, you returned it and delivered it to Mauricio, |
| 11:25:50 | 16 | didn't you? |
| 11:25:51 | 17 | A.      Yeah, at 406 South Illinois, yeah. |
| 11:25:53 | 18 | Q.      Okay.  So about continuing to stay there then, |
| 11:25:56 | 19 | when interviewed in April by federal investigators, you |
| 11:26:00 | 20 | said that you had to make trip -- I guess on direct |
| 11:26:02 | 21 | examination -- you said that you had to make trips to |
| 11:26:04 | 22 | Hutchinson, Kansas.  You talked about that for actually a |
| 11:26:07 | 23 | long time on direct examination; right? |
| 11:26:09 | 24 | A.      Yeah. |
| 11:26:09 | 25 | Q.      Okay.  You did not mention that in February |

| | | |
|---|---|---|
| 11:26:13 | 1 | initially after your arrest, did you? |
| 11:26:16 | 2 | A.    I don't recall. |
| 11:26:17 | 3 | Q.    But by the time of your April interview, you had |
| 11:26:19 | 4 | been assigned an attorney; right? |
| 11:26:22 | 5 | A.    Yes. |
| 11:26:22 | 6 | Q.    And by that time the superseding indictment had |
| 11:26:24 | 7 | been filed; right? |
| 11:26:25 | 8 | A.    Yes. |
| 11:26:26 | 9 | Q.    So after making some of those trips, you chose at |
| 11:26:32 | 10 | some point to stop making those trips, didn't you? |
| 11:26:36 | 11 | A.    Yeah, I said I didn't want to do them anymore. |
| 11:26:38 | 12 | Q.    Yeah, because the police pulled you over? |
| 11:26:40 | 13 | A.    Yes. |
| 11:26:40 | 14 | Q.    And freaked you out, rightly so. |
| 11:26:42 | 15 | A.    Absolutely. |
| 11:26:43 | 16 | Q.    They didn't find anything in your car; right? |
| 11:26:45 | 17 | A.    They did not. |
| 11:26:45 | 18 | Q.    But you told Mike you weren't going to do that |
| 11:26:48 | 19 | anymore? |
| 11:26:48 | 20 | A.    Yeah. |
| 11:26:48 | 21 | Q.    And you didn't? |
| 11:26:49 | 22 | A.    I did a couple more times, one more time, and then |
| 11:26:53 | 23 | he got somebody else to do them. |
| 11:26:54 | 24 | Q.    Okay.  So after you sort of put your foot down, |
| 11:26:57 | 25 | the trips stopped -- maybe one more, but you stopped |

| | | |
|---|---|---|
| 11:27:00 | 1 | going? |
| 11:27:00 | 2 | **A.**    **The trips to Hutch stopped.** |
| 11:27:03 | 3 | Q.    Your trips to Hutch stopped? |
| 11:27:04 | 4 | **A.**    **Yeah.** |
| 11:27:04 | 5 | Q.    And after getting pulled over, after the trips to |
| 11:27:07 | 6 | Hutch stopped, you continued to drink beer at 406; right? |
| 11:27:10 | 7 | **A.**    **Yes.** |
| 11:27:10 | 8 | Q.    You continued to smoke weed there? |
| 11:27:12 | 9 | **A.**    **Yes.** |
| 11:27:12 | 10 | Q.    You continued to stay there? |
| 11:27:14 | 11 | **A.**    **Yeah.** |
| 11:27:14 | 12 | Q.    But you didn't have to make anymore trips to |
| 11:27:16 | 13 | Hutch? |
| 11:27:16 | 14 | **A.**    **Not to Hutch.** |
| 11:27:17 | 15 | Q.    Okay.  Mitch Newman started making those trips to |
| 11:27:20 | 16 | Hutch; right? |
| 11:27:21 | 17 | **A.**    **Yes.** |
| 11:27:21 | 18 | Q.    But he didn't live at 406? |
| 11:27:23 | 19 | **A.**    **No.** |
| 11:27:25 | 20 | Q.    Did you go back to North Dakota again at this |
| 11:27:28 | 21 | point? |
| 11:27:28 | 22 | **A.**    **Not yet, I don't think.** |
| 11:27:29 | 23 | Q.    Not yet? |
| 11:27:30 | 24 | **A.**    **No.** |
| 11:27:30 | 25 | Q.    When did you? |

| | | |
|---|---|---|
| 11:27:33 | 1 | **A.      2018.** |
| 11:27:36 | 2 | Q.      All right.  So after the trips to Hutch stopped, |
| 11:27:39 | 3 | you had gone back to North Dakota? |
| 11:27:40 | 4 | **A.      Yeah.** |
| 11:27:40 | 5 | Q.      Where your family is? |
| 11:27:42 | 6 | **A.      Yeah, I went to stay with my mother.** |
| 11:27:43 | 7 | Q.      Okay.  How long did you stay there? |
| 11:27:47 | 8 | **A.      Maybe a month.** |
| 11:27:49 | 9 | Q.      All right.  And you decided to leave that |
| 11:27:51 | 10 | residence; right? |
| 11:27:54 | 11 | **A.      Yes, I was asked to come back.** |
| 11:27:55 | 12 | Q.      Right.  And you decided to leave? |
| 11:27:58 | 13 | **A.      Yeah.** |
| 11:27:58 | 14 | Q.      And you asked to come back -- you were asked to |
| 11:28:00 | 15 | come back.  You came back to 406 again; right? |
| 11:28:03 | 16 | **A.      Yes.** |
| 11:28:03 | 17 | Q.      Where you had had this bad experience? |
| 11:28:05 | 18 | **A.      Yes.** |
| 11:28:05 | 19 | Q.      Right.  And when you moved in there, this time |
| 11:28:10 | 20 | your roommate was Matthew; right?  Your friend? |
| 11:28:13 | 21 | **A.      Yeah, he had been my roommate before that, too.** |
| 11:28:15 | 22 | Q.      Okay.  You don't know that Matthew was ever |
| 11:28:19 | 23 | threatened by Mike, do you? |
| 11:28:20 | 24 | **A.      I don't know for sure, no.** |
| 11:28:22 | 25 | Q.      And you told investigators in February that |

6-3-21   USA v. ARJONA   No. 19-10025-01          109

| | | |
|---|---|---|
| 11:28:24 | 1 | Matthew was in the same boat as you were, didn't you? |
| 11:28:28 | 2 | **A.       Yeah.** |
| 11:28:28 | 3 | Q.       You don't know why he lived at 406, do you? |
| 11:28:31 | 4 | **A.       He didn't have a place to stay.** |
| 11:28:33 | 5 | Q.       He thought it was cool to live at 406; right? |
| 11:28:36 | 6 | **A.       I mean, I think he did.** |
| 11:28:37 | 7 | Q.       He wanted to smoke weed, didn't he? |
| 11:28:40 | 8 | **A.       Yeah.** |
| 11:28:40 | 9 | Q.       There was a lot of weed there, wasn't there? |
| 11:28:42 | 10 | **A.       Sure.** |
| 11:28:43 | 11 | Q.       It was a free place to live? |
| 11:28:44 | 12 | **A.       I wouldn't call it free.** |
| 11:28:46 | 13 | Q.       Well, you did when you talked to investigators, |
| 11:28:48 | 14 | didn't you? |
| 11:28:48 | 15 | **A.       I mean, I guess it was free money-wise.  I didn't** |
| 11:28:51 | 16 | **have to pay anything.  I didn't have to pay --** |
| 11:28:51 | 17 | Q.       You didn't a have to pay -- |
| 11:28:53 | 18 | **A.       I had the money, so I didn't have to pay.** |
| 11:28:53 | 19 |         THE COURT:  It would be helpful if you all would |
| 11:28:56 | 20 | talk one at a time. |
| 11:28:57 | 21 |         MR. BIEBIGHAUSER:  You're right.  I'm sorry, |
| 11:28:59 | 22 | Judge. |
| 11:28:59 | 23 | BY MR. BIEBIGHAUSER: |
| 11:28:59 | 24 | Q.       You didn't have to pay any money to stay there? |
| 11:29:01 | 25 | **A.       No.** |

6-3-21   USA v. ARJONA   No. 19-10025-01                    110

| | | |
|---|---|---|
| 11:29:03 | 1 | Q.    Let's move on to your substance abuse.  When you |
| 11:29:08 | 2 | were staying at 406, you were drinking alcohol; right? |
| 11:29:10 | 3 | **A.    Yes.** |
| 11:29:10 | 4 | Q.    How often? |
| 11:29:12 | 5 | **A.    Probably every day.** |
| 11:29:13 | 6 | Q.    How much? |
| 11:29:15 | 7 | **A.    I don't know.  A 12-pack.** |
| 11:29:16 | 8 | Q.    With who? |
| 11:29:17 | 9 | **A.    Myself or whoever was there and wanted to drink.** |
| 11:29:20 | 10 | Q.    Okay.  Sometimes Matthew? |
| 11:29:21 | 11 | **A.    Yeah.** |
| 11:29:21 | 12 | Q.    Sometimes Mike? |
| 11:29:23 | 13 | **A.    Yes.** |
| 11:29:24 | 14 | Q.    When you were at 406, you were smoking weed; |
| 11:29:26 | 15 | right? |
| 11:29:27 | 16 | **A.    Yes.** |
| 11:29:27 | 17 | Q.    When did you start smoking weed? |
| 11:29:30 | 18 | **A.    I don't remember exactly.** |
| 11:29:35 | 19 | Q.    About. |
| 11:29:36 | 20 | **A.    Maybe 20 years old.** |
| 11:29:40 | 21 | Q.    So you had been smoking weed for about two years |
| 11:29:43 | 22 | by the time this all comes to pass; right? |
| 11:29:45 | 23 | **A.    Two, three years.** |
| 11:29:48 | 24 | Q.    How much weed were you smoking when you were |
| 11:29:51 | 25 | living at 406, both the first and the second time? |

| 11:29:53 | 1 | A. | **We smoked every day.** |

11:29:53  1  A.    **We smoked every day.**

11:29:54  2  Q.    How much?

11:29:55  3  A.    **I don't know how much.**

11:29:56  4  Q.    How many times?

11:29:57  5  A.    **I don't know.**

11:29:59  6  Q.    With Matthew?

11:30:00  7  A.    **Yeah.**

11:30:00  8  Q.    With Mike?

11:30:01  9  A.    **Yes.**

11:30:05  10  Q.    How about smoking weed the day of your interview

11:30:08  11  in February?

11:30:08  12  A.    **No.**

11:30:08  13  Q.    Had you been smoking weed the day before?

11:30:11  14  A.    **No.  Well, probably, I'm sure.**

11:30:15  15  Q.    Were you using any other drugs at all at that time

11:30:18  16  in your life?

11:30:19  17  A.    **No.**

11:30:21  18  Q.    Do you remember today what it was like being under

11:30:24  19  the influence of marijuana?

11:30:25  20  A.    **I don't, no.**

11:30:25  21  Q.    You have no memory of being under the influence of

11:30:28  22  marijuana?

11:30:29  23  A.    **I mean, I was relaxed.  I can't remember what the**

11:30:32  24  **feeling was.  It's been a long time.**

11:30:35  25  Q.    You said it was relaxed.  Did it affect your

| 11:30:37 | 1 | emotional responses to things? |
| 11:30:40 | 2 | **A.      Probably.   Maybe not wanting to be aggressive.** |
| 11:30:42 | 3 | Q.      Sure.   Did it impact -- I'm just being general |
| 11:30:47 | 4 | here.   Did it impact the way that things like music and |
| 11:30:50 | 5 | movies made you feel? |
| 11:30:51 | 6 | **A.      No.** |
| 11:30:52 | 7 | Q.      Did -- I'm going to skip ahead to your familiarity |
| 11:30:59 | 8 | with the people involved in this case.   You mentioned on |
| 11:31:02 | 9 | direct examination that you were involved in distributing |
| 11:31:05 | 10 | meth with Mauricio; right? |
| 11:31:09 | 11 | **A.      Can you explain that?** |
| 11:31:11 | 12 | Q.      Sure.   You and Mike went together -- |
| 11:31:13 | 13 | **A.      Yes.** |
| 11:31:13 | 14 | Q.      -- to pick up drugs from Mauricio; right? |
| 11:31:17 | 15 | **A.      Yes.** |
| 11:31:17 | 16 | Q.      So that's what I mean when I say "involved in the |
| 11:31:21 | 17 | distribution."   Same thing with Aniceto; right? |
| 11:31:24 | 18 | **A.      Yeah.** |
| 11:31:24 | 19 | Q.      Same with Matthew; right? |
| 11:31:26 | 20 | **A.      Yes.** |
| 11:31:26 | 21 | Q.      And same with Mike?   Yeah? |
| 11:31:30 | 22 | **A.      Yeah.** |
| 11:31:32 | 23 | Q.      Fair to say that these actors were all sort of |
| 11:31:35 | 24 | part of the same orbit?   They're all interrelated, |
| 11:31:40 | 25 | working together? |

| | | |
|---|---|---|
| 11:31:42 | 1 | A.      I mean, they're working together.  I don't get |
| 11:31:45 | 2 | what you mean. |
| 11:31:45 | 3 | Q.      That's all I mean, they're working together. |
| 11:31:48 | 4 | A.      I guess so. |
| 11:31:48 | 5 | Q.      They have different roles, different assignments; |
| 11:31:51 | 6 | right? |
| 11:31:51 | 7 | A.      Yes. |
| 11:31:51 | 8 | Q.      Okay.  And over the course of time, these are |
| 11:31:53 | 9 | people that you got to know the preferences of in |
| 11:31:56 | 10 | relation to what they were doing and what they wanted |
| 11:31:59 | 11 | when you were distributing drugs; right? |
| 11:32:00 | 12 | A.      What do you mean their "preferences"? |
| 11:32:02 | 13 | Q.      You saw what made them angry, you knew what to |
| 11:32:04 | 14 | say, what not to say to make them angry -- |
| 11:32:06 | 15 | A.      Yeah. |
| 11:32:06 | 16 | Q.      -- to upset them, make the deal go bad? |
| 11:32:09 | 17 | A.      Oh, the people we were meeting with? |
| 11:32:10 | 18 | Q.      Yeah. |
| 11:32:11 | 19 | A.      No. |
| 11:32:11 | 20 | Q.      Okay.  So you were meeting with them just on a |
| 11:32:13 | 21 | whim, you didn't know what they were -- |
| 11:32:15 | 22 | A.      I didn't know how they acted, no.  I knew one guy. |
| 11:32:18 | 23 | Q.      Okay.  Do you remember in February after your |
| 11:32:20 | 24 | arrest, you told investigators that you could deal with |
| 11:32:22 | 25 | Mauricio without going through Mike.  Do you remember |

11:32:24   1   that?

11:32:25   2   **A.      No.**

11:32:53   3   Q.      I'm going to play this for you and, again, I'm

11:32:55   4   just going to ask you if you hear the same thing I do.

11:32:58   5   Okay?

11:32:58   6           (Playing Cobal video of interview.)

11:33:05   7   **A.      Okay.**

11:33:06   8   Q.      All right.  So the investigator asks you could you

11:33:08   9   deal with Mauricio without Mike; right?  Right?

11:33:12   10  **A.      Yeah.  That's what he said.**

11:33:13   11  Q.      And you said, "I don't know what he would say, but

11:33:15   12  yeah"?

11:33:15   13  **A.      But I'm sure I could go over to his house, I don't**

11:33:18   14  **know what would happen, but I'm sure I could walk to his**

11:33:20   15  **house and see what happens.**

11:33:22   16  Q.      Okay.  In February, after your arrest, you told

11:33:25   17  investigators that you could deal with Nick Brandt

11:33:28   18  without going through Mike; right?

11:33:30   19  **A.      I don't know.  I don't remember.**

11:33:42   20          **(Continuing to view Cobal video of interview.)**

11:33:50   21  Q.      The investigator asked you, "Do you think Nick

11:33:53   22  would deal with you if you went to him?"  Right?

11:33:57   23  **A.      That's what he asked, yeah.**

11:33:59   24  Q.      And you said "probably"; right?

11:34:03   25  **A.      Yeah.**

| | | |
|---|---|---|
| 11:34:03 | 1 | Q.      Let's talk about distributing drugs with Mike. |
| 11:34:07 | 2 | There was more than one customer; right? |
| 11:34:11 | 3 | **A.      Yes.** |
| 11:34:12 | 4 | Q.      And there was more than one supplier; right, |
| 11:34:15 | 5 | Mauricio and Ceto both? |
| 11:34:19 | 6 | **A.      Yes.** |
| 11:34:19 | 7 | Q.      Sometimes you would take phone calls from |
| 11:34:23 | 8 | customers or text messages; right? |
| 11:34:28 | 9 | **A.      I don't think so.** |
| 11:34:29 | 10 | Q.      You took Detective Weber's phone calls? |
| 11:34:31 | 11 | **A.      I did.** |
| 11:34:32 | 12 | Q.      You took his text messages, didn't you? |
| 11:34:34 | 13 | **A.      Sometimes.** |
| 11:34:35 | 14 | Q.      So sometimes Mike would take phone calls from |
| 11:34:38 | 15 | customers; right? |
| 11:34:39 | 16 | **A.      Yeah.** |
| 11:34:39 | 17 | Q.      Sometimes you would drop off drugs; right? |
| 11:34:44 | 18 | **A.      At the order of Mike.** |
| 11:34:46 | 19 | Q.      My question's just sometimes you would do it, |
| 11:34:49 | 20 | wouldn't you? |
| 11:34:49 | 21 | **A.      Yes, by the order of Mike.** |
| 11:34:52 | 22 | Q.      One of the people you dropped off drugs to was |
| 11:34:54 | 23 | Detective Weber? |
| 11:34:57 | 24 | **A.      Yes.** |
| 11:34:57 | 25 | Q.      And sometimes when you'd go to drop off drugs, |

| | | |
|---|---|---|
| 11:35:00 | 1 | Mike would be with you, wouldn't he? |
| 11:35:01 | 2 | A.      Yeah. |
| 11:35:01 | 3 | Q.      You said he went with you on that first trip to |
| 11:35:04 | 4 | Hutch; right? |
| 11:35:04 | 5 | A.      Yes. |
| 11:35:05 | 6 | Q.      Sometimes Mike would drop off the drugs; right? |
| 11:35:09 | 7 | A.      Yeah. |
| 11:35:09 | 8 | Q.      Mike dropped off drugs to Nick.  You mentioned his |
| 11:35:13 | 9 | name? |
| 11:35:13 | 10 | A.      Yeah. |
| 11:35:13 | 11 | Q.      Okay.  And sometimes when Mike did that, you would |
| 11:35:16 | 12 | go along; right? |
| 11:35:18 | 13 | A.      Yeah. |
| 11:35:18 | 14 | Q.      Sometimes you would drop off drugs with Mike.  And |
| 11:35:22 | 15 | I'll tell you what I mean by that.  That's the second |
| 11:35:24 | 16 | trip to Hutch; right?  The two of you go together? |
| 11:35:27 | 17 | A.      Yes. |
| 11:35:27 | 18 | Q.      Okay.  I want to also talk to you about Mauricio |
| 11:35:33 | 19 | and Aniceto.  On direct examination you said that |
| 11:35:38 | 20 | Mauricio spoke Spanish; right? |
| 11:35:40 | 21 | A.      Yes. |
| 11:35:41 | 22 | Q.      Mike spoke Spanish? |
| 11:35:42 | 23 | A.      Yes. |
| 11:35:43 | 24 | Q.      Sometimes they would speak Spanish together? |
| 11:35:45 | 25 | A.      Yeah. |

| | | |
|---|---|---|
| 11:35:45 | 1 | Q.      And you couldn't understand that? |
| 11:35:47 | 2 | **A.      No, I could not.** |
| 11:35:50 | 3 | Q.      Mike would pick up drugs from Mauricio, wouldn't |
| 11:35:53 | 4 | he? |
| 11:35:54 | 5 | **A.      Yeah.** |
| 11:35:54 | 6 | Q.      Mauricio was the supplier for larger amounts? |
| 11:35:57 | 7 | **A.      Yeah.** |
| 11:35:57 | 8 | Q.      And you would go along with Mike when he picked |
| 11:36:00 | 9 | that up? |
| 11:36:00 | 10 | **A.      Sometimes.** |
| 11:36:03 | 11 | Q.      When Mike received those larger amounts, he would |
| 11:36:06 | 12 | then turn around and become a supplier; right? |
| 11:36:09 | 13 | **A.      Yes.** |
| 11:36:10 | 14 | Q.      Do you know whether he was receiving those drugs |
| 11:36:12 | 15 | on a front? |
| 11:36:16 | 16 | **A.      I mean, I think so, yeah.** |
| 11:36:18 | 17 | Q.      Okay.  What do you mean -- what do you think I |
| 11:36:22 | 18 | mean by "front"? |
| 11:36:23 | 19 | **A.      He would get the drugs and come back with money at** |
| 11:36:25 | 20 | **a later time.** |
| 11:36:26 | 21 | Q.      And he had to come back with that money that he |
| 11:36:29 | 22 | got them for; right? |
| 11:36:30 | 23 | **A.      Yes.** |
| 11:36:30 | 24 | Q.      Okay.  That money that he got them for in a front |
| 11:36:33 | 25 | situation was set by the person that was offering the |

11:36:36    1  front; right?

11:36:37    2  A.      I'm sure, yeah.

11:36:39    3  Q.      So then the drugs have to be turned around to sell

11:36:43    4  enough to cover the initial front?  That's the idea;

11:36:45    5  right?

11:36:46    6  A.      Yes.

11:36:51    7  Q.      It was your understanding that at some point Mike

11:36:53    8  fell behind with Mauricio, didn't he?

11:36:55    9  A.      From what I remember, yeah.

11:36:57   10  Q.      And that Mauricio would sort of hound him down to

11:37:02   11  try to get the money, wouldn't he?

11:37:03   12  A.      Yeah.

11:37:03   13  Q.      So he would blow up Mike's phone?

11:37:05   14  A.      Yes.

11:37:06   15  Q.      He'd show up unexpectedly?

11:37:08   16  A.      Yes.

11:37:08   17  Q.      He -- and Mike didn't like that, did he?

11:37:11   18  A.      No.

11:37:12   19  Q.      You didn't know how much money Mike was making on

11:37:15   20  whatever his arrangement was with Mauricio, did you?

11:37:18   21  A.      No.

11:37:20   22  Q.      All right.  Let's talk about Aniceto.  The same

11:37:24   23  deal for Aniceto.  He spoke Spanish, Mike spoke Spanish,

11:37:27   24  and you did not; right?

11:37:28   25  A.      Correct.

| | | |
|---|---|---|
| 11:37:29 | 1 | Q.    Okay.  So there were conversations they had that |
| 11:37:31 | 2 | you couldn't understand? |
| 11:37:32 | 3 | **A.    Correct.** |
| 11:37:35 | 4 | Q.    Ceto, you said, was cooking meth in the kitchen at |
| 11:37:38 | 5 | 406? |
| 11:37:38 | 6 | **A.    Yes.** |
| 11:37:38 | 7 | Q.    The kitchen of the house that you were living in? |
| 11:37:41 | 8 | **A.    Yes.** |
| 11:37:41 | 9 | Q.    You knew he was cooking there; right? |
| 11:37:43 | 10 | **A.    I didn't know that was the plan but I knew once it** |
| 11:37:46 | 11 | **was happening.** |
| 11:37:46 | 12 | Q.    Yeah.  You saw him doing it. |
| 11:37:48 | 13 | **A.    Yeah, could smell it.** |
| 11:37:49 | 14 | Q.    On one occasion you drove Ceto to Dallas; right? |
| 11:37:53 | 15 | **A.    Yes.** |
| 11:37:53 | 16 | Q.    Mike didn't go that time, did he? |
| 11:37:55 | 17 | **A.    No.** |
| 11:37:58 | 18 | Q.    You didn't know what you were picking up from |
| 11:38:00 | 19 | Dallas?  You knew it was drugs. |
| 11:38:03 | 20 | **A.    Yeah.** |
| 11:38:03 | 21 | Q.    Okay.  You didn't know what or how much, that kind |
| 11:38:06 | 22 | of thing? |
| 11:38:06 | 23 | **A.    No, I did not.** |
| 11:38:07 | 24 | Q.    You figured Ceto knew, though; right? |
| 11:38:09 | 25 | **A.    I'm sure he did.** |

6-3-21   USA v. ARJONA   No. 19-10025-01

120

| | | |
|---|---|---|
| 11:38:10 | 1 | Q.    And he was the one you were driving? |
| 11:38:12 | 2 | **A.    Yes.** |
| 11:38:15 | 3 | Q.    Ceto also, you think, had a niece that would |
| 11:38:19 | 4 | supply Mike; right? |
| 11:38:20 | 5 | **A.    A niece or a daughter, I don't know exactly which,** |
| 11:38:22 | 6 | **but yeah.** |
| 11:38:22 | 7 | Q.    That supply came from Oklahoma? |
| 11:38:25 | 8 | **A.    Yes.** |
| 11:38:25 | 9 | Q.    Okay.  And you only attempted to go to Mexico that |
| 11:38:28 | 10 | one time that you described; right? |
| 11:38:30 | 11 | **A.    Yes.** |
| 11:38:30 | 12 | Q.    Okay.  And you were going to use the same wiper |
| 11:38:33 | 13 | fluid method that Ceto used? |
| 11:38:35 | 14 | **A.    Yeah, as far as I know.** |
| 11:38:36 | 15 | Q.    But you didn't come -- |
| 11:38:38 | 16 | **A.    I don't know exactly if that's how it was going to** |
| 11:38:41 | 17 | **go, but that's what I assumed.** |
| 11:38:42 | 18 | Q.    On that trip you didn't actually come back with |
| 11:38:44 | 19 | any drugs from Mexico, did you? |
| 11:38:46 | 20 | **A.    No, we did not.** |
| 11:38:46 | 21 | Q.    By the time you reached the border, a contact in |
| 11:38:51 | 22 | Mexico had your phone number; right? |
| 11:38:53 | 23 | **A.    I believe so.** |
| 11:38:54 | 24 | Q.    And they had Mike's number, too, didn't they? |
| 11:38:56 | 25 | **A.    Yeah.** |

6-3-21   USA v. ARJONA   No. 19-10025-01

121

| | | |
|---|---|---|
| 11:38:56 | 1 | Q.    Mike was coordinating that effort with you? |
| 11:38:59 | 2 | A.    **Yes.** |
| 11:39:00 | 3 | Q.    Mike owed -- you also were aware that Mike owed |
| 11:39:04 | 4 | Ceto money, weren't you? |
| 11:39:06 | 5 | A.    **Yes.** |
| 11:39:06 | 6 | Q.    And Ceto was in charge of whatever debt that was? |
| 11:39:09 | 7 | A.    **Yeah.** |
| 11:39:09 | 8 | Q.    Mike fell behind with Ceto, too, didn't he? |
| 11:39:12 | 9 | A.    **I think so.** |
| 11:39:12 | 10 | Q.    He wanted to avoid Ceto? |
| 11:39:15 | 11 | A.    **Yeah.** |
| 11:39:15 | 12 | Q.    He was trying to make Ceto think that he was in |
| 11:39:17 | 13 | jail or something? |
| 11:39:19 | 14 | A.    **Yep.** |
| 11:39:19 | 15 | Q.    You don't know how much money Mike was actually |
| 11:39:22 | 16 | making with his arrangements from Ceto? |
| 11:39:24 | 17 | A.    **No, I don't.** |
| 11:39:24 | 18 | Q.    What their agreement was? |
| 11:39:26 | 19 | A.    **No.** |
| 11:39:26 | 20 | (Whereupon, a sotto voce discussion was had |
| 11:39:31 | 21 | between Mr. Biebighauser and the defendant.) |
| 11:41:21 | 22 | BY MR. BIEBIGHAUSER: |
| 11:41:21 | 23 | Q.    Who's your attorney? |
| 11:41:23 | 24 | A.    **Mike Hepperly.** |
| 11:41:24 | 25 | Q.    Okay.  Is he in the courtroom today? |

| | | |
|---|---|---|
| 11:41:25 | 1 | A.      Yes. |
| 11:41:25 | 2 | Q.      Okay.  Do you see where he is now? |
| 11:41:28 | 3 | A.      Yes. |
| 11:41:28 | 4 | Q.      Where was he just a minute ago? |
| 11:41:30 | 5 | A.      Same spot. |
| 11:41:31 | 6 | Q.      Okay.  Did you see him talking to the Government |
| 11:41:33 | 7 | attorney while we were just taking a break? |
| 11:41:35 | 8 | A.      I wasn't paying attention to that. |
| 11:41:37 | 9 | Q.      You didn't see that happening? |
| 11:41:38 | 10 | A.      I mean, I saw him walk over there.  I don't know |
| 11:41:40 | 11 | if they were chatting or what, so . . . |
| 11:41:43 | 12 | Q.      Going back to that trip to Dallas. |
| 11:41:45 | 13 | A.      Okay. |
| 11:41:46 | 14 | Q.      Ceto was in the car with you; right? |
| 11:41:48 | 15 | A.      Yes. |
| 11:41:48 | 16 | Q.      He knew where you were going? |
| 11:41:50 | 17 | A.      Yeah. |
| 11:41:50 | 18 | Q.      He passed that information on to you? |
| 11:41:53 | 19 | A.      No.  I mean, I guess.  I was given an address to |
| 11:41:56 | 20 | go to.  Mike gave me an address. |
| 11:41:58 | 21 | Q.      Okay.  And Ceto was there in the car with you? |
| 11:42:00 | 22 | A.      Yes. |
| 11:42:01 | 23 |        MR. BIEBIGHAUSER:  Nothing further. |
| 11:42:03 | 24 |        THE COURT:  Ms. Andrusak, I assume you have very |
| 11:42:05 | 25 | little redirect, if any? |

| | | |
|---|---|---|
| 11:42:06 | 1 | MS. ANDRUSAK:  Just a little, Your Honor, just a |
| 11:42:09 | 2 | few clarifications. |
| 11:42:11 | 3 | THE COURT:  Well, let's make it brief. |
| 11:42:12 | 4 | MS. ANDRUSAK:  Yes, Your Honor. |
| 11:42:13 | 5 | REDIRECT EXAMINATION |
| 11:42:13 | 6 | BY MS. ANDRUSAK: |
| 11:42:26 | 7 | Q.    So I want to talk to you real quick about Nick |
| 11:42:28 | 8 | Brandt, and that interview that you played where you said |
| 11:42:31 | 9 | you could probably get in touch with Nick Brandt.  Did |
| 11:42:34 | 10 | you ever deal with Nick Brandt alone? |
| 11:42:36 | 11 | **A.    No.** |
| 11:42:36 | 12 | Q.    Did you ever decide what amounts were going to |
| 11:42:39 | 13 | Nick? |
| 11:42:39 | 14 | **A.    No.** |
| 11:42:39 | 15 | Q.    Did you ever make any deals with Nick without |
| 11:42:41 | 16 | being directed to by the defendant? |
| 11:42:43 | 17 | **A.    No.** |
| 11:42:44 | 18 | Q.    Okay.  And you didn't know but for Nick Brandt |
| 11:42:48 | 19 | because you made multiple deals with him, you didn't know |
| 11:42:51 | 20 | the individuals you were meeting with? |
| 11:42:52 | 21 | **A.    No, I did not.** |
| 11:42:53 | 22 | Q.    Okay.  And then when you did the buys with |
| 11:42:57 | 23 | Detective Weber, when he would call and text you or you |
| 11:43:01 | 24 | had the capability of doing so, did you set prices with |
| 11:43:04 | 25 | Detective Weber? |

| | | |
|---|---|---|
| 11:43:04 | 1 | A.      I did not. |
| 11:43:05 | 2 | Q.      Did you discuss the amounts of drugs that were |
| 11:43:08 | 3 | going to be passed back and forth? |
| 11:43:09 | 4 | A.      No. |
| 11:43:16 | 5 | Q.      You were asked about free living and you said it |
| 11:43:20 | 6 | wasn't free.  What did you mean by that? |
| 11:43:23 | 7 | A.      I had to -- I mean, I had to deliver drugs.  It |
| 11:43:26 | 8 | wasn't free. |
| 11:43:27 | 9 | Q.      So you didn't have to pay money but there were |
| 11:43:29 | 10 | other things you had to do? |
| 11:43:30 | 11 | A.      Exactly. |
| 11:43:31 | 12 | Q.      You said you were asked to come back from |
| 11:43:33 | 13 | Nebraska.  Is this when you were shown videos? |
| 11:43:36 | 14 | A.      It's North Dakota. |
| 11:43:37 | 15 | Q.      I'm sorry, yes. |
| 11:43:38 | 16 | A.      Yes, yes. |
| 11:43:39 | 17 | Q.      So when you were coming back -- or when you were |
| 11:43:42 | 18 | in North Dakota and you were asked to come back, is that |
| 11:43:46 | 19 | when mention of where your family lived was brought up? |
| 11:43:49 | 20 | A.      Yes.  That happened a few times.  It was brought |
| 11:43:51 | 21 | up then. |
| 11:43:52 | 22 | Q.      Okay.  Did you feel like you had a choice but to |
| 11:43:55 | 23 | come back? |
| 11:43:56 | 24 | A.      I had a choice, but I thought coming back was the |
| 11:43:59 | 25 | better choice for myself and my family. |

| 11:44:00 | 1 | Q.     Okay.  Because you feared the defendant? |

11:44:04   2   **A.     Yes.**

11:44:07   3   Q.     And we seem to have had a little clarification --

11:44:09   4   or address issue between myself asking you questions and

11:44:13   5   defense counsel asking you questions.  I think we're set

11:44:16   6   on 406 and 408 South Illinois Street.  First Street, when

11:44:21   7   I was talking to you, I said Parkdale.

11:44:23   8   **A.     Yeah.**

11:44:23   9   Q.     But where you actually lived with the defendant --

11:44:26   10   **A.     Parkdale comes off -- or First Street and Parkdale**

11:44:30   11   **kind of connect.**

11:44:30   12   Q.     Okay.  So it was actually a residence on First

11:44:32   13   Street and not Parkdale?

11:44:33   14   **A.     Yes.**

11:44:34   15   Q.     Okay.  A gun was pulled on you frequently by the

11:44:53   16   defendant; is that right?

11:44:54   17        MR. BIEBIGHAUSER:  Objection.  Leading.

11:44:55   18   **A.     It happened a few times.**

11:44:56   19        THE COURT:  Sustained.  Would you rephrase the

11:44:58   20   question?

11:44:58   21        MS. ANDRUSAK:  Yes, Your Honor.

11:45:01   22   BY MS. ANDRUSAK:

11:45:01   23   Q.     How often was a gun pulled on you by the

11:45:04   24   defendant?

11:45:04   25   **A.     It happened a couple times.**

```
11:45:09   1   Q.    Okay.  Were there any other weapons used by the

11:45:12   2   defendant on other people while you were there?

11:45:13   3   A.    The kid I mentioned earlier that had lived there

11:45:15   4   towards the end, Tyler Leach, he was hit with a sword by

11:45:22   5   Mike.  I didn't see it happen, but I heard that Matthew

11:45:26   6   McMillan screamed and was freaking out that he got hit --

11:45:31   7   that his friend had gotten hit by a sword.  And the kid

11:45:35   8   fainted.  He wasn't hurt by it.  I think he got a little

11:45:37   9   cut.  But that was frightening 'cause it could have been

11:45:40   10  much worse.  He got lucky.

11:45:42   11  Q.    And everything you've told us, whether it was my

11:45:44   12  questions or the defense counsel's questions, is what

11:45:48   13  happened; is that right?

11:45:49   14  A.    Yes.

11:45:50   15        MS. ANDRUSAK:  Okay.  Thank you.

11:45:51   16        THE COURT:  Any recross within the scope?

11:45:53   17        MR. BIEBIGHAUSER:  No, Your Honor.

11:45:54   18        THE COURT:  Mr. Cobal, you may step down.  Thank

11:45:56   19  you for your appearance here.

11:45:59   20        (Witness excused from the witness stand.)

11:45:59   21        THE COURT:  We're going to take a 15-minute

11:46:01   22  recess.  Counsel, you all predicted this would be a

11:46:03   23  two-hour hearing.  I have an afternoon docket.  So we are

11:46:06   24  going to come back after 15 minutes and work through the

11:46:08   25  lunch hour because I have an afternoon docket.  So let's
```

| | | |
|---|---|---|
| 11:46:13 | 1 | come back in about noon and we'll continue the hearing at |
| 11:46:18 | 2 | that point.  Court's in recess. |
| 11:46:19 | 3 | MR. BIEBIGHAUSER:  Your Honor.  If I can just |
| 11:46:20 | 4 | provide some guidance, Your Honor.  I don't think there |
| 11:46:23 | 5 | are anymore witnesses.  I don't plan to call any |
| 11:46:26 | 6 | witnesses on this issue, I don't also expect to have |
| 11:46:29 | 7 | additional commentary about sentencing.  In my place of |
| 11:46:32 | 8 | argument -- and I don't expect to have any comments at |
| 11:46:36 | 9 | all, if any -- there are a couple members of Mr. Arjona's |
| 11:46:38 | 10 | family here.  I've asked them to constrain their remarks |
| 11:46:41 | 11 | to no more than three minutes.  I expect altogether that |
| 11:46:43 | 12 | won't take more than ten, just for the Court's guidance. |
| 11:46:46 | 13 | THE COURT:  Well, certainly don't mistake my |
| 11:46:48 | 14 | comments to say I want either of you to truncate your |
| 11:46:54 | 15 | position beyond what you think the interests of justice |
| 11:46:58 | 16 | allowed.  I'm not trying to do that.  And I've obviously |
| 11:46:59 | 17 | give given you free rein with your inquiry.  I'm just |
| 11:47:03 | 18 | saying, in order to get that done, in light of my docket, |
| 11:47:04 | 19 | we're going to work through lunch.  And then you all will |
| 11:47:07 | 20 | get a late lunch and my staff will just be mad at me. |
| 11:47:10 | 21 | MS. ANDRUSAK:  Your Honor, before we close the |
| 11:47:12 | 22 | record, I just want to state that the Government rests |
| 11:47:14 | 23 | and does not have any further witnesses. |
| 11:47:15 | 24 | THE COURT:  All right.  I assumed you had two |
| 11:47:17 | 25 | witnesses to call and Mr. Biebighauser's indicated he has |

| | | |
|---|---|---|
| 11:47:19 | 1 | no witnesses, so after the recess we'll come back and |
| 11:47:22 | 2 | address the objections and hear argument.  Court's in |
| 11:47:25 | 3 | recess until noon. |
| 11:47:28 | 4 | CLERK KOEHLER:  All rise. |
| 11:47:29 | 5 | (A recess was taken from 11:47 A.M. to 12:02 P.M.) |
| 12:02:28 | 6 | CLERK KOEHLER:  All rise. |
| 12:02:29 | 7 | THE COURT:  You may be seated. |
| 12:02:37 | 8 | Counsel, as I understand, we have no more evidence |
| 12:02:39 | 9 | to put on by either side and so we're ready to move to |
| 12:02:42 | 10 | arguments on the objections to the presentence |
| 12:02:48 | 11 | investigation report.  I've already sustained objection |
| 12:02:50 | 12 | number one, which brings us to objection number two, |
| 12:02:58 | 13 | relating to the upward adjustment for the drugs being |
| 12:03:06 | 14 | imported from Mexico. |
| 12:03:07 | 15 | Mr. Biebighauser? |
| 12:03:12 | 16 | MR. BIEBIGHAUSER:  Thank you, Your Honor. |
| 12:03:13 | 17 | Unless the Court has questions about the facts -- |
| 12:03:17 | 18 | can I go here? |
| 12:03:18 | 19 | THE COURT:  Please do. |
| 12:03:23 | 20 | MR. BIEBIGHAUSER:  I'll just propose something, |
| 12:03:25 | 21 | Your Honor. |
| 12:03:26 | 22 | THE COURT:  Pardon me? |
| 12:03:27 | 23 | MR. BIEBIGHAUSER:  Unless the Court has questions |
| 12:03:28 | 24 | about the specific facts related to objection two or |
| 12:03:32 | 25 | three, my argument as to both is really the same, and so |

| | | |
|---|---|---|
| 12:03:36 | 1 | I don't want to waste your time by repeating myself. |
| 12:03:39 | 2 | THE COURT:  Well, you can argue both objections |
| 12:03:41 | 3 | then if you'd like. |
| 12:03:42 | 4 | MR. BIEBIGHAUSER:  I hope I can.  I'll try to. |
| 12:03:43 | 5 | Your Honor, the objection that the defense raises |
| 12:03:46 | 6 | in relation to both objections is that the evidence |
| 12:03:49 | 7 | before the Court is incomplete and unreliable.  It is |
| 12:03:53 | 8 | provided by confidential informants, drug users, |
| 12:03:58 | 9 | codefendants, and cooperators that the Court should not |
| 12:04:01 | 10 | find are reliable. |
| 12:04:02 | 11 | That came in two forms.  I should say it came |
| 12:04:05 | 12 | through two witnesses in multiple forms.  As it comes |
| 12:04:08 | 13 | from Detective Weber, he testified about his direct |
| 12:04:13 | 14 | experiences, which we went through in detail during |
| 12:04:16 | 15 | cross-examination, the time that he spent.  Contrary to |
| 12:04:19 | 16 | his testimony on direct examination, he did have |
| 12:04:22 | 17 | Mr. Cobal's phone number and contracted with him |
| 12:04:26 | 18 | specifically for the sale of drugs, and we went through |
| 12:04:29 | 19 | that information. |
| 12:04:29 | 20 | Then, secondly, and what I want to focus on is |
| 12:04:34 | 21 | Detective Weber's information that he had gathered what |
| 12:04:36 | 22 | I'm going to say from the large swath of the |
| 12:04:39 | 23 | investigation.  There were unattributed conclusions from |
| 12:04:44 | 24 | his review and interviews with various witnesses, people |
| 12:04:46 | 25 | that had agreed to cooperate with the Government, he |

| | | |
|---|---|---|
| 12:04:49 | 1 | said, that were drug users and that were codefendants. |
| 12:04:53 | 2 | That information, without those individuals here, for the |
| 12:04:55 | 3 | Court to test their credibility, to be placed under oath |
| 12:04:58 | 4 | or to test their veracity, is too unreliable for the |
| 12:05:03 | 5 | Court to rely on to rule in the Government's favor, to |
| 12:05:06 | 6 | determine that they've met their burden of proof. |
| 12:05:07 | 7 | THE COURT:  Detective Weber said -- pardon me, I'm |
| 12:05:10 | 8 | very sorry -- Detective Weber said Mr. Arjona himself |
| 12:05:16 | 9 | admitted the drugs came from Mexico.  Is that not his |
| 12:05:25 | 10 | testimony? |
| 12:05:25 | 11 | MR. BIEBIGHAUSER:  Your Honor, that was his |
| 12:05:27 | 12 | testimony, and I didn't present any cross-examination on |
| 12:05:30 | 13 | that testimony. |
| 12:05:30 | 14 | THE COURT:  All right. |
| 12:05:31 | 15 | MR. BIEBIGHAUSER:  I think what I had just been |
| 12:05:34 | 16 | saying doesn't apply to any statements that he heard, and |
| 12:05:39 | 17 | I don't dispute his paraphrasing of Mr. Arjona's |
| 12:05:43 | 18 | statements. |
| 12:05:43 | 19 | THE COURT:  All right. |
| 12:05:45 | 20 | MR. BIEBIGHAUSER:  So then when it comes to the |
| 12:05:47 | 21 | testimony of Cody Cobal, the Court heard, I know, |
| 12:05:51 | 22 | extensively -- and I appreciate the Court's familiar with |
| 12:05:53 | 23 | that, and I thank you for letting me make a record -- |
| 12:05:56 | 24 | about the follow-through of Mr. Cobal's cooperation.  His |
| 12:06:00 | 25 | early interview, the promises the agents made him, his |

12:06:04  1  plea agreement, his 5K addendum agreement, and all those

12:06:07  2  things are a through-line for the Court to find that he

12:06:10  3  is not credible evidence.

12:06:11  4      In addition, his status as a codefendant, his drug

12:06:14  5  use, and his youth make his perceptions about going on --

12:06:19  6  what was going on unreliable.  I would ask the Court

12:06:22  7  discount his testimony.  When it comes to looking at the

12:06:26  8  Government's evidence as a totality then, the Court is

12:06:29  9  left with Detective Weber, who testified about some

12:06:32  10  isolated experiences that involved Cody as much as they

12:06:35  11  involved Mike for what he knew, because, remember, he

12:06:37  12  wasn't a party to any of the other conversations between

12:06:40  13  them, and they came from a collection of interviews he

12:06:46  14  was and was not in attendance for.

12:06:48  15      And in the totality, Cody's testimony, Mr. Cobal's

12:06:52  16  testimony, fails to live up to the burden that the

12:06:55  17  Government needs to prepare when they provide reliable

12:06:58  18  evidence to the Court.  For all those reasons, the

12:07:02  19  statements of a 22-year-old cooperating drug user and

12:07:08  20  essentially an oral police report fail to satisfy the

12:07:11  21  Government's burden in relation to the defendant's

12:07:14  22  objections.  Thank you.

12:07:15  23      THE COURT:  Thank you, Mr. Biebighauser.

12:07:16  24      Ms. Andrusak?

12:07:17  25      MS. ANDRUSAK:  Would you like me to approach?

12:07:19  1          THE COURT:  Wherever you're most comfortable.

12:07:27  2          MS. ANDRUSAK:  So, Your Honor, addressing defense

12:07:29  3    counsel's arguments, as well as the Government's support

12:07:32  4    of the objections.  The Government believes that it has

12:07:36  5    met its burden, both through Detective Weber's statements

12:07:39  6    and that that this court can consider Mr. Cobal's

12:07:43  7    statements.

12:07:43  8          Hearsay, as the Court is aware, is something that

12:07:47  9    can be used in determining an appropriate sentence as

12:07:50  10   long as it's deemed reliable and there's some indicia of

12:07:53  11   reliability, and that it's actually with the sentencing

12:07:57  12   court to determine the credibility of a witness.

12:07:59  13         And this is not the first time, nor will it be the

12:08:02  14   last time, that an informant or cooperating defendant

12:08:05  15   testifies.  Obviously, there's always a plea agreement.

12:08:08  16   But what Mr. Cobal did testify to was corroborated by

12:08:12  17   things that were witnessed by Detective Weber, what other

12:08:16  18   people indicated as well.

12:08:18  19         Additionally, yes, he's young, but he admitted to

12:08:21  20   everything.  He admitted that he used drugs.  He was not

12:08:23  21   holding back.  And what he told us today is what he told

12:08:28  22   law enforcement in February and what he told law

12:08:30  23   enforcement in April, which were both before any plea

12:08:33  24   agreement was entered.

12:08:35  25         So, Your Honor, I do believe that there are

12:08:37   1   indicia of reliability between what Mr. Cobal testified

12:08:41   2   to at extreme length.  He had no problem telling us he

12:08:45   3   didn't know.  He had no problem telling us, when he was

12:08:49   4   told something versus when he made assumptions, and those

12:08:52   5   are all things that this court can consider, and I don't

12:08:54   6   think that completely discounting everything Cody Cobal

12:08:57   7   said fits within what this court can assess.  You can

12:09:03   8   give it weight.

12:09:04   9       And I think that his continued admission of his

12:09:10   10  portion; he never tried to talk down or diminish what he

12:09:16   11  did.  He was honest about everything that happened, and I

12:09:19   12  think that that, coupled with Detective Weber's

12:09:22   13  testimony, does make it something that this court can

12:09:25   14  consider.

12:09:26   15      And then, Your Honor, discussing the

12:09:31   16  supervisor/manager application just very briefly, defense

12:09:35   17  counsel spent a lot of time distinguishing supplier

12:09:39   18  versus Mauricio and Aniceto being above the defendant.

12:09:44   19  And there's no dispute about that.  Cody made that clear.

12:09:47   20  I think the PSR makes that clear.  However, there is a

12:09:50   21  distinction between an organizer/leader, which is

12:09:53   22  actually what is referenced in the case defense counsel

12:09:55   23  cited, which would be *Rubio-Sepulveda*.

12:09:59   24      I'll give you the spelling.

12:10:03   25      And that being a -- it says that "A role as a

| | | |
|---|---|---|
| 12:10:07 | 1 | supplier of drugs to others standing alone is not enough |
| 12:10:10 | 2 | to establish the enhancement under (a)," which is the |
| 12:10:13 | 3 | plus-four for an organizer/leader. |
| 12:10:15 | 4 | That's not what the PSR gives him, and that's not |
| 12:10:18 | 5 | what the Government has been arguing.  The Government is |
| 12:10:20 | 6 | arguing that he is a manager/supervisor.  And I believe |
| 12:10:24 | 7 | that Detective Weber and Cody's testimony establishes the |
| 12:10:29 | 8 | various factors that I'm not going to reiterate because |
| 12:10:32 | 9 | the Government laid them out in our response to the |
| 12:10:39 | 10 | objections. |
| 12:10:40 | 11 | And I do think that we've established there was |
| 12:10:43 | 12 | more than 5 participants as part of this organization and |
| 12:10:47 | 13 | that the defendant had supervisory control or managerial |
| 12:10:51 | 14 | control over at least one of them, which is what is |
| 12:10:53 | 15 | required for either the plus two or the plus three under |
| 12:10:56 | 16 | subsection (b) or (c). |
| 12:10:58 | 17 | THE COURT:  When you're counting five, were you |
| 12:11:00 | 18 | counting Mr. Arjona? |
| 12:11:02 | 19 | MS. ANDRUSAK:  Your Honor, I was counting |
| 12:11:04 | 20 | Mr. Cobal, Mr. McMillan, Mr. Baker, Mr. Brandt, Aniceto, |
| 12:11:10 | 21 | Mauricio, and Mitch Newman. |
| 12:11:15 | 22 | THE COURT:  Okay.  There's also reference in your |
| 12:11:17 | 23 | response to Garcia and Gonzalez, but I've not heard any |
| 12:11:22 | 24 | testimony on them. |
| 12:11:23 | 25 | MS. ANDRUSAK:  Your Honor, that would be Aniceto |

| | | |
|---|---|---|
| 12:11:26 | 1 | Gonzalez and Mauricio Garcia, so I used their last names. |
| 12:11:30 | 2 | I apologize. |
| 12:11:31 | 3 | THE COURT:  I apologize.  I see.  You're right. |
| 12:11:32 | 4 | You're exactly right.  I just underlined their last |
| 12:11:36 | 5 | names.  All right.  Anything further? |
| 12:11:38 | 6 | MS. ANDRUSAK:  Your Honor, I just want to point |
| 12:11:39 | 7 | out a couple of cases that the Government cited.  In the |
| 12:11:44 | 8 | *Backus* case, all that the defendant did to get an |
| 12:11:47 | 9 | application, that was an application under subsection |
| 12:11:50 | 10 | (c), is that he paid his doorman to let people in.  And |
| 12:11:54 | 11 | so that was considered sufficient behavior to be an |
| 12:11:59 | 12 | organizer/manager or supervisor under the lower level. |
| 12:12:02 | 13 | And I believe that the testimony presented today |
| 12:12:05 | 14 | shows that Mr. Arjona did much more than that, which gets |
| 12:12:08 | 15 | him to the plus three level under subsection (b), which |
| 12:12:11 | 16 | is akin to what happens in *Beltran* where they considered |
| 12:12:14 | 17 | the context and the abilities to arrange importation of |
| 12:12:18 | 18 | drugs from Mexico and falls in line with the *Gonzalez* |
| 12:12:22 | 19 | *Edeza* case, where he coordinated meth deliveries and had |
| 12:12:25 | 20 | supervision, giving instructions, ordering and directing |
| 12:12:26 | 21 | the conduct of others.  So I believe that the evidence |
| 12:12:29 | 22 | the Government has presented shows by a preponderance of |
| 12:12:31 | 23 | the evidence that the defendant is a supervisor or |
| 12:12:33 | 24 | manager over individuals to the point where he would fall |
| 12:12:37 | 25 | under subsection (b). |

| | | |
|---|---|---|
| 12:12:39 | 1 | THE COURT:  Thank you, Counsel. |
| 12:12:40 | 2 | MS. ANDRUSAK:  Do you have any questions?  I |
| 12:12:42 | 3 | apologize. |
| 12:12:42 | 4 | THE COURT:  I don't.  Thank you. |
| 12:12:44 | 5 | Any rebuttal, Mr. Biebighauser? |
| 12:12:50 | 6 | MR. BIEBIGHAUSER:  Yes, Your Honor, if I could, |
| 12:12:51 | 7 | just on a couple of factors. |
| 12:12:53 | 8 | THE COURT:  All right. |
| 12:12:53 | 9 | MR. BIEBIGHAUSER:  Your Honor, I want to draw the |
| 12:13:11 | 10 | Court's attention to some of the factors specifically |
| 12:13:13 | 11 | when it comes to evidence that's lacking for the Court to |
| 12:13:17 | 12 | really kind of consider the application of some of these. |
| 12:13:19 | 13 | There's some factors that are set out at 3B1.1, |
| 12:13:27 | 14 | and there -- the Tenth Circuit sort of sharpened some of |
| 12:13:31 | 15 | them because 3B1.1, of course, can apply to all kinds of |
| 12:13:35 | 16 | offenses, and so there's a couple that I want to address, |
| 12:13:40 | 17 | and really where evidence is missing and to give the |
| 12:13:42 | 18 | Court a lens for assessing these factors. |
| 12:13:46 | 19 | So I'm at 3B1.1, paragraph 4, where there's some |
| 12:13:52 | 20 | factors in the commentary.  And, of course, you know -- |
| 12:13:56 | 21 | THE COURT:  I'm sorry 3B1.1? |
| 12:13:58 | 22 | MR. BIEBIGHAUSER:  Application note 4. |
| 12:13:59 | 23 | THE COURT:  Oh, application note 4.  All right. |
| 12:14:02 | 24 | MR. BIEBIGHAUSER:  And, of course, as the Court |
| 12:14:04 | 25 | knows, this commentary here isn't case law.  There's no |

| | | |
|---|---|---|
| 12:14:07 | 1 | deference to the authority here.  But I understand that |
| 12:14:11 | 2 | nothing excludes the court from considering them.  So |
| 12:14:14 | 3 | looking at a couple of those, I think where the evidence |
| 12:14:18 | 4 | is missing on these is, for example, the claimed right to |
| 12:14:25 | 5 | a larger share of the fruits of the crime.  Well, there's |
| 12:14:28 | 6 | no evidence of that.  And the reason why there isn't |
| 12:14:31 | 7 | evidence of that, Your Honor, is because there was no |
| 12:14:32 | 8 | evidence, either from Cody or Detective Weber, that any |
| 12:14:35 | 9 | of the other individuals involved claimed a larger share |
| 12:14:38 | 10 | of any profits.  There just wasn't any evidence of that. |
| 12:14:42 | 11 | It wasn't an issue of degree or there was some but was |
| 12:14:46 | 12 | there enough.  There just wasn't. |
| 12:14:48 | 13 | And one of the reasons why that's true is because |
| 12:14:52 | 14 | there is no evidence here of what the profits were.  Both |
| 12:14:59 | 15 | Weber and Mr. Cobal testified that there wasn't any |
| 12:15:03 | 16 | understanding of the larger profits that existed here. |
| 12:15:06 | 17 | Additionally, when it comes to the degree of |
| 12:15:08 | 18 | control and authority exercised over others, Mr. Cobal |
| 12:15:12 | 19 | testified in his experience with Mr. Arjona, Mr. Arjona |
| 12:15:15 | 20 | was receiving drugs on a front.  And in that case |
| 12:15:20 | 21 | Mr. Cobal said what that meant to him was that if he was |
| 12:15:23 | 22 | receiving it on a front, then he wasn't in control of how |
| 12:15:28 | 23 | much money he had to pay back, what the rate of that |
| 12:15:30 | 24 | front was.  Cody said that he had been hounded by the |
| 12:15:33 | 25 | larger-scale suppliers.  And so that diminishes the |

12:15:36  1  degree of control and authority exercised over others

12:15:40  2  because -- and let me also get into another point.  A

12:15:43  3  distinction between Mr. Arjona communicating to Detective

12:15:48  4  Weber, Cobal, and others and Mr. Arjona setting or

12:15:54  5  stating or determining those values, there's evidence

12:15:58  6  from Detective Weber's phone calls and Mr. Cobal that

12:16:02  7  Mr. Arjona communicated those things, but there is scant

12:16:06  8  evidence that he determined those things.

12:16:08  9        Mr. Cobal and Detective Weber both said that they

12:16:12  10  weren't a part of any conversation where those prices

12:16:16  11  were determined, where they were set.  And so they kept

12:16:19  12  using that word.  That's not what the evidence was.  The

12:16:23  13  evidence was that Mr. Arjona communicated those things.

12:16:25  14  But where those things came from, the decision-making

12:16:28  15  authority that went into assigning those values, that

12:16:30  16  evidence just doesn't exist.

12:16:31  17        The Tenth Circuit sharpens a couple of those

12:16:34  18  factors, and I cited *Rubio-Sepulveda*.  I appreciate that

12:16:41  19  the bulk of that opinion is about the leader/organizer,

12:16:43  20  and it sounds like the Government isn't proceeding that

12:16:47  21  that's what's at issue here, but those -- they did

12:16:51  22  address the factors that they cited as a degree of -- as

12:16:55  23  degree rather than kind.  And what I mean by that is that

12:16:59  24  they were evaluating whether or not those factors got to

12:17:04  25  the degree -- those same factors got to the degree of

12:17:06   1   leader/organizer, but they would apply the factors they

12:17:09   2   considered in any case where 3B1.1 applies.

12:17:13   3        And so a couple of those factors for the Court to

12:17:16   4   pay attention to are set forth on page 5 of document 158

12:17:25   5   that include that -- that the defendant restricted the

12:17:33   6   people to whom other coconspirators could sell their

12:17:36   7   drugs.  There wasn't any evidence that that happened.  In

12:17:40   8   fact, Mr. Cobal stated that he was able to go to Mauricio

12:17:44   9   and also Nick to obtain drugs.

12:17:47   10        In addition, that he controlled the manner of

12:17:50   11   sales or set prices or claimed a right to the larger

12:17:54   12   share of proceeds.  Those things just don't exist on the

12:17:57   13   facts of this case because both witnesses said they

12:17:59   14   weren't a party to any conversations where things were

12:18:02   15   set or determined.

12:18:02   16        I wanted a chance to address couple of those

12:18:05   17   factors in relation to the evidence.  That's all I have,

12:18:07   18   Your Honor.

12:18:08   19        THE COURT:  All right.  Thank you, Counsel.

12:18:09   20        Well, I guess the first thing I should address

12:18:12   21   with respect to these objections, since we've handled

12:18:14   22   them in tandem, is the testimony of Mr. Cobal.  And

12:18:17   23   certainly Mr. Cobal is a cooperator, he's a codefendant,

12:18:20   24   he's charged with criminality himself and was clearly not

12:18:27   25   a candidate for Eagle Scout.  But this is not the Court's

12:18:31    1    first rodeo with cooperators.  And with respect to the

12:18:35    2    matter at issue here, I did find Mr. Cobal's testimony

12:18:40    3    credible with the matters that we're addressing today.

12:18:42    4        I think, as Ms. Andrusak noted, he freely admitted

12:18:46    5    to his own culpability and involvement.  The testimony he

12:18:53    6    proffered that is relevant to these issues was somewhat

12:18:56    7    detailed and extensive and not cumulative or speculative

12:19:00    8    or his own impressions, which may be dulled either by his

12:19:04    9    desire to cooperate or by the lapse of time or by any

12:19:09   10    altered mental state from his own drug use, but I think

12:19:12   11    sufficient, again, for these purposes to find it

12:19:15   12    reliable.

12:19:15   13        With respect to objection number two, the

12:19:18   14    enhancement for the drugs being imported from Mexico,

12:19:21   15    that's a controversial enhancement but it's controversial

12:19:26   16    for policy reasons that are beyond the prospect -- beyond

12:19:29   17    the purview of this court.  I think the evidence is

12:19:34   18    overwhelming in that regard.  Apparently Mr. Arjona

12:19:37   19    admitted to it himself.  But, again, Mr. Cobal testified

12:19:39   20    that he saw people present from Mexico; that he himself

12:19:42   21    was dispatched, albeit unsuccessfully to Mexico, to

12:19:46   22    obtain drugs.  There's no question, I think, the evidence

12:19:49   23    is overwhelming that the controlled substances in

12:19:55   24    question came from Mexico, and that enhancement, I think,

12:19:58   25    is correctly applied.

| | | |
|---|---|---|
| 12:19:59 | 1 | With respect to the role in the offense objection |
| 12:20:02 | 2 | raised by objection number three, I think much of the |
| 12:20:07 | 3 | evidence that I heard today was to indicate that |
| 12:20:11 | 4 | Mr. Arjona was not at the top of the pyramid.  And that I |
| 12:20:14 | 5 | have no doubt.  There were several people above him.  And |
| 12:20:20 | 6 | as such, he certainly did not have unfettered control. |
| 12:20:24 | 7 | But none of those are really relevant to this |
| 12:20:27 | 8 | consideration, particularly for the role in the |
| 12:20:30 | 9 | enhancement that the PSIR has applied. |
| 12:20:32 | 10 | I'll focus, as did Mr. Biebighauser, on the |
| 12:20:37 | 11 | commentary under 3B1.1.  And it notes factors to |
| 12:20:42 | 12 | consider.  Not all these factors need to be proven, but |
| 12:20:45 | 13 | they're merely a list of items to consider. |
| 12:20:47 | 14 | The exercise of decision-making authority. |
| 12:20:52 | 15 | Mr. Biebighauser would have the Court believe that, since |
| 12:20:56 | 16 | none of the witnesses were involved in all the |
| 12:20:58 | 17 | conversations, they have no idea who was in charge.  But |
| 12:21:01 | 18 | I think that misstates the evidence.  Both the detective |
| 12:21:04 | 19 | operating as an undercover and Mr. Cobal testified that |
| 12:21:08 | 20 | they saw Mr. Arjona making several key decisions.  It was |
| 12:21:13 | 21 | clear that Mr. Weber's impression from his negotiations |
| 12:21:18 | 22 | that he was negotiating the price, the delivery, and the |
| 12:21:21 | 23 | details of that with Mr. Arjona.  Although Mr. Arjona |
| 12:21:24 | 24 | frequently would send someone else to make those |
| 12:21:28 | 25 | transactions, it seemed quite clear to the detective that |

12:21:31  1   Mr. Arjona was the one making those decisions, and all

12:21:35  2   the defense offers in counter to that is speculation that

12:21:37  3   it could have been somebody else.

12:21:38  4         But the Government has proffered evidence that

12:21:41  5   Mr. Arjona was the one making those decisions.  I have no

12:21:44  6   evidence that there was anyone else, only speculation,

12:21:47  7   and I think that his role in the decision-making is

12:21:51  8   established.

12:21:53  9         The nature of his participation in the commission

12:21:55  10  of the offense, I think that restates what we just talked

12:21:59  11  about.

12:21:59  12        The recruitment of accomplices.  It seemed clear

12:22:03  13  to me from Mr. Cobal's testimony that Mr. Arjona was

12:22:08  14  recruiting perhaps not accomplices, perhaps underlings,

12:22:13  15  but he was recruiting others to assist in the process.

12:22:15  16        The rights to the larger share of the fruits of

12:22:17  17  the crime, I would largely have to agree with

12:22:20  18  Mr. Biebighauser.  We have almost no evidence on who got

12:22:22  19  what shares of the crime.  So whether Mr. Arjona had a

12:22:25  20  larger or smaller share or whether there were no shares,

12:22:28  21  this factor doesn't apply, as it were, one way or the

12:22:31  22  other.

12:22:31  23        The degree of participation in planning or

12:22:35  24  organizing the offense.  The testimony from both of the

12:22:38  25  witnesses was that it was their clear impression

12:22:41   1   observation, and evidence that Mr. Arjona was the one

12:22:42   2   planning and organizing the offense.

12:22:44   3         And then the nature and scope of the illegal

12:22:47   4   activity.  I think we've discussed that at length about

12:22:50   5   the details of the distributions charged in the

12:22:54   6   indictment.

12:22:54   7         And then the degree of control and authority

12:22:57   8   exercised over others.  There were -- I'm a little

12:22:59   9   reluctant to put much weight on the scope of authority

12:23:04  10   relied upon by Mauricio Garcia and Aniceto Gonzalez.  But

12:23:14  11   we have plenty of other people that Mr. Arjona, I think

12:23:19  12   the evidence has presented without contradiction, without

12:23:22  13   contrary evidence, Mitch Newman, Cody Cobal, Matthew

12:23:27  14   McMillan, Tristen Baker, and Nicholas Brandt, the

12:23:30  15   evidence that I have seen indicates that he was directing

12:23:37  16   and controlling them.  Again, any inference to the

12:23:39  17   contrary is merely speculative, I have no evidence to the

12:23:42  18   contrary, so I'm overruling both the objections at number

12:23:47  19   two and number three.

12:23:49  20         Are there any other objections can to the

12:23:54  21   presentence report besides these which are contained

12:23:55  22   within the PSIR?

12:23:56  23         MS. ANDRUSAK:  No, Your Honor.

12:23:59  24         MR. BIEBIGHAUSER:  No further objections, Your

12:24:01  25   Honor, but I sharpen what I previously made, after

12:24:04  1  hearing the Court's commentary, and that is that as the

12:24:07  2  Court marched through the guideline, it sounds as though

12:24:11  3  the Court is placing some deference on the factors that

12:24:14  4  are to be considered there, and I would object to that

12:24:16  5  process.

12:24:17  6      THE COURT:  I'm sorry, you would object to my

12:24:19  7  relying on the guidelines?  I'm not sure I'm following

12:24:21  8  your argument.

12:24:21  9      MR. BIEBIGHAUSER:  To the commentary of the

12:24:23  10  guidelines, Your Honor.

12:24:23  11      THE COURT:  You directed me to the commentary,

12:24:25  12  Mr. Biebighauser.

12:24:25  13      MR. BIEBIGHAUSER:  I did.  And I said it can be

12:24:28  14  considered as some but not all factors, and those are the

12:24:30  15  only factors that the Court walked through.

12:24:33  16      THE COURT:  Well, Mr. Biebighauser, you can't come

12:24:35  17  into my court and argue the guidelines to me and then

12:24:38  18  object to me when I consider them.  That's -- that's

12:24:41  19  untenable.  That makes no sense at all.  I went through

12:24:44  20  those factors because you went through those factors, and

12:24:47  21  I was responding to your argument.

12:24:49  22      MR. BIEBIGHAUSER:  Thank you, Your Honor.

12:24:52  23      THE COURT:  Based on the objections then, having

12:24:55  24  sustained objection number one, that means that the base

12:24:58  25  offense level is recomputed to a base offense level of

12:25:01   1   34.  The two-point enhancement for importation and the

12:25:04   2   three-point enhancement for all the offense still stand,

12:25:09   3   which gives us an adjusted offense level of 39, reduced

12:25:12   4   by acceptance of responsibility brings us to an offense

12:25:16   5   level of 36.

12:25:18   6       Mr. -- excuse me.  Mr. Arjona is criminal history

12:25:25   7   category I, so the guidelines, with an offense level of

12:25:30   8   36, offense level I, would suggest a sentence in the

12:25:35   9   range of 188 to 235 months.  Of course, as is well known,

12:25:40   10  although the law requires me to consider the guidelines,

12:25:43   11  it certainly does not require me to follow them or even

12:25:48   12  to presume them accurate.

12:25:53   13      The guidelines would also -- the statute requires

12:25:57   14  a term of supervised release of no less than five years,

12:26:01   15  and it's the minimal amount that the guideline would

12:26:05   16  recommend.

12:26:05   17      Let me hear arguments from counsel as to

12:26:08   18  sentencing and disposition.

12:26:12   19      MS. ANDRUSAK:  Thank you, Your Honor.  The

12:26:15   20  Government is requesting, pursuant to our plea agreement,

12:26:19   21  for an underlying sentence of 151 months of imprisonment,

12:26:23   22  with a term of supervised release of five years, and then

12:26:27   23  the special assessment.

12:26:29   24      THE COURT:  Can you explain that?  I mean, that's

12:26:31   25  a substantial reduction from the guidelines.  Again, the

12:26:34  1  Court's certainly free to do that, but it begs some

12:26:39  2  explanation or justification.

12:26:40  3       MS. ANDRUSAK:  Of course, Your Honor.  At the time

12:26:43  4  that the Government and defense counsel entered into the

12:26:47  5  plea agreement, something that neither party took into

12:26:50  6  consideration was the importation of narcotics.  And so

12:26:55  7  at the time it was the Government's position that that

12:26:57  8  number, based on where the aggravating role may or may

12:27:01  9  not fall out, 151 would either be the low number or the

12:27:04  10 high number of the guidelines, based on what happened

12:27:07  11 with the aggravating role.

12:27:08  12       And so the Government made that agreement and

12:27:13  13 we're sticking by that agreement.  I do think, Your

12:27:19  14 Honor, even with the enhancements that were applied

12:27:21  15 today, it is clear that the defendant was not our top dog

12:27:25  16 in this case, which was never argued by the Government,

12:27:29  17 and so I do believe that 151 months is a significant

12:27:32  18 amount of time, even with 188 being the potential low

12:27:39  19 number based on the new guidelines.

12:27:40  20       But 151 months is a significant amount of time,

12:27:43  21 especially since Mr. Arjona does not have extensive

12:27:46  22 criminal history; therefore, has not spent any

12:27:48  23 significant time in custody.  I think that that is a

12:27:53  24 sufficient amount to meet all of the factors this court

12:27:57  25 has to consider, based on deterrence and safety of the

12:28:03  1   community.  Twelve years is a significantly long time for

12:28:07  2   him to be out of commission.  So that is why the

12:28:11  3   Government is still recommending the 151 months.

12:28:14  4        THE COURT:  All right.  Thank you.

12:28:15  5        Mr. Biebighauser?

12:28:18  6        MR. BIEBIGHAUSER:  Thank you, Your Honor.  Can I

12:28:20  7   use the podium?

12:28:21  8        THE COURT:  Of course.

12:28:28  9        MR. BIEBIGHAUSER:  I said I wouldn't use much

12:28:29  10  breath here, Your Honor, and I don't intend to.  I'd like

12:28:32  11  to turn over really the bulk of the time I would spend

12:28:36  12  arguing to the family members that are here.  I think

12:28:37  13  they know him best and can communicate much more

12:28:41  14  effectively than I do about Mike's character.

12:28:42  15       I would note a couple of things about Mike first,

12:28:46  16  however, that differentiate him from -- or are important

12:28:52  17  to consider when imposing sentence.  First, his age.

12:28:55  18  Mr. Arjona is already 40 years old now.  That means that

12:28:58  19  if he serves a sentence of, as the Court proposes, 151

12:29:03  20  months, but a sentence of 120 months, that's ten years.

12:29:07  21  That is a sufficiently long time to incapacitate

12:29:11  22  Mr. Arjona by the time he's released.  The world will

12:29:14  23  have very much passed by.  He will be released without

12:29:17  24  any of the contacts he previously had, into a very

12:29:20  25  different world where incapacitation would no longer be

| | | |
|---|---|---|
| 12:29:24 | 1 | necessary. |
| 12:29:24 | 2 | Additionally, it's important to note that there |
| 12:29:28 | 3 | isn't history here that Mr. Arjona was supported by |
| 12:29:31 | 4 | criminal activity, because he has no criminal history. |
| 12:29:36 | 5 | That means when he's released we should expect Mr. Arjona |
| 12:29:38 | 6 | to successfully complete supervised release and return |
| 12:29:41 | 7 | back into the lifestyle that he had before he engaged in |
| 12:29:44 | 8 | his first-ever series of criminal conduct. |
| 12:29:49 | 9 | And, Your Honor, with that I'd like to turn over |
| 12:29:52 | 10 | the floor to Albert Arjona, Michael's brother, if I can. |
| 12:29:56 | 11 | THE COURT: All right. First of all, let me |
| 12:29:57 | 12 | comment, I see there are a number of people present on |
| 12:30:00 | 13 | behalf of Mr. Arjona. I appreciate your presence here. |
| 12:30:01 | 14 | I'm always heartened to see friends and family appear for |
| 12:30:06 | 15 | defendants who are here for sentencing because that's, |
| 12:30:07 | 16 | sadly, not the norm. I'll be happy to hear from any of |
| 12:30:10 | 17 | you who came here and would like to speak, whether you've |
| 12:30:13 | 18 | advised Mr. Biebighauser in advance you'd like to do so |
| 12:30:15 | 19 | or not. I'm going to ask that you each come and speak in |
| 12:30:19 | 20 | the podium so that our microphone can pick up what you're |
| 12:30:21 | 21 | saying and we all can hear, that you start just by |
| 12:30:25 | 22 | identifying for the record who you are, and then I'll be |
| 12:30:26 | 23 | happy to hear anything you'd like to say. |
| 12:30:28 | 24 | So, Mr. Arjona, if you would like to lead off. |
| 12:30:32 | 25 | MR. ARJONA: Thank you, Your Honor. |

12:30:42    1          Hello, Your Honor.  Thank you for your time.  My

12:30:45    2    name is Albert Arjona.  I'm here from Dallas, Texas, for

12:30:49    3    today's sentencing.

12:30:50    4          THE COURT:  Mr. Arjona, I'm concerned that you're

12:30:52    5    going to injure your back by leaning over.  I think you

12:30:54    6    can probably lift that microphone up a bit.  I want to be

12:30:57    7    sure that you're comfortable.

12:30:58    8          MR. ARJONA:  Very well.  Thank you.

12:30:59    9          THE COURT:  Thank you.

12:31:00   10          MR. ARJONA:  Got to be smarter than the

12:31:03   11    microphone.

12:31:06   12          Now, I heard some things that didn't quite add up

12:31:08   13    for me.  Michael became a young father.  He was 16 years

12:31:15   14    old.  I have a six-year-old daughter now.  You know, I'm

12:31:18   15    48.  I'm drawing back from Michael's experience with his

12:31:24   16    kids when he had his child very young.  You know, I'll

12:31:28   17    admit my brother Justin had just left.  We kind of -- we

12:31:31   18    didn't know what direction he was going to go.  He moved

12:31:33   19    out.  He worked at Dillons.  He quit school and worked at

12:31:36   20    Dillons.  But he became the dairy manager, moved his

12:31:41   21    little son Austin, who's here in the who's here in the

12:31:45   22    courtroom, moved him out, moved his girlfriend in.  He

12:31:48   23    took care of business.

12:31:49   24          The one thing that does stick out to me:  He never

12:31:53   25    once spanked his children, Austin or Alexis, who is also

12:31:57  1  here in the court as well.  And I see 'em -- I'm trying

12:32:02  2  to replicate what he's done with his children, in guiding

12:32:05  3  them and keeping them busy in sport.  He had a very

12:32:08  4  active role in both of their lives, so much so that

12:32:12  5  Austin received a full-ride scholarship, football

12:32:17  6  scholarship, to University of Kansas.  He went in a

12:32:19  7  different direction.  You know, he was "Yeah."  He end up

12:32:20  8  going towards the -- what was it? -- the sports science

12:32:27  9  of getting -- rehabilitating injuries with another

12:32:32  10  school.  And I heard about people associate him as

12:32:37  11  friends, you know, they were Austin's friends.  Austin

12:32:39  12  really only had a select core amount of friends.  He had

12:32:45  13  another friend that also was offered an athletic

12:32:49  14  scholarship to play at -- I'm sorry, track and field at

12:32:52  15  U.S.C.  Along the way, I think the other two friends I

12:32:58  16  know, Austin became a general manager for a chain here on

12:33:03  17  the east side and the west side of Wichita.  His friends

12:33:06  18  from school followed him there.  And I think they're all

12:33:11  19  positive contributors to society.

12:33:12  20      You know, when I hear about Michael potentially

12:33:15  21  getting -- you know, being reformed -- thank you -- I

12:33:19  22  think he can.  And also at the -- I apologize.  I was

12:33:24  23  looking at the prosecution.  And request -- and

12:33:28  24  requesting the court for the reduced time against the

12:33:33  25  guidelines.

12:33:34  1        I was a late bloomer.  When I was about Michael's
12:33:38  2  age when all this came down.  You know, before -- I had
12:33:41  3  my sense of success, but it didn't really hit me until I
12:33:44  4  got close to his age that I realized that it's
12:33:48  5  consistency that's going to get me that.  So I have a
12:33:51  6  ten-plus year career in business intelligence as a
12:33:55  7  business -- as a senior business intelligence developer.
12:33:58  8        And also a six-year-old daughter, which I look
12:34:04  9  back at Michael, when not one time did he spank his
12:34:09  10  children.  You know, I hear some other things,  the
12:34:12  11  violence they're throwing around, that just didn't add up
12:34:15  12  with me.
12:34:18  13        I do think Mike can be reformed.  Considering his
12:34:22  14  age, what I hear, the argument here, I kind of went a
12:34:26  15  little different direction than this, than I additionally
12:34:30  16  was.  I wasn't the older brother I should have been at
12:34:32  17  that point, but I think I'm taking on that role with my
12:34:36  18  last ten-plus years of consistency as a professional.
12:34:39  19  And I've given him ideas to help -- help him close that
12:34:44  20  gap when he gets out, making plans that make sure that
12:34:50  21  he -- I believe in him.  I believe that he can go in the
12:34:53  22  right direction, just like I did.  I believe that he is a
12:34:56  23  late bloomer.  In fact, I believe it so much, that if it
12:35:00  24  was possible, I'd be willing to consign my freedom for
12:35:05  25  him.  That's my time, Your Honor.  Thank you for hearing

```
12:35:09   1   me out.

12:35:10   2        THE COURT:  Thank you, Mr. Arjona, for your

12:35:12   3   comments.  I appreciate you being here today.

12:35:14   4        MR. BIEBIGHAUSER:  Your Honor, his mother would

12:35:15   5   like to speak.  I think I saw -- I saw Richard come in.

12:35:18   6   She'd like to use an interpreter, Your Honor.

12:35:20   7        THE COURT:  Very well.

12:35:46   8        MRS. ARJONA (through interpreter):  My name is

12:35:50   9   Violeta Arjona.  I am Michael's mother.  I have three

12:36:05  10   sons and Michael is my baby.  Michael is always helping

12:36:20  11   me because my husband was very sick and he passed away

12:36:31  12   about five years ago.  Without Michael's help, I wouldn't

12:36:40  13   been able to handle that situation.  It wasn't easy.  He

12:36:58  14   always was there to help me.  He also helped me at my

12:37:02  15   home when part of it was destroyed when a tree fell on my

12:37:06  16   house.  He helped me file a claim with the insurance.

12:37:36  17        He's always been a great father.  He was also in a

12:37:39  18   program called Watchdog, to help kids around the area.

12:37:54  19   And I will beg you -- ask you to consider to give him a

12:37:57  20   reduced sentence.  And please don't send him far away.

12:38:06  21   That way the kids and I can go and see him very often.

12:38:09  22   That's it.  Thank you very much.

12:38:11  23        THE COURT:  Thank you very much, ma'am.

12:38:15  24        MR. BIEBIGHAUSER:  And a family friend, Your

12:38:19  25   Honor, Jane.
```

| | | |
|---|---|---|
| 12:38:33 | 1 | THE COURT:  Good afternoon. |
| 12:38:34 | 2 | MS. RAY:  I'm Jane Ray.  I'm 55, a violinist in |
| 12:38:41 | 3 | the Wichita symphony, and I've taught in the public |
| 12:38:43 | 4 | schools and privately.  I've taught at Wichita Southeast, |
| 12:38:49 | 5 | Hispanic Opportunity Center, four years at the El Dorado |
| 12:38:52 | 6 | correctional facility, and three years at the Hutchinson |
| 12:38:56 | 7 | correctional facility as a volunteer there, and I taught |
| 12:39:01 | 8 | ESL and GED. |
| 12:39:04 | 9 | I first met the Arjonas when Violeta, the mother, |
| 12:39:08 | 10 | came to my class at the Hispanic Opportunity Center.  But |
| 12:39:12 | 11 | I quickly got to know her family.  They lived near us in |
| 12:39:19 | 12 | an apartment, and a really solid family, mother and |
| 12:39:23 | 13 | father of three great, great boys.  Michael was a |
| 12:39:27 | 14 | teenager and always hungry.  And my companion took him |
| 12:39:34 | 15 | out for hamburgers and mentored him quite a bit as a |
| 12:39:38 | 16 | teenager. |
| 12:39:38 | 17 | And then the next thing I knew of him, he was a |
| 12:39:41 | 18 | father, and a great father, I really observed.  Kids were |
| 12:39:47 | 19 | always well-dressed, had lots of toys.  He took them on |
| 12:39:50 | 20 | outings.  He really cared a lot for his kids. |
| 12:39:57 | 21 | On then in the year 2000, he started to work for |
| 12:40:00 | 22 | us as a person in the yard, doing all sorts of things. |
| 12:40:04 | 23 | And I have a list here.  He trimmed trees.  He dug out |
| 12:40:10 | 24 | bushes.  He helped remove branches touching the house, |
| 12:40:15 | 25 | for insurance purposes.  He got on the roof.  He repaired |

12:40:18   1   gutters.  And then we had a rental property.  He did

12:40:22   2   roofing repair there, and he repaired the parking area

12:40:26   3   many times using hot tar to put in the potholes and so

12:40:34   4   forth.  He has many skills, and he's willing to try new

12:40:37   5   things.  Some of the things he did for us I don't think

12:40:40   6   he'd ever done before, but he tried his best.

12:40:43   7        Then when my companion, Don, passed away in 2018,

12:40:49   8   Michael was really helpful to me.  He disposed of Don's

12:40:54   9   vehicle, which had been in the driveway forever, moved

12:40:57  10   some large barrels containing gasoline out of the storage

12:41:01  11   shed.  He sprayed the yard for poison ivy and many, many

12:41:06  12   other tasks.  And to this day I miss him because I don't

12:41:12  13   have anybody to replace him that did all the things he

12:41:15  14   did.

12:41:15  15        I depended on him.  And he and his mother and I

12:41:20  16   are still the best of friends.  I hope and pray that his

12:41:24  17   life is going to get back on track and that he can

12:41:28  18   develop even more skills to help him through life's path.

12:41:32  19   I think -- I've communicated with him by letter, and he's

12:41:36  20   expressed to me that he wants to increase his skills.  I

12:41:41  21   think he mentioned working with small engines, if he can

12:41:45  22   get some training that way.

12:41:48  23        I have a lot of faith in his eventual success, so

12:41:55  24   thank you.

12:41:56  25        THE COURT:  Thank you very much for being here,

| 12:41:57 | 1 | ma'am. |

12:42:02   2        Is there anyone else who wished to speak?

12:42:19   3        MS. CALLAWAY:  Hi, I'm Kayla, Mike's children's

12:42:22   4   mom.  I'm nervous.  He's always been a great father, has

12:42:28   5   always taken care of them.  He's done a lot of good

12:42:31   6   deeds.  He's gotten in trouble.  He's a fast learner.  I

12:42:36   7   think that ever since that he has gotten in trouble it

12:42:39   8   was a wake-up call.  He's finished his high school

12:42:42   9   diploma.  He plans on going to school.  I think that he

12:42:45   10   needed that wake-up call.  And I don't -- his children

12:42:49   11   are little, and I just don't want them to miss out on him

12:42:55   12   being a good father to them and being there and going to

12:42:58   13   their sports.  I just ask that you give a little mercy,

12:43:06   14   and I think that's it.

12:43:07   15        THE COURT:  Thank you, ma'am.

12:43:09   16        MS. CALLAWAY:  Thanks.

12:43:15   17        THE COURT:  Anyone else?  All right, well, again,

12:43:19   18   thank you all for being here.  I appreciate your

12:43:21   19   presence.

12:43:21   20        MR. BIEBIGHAUSER:  Judge, one thing that was said

12:43:23   21   reminded me to direct your attention to something.

12:43:24   22   You'll note that an amended presentence investigation

12:43:27   23   report was already filed in this case.

12:43:28   24        THE COURT:  Correct.

12:43:29   25        MR. BIEBIGHAUSER:  That's because the amended

12:43:30  1   report reflects that Mr. Arjona has a high school

12:43:35  2   diploma.  I wanted to make sure the Court was aware that

12:43:37  3   that diploma, as it states, was earned while he was in

12:43:40  4   Butler County jail in pretrial detention here, to reflect

12:43:43  5   that he's maximized his time so far in custody and has

12:43:47  6   taken available growth programs while he's there,

12:43:50  7   including his GED diploma.  Nothing else.

12:43:52  8          THE COURT:  Thank you very much.

12:43:53  9          Mr. Arjona, before I form a tentative sentence in

12:43:56  10  these cases, I always give the defendant an opportunity

12:43:58  11  to make any statement that he might like to make.  You

12:44:02  12  don't have to say anything at this hearing, but if

12:44:04  13  there's anything that you would like to say, I'll be

12:44:07  14  happy to hear from you at this time.

12:44:09  15         THE DEFENDANT:  Yes, I'd like to say something,

12:44:11  16  Your Honor.

12:44:11  17         THE COURT:  All right.  You may proceed.

12:44:13  18         THE DEFENDANT:  All right.  First of all, I'm not

12:44:15  19  the type of man that likes to speak out in a group.  I

12:44:19  20  tend to get nervous, so bear with me.

12:44:22  21         First of all, I want to say I accept full

12:44:26  22  responsibility of my actions.  I made a bad choice, and

12:44:34  23  I'm here to face the consequences for my bad choice I

12:44:37  24  made.

12:44:38  25         I also want to apologize for -- basically for

12:44:44   1   anybody that felt victim of addiction, you know, that I

12:44:50   2   was responsible, that my actions caused.  Addiction's a

12:44:53   3   big problem in this country, and, you know, I had my

12:44:59   4   dealings with it, too.  I didn't realize it until I was

12:45:02   5   incarcerated and going to AA that I had a problem.  And

12:45:08   6   attending AA showed me that I did have a problem.  And

12:45:14   7   attending AA also helped me to actually feel good, to be

12:45:19   8   able to speak out in a group and to talk about your

12:45:21   9   issues and problems.  And that was a good thing for me.

12:45:32  10        Basically in my time in incarceration, I just try

12:45:35  11   to think what can I do while I'm in this position and

12:45:38  12   what can I do that can be positive to improve myself to

12:45:44  13   be a better man for myself, my family, and society.  So I

12:45:48  14   came up with some goals.  And one of them was attending

12:45:52  15   the AA meetings.  I signed up for it all the time.  They

12:45:58  16   did it about twice a month.

12:46:01  17        I seen Keith all the time until the pandemic, and

12:46:05  18   he's the guy that came and did the AA meetings.  A really

12:46:09  19   good guy.  And he taught me a lot of stuff, you know,

12:46:14  20   just taking it day by day and just trying to follow that

12:46:18  21   book, the Alcohol Anonymous book, you know, and just

12:46:22  22   following the steps.  He's been very successful at it

12:46:26  23   for, I believe, almost 30 years or more.  And he's just

12:46:30  24   followed that book, and that's the one thing that I want

12:46:34  25   to also do is also, you know, keep that book with me,

12:46:37  1  take it day by day, follow the 12 traditions, and just

12:46:44  2  follow those steps.  I mean, if it helped him and many

12:46:47  3  other people, I know that it can help me, too.

12:46:49  4      And a lot of it, too, that, you know, I hid a lot

12:46:52  5  of this stuff from my family that didn't know about it,

12:46:55  6  but I knew if I opened up to them and they knew about it,

12:47:00  7  you know, that I'd have them as a support system.  But I

12:47:03  8  was ashamed, so, you know, I hid that, I hid the drinking

12:47:08  9  and the marijuana and from time to time occasions on

12:47:12  10  other things.  But I was -- you know, I was glad to be

12:47:18  11  able to attend AA.  That was one of my -- one of my goals

12:47:21  12  that I established.

12:47:22  13      And my second goal was to sign up for Catholic

12:47:26  14  Bible study, English Bible study, Spanish Bible study,

12:47:30  15  Gideon's Bible study.  I just, you know, I'd rather go

12:47:34  16  there and listen to inspirational words from the Bible,

12:47:37  17  you know, instead of being in the dayroom with, you know,

12:47:42  18  other inmates that just like -- I mean, just that, I

12:47:48  19  mean -- I mean, they're just -- there's a lot of people

12:47:51  20  there that, from me listening, that they just try to

12:47:56  21  communicate with each other and then they want to link up

12:47:59  22  when they get out.  And I don't want no part of that, you

12:48:02  23  know.  That's why I'd always sign up for those Bible

12:48:06  24  studies 'cause I'd rather go there and listen to

12:48:08  25  inspirational words and think positive and try to do

| | | |
|---|---|---|
| 12:48:13 | 1 | positive things. |
| 12:48:15 | 2 | And through my experience with Bible study is |
| 12:48:20 | 3 | that, you know, no matter what, good decision, bad |
| 12:48:24 | 4 | decision, God and Jesus is always going to be there for |
| 12:48:27 | 5 | me.  But my thing is that I need to go on the right path |
| 12:48:35 | 6 | and move forward and stay on that path.  The bad decision |
| 12:48:39 | 7 | that I made, which lies me here in front of you, is going |
| 12:48:43 | 8 | to be in my past and locked away, and I'm ready to start |
| 12:48:46 | 9 | a new beginning in my life and a positive one. |
| 12:48:51 | 10 | My next goal was, you know, signing up for Orion's |
| 12:48:57 | 11 | education, and that was one of the greatest things I did. |
| 12:49:01 | 12 | You know, I went in there, I finished introduction, I got |
| 12:49:05 | 13 | a half a credit for that.  I got my transcripts. |
| 12:49:08 | 14 | Mr. Friesen [ph] said I would need 20 credits to |
| 12:49:12 | 15 | graduate.  I said, "Wow, that's a lot of credits.  I |
| 12:49:15 | 16 | don't know that I'm going to be able to do that."  So I |
| 12:49:17 | 17 | was thinking to myself, "Is this a waste of time?"  And |
| 12:49:20 | 18 | then I started thinking, "You know, I don't need to think |
| 12:49:23 | 19 | like that.  I just need to keep moving forward and keep |
| 12:49:27 | 20 | going to class and get as far as I can," and, you know, |
| 12:49:30 | 21 | whether I would have graduated or not, I tried. |
| 12:49:33 | 22 | But I kept to it.  I asked Mr. Friesen, "Man, is |
| 12:49:40 | 23 | there anything I can do to try to speed the process up |
| 12:49:43 | 24 | since we only got, like" -- at that time things were |
| 12:49:47 | 25 | going maybe two times a week, two to three times a week, |

12:49:53  1  and I said, "If there's any way I could do anything to

12:49:56  2  speed up the process to try to help me get more credits

12:49:59  3  faster," so he started sending a lot of homework with me.

12:50:04  4  And so I just, in my time during dayroom or in the cell,

12:50:08  5  I just worked on my homework.  I would try to complete

12:50:13  6  the whole section, which is about five units, you

12:50:18  7  complete the five units, and then after that you take the

12:50:24  8  exam.  And so I was trying hard to finish the whole thing

12:50:28  9  in, like, a day or two.  And, you know, I did.  Caused me

12:50:33  10  a lot of headaches, but I did it, and -- from thinking a

12:50:37  11  lot, so I got a lot of headaches from it.  But it was

12:50:40  12  worth it.

12:50:42  13       And, you know, it made -- it kept my mind off

12:50:45  14  things, and I knew I was doing something positive while

12:50:51  15  staying incarcerated.  And sure enough, I just stuck to

12:50:56  16  it and stuck to it, started getting -- I was at 10

12:50:59  17  credits, and 13 credits, and 15 credits, and I was like,

12:51:03  18  "Man, I wonder if I can get this done before my

12:51:07  19  sentencing?"  And I kept going at it and going at it.

12:51:12  20  And finally I got my 20th credit.

12:51:14  21       And I was very proud of that moment because I was

12:51:18  22  the very first person in that program to ever graduate,

12:51:23  23  to get 20 credits.  And to me I felt like, you know, I

12:51:28  24  accomplished a lot, like I set a record, I mean, given

12:51:32  25  the circumstances of where I was at or whatever.  But

12:51:34    1    still, I mean, I did it and I didn't stop.  I kept

12:51:37    2    thinking positive.  And that's where I get this idea, as

12:51:41    3    long as I keep moving forward and thinking positive, I

12:51:44    4    can accomplish anything that I want to accomplish.

12:51:48    5         You know, my next goals are to, wherever I go, I

12:51:55    6    was looking at some of the prisons, and they have

12:51:59    7    horticulture, landscaper classes that I can take that I

12:52:04    8    wanted to do since I'm already in that line of field, and

12:52:07    9    that's one of the things that I want to do and get my

12:52:09    10   certificate in that.  And then after that I want to do

12:52:11    11   the lawn care certificate, to get my certificate in that

12:52:15    12   'cause I feel like that's going to be positive for me

12:52:19    13   since I'm already in that line of work, and I also want

12:52:23    14   to get some college credits in business management 'cause

12:52:27    15   since I have my own business, that's -- I feel that's

12:52:31    16   going to help me out even more and prepare me for

12:52:34    17   whenever I get out, and I'll be ready to take over my

12:52:38    18   business again.  So I'm not going to have no problem of

12:52:41    19   finding work.  It's already going to be there when I get

12:52:43    20   out.

12:52:44    21        And I just want to keep moving forward and

12:52:50    22   positive in my life, and I also would like to keep

12:52:56    23   getting his phone number from AA, and I can start -- I

12:53:00    24   would like to meet up with him and start going to those

12:53:03    25   AA meetings in El Dorado and, you know, I feel like if

12:53:07  1  you surround yourself around good people like that,

12:53:10  2  that's really important, and try to stay away from people

12:53:14  3  in the past or anything that had any affiliations with

12:53:18  4  anything because I feel like if you set yourself and you

12:53:22  5  surround yourself with good people, you know, you're

12:53:26  6  going to just move forward and be successful.  And, I

12:53:35  7  mean, you probably never heard this before, but when we

12:53:38  8  came from my appeal of the bond hearing, I'm actually

12:53:42  9  thankful that you revoked it and threw me in jail 'cause

12:53:47  10  I wouldn't have been able to accomplish all this stuff

12:53:50  11  that I did while being incarcerated.  And it made me a

12:53:55  12  better person, I feel like, and a better man, and I just

12:54:00  13  wanted to thank you for that.  And I want nothing -- none

12:54:05  14  of this would ever happened if it wasn't for that.  If I

12:54:07  15  was set free, I wouldn't have got my diploma, I wouldn't

12:54:11  16  be attending church, I wouldn't be attending AA.  So I

12:54:16  17  just wanted to thank you for that.  And I appreciate

12:54:18  18  that.  Thank you for your time for letting me speak.

12:54:21  19      THE COURT:  Thank you very much, Mr. Arjona.

12:54:25  20      Well, as I noted, pursuant to the Court's earlier

12:54:28  21  ruling on the objections in the PSIR, Mr. Arjona presents

12:54:31  22  to this court at an offense level 36, criminal history

12:54:35  23  category I.  I have ruled, I believe, that that offense

12:54:40  24  level is accurately calculated.

12:54:44  25      I will tell you, however, that, notwithstanding

| | | |
|---|---|---|
| 12:54:49 | 1 | that determination and notwithstanding the fact that an |
| 12:54:52 | 2 | offense level 36 is a pretty high offense level under the |
| 12:54:56 | 3 | guidelines, I think in some ways it underrepresents the |
| 12:55:01 | 4 | severity of Mr. Arjona's offenses.  And I say that based |
| 12:55:07 | 5 | on two considerations, neither of which me thinks -- |
| 12:55:13 | 6 | leads me to think that the 36 is the wrong level, but |
| 12:55:17 | 7 | these are areas in which I think may underrepresent the |
| 12:55:20 | 8 | severity of his offense, and that is the quantity of |
| 12:55:23 | 9 | drugs involved. |
| 12:55:24 | 10 | We discussed that at the beginning of the hearing. |
| 12:55:27 | 11 | Ms. Andrusak indicated they were going to agree to the |
| 12:55:29 | 12 | lower amount, they were going to agree to the defendant's |
| 12:55:31 | 13 | stipulation, notwithstanding the higher amounts have been |
| 12:55:34 | 14 | used for codefendants.  And she made the quite colorable |
| 12:55:37 | 15 | defense that that was because the codefendant had |
| 12:55:39 | 16 | admitted and this defendant had not.  And that's a very |
| 12:55:46 | 17 | justifiable basis for doing that.  But, of course, the |
| 12:55:49 | 18 | Government, pursuant to the plea agreement, had already |
| 12:55:50 | 19 | agreed to a much-lower guideline.  Based on its own |
| 12:55:54 | 20 | earlier, as it turned out, erroneous calculation of what |
| 12:55:57 | 21 | it thought the guidelines would be, it had already agreed |
| 12:56:00 | 22 | in the plea agreement to recommend a much lower |
| 12:56:02 | 23 | guidelines, so there was no reason for the Government to |
| 12:56:08 | 24 | put on evidence about higher drug quantities.  But I |
| 12:56:12 | 25 | think that the amount of drugs involved in this case that |

12:56:15  1  factor into the base offense level that ultimately arrive

12:56:19  2  at the offense level of 36 is, without a doubt, the least

12:56:23  3  amount of drugs that were involved in this offense.

12:56:27  4      There's another factor in this offense that is not

12:56:30  5  reflected at all in calculation of this guidelines, and

12:56:33  6  this is what I think is the extraordinary use of the

12:56:39  7  threats of violence that Mr. Arjona made repeatedly.

12:56:45  8  Mr. Cobal testified that he was persuaded, if I can use

12:56:51  9  that word, to come back after he left for North Dakota,

12:56:56  10  by -- I was going to say implicit threats, I'm not clear

12:56:59  11  how implicit they were, and by viewing a video of, he

12:57:03  12  claimed, of some cartel activity.  He claimed that on at

12:57:08  13  least two occasions -- I think he said two occasions --

12:57:11  14  Mr. Arjona pulled a loaded gun on him.

12:57:14  15      In the presentence report, I note that

12:57:17  16  Mr. McMillan indicated that he was scared of Mr. Arjona

12:57:20  17  and thought that Mr. Arjona could have him killed.  And

12:57:24  18  likewise, when he tried to leave, he felt Mr. Arjona

12:57:30  19  threatened him.  There's testimony, both in the

12:57:33  20  presentence investigation report as well as Mr. Cobal,

12:57:35  21  that Mr. Arjona hit Mr. Leach with a sword.  Many of

12:57:40  22  these may have occurred while inebriated, but I don't

12:57:45  23  find that's much of a defense.

12:57:49  24      And then, in paragraph 126 of the presentence

12:57:53  25  investigation report, I have a report of when Mr. Arjona

12:57:58   1   was arrested in 2014, November of 2014, Sedgwick County

12:58:08   2   Sheriff's deputies, that they reported that he claimed to

12:58:12   3   be working in the cartel, working in the Mexican cartel,

12:58:17   4   does his own murders and rapes, told the deputy the

12:58:20   5   deputy would feel his wrath, that the deputy's wife and

12:58:23   6   kids were going to pay, he was going to order rapes on

12:58:26   7   them, et cetera, et cetera, et cetera.

12:58:28   8          Now, I have to tell you that if there were one or

12:58:34   9   two of these, I would not credit them extensively much at

12:58:39  10   all.  But the repeated reference of extraordinary threats

12:58:44  11   of violence in this case, similar threats from different

12:58:48  12   sources and different individuals at different times, to

12:58:52  13   me, indicates that there is some credibility, some

12:58:55  14   reliability in these threats, and that Mr. Arjona,

12:59:00  15   albeit, and I note this, did not commit acts of

12:59:04  16   violence -- I'm not sure that's actually accurate.  I

12:59:07  17   think pulling a loaded gun on someone, even if you don't

12:59:09  18   discharge it, is an act of violence.  I think clearly

12:59:13  19   smacking someone with a sword to where they become

12:59:16  20   unconscious, if, in fact, that's what happened.  I'm not

12:59:19  21   certain I want to rely on that testimony as an act of

12:59:22  22   violence.

12:59:23  23          But the threats of violence themselves and

12:59:27  24   Mr. Arjona's apparent pleasure on several occasions in

12:59:30  25   claiming his affiliation with the Mexican cartel.  I'm

12:59:36   1   not certain he was affiliated with the cartel but he

12:59:39   2   likes to claim it, in implicit and sometimes explicit

12:59:43   3   threats of violence to enforce his own will on

12:59:48   4   individuals, and there's no adjustment in the offense

12:59:52   5   level for the unusual amount of violence that, at least

12:59:56   6   in my case and I see lots of drug distribution offenses

13:00:00   7   every year in this courtroom that are reflective in

13:00:02   8   there, so, again, I'm not adjusting the offense level.  I

13:00:05   9   found it's at 36.  I think that's an appropriate level.

13:00:09   10  But these factors persuade me, number one, that a

13:00:12   11  downward departure is not in any means warranted and,

13:00:15   12  moreover, they persuade me that a low-end guideline

13:00:19   13  sentence is not warranted.

13:00:20   14        Based on all these factors, the extraordinarily

13:00:23   15  extensive drug involvement that he had -- I say

13:00:27   16  "extraordinarily extensive," I've seen worse, but it was

13:00:30   17  certainly significant drug distribution -- his

13:00:33   18  involvement of accomplices, his threats of violence,

13:00:39   19  based on all these factors it's the Court's determination

13:00:43   20  that I should impose and I intend to impose a mid-tier

13:00:46   21  guideline sentence of incarceration on Mr. Arjona, and

13:00:49   22  I'm proposing a sentence of 210 months incarceration for

13:00:54   23  Mr. Arjona on the offense of conviction.

13:00:56   24        Following that, I intend to place him on five

13:00:58   25  years of supervised release.  I don't intend to impose a

13:01:02  1  fine, but he is required to pay a hundred dollar special

13:01:07  2  assessment.

13:01:08  3        I see from my notes I neglected to mention, in the

13:01:11  4  line of violence, that he also has criminal history

13:01:14  5  including violence, such as, in fact, violence, criminal

13:01:18  6  threats, et cetera, all of which are further support for

13:01:23  7  the statements I've already made.

13:01:24  8        Given the large drug conspiracy that he played

13:01:28  9  a -- at least a supervisory leading role on, given his

13:01:34  10  pensions for resorting to violence, given the role that

13:01:38  11  he played on this, I think -- and the factors we've heard

13:01:41  12  in this case -- I think that the proposed sentence of 210

13:01:44  13  months, a mid-tier guideline sentence, is a sufficient

13:01:49  14  sentence but I do not believe it is greater than

13:01:51  15  necessary to reflect the seriousness of the offenses that

13:01:54  16  this defendant committed.  I think it's sufficient and

13:01:58  17  necessary to promote respect for the law and to provide

13:02:02  18  just punishment for the offense.

13:02:05  19        I can never, in these situations, do more than

13:02:08  20  hope, but I do hope that it will afford adequate

13:02:10  21  deterrence to future criminal conduct and protect the

13:02:13  22  public from further crimes of the defendant.

13:02:15  23        As noted, following his term of incarceration, I

13:02:17  24  intend to place him on supervised release for a period of

13:02:20  25  five years.  That's the minimum amount that the law

13:02:24  1  allows me to impose, but I think a five-year term is

13:02:26  2  sufficient.

13:02:27  3      While he's on supervision, I intend to impose the

13:02:30  4  mandatory and special conditions of supervision that are

13:02:33  5  set forth in the presentence report.  In addition, given

13:02:37  6  his long history and pattern of criminal behavior -- I

13:02:41  7  say "long history," recognizing that he's criminal

13:02:45  8  history category number I, category I, but the facts in

13:02:48  9  this case show that that this was not a one-off

13:02:51  10  incident -- I believe that his participation in a

13:02:54  11  cognitive behavioral program, which may include moral

13:02:57  12  reconation therapy, is appropriate and I'm ordering that

13:03:00  13  during his term of supervision.

13:03:02  14      Mr. Arjona admittedly has a history of abusing

13:03:05  15  drugs, and even more, drinking heavily.  No doubt his

13:03:10  16  addiction to both substances has played a significant

13:03:13  17  role in the situation in which he finds himself in being

13:03:18  18  brought to today, so I'm going to, during his term of

13:03:22  19  supervision, require him to participate in a substance

13:03:25  20  abuse program, and I'm going to require he abstain from

13:03:28  21  any alcohol consumption during his five-year term of

13:03:30  22  supervision.

13:03:30  23      And given the nature of his offense, the breadth

13:03:34  24  of the criminal distribution that he had, the penchant

13:03:39  25  for violence the Court's already noted, the search

| 13:03:41 | 1 | condition is appropriate in this case.  And I'm ordering |

13:03:41  1  condition is appropriate in this case.  And I'm ordering

13:03:42  2  it both to provide adequate deterrence to criminal

13:03:46  3  conduct, to protect the public and to protect the

13:03:51  4  probation office during their performance of supervisory

13:03:55  5  responsibilities.

13:03:55  6      Mr. Arjona's in custody.  He's clearly not a

13:03:58  7  candidate for voluntary surrender.  I'm remanding him to

13:04:01  8  the custody of the marshals at the conclusion of this

13:04:02  9  hearing, pending designation of an appropriate facility

13:04:06  10  for him to serve his sentence of incarceration within the

13:04:09  11  Bureau of Prisons.

13:04:11  12      He's required to pay a hundred dollar special

13:04:13  13  assessment to the Crime Victims Fund.  I believe I noted

13:04:16  14  I do not intend to impose any fine on him.

13:04:21  15      That is the tentative sentence of the court.  Are

13:04:24  16  there objections to this sentence?

13:04:25  17      MS. ANDRUSAK:  No, Your Honor.

13:04:28  18      MR. BIEBIGHAUSER:  Yes, Your Honor, but first

13:04:29  19  could I also ask you to include a -- request the Bureau

13:04:35  20  of Prisons that Mr. Arjona be placed within 500 miles of

13:04:40  21  Wichita, Kansas, based on his proximity to the family and

13:04:43  22  their ability to visit him -- his family's here today --

13:04:46  23  and, additionally, consider placement at a facility that

13:04:49  24  offers horticultural job skills programs?

13:04:53  25      THE COURT:  I'd be happy to do both of those.  And

| | | |
|---|---|---|
| 13:04:57 | 1 | I noted Mr. Arjona referenced an interest in pursuing |
| 13:05:01 | 2 | horticultural vocational opportunities, and so I will |
| 13:05:02 | 3 | include that in the judgment order in this case to the |
| 13:05:04 | 4 | Bureau of Prisons. |
| 13:05:04 | 5 | MR. BIEBIGHAUSER: One question, Your Honor, |
| 13:05:05 | 6 | before I provide a couple of objections. You had |
| 13:05:07 | 7 | indicated reliance on a particular paragraph in the PSR |
| 13:05:10 | 8 | and I missed it, just the paragraph number regarding the |
| 13:05:13 | 9 | evidence of threats of rape. Can you give me the |
| 13:05:15 | 10 | paragraph number you referenced? |
| 13:05:16 | 11 | THE COURT: This was a threat that he made when |
| 13:05:20 | 12 | arrested in 2014, if I recall, by Sedgwick County |
| 13:05:25 | 13 | Sheriff's deputies. |
| 13:05:26 | 14 | MR. BIEBIGHAUSER: Okay. |
| 13:05:26 | 15 | THE COURT: And these are the reports the deputy |
| 13:05:28 | 16 | indicated that he made. Let me find that for you. |
| 13:05:31 | 17 | MS. ANDRUSAK: Your Honor, I did write it down. I |
| 13:05:33 | 18 | believe it was 126. |
| 13:05:36 | 19 | MR. BIEBIGHAUSER: Okay. |
| 13:05:37 | 20 | THE COURT: I've got the rest of it covered up. |
| 13:05:39 | 21 | Thank you, it is 126, on my version of the PSR, the |
| 13:05:42 | 22 | amended PSR, it's in the middle of paragraph -- I'm |
| 13:05:46 | 23 | sorry, middle of page 25, the paragraph immediately prior |
| 13:05:49 | 24 | to the criminal history computation subsection. |
| 13:05:51 | 25 | MR. BIEBIGHAUSER: I found it, Judge. Thank you. |

| | | |
|---|---|---|
| 13:05:53 | 1 | In that case Mr. Arjona objects that the sentence is |
| 13:05:58 | 2 | substantively unreasonable for the reasons previously |
| 13:06:01 | 3 | argued, and procedurally unreasonable because the |
| 13:06:06 | 4 | evidence, as I argued, the Court relied on unreliable |
| 13:06:10 | 5 | evidence and, therefore, the sentence is also |
| 13:06:12 | 6 | procedurally unreasonable and because the defense |
| 13:06:15 | 7 | believes the Court has provided overdeference to the |
| 13:06:19 | 8 | wrong factors contained in the guideline range. |
| 13:06:23 | 9 |         THE COURT:  I'm sorry, to which factors? |
| 13:06:25 | 10 |         MR. BIEBIGHAUSER:  To the factors contained at the |
| 13:06:27 | 11 | guideline commentary note four at 3B1.1. |
| 13:06:30 | 12 |         THE COURT:  All right.  Those objections are noted |
| 13:06:32 | 13 | for the record.  They're overruled.  As I indicated, it's |
| 13:06:37 | 14 | the breadth of similar reports of Mr. Arjona's penchant |
| 13:06:46 | 15 | for threatening violence that gives credibility to those |
| 13:06:50 | 16 | substances.  And as I discussed before, my reference with |
| 13:06:57 | 17 | respect to the leader/organizer role, I noted, as the |
| 13:07:01 | 18 | guideline requires, that there were at least five |
| 13:07:03 | 19 | individuals.  I named them in my ruling on that |
| 13:07:05 | 20 | objection.  And then the rest was my response to |
| 13:07:09 | 21 | counsel's argument, which I made only in response to your |
| 13:07:11 | 22 | argument.  But I found that he played a role with respect |
| 13:07:14 | 23 | to a leader with five named individuals that I stated at |
| 13:07:17 | 24 | the time, which is sufficient for the sustaining of that |
| 13:07:21 | 25 | enhancement, and so those objections are both overruled. |

13:07:23   1          I will adopt, as noted, the recommendation for

13:07:27   2   placement in the Bureau of Prisons as you requested.

13:07:30   3          Mr. Arjona, would you stand for the sentence of

13:07:32   4   the court.

13:07:32   5          (The defendant complies.)

13:07:33   6          THE COURT:  The Court determines that the

13:07:38   7   presentence investigation report and the previously

13:07:39   8   stated findings are accurate, and I'm ordering those

13:07:41   9   findings incorporated into the following sentence:

13:07:43   10  Pursuant to the Sentencing Reform Act of 1984, it's the

13:07:47   11  judgment of this court that the defendant Michael A.

13:07:50   12  Arjona is hereby sentenced to the custody of the Bureau

13:07:53   13  of Prisons for a term of 210 months on his conviction of

13:07:59   14  Count 1 of the indictment.  This term of imprisonment is

13:08:01   15  to be followed by five years of supervised release.

13:08:04   16  Within 72 hours of your release from the custody of the

13:08:07   17  Bureau of Prisons, you are to report to the United States

13:08:10   18  Probation Office in which you are released.  While on

13:08:12   19  supervision, you are to comply with the mandatory and

13:08:14   20  standard conditions of supervision adopted by this court,

13:08:17   21  as well as the special conditions of supervision set

13:08:20   22  forth in Part D of the presentence report.

13:08:22   23          Defendant's ordered to pay the United States a

13:08:25   24  special assessment of $100 to the Crime Victims Fund

13:08:28   25  pursuant to 18 United States Code § 3013.  That

13:08:31  1  assessment's due immediately and it may be satisfied

13:08:33  2  while you're in Bureau of Prisons custody.  No fine is

13:08:37  3  imposed.

13:08:37  4      I'm required to advise all parties of their

13:08:40  5  respective rights to appeal this conviction and sentence.

13:08:44  6  Appeals taken are subject to 18 United States Code §

13:08:50  7  3742.  They're also subject to any waiver of appeal

13:08:53  8  rights you've entered into in this plea agreement, so I

13:08:55  9  would advise the defendant that it's your right to appeal

13:08:57  10  this sentence and conviction only to the extent you've

13:09:00  11  not waived that right in the plea agreement.  Moreover,

13:09:03  12  any rights to appeal you have remaining following that

13:09:05  13  waiver you will still lose if you do not timely file a

13:09:08  14  notice of appeal in the district court within 14 days of

13:09:11  15  the entry of judgment.  If you request, the clerk of our

13:09:14  16  court will prepare and file a notice of appeal in your

13:09:16  17  behalf, and if you cannot pay costs of appeal, you may

13:09:19  18  apply for leave to appeal in forma pauperis.

13:09:20  19      That is the judgment and sentence of the court.

13:09:23  20  The defendant's remanded to the custody of the marshals

13:09:26  21  pending designation by the Bureau of Prisons of an

13:09:28  22  appropriate facility.  My recommendation regarding that

13:09:31  23  is as previously noted on the record.

13:09:32  24      Ms. Andrusak, the Government has a motion to make

13:09:35  25  at this point.

6-3-21   USA v. ARJONA   No. 19-10025-01

174

13:09:36   1        MS. ANDRUSAK:  Yes, Your Honor.  The Government

13:09:37   2   would move to dismiss all remaining counts as to this

13:09:41   3   defendant in the charging documents.

13:09:43   4        THE COURT:  All remaining counts as to this

13:09:44   5   defendant, which I believe are the counts in the original

13:09:47   6   indictment as well as Counts 4 and 6 of the superseding

13:09:50   7   indictment, all counts other than Count 1 of the

13:09:54   8   superseding to which he pled are dismissed pursuant to

13:09:57   9   the Government's motion.

13:09:57  10        Is there anything else we need to take up

13:09:59  11   regarding this matter now this afternoon?

13:10:01  12        MS. ANDRUSAK:  No, Your Honor.

13:10:02  13        MR. BIEBIGHAUSER:  No, Your Honor.

13:10:03  14        THE COURT:  Court's in recess.

13:10:04  15        CLERK KOEHLER:  All rise.

13:10:05  16        (Whereupon, the proceedings were concluded at

13:10:06  17   1:10 P.M.)

          18

          19

          20

          21

          22

          23

          24

          25

C E R T I F I C A T E

   I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

   That the above and foregoing proceedings were taken by me at said time and place in stenotype;

   That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

   That I am a disinterested person to the said action.

   IN WITNESS WHEREOF, I hereto set my hand on this the 11th day of June, 2021.


     s/ Johanna L. Wilkinson
     Johanna L. Wilkinson, CSR, CRR, RMR
     United States Court Reporter